## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

THE DREAM DEFENDERS; THE
BLACK COLLECTIVE, INC.;
CHAINLESS CHANGE, INC.; BLACK
LIVES MATTER ALLIANCE BROWARD;
FLORIDA STATE CONFERENCE OF
THE NAACP BRANCHES AND YOUTH
UNITS; and NORTHSIDE COALITION
OF JACKSONVILLE, INC.,

      Plaintiffs,

v.

RON DESANTIS, in his official capacity as
Governor of the State of Florida; ASHLEY
MOODY, in her official capacity as
Attorney General of the State of Florida;
WALT MCNEIL, in his official capacity as
Sheriff of Leon County, Florida; MIKE
WILLIAMS, in his official capacity as
Sheriff of Jacksonville/Duval County,
Florida; and GREGORY TONY, in his
official capacity as Sheriff of Broward
County, Florida,

      Defendants.

Case No.: 4:21-cv-191

## <u>COMPLAINT</u>

Plaintiffs The Dream Defenders; The Black Collective, Inc.; Chainless

Change, Inc.; Black Lives Matter Alliance Broward; the Florida State Conference

of the NAACP Branches and Youth Units; and Northside Coalition of

Jacksonville, Inc. (collectively, "Plaintiffs"), on behalf of their organizations and

1

membership, sue Defendants Ron DeSantis, Governor of the State of Florida; Ashley Moody, Attorney General of the State of Florida; Walt McNeil, Sheriff of Leon County, Florida; Mike Williams, Sheriff of Jacksonville/Duval County, Florida; and Gregory Tony, Sheriff of Broward County, Florida. Each Defendant is sued in his or her official capacity.

## INTRODUCTION

1.     In direct response to a nationwide groundswell of protests seeking racial justice, Florida enacted the Combating Public Disorder Act (the "Act" or "HB1"), which (among other things) codifies new crimes and increases penalties for those who participate in public demonstrations. On its face, the Act is both overbroad and vague; it subjects non-violent protestors to criminal liability for exercising protected rights to speech and assembly. Meanwhile, the Act provides an affirmative defense to those who are violent towards protestors, allowing them to escape potential civil liability for killing or injuring non-violent demonstrators. The intended effect of the Act is to deter the exercise of First Amendment rights by certain individuals—namely, those interested in changing the way police interact with Black communities—by threatening (in Defendant Governor Ron DeSantis's words) to have "a ton of bricks rain down on" them.

2.     Deterrence is precisely what the Act has accomplished. Plaintiffs, Black-led groups of Florida residents who organize and conduct racial justice

2

protests, are fearful that their members risk criminal liability merely for speaking out and advocating for change.  Until enjoined, the Act will harm these groups and their members by chilling and punishing the exercise of their constitutional rights.

3.      The Act is rife with constitutional infirmities.  By defining new protest-related crimes, and by amending the definitions of terms like "riot" to extend far beyond their historical, common-law roots, Florida now permits the arrest, detention, and prosecution of protestors who are not engaged in criminal conduct, but rather who simply participate in certain protests.  At the same time, the Act creates mandatory minimums for certain offenses and prohibits bail for those arrested—ensuring that even *wrongfully detained* non-violent protestors must remain in custody for extended periods of time.  The law also allows those who intentionally injure or kill protestors to escape civil liability for their conduct.  And the Act includes new offenses that, as written and intended, will be applied to such basic free-speech activities as electronically posting the name and email address of a state legislator or sheriff—public figures—on the Internet.  The enactment of these overbroad and vague offenses, coupled with heightened penalties for existing ones, serves to do exactly what was intended—*i.e.*, silence Black people and their allies who protest racial injustice.

4.      The Act was also designed to advance one viewpoint over others:  to support a traditional conception of law enforcement, with its attendant racist

3

history, while criminalizing the viewpoint and message of those wishing to protest police misconduct and advocate for a different type of antiracist law enforcement approach.    The law—which Governor DeSantis calls the strongest "pro-law enforcement piece of legislation in the country"—specifically rejects causes that motivated last summer's protests:   limiting police funding and reducing police violence.   In an unusual provision, the law restricts the ability of local Florida municipalities to decrease law enforcement budgets (but does not limit increases), interferes with municipalities' discretion to temper their police response to non-violent protests, and even subjects cities and towns to liability for any damages that result from not allowing law enforcement to have what it deems "adequate equipment" or otherwise "respond appropriately" to protests—*i.e.*, to use whatever ammunition, tools, and violent practices the police want.   Such an attempt by government officials to favor one viewpoint over another is anathema to the freedoms of speech and assembly enshrined in the United States Constitution.

5.    The law also violates the Equal Protection Clause of the Fourteenth Amendment because it targets Black organizers and organizations.   The text, legislative history, timing, and public statements about the Act made by Florida officials all make clear that the Act was racially motivated.   The Act was first introduced in the fall of 2020 in direct response to nationwide protests sparked by multiple killings of unarmed Black people by the police.   Through various

4

procedural machinations, the Florida legislature hurried the legislation's timeline, curtailed public comment, and even gave the Act an unusual immediate effective date in order to coincide with the eve of the verdict in the murder trial of Minneapolis police officer Derek Chauvin over the killing of George Floyd, an unarmed Black man.  And as noted, multiple provisions reveal that the Act was explicitly designed to single out and punish Black organizers and those who lead protests seeking to end police violence against Black people.

6.     Because the Act violates the First and Fourteenth Amendments of the United States Constitution, this Court should declare the Act unlawful and preliminarily and permanently enjoin Defendants from enforcing HB1.

## JURISDICTION AND VENUE

7.     This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.  This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343.

8.     This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202, and Federal Rule of Civil Procedure Rule 57.

9.     Venue is proper in the Northern District of Florida under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims have occurred or will occur in this District and because Defendants Governor Ron DeSantis, Attorney General Ashley Moody, and Sheriff Walt

McNeil are located in this judicial district.  Defendants are sued in their official capacity.  Each Defendant resides within the State of Florida.

## THE PARTIES

10.     Plaintiff The Dream Defenders ("Dream Defenders") is a Florida-based organization that was established in 2012 following the killing of Black teenager Trayvon Martin.  Dream Defenders is a chapter and membership-based organization led by Black and Latinx youth who focus on promoting civic engagement and organizing young people and students against structural inequality.  Dream Defenders is a fiscally sponsored project of Tides Advocacy, a California nonprofit public benefit corporation.  Dream Defenders bases operations in Miami but has chapters and members throughout the state, including in Tallahassee (Leon County).  Dream Defenders has more than 1,000 members throughout the State of Florida.

11.     Dream Defenders and its members regularly organize and participate in political actions and demonstrations focused on bringing attention to structural inequality.  Dream Defenders and its members also rely heavily on social media platforms, such as Instagram, Twitter, and Facebook, to communicate with each other, elected officials, and the public.  They also host a website and send regular electronic messages in the form of newsletters and text message alerts.  They regularly share the names and contact information for elected officials and law

enforcement on these platforms in the course of their work.

12.    The enactment of the Act has rendered Dream Defenders fearful of arrest and prosecution for engaging in speech, organizing, or participating in demonstrations that constitute permissible and protected speech, particularly given its experience with violence at protests initiated by police and counter-protestors. Because of that fear, Dream Defenders has canceled demonstrations and refrained from publishing electronic communications.   Most recently, Dream Defenders intended to organize a vigil for George Floyd following the trial of police officer Derek Chauvin.   Following the enactment of the Act and out of fear of arrest, Dream Defenders canceled that event.

13.    Dream Defenders and its members have been forced to add additional time and effort to review electronic communications and are fearful that the communications they regularly engage in will lead to arrest.   The passage of the Act has already substantially diverted scarce organizational resources away from Dream Defenders' programs and services.   Dream Defenders has allocated staff and volunteer time to work on issues related to the Act and how it will be implemented by law enforcement, in large part due to the Act's overbroad and vague construction.

14.    Plaintiff The Black Collective, Inc. ("The Black Collective") is a Florida nonprofit corporation focused on promoting political participation and

economic empowerment of Black communities.  The Black Collective is based in Miami but works throughout the State of Florida.

15.    The Black Collective regularly organizes canvassing programs, trainings, and events where people gather.  The Black Collective relies heavily on social media platforms, such as Instagram, Twitter, Facebook, and similar platforms, to communicate with its members, elected officials, and the public.  It also hosts a website and sends regular electronic messages in the form of newsletters.  It regularly shares the names and contact information for elected officials and asks the public to contact them about bills that may be harmful to the Black community.

16.    The passage of the Act has already substantially diverted scarce organizational resources away from The Black Collective's programs and services. The Black Collective has allocated staff and volunteer time to work on issues related to the Act and how it will be implemented by law enforcement, in large part due to the Act's overbroad and vague construction.

17.    Plaintiff Chainless Change, Inc. ("Chainless Change") is a Florida nonprofit corporation and recovery community that aims to improve the lives of justice-involved individuals through community organizing that addresses systemic inequality.  Chainless Change is based in Broward County, Florida, but works throughout the State of Florida.

8

18.     Chainless Change uses outreach and community mobilization strategies to organize demonstrations and direct actions aimed at facilitating progressive change in affected communities.   It works primarily with people who have criminal arrest records (including those on probation and other forms of community supervision), who are majority Black and Latinx.   Direct actions are the primary tool Chainless Change uses to effect progressive change in affected communities. Without the ability to organize direct actions, Chainless Change cannot operate effectively.

19.     Because   Chainless Change   works   almost   exclusively   with communities comprised of people who have criminal arrest records, the enactment of the Act, with its sentence enhancements, has rendered Chainless Change fearful of arrest and prosecution for organizing or participating in demonstrations or direct actions that constitute permissible and protected speech, particularly given their experience with violence at such protests initiated by police and/or counter-protestors.   Based on that fear, Chainless Change has canceled events and been forced to allocate financial resources differently.   Chainless Change is also fearful of the Act's potential to strip participants in their demonstrations of their voting and other civil rights.

20.     Most recently, Chainless Change intended to hire two community organizers, who were both people with a history of incarceration or arrest.   Out of

fear of unlawful arrest in response to protected activity in accordance with the Act, Chainless Change was no longer able to guarantee the safety of community organizers and was unable to hire for these positions.  Chainless Change also has canceled or postponed numerous planned direct actions out of fear of unlawful arrest in response to protected activity in accordance with the Act.

21.    Chainless Change has been forced to expend funds on hiring a consulting company to transition from direct action to other communication tools, since the Act interfered with its ability to engage in direct action.  Chainless Change spent the last four months identifying tools, creating educational material for the community, and creating digital materials that are no longer useful since implementation of the Act.

22.    Chainless Change also regularly utilizes social media as an educational tool to inform the community about the stated positions of local elected officials and potential ramifications of different policies.  Chainless Change has published social media posts informing the community about various matters and urging people to engage in the civic process by contacting their local representatives regarding their individual positions on the matter.  Because of fear and a lack of clarity around the Act and specifically its cyber intimidation provisions, Chainless Change has ceased this practice and must now seek alternative means of conveying this information.

23.     Plaintiff Black Lives Matter Alliance Broward is a grassroots alliance of community organizations and individuals, established in June 2015, aiming to abolish institutional racism and policing through direct actions, political education, and community organizing.  Although Black Lives Matter Alliance Broward aligns closely with the principles and goals of the greater Black Lives Matter network, the Alliance is a locally focused and fully autonomous coalition that, at this time, is wholly made up by the voluntary efforts of its membership.  Black Lives Matter Alliance Broward is based in Broward County, Florida, but works in coalitions to organize and support direct actions throughout the State of Florida.

24.     Black Lives Matter Alliance Broward utilizes direct action and political education as its primary means of drawing attention to organizational and community priorities, such as combating police violence, defunding police budgets and reducing mass incarceration.

25.     The enactment of the Act has rendered Black Lives Matter Alliance Broward fearful of arrest and prosecution for engaging in speech, organizing, or participating in demonstrations that constitute permissible and protected speech. Black Lives Matter Alliance Broward has ceased engaging in rapid response direct actions for fear of prosecution under the Act, and must now expend time and limited resources to coordinate Know Your Rights trainings before all future direct actions.

11

26.    In addition, Black Lives Matter Alliance Broward has been forced to divert its time and limited resources from normal activities towards opposing HB1. For example, in March 2021, Black Lives Matter Alliance Broward expended funds to bring a constituency of eight to Tallahassee to speak out against HB1 in committee hearings.   After passage of the Act, on April 25, 2021, Black Lives Matter Alliance Broward expended time and limited resources to co-organize a Know Your Rights training with Dream Defenders Broward SquaDD.

27.    Black Lives Matter Alliance Broward has published social media posts asking that readers take action "urging" their political representatives to take a position on a matter, and including the contact information for those representatives.   Because of fear and a lack of clarity around the Act and specifically its cyber intimidation provisions, Black Lives Matter Alliance Broward has stopped publishing these posts on social media and must now seek alternative means to convey this information.

28.    Plaintiff Florida State Conference of the NAACP Branches and Youth Units ("Florida NAACP") is a Black-led organization that is committed to ensuring the political, educational, social, and economic equality of rights for all persons and to eliminate race-based discrimination.   The Florida Conference, Florida NAACP, is made up of local Adult Branches, Youth Units, and College Chapters. Florida NAACP was founded in 1941 and was the first NAACP State Conference

in the nation.  Florida NAACP has over 40 Branches across the State of Florida, which are made up of over 12,000 members statewide.

29.    The enactment of the Act has rendered Florida NAACP fearful of the impact that this Act could have on its members and organizational activity. In particular, Branch Presidents and members have cited concerns about the vagueness of the Act's language and fear of unlawful arrest.  Florida NAACP, through its local Branches and local Branch leadership, has distributed or instructed its Branches to distribute Know Your Rights materials related to HB1 and to conduct follow-up conversations with Branch members regarding the Act's impact on organizational activities.

30.    Florida NAACP has been forced to reallocate resources that otherwise would have gone to other civic engagement activities to address the impacts of the Act on its membership and mission.  In particular, Florida NAACP sent Branch representatives to Tallahassee to speak in opposition to the proposed Act, submitted written testimony opposing it, participated in press conferences, and noted its opposition in Committee Hearings.  In the event of future demonstrations or parades, Florida NAACP will have to reallocate more time and resources in order to attempt to ensure that the gatherings will remain safe for all those involved, in large part due to the Act's overbroad and vague construction.

31.    The Act's provisions also harm Florida NAACP because it anticipates

that its insurance rates for engaging in protesting and demonstrations across the state will increase to provide coverage for HB1's expansively broad reach and proscription of protected speech, expression, and assembly.

32.    Plaintiff Northside Coalition of Jacksonville, Inc. ("Northside Coalition of Jacksonville") is a Florida nonprofit corporation that focuses on the problems of social, racial, and economic injustice and regularly engages in nonviolent direct action. Standing up and speaking out against injustice is core to its mission.   It is a Black-led organization, based in Jacksonville, with approximately 1,400 members.  It regularly mobilizes between 50 and 60 members for demonstrations and protests on issues such as racial bias in the criminal legal system and community and police relations. Many of its members are older adults who would be at particular risk if placed under arrest.

33.    Northside Coalition of Jacksonville and its members rely on social media platforms to communicate with its members, elected officials, and the public. It also hosts a website and send regular electronic messages in the form of newsletters.   As a result of the passage of the Act, Northside Coalition of Jacksonville's members are afraid to speak out on social media regarding racial and economic injustice.

34.    The enactment of the Act has rendered Northside Coalition of Jacksonville and its members fearful of arrest and prosecution for engaging in

speech, organizing, or participating in demonstrations that constitute permissible and protected speech. Northside Coalition of Jacksonville's members have expressed that they will not be able to participate in future nonviolent demonstrations due to their fear of unlawful arrest. Northside Coalition of Jacksonville and its members are fearful that they will be targeted based on the speech and actions they regularly engaged in prior to the passage of the Act.

35. Northside Coalition of Jacksonville has been forced to spend time and resources identifying legal observers, which it had not previously relied on, and additional peacekeepers out of fear of unlawful arrest and prosecution. The passage of the Act has already substantially diverted scarce organizational resources away from Northside Coalition of Jacksonville's programs. Northside Coalition of Jacksonville has allocated staff and volunteer time to work on issues related to the Act and how it will be implemented by law enforcement, in large part due to the Act's overbroad and vague construction.

36. Defendant Ron DeSantis is the Governor of the State of Florida. He is sued in his official capacity. He is the Florida constitutional officer vested with "supreme executive power" who must "take care that the laws be faithfully executed." Fla. Const. Art. IV, § 1(a). He is also vested with the "power to call out the militia to preserve the public peace, execute the laws of the state, suppress insurrection, or repel invasion." Fla. Const. Art. IV, § 1(d). Governor DeSantis is

responsible for the enforcement of the Act and an appropriate defendant in this case.

37.     Governor DeSantis has previously activated the Florida National Guard on or about May 31, 2020, to respond to and against non-violent protestors across the state, sending 150 guardsmen to Miramar, Florida, 150 guardsmen to Camp Blanding, Florida, and 100 guardsmen to Tampa, Florida.[1]  As of June 2, 2020, Governor DeSantis had mobilized 700 national guardsmen in response to racial justice protests.[2]

38.     Defendant Ashley Moody is the Attorney General of the State of Florida.  She is sued in her official capacity.  She serves as the State's chief legal officer.  Fla. Const. Art. IV, § 4(b).  The Florida Constitution creates the Office of the Statewide Prosecutor under Attorney General Moody's oversight and control. That Office has concurrent jurisdiction with the state attorneys "to prosecute

---

[1] *See* Melissa Alonso, *May 31 George Floyd Protest News, Fla. Gov. Activates Nat.'l Guard*, CNN, https://www.cnn.com/us/live-news/george-floyd-protests-05-31-20/h_a58e55e3f9e9f0b262eb870927a58e7b; David Dwork, *Fla. Nat.'l Guard activated by Gov. Ron DeSantis in response to George Floyd Protests* (May 31, 2020, 11:41 PM), https://www.wcjb.com/content/news/Florida-National-Guard-activated-by-Gov-Ron-DeSantis-in-response-to-George-Floyd-protests-570913011.html?ref=011.

[2] News Release, Office of Gov. Ron DeSantis, *Gov. Ron DeSantis Reports That Fla. Demonstrations Have Remained Largely Peaceful Over Past 24 Hours* (June 2, 2020), https://www.flgov.com/2020/06/02/governor-ron-desantis-reports-that-florida-demonstrations-have-remained-largely-peaceful-over-past-24-hours.

16

violations of criminal laws occurring or having occurred, in two or more judicial circuits as part of a related transaction, or when any such offenses is affecting or has affected two or more judicial circuits as provided by general law." *Id.* Such authority is interpreted broadly. *King v. State*, 790 So. 2d 477, 478 (Fla. 5th DCA 2001); *accord Scott v. State*, 102 So. 3d 676, 677 (Fla. 5th DCA 2012). Attorney General Moody is responsible for enforcement of the Act and is therefore an appropriate defendant in this case.

39.    Article VIII, § 1(d) of the Florida Constitution creates and identifies sheriffs as elected county officers. Fla. Const. Art. VIII, § 1(d).

40.    Defendant Sheriff Walt McNeil is the duly elected sheriff of Leon County, Florida.   He is sued in his official capacity.   Pursuant to Fla. Stat. § 30.15(1)(f), Sheriff McNeil is authorized to "[s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand."   Additionally, Sheriff McNeil is authorized to "[a]pprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer." *Id*. at § 30.15(1)(g). Florida law also authorizes sheriffs, including Sheriff McNeil, to "temporarily close any public beach, park, or other public recreation facility within [Defendant's] jurisdiction when in his or her discretion conditions exist which present a clear and present or probable threat of violence, danger, or disorder, or at any time a disorderly situation exists." *Id*. at § 30.291(1). Sheriff McNeil is

responsible for enforcement of the Act and is therefore an appropriate defendant in this case.

41.    Defendant Sheriff Mike Williams is the duly elected sheriff of Jacksonville, Florida.  The City of Jacksonville and Duval County are consolidated, and Sheriff Williams serves as the head of the Jacksonville Sheriff's Office, a consolidated city-county law enforcement agency.  He is sued in his official capacity.  Pursuant to Fla. Stat. § 30.15(1)(f), Sheriff Williams is authorized to "[s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand."  Additionally, Sheriff Williams is authorized to "[a]pprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer."  *Id*. at § 30.15(1)(g).  Florida law also authorizes sheriffs, including Sheriff Williams, to "temporarily close any public beach, park, or other public recreation facility within [Defendant's] jurisdiction when in his or her discretion conditions exist which present a clear and present or probable threat of violence, danger, or disorder, or at any time a disorderly situation exists."  *Id*. at § 30.291(1).  Sheriff Williams is responsible for enforcement of the Act and is therefore an appropriate defendant in this case.

42.    Defendant Sheriff Gregory Tony is the duly elected sheriff of Broward County, Florida.  He is sued in his official capacity.  Pursuant to Fla. Stat. § 30.15(1)(f), Sheriff Tony is authorized to "[s]uppress tumults, riots, and unlawful

assemblies in their counties with force and strong hand."   Additionally, Sheriff Tony is authorized to "[a]pprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer."   *Id*. at § 30.15(1)(g).   Florida law also authorizes sheriffs, including Sheriff Tony, to "temporarily close any public beach, park, or other public recreation facility within [Defendant's] jurisdiction when in his or her discretion conditions exist which present a clear and present or probable threat of violence, danger, or disorder, or at any time a disorderly situation exists."   *Id*. at § 30.291(1).   Sheriff Tony is responsible for enforcement of the Act and is therefore an appropriate defendant in this case.

## FACTS

I.    **IN 2020, THE AMERICAN PUBLIC PARTICIPATED IN MASSIVE, UNPRECEDENTED RACIAL JUSTICE PROTESTS IN RESPONSE TO WELL-PUBLICIZED KILLINGS OF BLACK PEOPLE.**

43.    During Memorial Day weekend of 2020, George Floyd, a 43-year-old Black man living in Minneapolis, Minnesota, was murdered by a police officer who knelt on Mr. Floyd's neck for nine minutes and 29 seconds during an arrest related to the alleged use of a $20 counterfeit bill.

44.    Two months earlier, Breonna Taylor, a 26-year-old Black medical worker from Louisville, Kentucky, was shot and killed by police while she was sleeping, when officers fired on her bedroom during a police raid focused on

someone who did not live in and was not present in her apartment.

45.     These two killings, in the context of historical police violence against Black communities in America, initiated a wave of large, non-violent demonstrations in cities around the country—and the world—during the summer of 2020, often organized under the banner of the Black Lives Matter movement.

46.     Between 15 million and 26 million people in the United States are estimated to have participated in racial justice demonstrations over the death of Mr. Floyd and others in 2020, making the 2020 protests for racial justice among the largest mass movements in the country's history.[3]

47.     Florida cities, including Tallahassee, Miami, Ft. Lauderdale, Tampa, Orlando, Gainesville, and Jacksonville, all saw community members peacefully rise up in demonstration against police brutality.   The protestors' demands included, among other things, reducing or "defunding" police budgets, and rerouting those funds to alternative community intervention mechanisms and greater investment in the wellness of Black communities.

48.     The majority of these Florida demonstrations were organized by Black-led organizations, including Plaintiffs Dream Defenders, Florida NAACP,

---

[3] Larry Buchanan, Quoctrung Bui & Jugal K. Patel, *Black Lives Matter May Be the Largest Movement in U.S. History*, N.Y. Times, (July 3, 2020), https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html.

the Black Lives Matter Alliance Broward, the Northside Coalition of Jacksonville, and Chainless Change.

49.    The Florida demonstrations, like the demonstrations nationwide, were overwhelmingly non-violent.   Yet during protests in Florida and around the country, a familiar scene unfolded: that of unarmed protestors carrying signs and being confronted by heavily armed police in riot gear.   Now, Plaintiffs are fearful of unlawful arrest in the wake of HB1, not because they have or intend to engage in violent protests, but because Plaintiffs have often experienced that protests can turn violent because of violence instigated by police or counter-protestors.

50.    At a protest organized by Plaintiff Black Lives Matter Alliance Broward, violence erupted "only after an officer shoved a kneeling protestor in the face without provocation."[4]

51.    And nationwide, racial justice protests were plagued by white supremacists driving vehicles into the demonstrations—a tactic that first garnered national attention in 2017, when a white supremacist killed Heather Heyer in

---

[4] Sarah Blaskey, *She Returns to Where She Was Struck in The Eye by Police. Her New Cause: Fight 'Jim Crow' Bills*, Miami Herald, (Feb. 26, 2021), https://www.miamiherald.com/news/local/community/broward/article249526205.html.

Charlottesville, Virginia.[5]   Over the summer of 2020, over a hundred cars drove

into crowds at racial justice demonstrations.[6]

52.    Collectively, the nationwide demonstrations helped build local and

national momentum towards police reforms, including removing police from

schools,[7] limiting the use of no-knock warrants[8] and prohibiting the use of

chokeholds by police.[9]

53.    By August 2020, more than 450 legislative proposals related to police

---

[5] George Joseph, *White Supremacists Joked About Using Cars to Run Over Opponents Before Charlottesville*, ProPublica (Aug. 28, 2017), https://www.propublica.org/article/white-supremacists-joked-about-using-cars-to-run-over-opponents-before-charlottesville.

[6] Grace Hauck, *Cars Have Hit Demonstrators 104 Times Since George Floyd Protests Began*, USA Today (Sept. 27, 2020), https://www.usatoday.com/story/news/nation/2020/07/08/vehicle-ramming-attacks-66-us-since-may-27/5397700002/; Ari Weil, *Protesters Hit By Cars Recently Highlight A Dangerous Far-Right Trend In America*, NBC News (July 12, 2020), https://www.nbcnews.com/think/opinion/seattle-protester-hit-car-latest-casualty-dangerous-far-right-trend-ncna1233525.

[7] Ryan Faircloth, *Mpls. Public Schools Terminates Contact with Police Dep't Over George Floyd's Death*, Star Trib., (June 2, 2020), https://www.startribune.com/mpls-school-board-ends-contract-with-police-for-school-resource-officers/570967942/.

[8] Rachel Treisman, *Ky. Law Limits Use of No-Knock Warrants, A Year after Breonna Taylor's Killing*, NPR, (Apr. 9, 2021), https://www.npr.org/2021/04/09/985804591/kentucky-law-limits-use-of-no-knock-warrants-a-year-after-breonna-taylors-killin.

[9] Alan Suderman, *States Race to Pass Policing Reforms after Floyd's Death*, AP, (Aug. 8, 2020), https://apnews.com/article/virus-outbreak-police-us-news-ap-top-news-ca-state-wire-0ac7a97ce73fb49346d9965787085fce.

reform had been introduced in more than 30 states.[10]   This police reform was designed to advocate for a new policing paradigm that breaks away from the traditional notions of racialized policing that are "sustained by systemic exclusion and discrimination, and fueled by implicit and explicit bias."[11]

54.   As explained below, however, the Florida legislature responded to the demonstrations with legislation aimed specifically at deterring such protests and criminally penalizing the protestors and their message.

## II.   GOVERNOR DESANTIS PROPOSED LEGISLATION IN SEPTEMBER 2020 IN DIRECT RESPONSE TO RACIAL JUSTICE PROTESTS.

55.   Following the nationwide and Florida racial justice protests of summer 2020, Governor DeSantis and other leading proponents of the Act used their public platforms to oppose demonstrations advocating for an end to police violence against Black people.   These same government officials critiqued Plaintiffs' direct actions related to reform and accountability, as well as Plaintiffs' calls to transfer funding from police departments to bolster other social services and community resources.

---

[10] Colleen Long, Kat Stafford and R.J. Rico, *Summer of Protest: Chance for Change, But Obstacles Exposed*, AP, (Sept. 6, 2020), https://apnews.com/article/election-2020-shootings-race-and-ethnicity-or-state-wire-racial-injustice-9035ecdfc58d5dba755185666ac0ed6d.

[11] Colleen Walsh, *Solving Racial Disparities In Policing*, The Harvard Gazette, (Feb. 23, 2021), https://news.harvard.edu/gazette/story/2021/02/solving-racial-disparities-in-policing/.

56.     During a September 21, 2020 press conference, Governor DeSantis announced the "Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act"—the legislative proposal that ultimately led to HB1. Governor DeSantis summarized the proposal, highlighting felony penalties for protestors for "incapacitat[ing] [] roadways," "destroying or toppling [] monuments," and "harassing innocent people in public accommodations."[12] Harkening back to a number of incidents that received significant media attention during the summer's Black-led protests calling for an end to police violence against Black people,[13] Governor DeSantis referenced "videos of [] innocent people eating dinner and…crazed lunatics just screaming at them and intimidating them."[14]

---

[12] Video, Gov. Ron DeSantis Sept. 21, 2021 Press Conf. on Law Enf't Legis., Fla. Channel (Sept. 21, 2020) at 3:53, 4:08, https://thefloridachannel.org/videos/9-21-20-press-conference-on-law-enforcement-legislation/; News Release, Office of Gov. Ron DeSantis, *Gov. DeSantis Announces the "Combatting Violence, Disorder and Looting and Law Enf't Prot. Act"* (Sept. 21, 2020), https://www.flgov.com/2020/09/21/governor-ron-desantis-announces-the-combatting-violence-disorder-and-looting-and-law-enforcement-protection-act/

[13] For instance, on August 25, less than a month before Gov. DeSantis's press conference, participants in a racial justice demonstration confronted diners in Washington, D.C. *See* Fredrick Kunkle, *Protesters Target D.C. Diners, Triggering Backlash After Heckling Woman*, Wash. Post (Aug. 25, 2020), https://www.washingtonpost.com/dc-md-va/2020/08/25/dc-protesters-blm-diner-confrontation/.

[14] DeSantis Press Conf., *supra* note 12, at 4:18–4:30.

24

57.    Governor DeSantis proceeded to describe how, in his view, other cities—including Portland, Oregon—had not sufficiently punished protestors at racial justice protests.   Specifically, Governor DeSantis described "scraggly looking Antifa types"[15] who were arrested and then released shortly thereafter over the summer.[16]  Governor DeSantis explained how "that's not going to happen here in Florida," due in part to the new bail provisions included in his proposal.[17] Governor DeSantis further stated that his proposal would make any person convicted of participating in a disorderly assembly ineligible for state benefits and employment.[18]

58.    Governor DeSantis explained his rationale for this "very robust package" was to proscribe disorderly protests and demonstrations across the State. Specifically, Governor DeSantis stated, "We are not going to let Florida go down the road that some of these other places have gone," and further indicated anyone participating in conduct proscribed by his proposed legislation would have "a ton

---

[15] "Antifa," the term used to refer to a "loose affiliation of local activists scattered across the U.S. and a few other countries," are known for opposing various "far-right ideologies," including "white supremacy" and "racism." Leslie Gornstein, *What is Antifa? Is it a Group or an Idea, and What do Supporters Want?*, (last updated March 29, 2021, 12:15 PM), https://www.cbsnews.com/news/what-is-antifa/.

[16] DeSantis Press Conf., *supra* note 12 at 4:54–5:15.

[17] *Id.* at 4:54–5:20.

[18] *Id.* at 7:05–7:17.

of bricks rain down on [them]."[19]

59.     To frustrate protestors' demands to reallocate government funds to social programs that would improve Black and Latinx communities, Governor DeSantis proposed to prohibit localities from reducing police funding or reallocating funding to other community programs.[20]

60.     The next day, Governor DeSantis promoted his proposed bill on the Tucker Carlson Show, referring to detractors of the bill as "people on the far left" who are "anti-police" and "believe in defunding the police."[21]

61.     In addition to the examples set forth above, Governor DeSantis, Senate President-Designate Wilton Simpson, and House Speaker-Designate Chris Sprowls—the earliest proponents of the proposal that became HB1—all characterized the Act as a direct response to the Black-led protests advocating for racial justice and police reform that occurred throughout the summer of 2020.

62.     The Governor's focus and the focus of HB1's proponents on Black-led racial justice protests only persisted through the legislative process.

63.     Indeed, in recognition of the racially discriminatory intent behind the bill, Broward County Colonel David R. Holmes directed approximately 30 district

---

[19] *Id.* at 7:17–7:43.

[20] *Id.* at 6:19–6:49, 22:04–22:44.

[21] Gov. Ron DeSantis joins 'Tucker Carlson Show', Facebook (Sept. 22, 2020) https://www.facebook.com/watch/?v=356894608832351.

captains not to enforce HB1, saying the Broward County Sheriff's Offices does not need "any overzealous deputies utilizing the new law to conduct enforcement that could violate people's civil liberties."[22]

64.    Despite Governor DeSantis's acknowledgement that the 2020 racial justice protests in Florida were largely non-violent,[23] law enforcement met protestors in Florida with tear gas, rubber bullets, and mass arrests.  As early as June 2, 2020, Governor DeSantis mobilized 700 National Guard members to respond to the racial justice protests.[24]   Local law enforcement followed suit, arresting hundreds of Floridians who were protesting non-violently against police

---

[22] Eileen Kelley, *Sheriff's Office backs away from anti-riot law, worried that people's civil rights could be violated*, South Fla. Sun Sentinel, (Apr. 23, 2021), https://www.sun-sentinel.com/news/crime/fl-ne-anti-riot-ss-prem-20210423-in42u4ngsjhsragl5uvl4lnr6y-story.html.

[23] *Tucker Carlson, Ron DeSantis Take Turns Slamming CNN's Attacks on Florida's COVID Response*, Rumble  (Jan. 5, 2021), https://rumble.com/vch4v3-watch-tucker-carlson-ron-desantis-take-turns-slamming-cnns-attacks-on-flori.html.

[24] News Release, *supra* note 2.

violence over the last year.[25]   In contrast, across Florida, law enforcement officers allowed people opposing racial justice reforms to continue protesting without intervention, while Black-led groups and their allies protesting for racial justice at the same locations were frequently arrested or threatened with arrest.[26]

65.     Furthermore, Black Floridians already face discrimination throughout the state's criminal justice process.   Among other things, Black Floridians are incarcerated at rates significantly disproportionate to their population share: as of 2020, 47 percent of the state's prison population was Black, when Black Floridians

---

[25] *See, e.g.*, Cristobal Reyes, *More Than 100 Arrested During George Floyd Protests in Orlando; Nearly 80 Have  Had Charges Dropped*, Orlando Sentinel, (July 20, 2020),   https://www.orlandosentinel.com/news/os-ne-protester-arrest-disorderly-conduct-dropped-20200720-spfogvhrc5ghdmmpbq5mcep5ny-story.html; Dan Sullivan, *Hillsborough Declines to Prosecute 67 Arrested in Protests*,        TB        Times,        (June        15,        2020), https://www.tampabay.com/news/hillsborough/2020/06/15/hillsborough-declines-to-prosecute-67-arrested-in-protests/; *Bodycam Footage Shows Protesters Arrested in May After Attempting to Disperse*, News 4 Jax, (Sept. 10, 2020), https://www.news4jax.com/i-team/2020/09/10/bodycam-footage-shows-protesters-arrested-in-may-after-attempting-to-disperse-3/.

[26] Tim Craig, *He Was Arrested at A Black Lives Matter Protest. Now, He's Warning Others About Florida's Anti-Riot Proposal*, Wash. Post, (Apr. 9, 2021), https://www.washingtonpost.com/national/florida-protest-bill-silences-activists/2021/04/09/5b5b252c-93c2-11eb-a74e-1f4cf89fd948_story.html; Danielle Wallace, *Fla. Man Who Brandished Gun at BLM Protest Was 'Lawfully Defending Himself;' No Charges Filed: Police*, Fox News, (Aug. 31 2020), https://www.foxnews.com/us/florida-tallahassee-blm-protest-gun-lawfully-defending-himself; Tim Craig, *Proud Boys and Black Lives Matter Activists Clashed in A Fla. Suburb. Only one Side Was Charged*, Wash. Post, (Feb. 4, 2021), https://www.washingtonpost.com/national/florida-protest-bill-unequal-treatment/2021/02/01/415d1b02-6240-11eb-9061-07abcc1f9229_story.html.

comprised just 17 percent of the state's overall population.[27]   Similarly, a 2018 study published by the ACLU of Florida and University of Miami found higher rates of arrest, pretrial detention, conviction, and incarceration for individuals arrested in Black neighborhoods in Miami-Dade County.[28]

66.    The data also indicates that law enforcement officials in Florida exercise discretion in racially discriminatory ways.  For instance, the 2018 ACLU of Florida and University of Miami study found that in Miami-Dade County, Black people were arrested at a rate over two times more than their county population share and Black Hispanic people were arrested at a rate four times their county population share.[29]   A 2017 analysis of pedestrian ticketing in Jacksonville found that in the preceding five years, Black pedestrians were nearly three times as likely as white pedestrians to receive a pedestrian ticket.[30]   Likewise, in 2014, Black motorists across Florida were stopped and ticketed for seatbelt violations at nearly

---

[27] Natishia Y. June, *Racial Disparities in Florida's Criminal Justice System Are Shameful*, ACLU Fla., (June 25, 2020), https://www.aclufl.org/en/news/racial-disparities-floridas-criminal-justice-system-are-shameful.

[28] *Unequal Treatment: Racial and Ethnic Disparities in Miami-Dade Criminal Justice*, ACLU Fla., (July 2018), https://www.aclufl.org/sites/default/files/aclufl_unequaltreatmentreport2018.pdf.

[29] *Id.* at 13.

[30] Topher Sanders, Kate Rabinowitz and Benjamin Conarck, *Walking While Black, Jacksonville's Enforcement of Pedestrian Violations Raises Concerns That it's Another Example of Racial Profiling*, ProPublica, (Nov. 16, 2017), https://features.propublica.org/walking-while-black/jacksonville-pedestrian-violations-racial-profiling/.

twice the rate as white motorists.[31]

## III.   KEY PROVISIONS OF THE ACT.

67.    HB1 contains a number of measures designed to implement Governor DeSantis's promise that "a ton of bricks [will] rain down on" protesters in the State of Florida.   Among other provisions, the Act exposes non-violent protestors to arrest for their mere proximity to acts of violence or property destruction, creates new and harsher penalties for non-violent protest activity including blocking of roadways, interferes with municipalities' discretion to temper their police response to protests, and allows people opposed to protestors to use violence against them without fear of civil repercussion.

**Section 15: Riots, and Inciting a Riot.**

68.    Section 15 amends Fla. Stat. § 8701.01 to define, among other things, the offenses of rioting and inciting a riot.

69.    Section 15 also eliminates bail for those arrested under this section. Even wrongfully arrested individuals must be held without bail until brought before a judge for a bail determination.

70.    Under Section 15, a person who "participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," resulting in injury or

---

[31] *Id.*

30

damage to another person, damage to property, or imminent danger of injury to another person or damage to property commits a riot, which is a third-degree felony charge punishable by up to five years in prison.

71.    And a person who "willfully incites another person to participate in a riot, resulting in a riot or imminent danger of a riot" commits inciting a riot, which is a third-degree felony.

72.    The section fails to clarify whether a participant in a larger demonstration where violence occurs must share "common intent to assist" others in "violent and disorderly conduct."

73.    Thus, an individual who is participating in a peaceful protest but who finds themself in close proximity to an act of violence or property destruction in which they themselves do not participate may potentially be arrested and charged under this section.  Likewise, a peaceful protestor who defends another protestor who is attacked by a counter-protestor could potentially be charged under this section.

74.    Because Section 15 confers discretion to law enforcement to arrest nonviolent protesters in close proximity to a violent outburst that is caused by others, would-be protesters have already been and will continue to be discouraged from participating in demonstrations for fear that the intents and actions of others may subject them to severe criminal penalties.

**Section 2: Obstruction of Public Streets, Highways, and Roads.**

75.     Section 2 amends Fla. Stat. § 316.2045 regarding pedestrian violations by prohibiting willful obstruction of traffic. The amendment's language is broad enough to criminalize standing on the street and hindering any traffic, even temporarily.

76.     This provision will make it easier for law enforcement to use their discretion to arrest and ticket peaceful protesters who temporarily block a street.

77.     Due to this provision, would-be protesters—and in particular, Black-led organizations and Black individuals who are familiar with the systemic disparate treatment of Black people in Florida by law enforcement—have already been and will continue to be discouraged from exercising their First Amendment rights for fear of arrest.

**Section 16: Breach of the Peace.**

78.     Section 16 amends the misdemeanor offense of Unlawful Assemblies to require anyone arrested under this provision to be held without bail until brought before a judge for a hearing.

79.     Under this section, a person arrested for breach of the peace, which is a low-level misdemeanor, will spend at least one night in jail.  This section thus targets a certain kind of expression, *i.e.* protest, for harsh punishment.

80.     This section has already chilled and will continue to chill protected

speech by discouraging would-be protesters from participating in a demonstration for fear that they may be arrested for the low-level offense of breaching the peace and have to spend at least one night in jail as a result.

**Section 8: Mob Intimidation.**

81.     Section 8 of the Act creates the new offense of "mob intimidation," which prohibits one person "assembled with two or more other persons and acting with a common intent, to use force or threaten to use imminent force, to compel or induce, or attempt to compel or induce, another person to do or refrain from doing any act or to assume, abandon, or maintain a particular viewpoint against his or her will."

82.     A person who violates this section commits a misdemeanor of the first degree.

83.     Section 8 also eliminates bail for those arrested under its provisions. Such individuals must be held without bail until brought before a judge for a bail determination.

84.     Prior to HB1, Florida law already criminalized assault as a second-degree misdemeanor.[32]   The new mob intimidation provision thus enhances liability for assault only when it is committed using protest-based speech or expression, subjecting a protestor to up to 300 extra days in jail.

---

[32] *See* Fla. Stat. § 784.011.

85.     Section 8 has been touted by the Governor's office as ensuring "that Florida will not be a welcoming place for those wishing to impose their will on innocent civilians and law enforcement by way of mob mentality."[33]

86.     Section 8 serves no legitimate purpose because existing battery and assault laws already prohibit threatening and intimidating conduct.

**Section 14: Cyberintimidation by Publication.**

87.     Section 14 creates Fla. Stat. § 836.115, the new crime of cyberintimidation by publication, which makes it "unlawful for a person to electronically publish another person's personal identification information with the intent to, or with the intent that a third party will use the information to incite violence or commit a crime against the person; or threaten or harass the person, placing such person in reasonable fear of bodily harm."

88.     This provision fails to give reasonable notice of what is proscribed, and runs the risk of criminalizing political speech, or speech involving other matters of public concern, that is critical of law enforcement officials and other public officials.  As a result, this provision threatens protected speech.

89.     The section serves no legitimate purpose because criminal statutes

---

[33] News Release, Office of Gov. Ron DeSantis, *WHAT THEY ARE SAYING: Gov. Ron DeSantis Signs Hallmark Anti-Rioting Legislation Taking Unapologetic Stand for Public Safety* (Apr. 19, 2021), https://www.flgov.com/2021/04/19/what-they-are-saying-governor-ron-desantis-signs-hallmark-anti-rioting-legislation-taking-unapologetic-stand-for-public-safety/.

already proscribe threats, harassment, and inciting violence.[34]

**Section 18: Affirmative Defense in Civil Action.**

90.     Section 18 creates Fla. Stat. § 870.07, "Affirmative defense in civil action; party convicted of riot," which provides that "[i]n a civil action for damages for personal injury, wrongful death, or property damage, it is an affirmative defense that such action arose from an injury or damage sustained by a participant acting in furtherance of a riot." The affirmative defense authorized by this section shall be "established by evidence that the participant has been convicted of a riot or an aggravated riot prohibited under s. 870.01 [*i.e.* Section 15 of HB1], or by proof of the commission of such crime by a preponderance of the evidence."

91.     Section 18 shields from civil liability those who kill or injure other people, based solely on whether those other people are protestors. In so doing, this provision invites violence against protestors and others engaged in protected speech activity by completely insulating the aggressors from money damages if they either can point to a "rioting" conviction or provide "proof"—which need not even satisfy criminal evidentiary standards—that the injured or killed person participated in a riot.

---

[34] ACLU-FL, *Oppose HB1/SB484*, at 17, https://www.aclufl.org/en/written-testimony-oppose-hb-1-and-sb-484-anti-protest-bill.

**Section 1: Appeal of Municipal Law Enforcement Agency Budget.**

92.     Section 1 of the Act amends Fla. Stat. § 166.241 to provide that where a municipality's tentative budget includes "a funding reduction to the operating budget of the municipal law enforcement agency," the state attorney or member of the governing body of the municipality may appeal the funding reduction "by petition to the Administration Commission" within 30 days after the tentative budget is posted on the municipality's official website.  The appeal must "set forth the tentative budget proposed by the municipality . . . the operating budget of the municipal law enforcement agency as approved by the municipality for the previous year, and state the reasons or grounds for the appeal."  The appeal must be filed with the Executive Office of the Governor and a copy served upon the municipality.

93.     Following service of the appeal, the municipality has five business days to file a reply with the Executive Office of the Governor and petitioner.  Upon receipt, the Governor shall hold a budget hearing and then issue a report with findings and recommendations to the Administration Commission, which will then have 30 days to either approve, amend, or modify the budget proposal.  The Administration Commission's decision shall be final.

94.     By its terms, this provision applies only to budget proposals seeking law-enforcement "funding reduction[s]"—*i.e.*, those that *reduce* law enforcement

budgets.   The Act provides no definition for the term "funding reduction." Consequently, this provision has already and will continue to chill Black would-be protesters from engaging in protest.

**Section 3: Waiver of Sovereign Immunity.**

95.   Section 3 amends Fla. Stat. § 768.28 to provide for municipal liability for damages caused during a "riot."  Specifically, under the Act, each municipality in Florida now has a statutory duty "to respond appropriately to protect persons and property during a riot or an unlawful assembly based on the availability of adequate equipment to its municipal law enforcement officers and relevant state and federal laws."

96.   If the municipality breaches that duty, the municipality can be held civilly liable for any damages "arising from personal injury, wrongful death, or property damages proximately caused by the municipality's breach of duty."

97.   The amendment creates new civil liability on the part of municipalities, opening the door to civil lawsuits against the city for unlimited damages.  As a result, municipalities are incentivized not to intervene or otherwise thwart overly punitive law enforcement responses to demonstrations, for fear of running afoul of this provision.

98.   As a further result, protesters are likely to be subject to unfettered and harsh police responses, including force and arrest, and will be precluded from

appealing to their local government to prevent or mitigate these responses. As the disparities in Florida's criminal justice system make clear, Black people will almost certainly be disproportionately affected by these police responses.[35]

99.   Consequently, this provision has already and will continue to chill Black would-be protesters from engaging in protest. This provision also impedes would-be protesters from petitioning their municipal governments to reform the local police by rendering such advocacy useless.

## IV.   THE FLORIDA LEGISLATURE WAS MOTIVATED, AT LEAST IN PART, BY A RACIALLY DISCRIMINATORY PURPOSE AND WAS AWARE OF THE LIKELY DISCRIMINATORY IMPACT OF THE ACT.

100.   The Florida legislature was aware of HB1's likely discriminatory impact and speech-chilling effect before voting to pass it into law on April 15, 2021.

101.   Opponents of the bill, including legislators, community organizations, and swaths of the public writ large, consistently emphasized through testimony, media, and other means that HB1 was a clear response to the demonstrations advocating for racial justice that took place in 2020 and was designed to target

---

[35] *See supra* ¶¶ 65–66.

38

Black-led protests.[36] The bill's broad coalition of opponents also consistently expressed concern that HB1 would have a discriminatory impact.[37]

———————————

[36] *John Dailey: HB1 is Bad for Tallahassee & Fla.* Fla. Politics, (Mar. 22, 2021), https://floridapolitics.com/archives/413678-john-dailey-hb-1-is-bad-for-tallahassee-florida/ (Tallahassee Mayor John Dailey arguing that "while some suggest that this legislation is in response to the January 6 insurrection at the U.S. Capitol, the truth is that it was proposed last summer in the wake of the global protests against racial injustice after the killing of George Floyd and directed at Black Lives Matter protests"); Letter, Fla. Conservation Voters to Members of the Fla. Leg. (Jan. 27, 2021), https://drive.google.com/file/d/1QJhB9bo69f4V47WpZVG9DQbdSsMTHb3A/view (stating "[i]t could not be more obvious that [HB1/SB 484] is a direct response to the peaceful Black Lives Matter movement"); Letter, Envtl. Orgs to President Simpson and Speaker Sprowls (Mar. 2, 2021), https://drive.google.com/file/d/1hQrxw2_u6Gm5Y8U5C4Ar_MJIV3JM358g/view (calling HB1 a "disingenuous reaction to the movement for Black lives protests last year"); Miami Herald Editorial Board, *Could Anything Be Worse Than Fla's Stand Your Ground? Yes, A New, Racist Legislative Proposal*, Miami Herald (Feb. 10, 2021), https://www.miamiherald.com/opinion/editorials/article249138640.html (describing the legislation as "redundant, racist and totally political. It's aimed at Black Lives Matter and will make it dangerous for the movement's supporters to take to the streets, however peacefully"); Katie Rice, *Dozens Attend 'Rally To Save Protesting' After Anti-Riot Bill Passes Fla. House*, Orlando Sentinel (Mar. 26, 2021), https://www.orlandosentinel.com/news/breaking-news/os-ne-rally-to-save-protesting-orlando-20210327-t7d3mznum5hytbbab45x3pjfzi-story.html (noting HB1 is "seen by many as a response to the Black Lives Matter protests last year after the death of George Floyd").

[37] Video, Jan. 27, 2021 H. Criminal Just & Pub. Safety Subcomm. Hearing at 2:00:38–2:02:30, https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/ (Rep. Hart saying evidence shows "this law would disproportionately hurt communities of color trying to exercise their constitutional rights" by giving "bad actors in law enforcement and the criminal justice system additional weapons to harm, incarcerate, and kill Black and Brown Floridians"); Mar. 10, 2021 H. Judiciary Comm. Hearing, March 10, 2021 at 2:15:23–2:26:16, https://thefloridachannel.org/videos/3-10-21-house-judiciary-

102.   For example, drawing on "experience of Florida law enforcement's militaristic tactics at BLM protests," Plaintiffs' counsel, the ACLU of Florida, warned that HB1's "burdens will disproportionately fall on Black and Latinx people and their families. Police have, and will, respond to Black protesters with violence, then use these new statutory 'tools' when they are met with resistance or outrage."[38]   Indeed, the bill carried an obvious likelihood of discriminatory impact, given the disparities in policing and criminal punishment that Black people in Florida already experience.[39]

103.   Many of the citizens who testified and opposed HB1 also highlighted the Act's chilling effect on their First Amendment rights to speak, assemble, and petition their government.   For example, March for Our Lives organizer Alyssa Ackbar expressed fear "to speak out on issues that impact [her]" as an organizer who wanted to create change for her community, because "HB1 would make [her] actions criminal."[40]   Ms. Ackbar stressed the "terrifyingly broad" terms and

---

committee/ (Rep. Ramon Alexander stating HB1 "will not be equally applied…[b]ecause it will be up to the discretion of a law enforcement officer").

[38] ACLU-FL, *supra* note 34, at 5.

[39] *See supra* ¶¶ 65–66.

[40] Video, Jan. 27, 2021 H. Criminal Just & Pub. Safety Subcomm. Hearing, *supra* note 37 at 1:08:20–1:09:24.

descriptions throughout the bill.[41]

104.   Additionally, the Florida legislature was on notice of numerous incidents in which white supremacists used the tactic of driving vehicles through protestors marching to advance a message of racial justice.  For example, on March 1, 2021, Protect Democracy sent a letter to Florida lawmakers noting that there were over 100 documented instances of motorists driving into protestors since Mr. Floyd's killing.[42]

105.   Ranking Member Michael Grieco called attention to the fact that each member of the Criminal Justice and Public Safety Subcommittee "received emails and letters and phone calls from thousands" of Floridians all over the state regarding their concerns if the Act passed.[43]

106.   Despite being confronted with concerns regarding HB1's discriminatory impact, the bill's proponents refused to address it. For example,

---

[41] *Id.*; *see also* Video, Jan. 27, 2021 H. Criminal Just & Pub. Safety Subcomm. Hearing, *supra* note 37 at 58:02–59:28 (testimony from Pensacola Citizens Police Advisory Committee Member Haley Morrisette that she would have to choose between being jailed for organizing and participating in a non-violent protest or caring for her children as a single mother).

[42] Protect Democracy, Ltr. to Senator Jason W.B. Pizzo, *et al.* re: *Constitutional Law Concerns with H.B. 1/S.B. 484* (Mar. 1, 2021), https://drive.google.com/file/d/1mdN5ByLWNdCSWhlmK-p90NAG_pK-9RPp/view.

[43] Video, Jan. 27, 2021 H. Criminal Just & Pub. Safety Subcomm. Hearing, *supra* note 37, at 1:57:38–2:00:30.

Representative Marie Woodson, an opponent of HB1, noted the disparities that exist in "Black and Brown communities" and asked Representative Fernandez-Barquin, a bill sponsor, to provide "examples as to why not you do not think that this Black and Brown communities would not be impacted" by HB1. Speaker Sprowls, a proponent of the bill, responded, "Representative Woodson, I believe that's outside the scope of the bill."[44]

107. Indeed, the legislature also forwent multiple opportunities to amend the law to study and understand HB1's racially discriminatory impact. Proposed amendments that would have required a study of the law's racial impact were either withdrawn or defeated.[45]

## V. EXISTING FLORIDA LAW IN EFFECT PRIOR TO HB1 ALREADY PROSCRIBES THE UNLAWFUL ACTIONS OUTLAWED IN THE ACT.

108. The Legislature also was aware that the Act served no legitimate purpose, given that multiple provisions of Florida law already proscribe violence and disorderly conduct connected with actual riots.

109. For instance, prior to HB1, Florida law already criminalized riots and

---

[44] Video, Mar. 25, 2021 H. Session Hearing, March 25, 2021 at 01:09:02–01:10:38, https://thefloridachannel.org/videos/3-25-21-house-session/.

[45] Fla. S. Amend. 866454 (requiring racial impact study, taking into account ideologies and racial composition of demonstrations, how they are policed, and the effect on the state's criminal justice population, withdrawn); Fla. S. Amend. 650056 (requiring study of bill's anticipated effects on racial inequality, failed).

unlawful assemblies.[46]   Under pre-existing Florida law, rioting is a third-degree felony punishable by up to five years in prison.

110.   Florida law also already criminalized assault, aggravated assault, battery, aggravated battery, assault or battery of law enforcement, criminal mischief/property damage, theft, burglary, and defacing a flag.[47]

111.   Extensive public testimony explained why existing laws make the Act's harsh new provisions unnecessary (and unconstitutional).   The ACLU of Florida pointed out in its written testimony the Act serves no legitimate purpose because already-existing Florida law criminalizes conduct spelled out in the Act.[48] The Law Enforcement Action Partnership submitted a letter to the legislature stating the law is "unnecessary to protect public safety" because the "state already has many laws on the books to address unlawful assembly, property damage, riots, and sedition.[49]   In a publication in the Sun Sentinel, State Attorney Andrew Warren explained "[e]xisting laws already give police and prosecutors the tools to hold

---

[46] *See* Fla. Stat. §§ 870.01–870.03.

[47]  *See* Fla. Stat. §§ 784.011, 784.021, 784.03, 784.045, 784.07, 806.13, 812.014, 810.02, 876.52.

[48] ACLU-FL, *supra* note 34, at 8.

[49]  Letter, Law Enf't Action Partnership (Jan. 27, 2021), https://drive.google.com/file/d/1cTFnaBdM2kgZssLlQA8fx7YtTdBX3YHB/view.

looters and rioters accountable."[50]

112.   Executive Director for the Department of Law Enforcement at the Broward County Sheriff's Office, Colonel David Holmes, told district captains that Florida already has "enough laws on the books to do our job effectively without the new law, and [t]hings should not change for us in how we enforce the law pertaining to protest(s) as we have been very effective doing just that."[51]

## VI.   THE UNUSUAL EVENTS LEADING UP TO THE HURRIED CONSIDERATION AND PASSAGE OF THE ACT.

113.   The Florida legislature fast-tracked HB1, limited the public's opportunity to offer testimony, and purposefully took steps to limit public discussion of the Act's discriminatory impact.  In doing so, the Florida legislature departed from its normal procedures.

114.   On January 6, 2021, HB1 and its companion bill, SB 484, were introduced in the House and Senate, respectively. During legislative sessions in January and March, HB1 made its way through the House committee process and was eventually passed on March 26, 2021.

---

[50] Andrew Warren, *This State Prosecutor Is Against DeSantis' Anti-Protest Bill*, South Fla. Sun Sentinel (Feb. 10, 2021), https://www.sunsentinel.com/opinion/commentary/fl-op-com-desantis-anti-protest-bill-prosecutor-20210210-6n44w542xrdrlh6ujc67edille-story.html.

[51] Eileen Kelley, *Sheriff's Office Backs Away From Anti-Riot Law, Worried That People's Civil Rights Could Be Violated*, South Fla. Sun Sentinel, (Apr. 23, 2021),             https://www.sun-sentinel.com/news/crime/fl-ne-anti-riot-ss-prem-20210423-in42u4ngsjhsragl5uvl4lnr6y-story.html.

115.  The legislature curtailed public testimony by imposing arbitrary time limits.  On January 27, 2021, during the first committee hearing on HB1, Chairman and co-sponsor Representative Cord Byrd acknowledged significant interest in public comment on the bill but placed a 1-minute cap on witness testimony.

116.  Similarly, members of the public who attempted to voice opposition to the bill and its discriminatory impact at the March 10, 2021 House Judiciary Committee hearing were frequently muted and cut off.

117.  Unlike HB1, SB 484 was never voted out of the Senate Committee on Criminal Justice, the first of three Senate committees that normally would have received public testimony and voted on the bill.  Instead, on April 2, 2021, HB1 was referred directly to the Senate Appropriations Committee, bypassing the Committee on Criminal Justice and the Appropriations Subcommittee on Criminal and Civil Justice.  On April 8, 2021, neither HB1 nor SB 484 had received a hearing in the Senate.

118.  On April 9, 2021, the Senate Appropriations Committee voted in favor of HB1.  On April 15, 2021, the bill received a favorable vote from the full Senate. It was immediately certified and sent to the Governor for signature.

119.  Although the bill was initially intended to go into effect on July 1, 2021, HB1 was revised in early March to have immediate effect upon the governor's signature.  As such, the bill went into effect when Governor DeSantis

signed it on April 19, 2021—one day before the verdict was announced in the criminal trial of Minneapolis police officer Derek Chauvin.

120.  On the day it was signed, Governor DeSantis referred to it as "the strongest anti-rioting, pro-law-enforcement piece of legislation in the country."[52]

**CLAIMS FOR RELIEF**

**COUNT 1 – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) RACIALLY DISCRIMINATORY PURPOSE**

121.  Plaintiffs, on behalf of themselves as organizations and their members, repeat and incorporate by reference each allegation contained in paragraph numbers 1–120 as if fully set forth herein.

122.  The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

123.  An official action taken for the purpose of discriminating on account of race has no legitimacy under the United States Constitution.  *City of Richmond, Va. v. U.S.*, 422 U.S. 358, 278–79 (1975).

---

[52] *Gov. DeSantis Signs Florida's 'Anti-Riot' Bill into Law*, NBC Miami, (updated Apr. 20, 2021 9:19 AM), https://www.nbcmiami.com/news/local/gov-desantis-signs-floridas-anti-riot-bill-into-law/2431822/.

124.   Demonstrating intentional discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977).  Instead, the plaintiff's burden is to show that discriminatory purpose was a motivating factor, rather than the primary or sole purpose. *Id.* at 265–66.

125.  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266.

126.   Because legislation that "appears neutral on its face" may nonetheless be motivated by discrimination, the United States Supreme Court articulated several non-exhaustive factors to inform an analysis of discriminatory intent, including: (1) evidence that defendants' decision bears more heavily on one race than another; (2) the historical background of the decision; (3) the specific sequence of events leading up to the decision; (4) departures from the normal procedural sequence; (5) substantive departures; and (6) legislative history, including "contemporary statements by members of the decision making body, minutes of its meetings, or reports." *Id.* at 266–68.

127.  Applying the *Arlington Heights* factors reveals that the Act was enacted, at least in part, with the purpose to discriminate against Black-led organizations and Black protesters in violation of the United States Constitution.

47

128.   The Act's impact will bear more heavily on Black individuals than white individuals.  HB1 was passed with the purpose of deterring demonstrations advocating on behalf of racial justice, and these demonstrations are overwhelmingly organized by Black-led organizations.   Moreover, Florida's criminal justice system discriminatorily impacts Black people in general, meaning enhanced penalties and broadened police discretion will have a disproportionate and discriminatory effect on Black people who engage in demonstrations.  Black people are also aware that they are more likely to be targeted for arrest and prosecution.  The Act will thus chill protesting and organizing by Black people and Black-led organizations, including each of the Plaintiffs.

129.   The history surrounding the adoption of the Act, along with the unusual events leading up to its signing and substantive departures from the normal legislative process that resulted in its enactment, further demonstrate the discriminatory purpose behind the Act.  Moreover, the statements from various governmental officials and testimony surrounding HB1's enactment, show that the Florida legislature and Governor DeSantis were aware of the discriminatory purpose and intended impact of the Act.

130.   The Act's history, known and reasonably foreseeable discriminatory impact, sequence of events and substantive departures from the normal legislative process that resulted in its enactment, and the tenuousness of the stated

48

justifications for the new law, all show that it was enacted with a discriminatory purpose in violation of the Equal Protection Clause of the Fourteenth Amendment.

131.  Each of the Defendants is responsible for enforcing the Act.

132.  By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

133.  As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights.

## COUNT 2 – VIOLATION OF THE EQUAL PROTECTION CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983) TARGETING RACIAL JUSTICE ADVOCACY

134.  Plaintiffs, on behalf of themselves as organizations and their members, repeat and incorporate by reference each allegation contained in paragraph numbers 1-120 as if fully set forth herein.

135.  Laws that burden the fundamental right of expression and are targeted at certain messages violate the Equal Protection Clause.  *See Police Dep't of Chicago v. Mosely*, 408 U.S. 92 (1972); *Carey v. Brown*, 447 U.S. 455, 100 (1980).

136.  Thus, "[w]hen government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized."

49

*Carey*, 447 U.S. at 461–62.

137.   Throughout HB1's legislative history, proponents of the new law—including but not limited to Governor DeSantis, President Simpson, Speaker Sprowls, and others—repeatedly cited the summer 2020 protests sparked by police violence against Black people as the cause giving rise to the Act.

138.   HB1's history demonstrates that the Act's intent is to suppress the viewpoints of Black-led organizations and their allies, including each of the Plaintiffs, while advancing the viewpoints of those who support the government's "law and order" message.

139.   Moreover, HB1 vests the police with wide discretion in determining whom to arrest during a given demonstration, raising a substantial risk that police will target for arrest individuals advocating messages with which the police disagree. In particular, Black-led organizations, Black organizers, and their allies advocating for police reform are vulnerable to discriminatory enforcement of HB1's broad provisions.

140.   Thus, the Act unconstitutionally targets and burdens fundamental speech activities on the part of those who wish to advocate on behalf of racial justice and police reform, including each of the Plaintiffs.

141.   There is no substantial state interest in suppressing advocacy for racial justice and police reform, especially considering that the demonstrations in Florida

and nationwide that prompted HB1's enactment were overwhelmingly non-violent and preexisting Florida law already covered violent and disorderly conduct.

142.   Each of the Defendants is responsible for enforcing the Act.

143.   By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

144.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights.

## COUNT 3 – VIOLATION OF THE FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

145.   Plaintiffs, on behalf of themselves as organizations and their members, repeat and incorporate by reference each allegation contained in paragraph numbers 1–120 as if fully set forth herein.

146.   The First Amendment to the United States Constitution, applicable to the states through the Fourteenth Amendment, prohibits the State of Florida from, in relevant part, "abridging the freedom of speech . . . or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

147.   The Act constitutes impermissible viewpoint and content discrimination, and is overbroad, in violation of Plaintiffs' First Amendment rights to speech and assembly.

148.   Laws that proscribe speech based on its content or viewpoint are presumptively invalid and receive heightened scrutiny.  *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).   The State of Florida may not prohibit speech or expressive conduct based solely on the government's disapproval of the ideas or viewpoints expressed.  *Id.*  Even where the government is allowed to proscribe certain categories of speech and expression, it still may not regulate subsets within those categories based on an effort to suppress an underlying, non-proscribable idea, or based on the government's favoritism or hostility towards that underlying non-proscribable idea.  *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 383–84 (1992).

149.   The Act places unconstitutional viewpoint and content-based restrictions on non-proscribable speech and expression.   Touted as "the strongest anti-rioting, pro-law enforcement piece of legislation in the country," the Act is designed to favor, and will be implemented in a way that impermissibly favors, one viewpoint over another by suppressing the free expression of those who organize and conduct racial justice protests against police violence.   It demonstrates the state's hostility toward protest-based speech supporting racial justice on the one hand, and its favoritism towards groups adopting the state's "law and order" viewpoint and those committing violence acts against protestors on the other.

150.   The Act further advances one viewpoint over another by, *inter alia*, restricting the ability of municipalities only to decrease (not to raise) law enforcement budgets, and thus directly opposes messages that call for decreased law enforcement budgets (Section 1); interfering with municipalities' discretion to temper their police response to non-violent protests (Section 3); subjecting cities and towns to liability for any damages that result from not allowing law enforcement to have "adequate equipment" or otherwise "respond appropriately" to protests (Section 3); proscribing force or threat of imminent force only in the context of protest-based speech and expression (Section 8); creating an affirmative defense in a civil action for anyone who kills, inflicts injury to, or damages the property of a protestor, without creating similar protections for protestors (Section 18); and targeting for harsh punishment those engaged in protest-related offenses (Section 15 and Section 16).

151.   The Act also constitutes impermissible content-based discrimination motivated by the state's hostility towards protest-based speech and expression. Section 8 prohibits use of force or threats to use imminent force "to compel or induce, or attempt to compel or induce, another person to do or refrain from doing any act or to assume, abandon, or maintain a particular viewpoint against his or her will."   Section 8 directly involves speech and expression because it prohibits conduct based on an intended communicative purpose.  *Texas v. Johnson*, 491 U.S.

397, 404 (1989) ("In deciding whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play, we have asked whether '[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'").

152.   Section 8 is an unconstitutional content-based regulation on a subset of protected, non-proscribable speech because it takes a category of proscribable speech and expression ("force or threat of imminent force") and exclusively prohibits a subset of nonproscribable speech within that category—namely, speech designed to compel or induce another person to adopt or reject a particular viewpoint.  *R.A.V.*, 505 U.S. at 383–84.  "[T]he very basis for [Section 8] is the difference in content between" protest-based speech or expression and any other speech or expression in the category of force or threat of imminent force.  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 429 (1993).  "Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" *Id*.

153.   In addition, the Act is unconstitutionally overbroad and not narrowly tailored to serve a legitimate government interest.  By expanding the definitions of "riot" and "inciting a riot" and creating the new crimes of "aggravated rioting," "inciting a riot," and "aggravated inciting a riot" in Section 15, the Act risks

impermissibly criminalizing the protected First Amendment activity of non-violent protestors who choose to peacefully exercise their right to protest but find themselves in close proximity to an act of violence or property destruction. The Act also unconstitutionally criminalizes such basic expressive conduct as standing on the street and hindering any traffic, even temporarily (Section 2).

154.   The Act has resulted in irreparable constitutional harm by chilling, and threatening to chill, the protected speech and assembly rights of Plaintiffs. The Act is discouraging would-be protesters from participating in a demonstration for fear that they may be arrested for violating the Act's vague and ambiguous offenses—such as merely being present at a demonstration where someone else destroys property—particularly because the Act enhances penalties and eliminates bail for certain offenses. *See, e.g.*, Section 16.

155.   Section 14, which proscribes the release of "personal identification information," is also overbroad as a matter of law because it chills, and threatens to chill, Plaintiffs' constitutionally protected electronic communications. Section 14 unlawfully criminalizes a speaker posting another person's name or photograph with malintent. Although states are permitted to regulate true threats, the "release of personal information, even with the intent to intimidate, is not per se a true threat." *Brayshaw v. City of Tallahassee, Fla.*, 709 F. Supp. 2d 1244, 1248 (N.D. Fla. 2010). Nor, without more, does the mere release of personal information lead

to a rational inference that the disseminated information would produce, or is likely to produce, imminent and violent disorder.  *See, e.g.*, *Hess v. Indiana*, 414 U.S. 105, 109 (1973).

156.  Section 14 hinges criminal liability on the speaker's intent, without any requirement of any proof of injury, or any threat to a specific person putting them in fear of bodily harm.  It applies to instances where no individual is harmed or impacted, and "also applies in political contexts where . . . the risk of censorious selectivity by [the state] and [its law enforcement] and prosecutors is also high."  *See, e.g.*, *United States v. Alvarez*, 567 U.S. 709, 736 (2012) (Breyer, J., concurring).  In particular, given the context underlying Section 14, there is a significant risk that advocates for racial justice, including Plaintiffs, would be improperly presumed to have a prohibited intent whenever they published information covered by Section 14.

157.  Section 14 thereby chills expressions of protected speech because "[a]n intent-based standard blankets with uncertainty whatever may be said and offers no security for free discussion" protected by the First Amendment.  *FEC v. Wis. Right to Life, Inc.*, 501 U.S. 449, 468–69 (2007).

158.  Moreover, Section 14 runs the risk of subjecting a speaker to arrest or criminal prosecution for simply posting another's name, so long as the individual's name was posted by the speaker with the intent to incite violence, to commit a

crime, or even to "harass" someone.  Unlike widely known symbols of hate, such as cross-burning or racial epithets, "[s]imply publishing an [individual's name] phone number, address, and email address is not itself a threat or serious expression of intent to commit an unlawful act of violence." *Brayshaw*, 709 F. Supp. 2d at 1248.

159.   The breadth of Section 14's text accordingly runs a substantial risk of punishing mere advocacy and protected political speech.  *Brandenburg v. Ohio*, 295 U.S. 444, 448–49 (1969).

160.   The Act is not narrowly tailored to achieve a compelling government interest.  Indeed, it serves no legitimate purpose whatsoever because existing laws already prohibit threatening, intimidating, and violent conduct.

161.   Each of the Defendants is responsible for enforcing the Act.

162.   By acting under color of state law to deprive Plaintiffs of their First Amendment rights, Defendants have violated 42 U.S.C. § 1983.

163.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their rights to speech, assembly, and other expressive conduct as guaranteed by the First Amendment.

## COUNT 4 – VIOLATION OF THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION (42 U.S.C. § 1983)

164.   Plaintiffs, on behalf of themselves as organizations and their members, repeat and incorporate by reference each allegation contained in paragraph numbers 1–120 as if fully set forth herein.

165.   The Due Process Clause of the Fourteenth Amendment of the United States Constitution prohibits the State of Florida from "depriv[ing] any person of life, liberty, or property without due process of law."  U.S. Const. amend. XIV, § 1.

166.   A state violates the Due Process Clause "by taking away someone's life, liberty, or property under a criminal law so vague that it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement."  *Johnson v. United States*, 576 U.S. 591, 595 (2015).

167.   The Act is impermissibly vague because it fails to provide a person of ordinary intelligence fair notice of what is prohibited, and is so standardless that it authorizes or encourages arbitrary and discriminatory enforcement of the Act.

168.   Because Section 15's expanded definitions of "riot" and "inciting a riot"—as well as its new crimes of "aggravated rioting," "inciting a riot," and "aggravated inciting a riot"—are vague and overbroad, the Act fails to provide fair notice to ordinary people seeking to exercise their right to protest regarding their exposure to potential criminal liability by merely being present at a demonstration

where violence or property destruction occurs.  The Act also invites arbitrary and discriminatory enforcement by conferring discretion on law enforcement to arrest nonviolent protestors in close proximity to an act of violence committed by others.

169.   Plaintiffs have already been and will continue to be discouraged from participating in demonstrations for fear that the intent and actions of others may subject them to arbitrary enforcement and severe criminal penalties under the Act because of the overbroad and vague definitions in Section 15.

170.   Section 2 of the Act is also unconstitutionally vague.  By prohibiting the willful obstruction of traffic—including by standing in the street even temporarily—the Act fails to provide fair notice to ordinary people regarding where and how to conduct nonviolent protests without exposing themselves to risk of arrest.  Section 2 also invites arbitrary and discriminatory enforcement against nonviolent protestors who assemble in public streets and roads as opposed to non-protestors who may be similarly gathered for a different purpose.

171.   Plaintiffs have already been and will continue to be discouraged from assembling to exercise their constitutionally protected right to protest because the Act's vague and overbroad prohibition on "obstruction of public streets, highways, and roads" creates a risk of arrest and is likely to be arbitrarily enforced against them.

172.   Because the Act is vague and standardless, it has resulted in

irreparable constitutional harm by violating Plaintiffs' constitutional rights to due process under the Fourteenth Amendment.

173. Each of the Defendants is responsible for enforcing the Act.

174. By acting under color of state law to deprive Plaintiffs of their Fourteenth Amendment rights, Defendants have violated 42 U.S.C. § 1983.

175. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm, including violations of their Fourteenth Amendment rights.

## PRAYER FOR RELIEF

WHEREFORE, in light of the foregoing facts and arguments, Plaintiffs request that the Court:

a) Declare that Sections 2, 3, 8, 14, 15, 16, and 18 of the Combating Public Disorder Act, and the Combating Public Disorder Act in its entirety, are unconstitutional;

b) Preliminarily and permanently enjoin Sections 2, 3, 8, 14, 15, 16, and 18 of the Act, and the Act in its entirety;

c) Grant Plaintiffs' costs of suit, and reasonable attorneys' fees and other expenses pursuant to 42 U.S.C. § 1988; and

d) Grant any other relief as the Court may deem just and proper.

Dated:  May 11, 2021

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**

*/s/ Rachel M. Kleinman*
Rachel M. Kleinman*
rkleinman@naacpldf.org
Morenike Fajana*
mfajana@naacpldf.org
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-3709
Facsimile: (212) 226-7592
-and-
Georgina C. Yeomans*
gyeomans@naacpldf.org
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 216-2721
Facsimile: (202) 682-1312

**COMMUNITY JUSTICE PROJECT, INC.**

*/s/ Alana Greer*
Alana Greer
Florida Bar No. 92423
alana@communityjusticeproject.com
Berbeth Foster
Florida Bar No. 83375
berbeth@communityjusticeproject.com
Denise Ghartey
Florida Bar No. 1019211
denise@communityjusticeproject.com
Miriam Haskell
Florida Bar No. 069033
miriam@communityjusticeproject.com
3000 Biscayne Blvd.
Suite 106
Miami, Florida 33137
Telephone: (305) 907-7697

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

*/s/ Anya A. Marino*
Anya A. Marino
Florida Bar No. 1021406
amarino@aclufl.org
Max H. Gaston*
mgaston@aclufl.org
Daniel B. Tilley
Florida Bar No. 102882
dtilley@aclufl.org
Nicholas Warren
Florida Bar No. 1019018
nwarren@aclufl.org

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Joseph L. Sorkin*
Joseph L. Sorkin*
jsorkin@akingump.com
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile:  (212) 872-1002
-and-
Steven H. Schulman*
sschulman@akingump.com
James E. Tysse*
jtysse@akingump.com

4343 West Flagler Street, Suite 400
Miami, Florida 33134
Telephone: (786) 363-2707

Robert S. Strauss Tower
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

***Counsel for Plaintiffs***

*\* Pro Hac Vice Applications to be filed*