## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF FLORIDA TALLAHASSEE DIVISION

THE DREAM DEFENDERS; THE
BLACK COLLECTIVE, INC., et al.

     Plaintiffs,

v.                                                    Case No.: 4:21-CV-191

RON DESANTIS, in his official capacity as
Governor of the State of Florida, et al.,

     Defendants.

_____/

## ATTORNEY GENERAL'S MOTION TO DISMISS AND INCORPORATED MEMORANDUM OF LAW

Pursuant to Rules 12(b)(1) and 12(b)(6), Defendant, the Attorney General of Florida, moves to dismiss Plaintiffs' Complaint (Doc. 1) and to dismiss the Attorney General as a defendant.

## BACKGROUND

Every American has the right to peacefully demonstrate. Throughout our Nation's history, people have exercised their rights to free speech and peaceable assembly to express various viewpoints and political ideas. But while the First Amendment affords protection to those who wish to peacefully protest, no person has the right to engage in violence or destroy property.

1. The allegations in the Complaint focus largely on recent nationwide protests related to policing.  Around the summer of 2020, protests broke out

across the nation, and many Americans exercised their First Amendment rights to have their voices heard. Others, however, attacked innocent police officers and citizens and destroyed property, including government buildings and small businesses.  Florida was not immune to this violence.[1]

In order to protect against rioting and looting, the Florida legislature passed House Bill 1, the Combating Public Disorder Act (HB 1 or "Act"). Plaintiffs are organizations that seek to enjoin enforcement of the Act, alleging that it violates their Fourteenth Amendment right to Equal Protection (Counts I and II), their First Amendment right to free speech and assembly (Count III), and their Fourteenth Amendment right to due process (Count IV).  They allege that the Act was passed with discriminatory intent and was meant to silence "Black people and their allies who protest racial justice." Doc. 1 at ¶ 3. They allege that the Act was "designed to single out and punish Black organizers and those who lead protests to end police violence against Black people." *Id.* at ¶ 5

The Act does none of those things. It does not prohibit or discourage peaceful demonstration. Nor does it single out speech regarding racial justice.

---

[1] *See e.g.*, https://www.miamiherald.com/article243130356.html; https://wusfnews.wusf.usf.edu/law-order/2020-05-30/peaceful-protests-turn-violent-in-tampa-in-response-to-george-floyd-killing (last visited June 14, 2021).

The Act prohibits inciting or engaging in violence, and it singles out no group—it applies to every person who engages in such unlawful acts.

2. While the Complaint seeks to enjoin the entire Act, it only references Sections 1, 2, 3, 8, 14, 15, 16 and 18. Sections 8, 14, 15, and 16 are all criminal statutes that require unlawful intent and penalize only conduct that is violent, incites violence, or involves true threats. Sections 1, 2, 3, and 18 address law enforcement budgets, obstruction of a highway, waiver of sovereign immunity, and an affirmative defense in a civil action, respectively.

The Complaint, however, does not specifically challenge all those sections. In setting forth Plaintiffs' counts, the Complaint makes broad allegations, raising specific allegations about only a handful of the sections. Counts 1 and 2 do not specifically challenge any of the sections but instead broadly allege that the whole Act is invalid. Count 3 broadly alleges that the "Act constitutes impermissible viewpoint and content discrimination and is overbroad," but it only makes substantive allegations regarding Sections 2, 8, 14, and 15. Finally, Count 4 broadly alleges that the "Act is impermissibly vague," but only discusses Sections 2 and 15. None of the counts specifically address Sections 3, 16, or 18.

## MEMORANDUM OF LAW

## ARGUMENT

Plaintiffs' claims should be dismissed because (1) the Attorney General is not a proper party; (2) Plaintiffs do not have standing; and (3) Plaintiffs fail to state a claim.

### I. Sovereign Immunity Bars Suit Against the Attorney General

Under the *Ex Parte Young* exception to the Eleventh Amendment, a state official is subject to suit in his official capacity only when he has "responsibility to enforce the law . . . at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). "Federal courts have refused to apply *Ex [P]arte Young* where the officer who is charged has no authority to enforce the challenged statute." *Summit Med. Assocs. v. Pryor*, 180 F.3d 1326, 1342 (11th Cir. 1999). Furthermore, the enforcement authority must be specific. The official's "general executive power" is "not a basis for jurisdiction in most circumstances." *Women's Emergency Network v. Bush*, 323 F.3d 937, 949 (11th Cir. 2003).

As to suits against a state attorney general, the Supreme Court has explained that if state statutes could be challenged by suing the attorney general on the theory that she "might represent the state in litigation involving the enforcement of its statutes," it would eviscerate "the fundamental principle

that [States] cannot, without their assent, be brought into any court at the suit of private persons." *Ex Parte Young*, 209 U.S. at 157.

Here, because the Attorney General has no enforcement authority over the Act, she is not a proper defendant. The Attorney General is the "chief state legal officer." Fla. Const. Art. IV, § 4(b). She has the authority to intervene in cases "in which the state may be a party, or in anywise interested." Fla. Stat. § 16.01(4). However, this authority is discretionary. *See Mallory v. Harkness*, 923 F. Supp 1546, 1553 (S.D. Fla. 1996) ("The [Attorney General] is . . . not affirmatively required to intervene every time an entity challenges the constitutionality of a statute." (citations omitted)), *aff'd without opinion*, 109 F.3d 771 (11th Cir. 1997). Forcing the Attorney General to defend the constitutionality of a statute would effectively eliminate her unreviewable discretion to intervene. *See State ex.rel. Landis v. S.H. Kress & Co.*, 155 So. 823, 826 (Fla. 1934).

This discretionary authority is a general executive power and does not constitute a sufficient connection to make the Attorney General a proper defendant. *See Women's Emergency Network*, 323 F.3d at 949-50; *see also Osterback v. Scott*, 782 F. App'x 856, 859 (11th Cir. 2019) (holding that Florida Governor's general authority to enforce Florida's laws "did not make him a proper party").

Nor does Plaintiffs' assertion that the Attorney General has "oversight and control" over the Office of the Statewide Prosecutor establish that she has enforcement authority. The Office of the Statewide Prosecutor has jurisdiction over certain statutorily enumerated offenses that are "occurring, or [have] occurred" in multiple judicial circuits "as part of a related transaction" or in connection "with an organized criminal conspiracy." Fla. Stat. § 16.56(1)(a). But none of the crimes in the Act, with the exception of burglary, fall within the prosecutorial authority of the Statewide Prosecutor, and Plaintiffs have raised no challenge to the burglary statute, nor have they alleged any risk of punishment under the statute, much less that they face a risk of prosecution by the Statewide Prosecutor for engaging in "related transactions" or "an organized criminal conspiracy" across judicial circuits. *See id.*

Finally, the Attorney General does not have the authority to prosecute the criminal offenses in the Act. Under Florida's Constitution, it is the locally elected state attorney—not the Attorney General—who is "the prosecuting officer of all trials courts in [each judicial] circuit." Fla. Const. Art. V, s. 17; *see also Valdes v. State*, 728 So. 2d 736, 738 (Fla. 1999) ("This Court has long held that as the prosecuting officer, the state attorney has 'complete discretion' in the decision to charge and prosecute."). While the Attorney General has "general superintendence" over state attorneys, no court has ever held that she has the power to direct state attorneys to prosecute, or forego prosecuting,

particular offenses. *See* Fla. Stat. § 16.08.  Nor has any court determined that the Attorney General is a proper defendant in a facial challenge to a Florida criminal statute because of her general superintendence. *Accord Nat'l Rifle Ass'n v. Swearingen*, 2020 WL 5646480, at *3 (N.D. Fla. May 1, 2020) (Walker, J.) (dismissing Attorney General based on sovereign immunity from suit challenging a Florida criminal statute).

In short, there is no connection between the Attorney General and enforcement of the Act, so she should be dismissed.[2]

## II.     There is no case or controversy

In order to satisfy Article III's case-or-controversy requirement, a plaintiff must show that he has standing and that the case is ripe for review. *Elend v. Basham*, 471 F.3d 1199, 1204-05 (11th Cir. 2006). In pre-enforcement challenges, the standing and ripeness inquiries tend to converge. *Id.* at 1205. Here, both standing and ripeness deficiencies require dismissal.

---

[2] If this Court were to dismiss the Attorney General but otherwise permit Plaintiffs' claims to proceed, the Attorney General would seek leave to intervene on behalf of the State of Florida to defend the constitutionality of the Act. *See, e.g.*, 28 U.S.C. § 2403(b). Although the Attorney General is not a proper defendant, she has discretion, as Florida's chief legal officer, to defend the state's laws as an intervenor. She desires and intends to offer a robust defense of the statute, but because the *Ex Parte Young* analysis is similar to the standing analysis, the Attorney General's status as an improper defendant is not waivable.

### A. Plaintiffs lack standing

To establish standing, Plaintiffs must show (1) injury in fact that is (a) concrete and particularized and (b) actual or imminent; (2) a causal connection between that injury and the complained-of conduct; and (3) redressability, meaning a favorable decision would eliminate the injury. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). Where prospective declaratory and injunctive relief is requested, such as here, a plaintiff must first "demonstrate that he is likely to suffer future injury; second, that he is likely to suffer such injury at the hands of the defendant; and third, that the relief [sought] will likely prevent such injury from occurring." *Cone Corp. v. Fla. Dept. of Transp.*, 921 F.2d 1190, 1203-04 (11th Cir. 1991). Because an injunction would regulate future conduct, a plaintiff seeking injunctive relief must also allege for the "injury-in-fact prong" a real and immediate threat, not merely a conjectural or hypothetical threat of a future injury. *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citation omitted). Importantly, a plaintiff must establish standing as to each claim and for each form of relief sought. *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008).

Plaintiffs have established neither injury, traceability, nor redressability for any claim.

### i.  Plaintiffs lack organizational standing

"[A]n organization has standing to sue on its own behalf if the defendant's illegal acts impair its ability to engage in its projects by forcing [it] to divert resources to counteract those illegal acts." *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165 (11th Cir. 2008).

Plaintiffs allege that they diverted resources to address how law enforcement will implement the overbroad and vague construction of the Act. Doc. 1 at ¶¶ 13,16, 35, and to conduct Know Your Rights trainings.  Doc. 1 at ¶¶ 25, 26, 29. But Plaintiffs fail to allege how this diversion of resources has impaired their ability to engage in their projects, nor have they "explained what activities" the expenditures were "divert[ed]…away from." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1250 (11th Cir. 2020). That is fatal to their standing. *See id.* (stating that "precedent requires" a plaintiff-organization to "explain[] what activities [it] would divert resources away *from* in order to" address a challenged law).

And at any rate, Plaintiffs' decision to expend resources to combat a future hypothetical injury that may or may not occur is insufficient to establish standing.  *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 402 (2013) (a plaintiff "cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."). As

discussed below, Plaintiffs' injuries are purely hypothetical, so they cannot form a basis for standing.

Finally, the Act does not apply to organizations—it applies to individuals and to governmental entities—so the Act does not, and cannot, inflict any legally cognizable injury on Plaintiffs.

### ii.   Plaintiffs lack associational standing

Plaintiffs do not have associational standing either.  To establish associational standing, an organization must show that its members would have standing to sue in their own right, and Plaintiffs' members lack standing. *See Jacobson*, 974 F.3d at 1248.

### a. Plaintiffs have not alleged an actual or imminent injury-in-fact

In a pre-enforcement challenge, the plaintiff must show a "realistic danger of sustaining injury as a result of the statute's operations or enforcement." *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1247 (11th Cir. 1998) (quotations omitted). A plaintiff can meet this standard by showing 1) he was threatened with application of the statute; 2) application is likely; or 3) there is a credible threat of application. *Id.* at 1245.

Here, Plaintiffs have not been threatened with prosecution.  Rather they allege they are "fearful that their members risk criminal liability merely for speaking out and advocating for change." Doc. 1 at ¶ 2.  In other words, they have a subjective fear of prosecution which they claim has chilled their speech.

Yet, they have not alleged that they intend to engage in any activity that is arguably forbidden by HB 1. Therefore, they have failed to establish a credible threat of prosecution. *See Harrell v. The Fla. Bar*, 608 F.3d 1241, 1260 (11th Cir. 2010) (holding that "[i]n the context of . . . First Amendment claims," a plaintiff must show that he seeks to engage in expression "that is at least arguably forbidden by the pertinent law").

Simply engaging in demonstrations (Doc. 1 at ¶ 12) is not arguably forbidden. *See* Fla. Stat. § 870.01(7) ("[T]his section does not prohibit constitutionally protected activity such as a peaceful protest."). Sharing the contact names of elected officials (Doc. 1 at ¶ 15) is not arguably forbidden. Urging people to contact their local representatives (Doc. 1 at ¶ 22) is not arguably forbidden. Nor is asking the readers of Plaintiffs' social media to urge their political representatives to take a particular position (Doc. 1 at ¶ 27). All the criminal penalties in the Act that Plaintiffs reference in their Complaint require criminal intent, and they are all tailored to prohibit incitement of violence and threats causing fear of bodily harm. *See* Fla. Stat. § 870.01 (person commits a riot when they "willfully participate in a violent public disturbance" and act with a "common intent to assist…in violent and disorderly conduct"); *id.* § 836.115(2) (person commits cyberintimidation when they when they publish personal identification information "with the intent" to (1) "incite violence or commit a crime" or (2) "threaten of harass the person, placing such

person in reasonable fear of bodily harm."); *id.* § 784.0495 (a person commits mob intimidation when they "act with a common intent, to use force or threaten to use force"). None of Plaintiffs' allegations arguably implicate the prohibitions in these statutes.

Relatedly, a subjective assertion of a fear of prosecution alone is not sufficient to establish injury—Plaintiffs must show that their fear is objectively reasonable, which they cannot do. *See Pittman v Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001). They allege that they could be arrested for being in the "mere proximity to acts of violence or property destruction." Doc. 1 at ¶ 67. However, the plain text of section 870.01 does not penalize being in the vicinity of a riot— it requires a person to "act[] with a common intent to assist . . . other[s] in violent and disorderly conduct." *See* Fla. Stat. § 870.01. Moreover, this scenario assumes that while Plaintiffs are engaged in a peaceful demonstration a riot will break out near them. Yet, one of Plaintiffs main contentions is that the demonstrations in Florida were "overwhelmingly non-violent." Doc. 1 at 49. Plaintiffs cannot on one hand argue that there is no need for the Act because their demonstrations are non-violent and on the other argue that they are at imminent risk of being arrested for being in the proximity of riot.

Finally, Plaintiffs' allegations that the Act will be applied in an arbitrary and discriminatory manner is pure speculation. This argument is rooted in their contention that "Black people…are more likely to be targeted for arrest

and prosecution" across the board. Doc 1. at ¶128.  This broad theory is not sufficient to support injury.  *Cf. City of Los Angeles v. Lyons*, 461 U.S. 95, 108 (1983) ("past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief").  If it were, Plaintiffs would have the blanket ability to challenge any criminal law by asserting the potential for police bias.

In any event, it is pure conjecture that Plaintiffs' members will be arrested while engaging in peaceful demonstration by police acting with a discriminatory purpose.  *See id.* (finding plaintiff lacked standing and stating "it is no more than conjecture to suggest that in every instance of a[n] . . . encounter between police and a citizen, the police will act unconstitutionally and inflict injury without provocation or legal excuse.").  Plaintiffs' theory requires this Court to speculate not only as to future events that may or may not happen but also as to the actions of independent third parties (both law enforcement and other protesters).  *See Hallendale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 911 F.2d 756, 762 (11th Cir. 1991); *Clapper v. Amnesty Int'l*, 568 U.S. 398, 413 (2013) ("[W]e have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."); *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1381–82 (11th Cir. 2019) ("The Club might also suggest that the Ordinance contains vague language that causes it to fear that the City will

enforce it arbitrarily, and is thereby injured. But mere fear of unconstitutional action alone on the part of the City is too speculative an injury to confer standing to the Club.").[3]

### iii.    Plaintiffs failed to establish traceability and redressability as to the Attorney General

Article III standing requires an even more rigorous analysis than *Ex Parte Young*. *See Jacobson*, 974 F.3d at 1256. Therefore, because Plaintiffs cannot establish that the Attorney General is a proper defendant under *Ex Parte Young*, they cannot establish traceability or redressability. Plaintiffs' purported injury is not "fairly traceable" to the Attorney General because she has no enforcement authority over the laws that they challenge, and an injunction against her therefore will not redress the injury. *See id.*; *Lewis v. Governor of Ala.*, 944 F.3d 1287 (11th Cir. 2019) (en banc) (rejecting the plaintiffs' argument that they had standing to sue the Alabama Attorney General because he has broad authority to act in the public interest). As the Eleventh Circuit has recently held, a party lacks standing to sue a state official when state law assigns enforcement authority to a different, independent official—here, locally elected state attorneys. *See Jacobson*, 974 F.3d at 1253–54; *Claire v. Fla. Dep't of Mgmt. Servs.*, 2020 WL 7086140, at *3 (N.D. Fla. Dec.

---

[3] And Plaintiffs certainly cannot establish injury from Sections 1 and 3 of the Act, which apply only to governmental entities or Section 18 which establishes an affirmative defense.

3, 2020) (Walker, J.) ("Per the Eleventh Circuit, when a state law makes *one* state official responsible for the challenged action, plaintiffs lack standing to sue *another, independent* state official for that action.").

## B. The Action is Not Ripe

The ripeness doctrine keeps courts from deciding cases prematurely. *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006). It differs from standing as it relates to the timing of the suit as opposed to whether the party can bring suit. *Elend*, 471 F.3d at 1202. In determining whether a claim is ripe, a court evaluates the fitness of the issues for judicial review and the hardship to the parties of withholding consideration. *Pittman*, 267 F.3d at 1288. Both factors show that this action is not ripe.

First, "claims are less likely to be considered 'fit' for adjudication when they venture beyond purely legal issues or when they require 'speculation about contingent future events.'" *Id.* at 1278; *see also Texas v. United States*, 523 U.S. 568, 580-81 (1985). And here, all of Plaintiffs' claims are based entirely on speculation and hypothetical scenarios, such as their members being arrested for peacefully protesting or for urging people to contact their representatives.

What is more, it "is often true" that "determination of the scope of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper

15

exercise of the judicial function." *Texas v. United States*, 523 U.S. 296, 301 (1998). This is all the more true when the state judiciary has yet to interpret the legislation. Federal courts should exercise restraint in cases "where the challenged state statute is susceptible of a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question," including First Amendment questions such as overbreadth and vagueness. *See Zwickler v. Koota*, 389 U.S. 241, 249 (1967). Plaintiffs, however, ask this Court to assess the validity of the entire Act, wading into overbreadth and vagueness issues, in a vacuum and before a state court has had an opportunity to interpret any of the Act's various provisions.

Second, "[h]ardship can sometimes be established if a plaintiff demonstrates that he would have to choose between violating an allegedly unconstitutional statute or regulation and risking criminal or severe civil sanctions." *Elend*, 471 F.3d at 1212.   In this circumstance, "plaintiffs must still demonstrate a 'credible threat of prosecution.'" *Id.*  Plaintiffs cannot do so. And they do not have to choose between engaging in their expressive conduct and risking penalties under the Act as their intended conduct of "speaking out and advocating for change" is not reasonably within the scope of conduct prohibited by the Act.

### III.    Plaintiffs Fail to State a Claim as to Each Count

### A. The Complaint is legally deficient because it fails to put Defendants on notice of the claims against them.

Plaintiffs must provide a short and plain statement showing that they are entitled to relief, Fed. R. Civ. P. 8(a)(2), and they must "state [their] claims . . . in numbered paragraphs, each limited as far as practicable to a single set of circumstances." Fed. R. Civ. P. 10.  Plaintiffs fail to comply with either rule.

Each of their four counts incorporates by reference paragraphs 1-120. It is difficult to discern which statutes are challenged under each count and which allegations support which counts because paragraphs 1-120 contain allegations about several statutes which are not specifically mentioned in the counts.   Because of the overbroad incorporation of paragraphs 1-120, each count includes conclusory, vague and immaterial facts. Such pleading infirmities fail to give Defendants adequate notice of the claims against each of them and the grounds upon which each claim is based. *See Weiland v. Palm Beach Cty. Sheriff's Office*, 792 F.3d 1313, 1322-23 (11th Cir. 2015) (describing categories of shotgun pleadings and why they are inadequate).

These deficiencies are compounded by Plaintiffs overbroad allegations. For example, Count 3 makes broad allegations that the "Act constitutes impermissible viewpoint and content discrimination and is overbroad" but only makes substantive allegations regarding Sections 2, 8, 14,  and 15. Count 4

also makes broad allegations that the "Act is impermissibly vague" but only specifically makes allegations regarding Section 15 and Section 2.

## B. Plaintiffs Fail to State an Equal Protection Claim

A facially neutral law violates the Equal Protection Clause only if (1) a plaintiff can show both that the legislature acted with a discriminatory purpose and that the law has a discriminatory effect, and (2) the defendant cannot meet its shifted burden that the law would have been enacted absent discriminatory intent. *See Johnson v. Governor*, 405 F.3d 1214, 1222 (11th Cir. 2005) (en banc). In other words, a law is not invalid simply because it results in a racially disproportionate impact. *Vill. of Arlington Heights v. Metro. Hous. Dev.*, 429 U.S. 252, 264-65 (1977); *see also Washington v. Davis*, 426 U.S. 229, 242 (1976). The plaintiff must establish that discrimination was a substantial and motivating factor in the adoption of the law. *Vill. of Arlington Heights,* 429 U.S. at 266-67.

That is a heavy burden. "[N]o [Supreme Court] case . . . has held that a legislative act may violate equal protection solely because of the motivations of the men who voted for it." *Palmer v. Thompson*, 403 U.S. 217, 224 (1971). "As a general matter, determining the intent of the legislature is a problematic and near-impossible challenge." *Greater Birmingham Ministries v. Sec'y of State*, 992 F.3d 1299, 1324 (11th Cir. 2021). "[I]t is extremely difficult for a court to ascertain the motivation, or collection of different motivations, that lie behind

18

a legislative enactment." *Palmer*, 403 U.S. at 224. Moreover, "a strong state policy in favor of [the challenged practice], for reasons other than" a protected characteristic—such as public safety concerns behind the Act—"is evidence that the [practice] does not have a discriminatory intent." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1571 (11th Cir. 1984).

1. In Count I, Plaintiffs allege that the Act was passed with discriminatory intent, but they have failed to allege facts sufficient to establish discriminatory intent or impact. As for intent, the Complaint is rife with allegations regarding purportedly discriminatory statements on the part of the Governor but is devoid of any such allegations on the part of the legislature – the governing body that enacted the law.  Plaintiffs' focus on the Governor's announcement and support of the bill.  *See* Doc. 1 ¶¶ 55-64. They cite to the Governor's press releases, press conferences, and his mobilization of the National Guard as evidence of discriminatory intent. Plaintiffs' allegations in this regard are without merit, are largely taken out of context, and are misconstrued to meet the purposes of this lawsuit. And in any event none of the allegations support a claim that the *legislature* passed the Act with a discriminatory intent and purpose.

Unable to identify any "contemporary statements" that suggest the legislature acted with discriminatory intent, *see Greater Birmingham Ministries*, 992 F.3d at 1322, Plaintiffs assert that there were "unusual events"

leading up to the consideration of the Act, including limiting public comments to one minute per person, muting and "cutting off" members of the public and giving the bill an immediate effective date. Doc. 1 at ¶¶ 115,116, 119. None of these are "unusual events," much less events that are so problematic as to establish discriminatory intent.

As Plaintiffs point out, many members of the public spoke at the committee meetings. Because there were so many people, the time allotted for each speaker was limited to allow sufficient time for the committee members to debate the bill.[4] This is hardly a departure from common practice. Muting and "cutting off" of those who speak beyond their allotted timeframe and impede the committee's debate on the bill is not "unusual." Finally, the Act was not the only bill from the 2021 legislative session that took immediate effect. *See* SB 72 and HB 337.

But even if Plaintiffs had alleged facts sufficient to establish discriminatory intent, their claim would fail because they have not established discriminatory impact. Plaintiffs allege that the Act will have a

---

[4] Plaintiffs specifically allege that a one-minute time cap was placed on public testimony at the January 27, 2021 Criminal Justice & Public Safety Subcommittee. Approximately 69 appearance cards were submitted at this hearing with only one waiving speaking. *See* https://www.myfloridahouse.gov/CommitteeMeeting AppearanceListing?billnumber=0001&termid=89&sessionid=90&committeeid=3099 &committeemeetingid=12718&proponent=-20. In order to dedicate enough time for the committee members to debate the bill, a one-minute time limit was placed on testimony. *See* https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/ at (1:10).

"disproportionate and discriminatory effect on Black people who engage in demonstrations" because they are "more likely to be targeted for arrest and prosecution." Doc 1. at ¶ 128.  But even accepting Plaintiffs' allegations as true at this stage of the proceeding, such a broad generalization of application of the criminal justice system is insufficient to establish disparate impact.  To hold otherwise would mean that any passage of or amendment to a criminal law could be said to give rise to an Equal Protection claim.   Furthermore, the blanket, conclusory allegation that the Act will disproportionately impact Black-led organizations is not sufficient to establish a claim.

2. In Count 2, Plaintiffs raise Equal Protection claims based on allegations that the Act suppresses "viewpoints of Black-led movements and their allies, while advancing the viewpoint of those who support the government 'law and order' message." Doc. 1 at ¶ 138.  But no facts are alleged to support this allegation, including what those various viewpoints are and which sections of the Act allegedly suppress viewpoints.  Moreover, this count merely seeks to "convert" a First Amendment argument "into one founded on the [equal protection] clause," and as shown below, the Act does not discriminate against any viewpoints or otherwise raise First Amendment concerns. *See Manuel v. City of Joliet*, 137 S. Ct. 911, 919 (2017); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 54 (1983) ("We have rejected this" claim of "impermissible content discrimination" when "cast as a First

Amendment argument, and it fares no better in equal protection garb."); *Wagner v. FEC*, 793 F.3d 1, 32–33 (D.C. Cir. 2015) (en banc) ("We reject this doctrinal gambit . . . . [T]he challengers can fare no better under the Equal Protection Clause than under the First Amendment itself." (quotations omitted)).

## C. Plaintiffs Fail to State a Claim Under the First Amendment

Plaintiffs allege that the Act is an impermissible viewpoint or content-based regulation, and they allege that it is overbroad. The Act is neither. Indeed, it does not even regulate protected speech.

### i. Plaintiffs' claims fail because the Act does not regulate protected speech.

1. Incitement, fighting words, true threats, and speech integral to criminal conduct are "well-defined . . . classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Stevens*, 559 U.S. 460, 468–69 (2010). The Act regulates only those classes of speech. It proscribes inciting or engaging in violence. *See Brandenburg v. Ohio*, 385 U.S. 444, 447 (1969); Fla. Stat. § 836.115(2)(a) (requiring "an intent to incite violence or commit a crime against the person"); *id.* § 784.0495(1) (requiring that a person "act[] with a common intent . . . to use force or threaten to use imminent force"). It further proscribes true threats. *See Virginia v. Black*, 538 U.S. 343, 359 (2003); Fla. Stat.

22

§836.115(2)(b) (prohibiting publishing information with the "intent to threaten or harass the person, placing such person in reasonable fear of bodily harm"). There is not a single provision in the Act that proscribes mere protest or advocacy. The provisions are no different than the riot, affrays, and unlawful-assembly laws that have existed for decades. *See, e.g.*, *State v. Beasley*, 317 So. 2d 750, 753 (Fla. 1975) (rejecting constitutional challenge to Florida riot law); *Ferguson v. Estelle*, 718 F.2d 730, 732 (5th Cir. 1983) (same but as to Texas riot law).

2. Nor is the Act otherwise content-based—that is, it does not discriminate among unprotected speech based on the "subject the speech addresses." *See R.A.V. v. City of St. Paul*, 505 U.S. 377, 384–85 (1992); *Id.* at 386 ("[T]he power to proscribe [speech] on the basis of *one* content element (*e.g.,* obscenity) does not entail the power to proscribe it on the basis of *other* content elements"). Plaintiffs generally allege that the Act singles out "protest-based speech" and speech related to racial justice, but those claims are without merit.

First, the plain text of the Act does not mention protests, much less prohibit advocacy for or against any specific topic, such as racial justice. Instead, the Act punishes those who choose to incite or engage in violence, damage property, or intimidate others with threats of violence—without reference to the subject of such unprotected speech. Indeed, although Plaintiffs

23

generally allege that the Act is impermissibly content-based, they raise specific allegations only as to one provision, Section 8, and nothing in Section 8 singles out mere protest or advocacy for racial justice. *See* Fla. Stat. § 784.0495(1) (prohibiting people from "acting with a common intent . . . to use force or threaten to use imminent force . . . to compel . . . another person to do or refrain from doing any act or to assume, abandon, or maintain a particular viewpoint against his or her will").[5]

Second, "protest-based speech" is not even a category of content-based speech. Content-based restrictions are those that target speech based on a topic, idea, or message, *see Boyer v. City of Simi Valley*, 978 F.3d 618, 621 (9th Cir. 2020), and "protest-based speech" is not any of these. It is a broad concept that can touch upon many different topics, ideas, or messages.

Third, the Act was not enacted with the "manifest purpose" to regulate speech related to racial justice. *See Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 645 (1994) ("[A] regulation neutral on its face may be content based if its manifest purpose is to regulate speech because of the message it conveys."). The government's purpose is in the bill – to combat public disorder. The Act is known colloquially as the "Anti-Riot" act and was enacted as a public safety

---

[5] Plaintiffs further generally allege that Sections 1, 3, 15, 16, and 18 advance one viewpoint over another. But they fail to plead which specific portions of these statutes constitute viewpoint discrimination or any specific facts in support of this claim.

measure to address the violence that erupted across the country and in Florida. Plaintiffs themselves acknowledge that the racial justice protests were plagued with violence by counter-protesters.  Doc. 1 at ¶¶ 12, 19, 49.

Plaintiffs generally allege that the Act is "designed to favor, and will be implemented in a way that impermissibly favors, one viewpoint over another by suppressing the free expression of those who organize and conduct racial justice protest against police violence."  Doc. 1 at ¶149.  Plaintiffs further allege that the bill "demonstrates the state's hostility toward protest-based speech supporting racial justice on the one hand, and its favoritism towards groups adoption the state's 'law and order' viewpoint and those committing violen[t] acts against protestors on the other."  Doc 1. at ¶ 149.  But they offer no factual support for these sweeping allegations.

At bottom, Plaintiffs' claims are premised on their argument that the Act was passed to promote the message of "law and order" over the message of "racial justice."  This presupposes that these viewpoints are diametrically at odds with each other.  They are not.  While the First Amendment protects peaceful protests, it does not protect violence, incitement of violence, or threats.

In short, the Act regulates only unprotected speech, and it does not impermissibly regulate such speech based on the subject it addresses.  The Act therefore does not "raise any Constitutional problem," and Plaintiffs' First Amendment claims fail as a matter of law. *See Stevens*, 559 U.S. at 468–69.

### iii. The Act is not overbroad

Under the overbreadth doctrine a statute is facially invalid if it prohibits a substantial amount of protected speech. *United States v. Williams*, 553 U.S. 285, 292 (2008).  When determining whether a statute is overbroad, the court must construe the statute and determine whether the statute "criminalizes a substantial amount of protected expressive activity." *Id.*

1. Plaintiffs allege that the Act is overbroad because it could subject non-violent protestors to arrest if they are within close proximity to an act of violence or property destruction. Doc 1. at ¶¶153, 154.  Plaintiffs ignore the plain text of the statute.

Pursuant to section, 870.01(2), a person commits a riot when he "*willfully* participates in a violent public disturbance involving an assembly of three or more persons, acting with a *common intent* to assist each other in violent and disorderly conduct." Fla. Stat. § 870.01(2) (emphasis added).  The conduct proscribed by the statute, i.e. violence and imminent danger of injury, is not afforded First Amendment protection and the statute clearly requires willful participation and an intent to engage in violent and disorderly conduct.  It does not fairly penalize anyone who is merely in the proximity of others engaged in these proscribed acts.

*Ferguson* is on point. There, the plaintiffs asserted that Texas's anti-riot law is overly broad, claiming that it criminalizes "participation in an initially

peaceable assembly that subsequently results in conduct creating an immediate danger of damage to persons or property." *Ferguson*, 718 F.3d at 733. But the Fifth Circuit rejected the plaintiffs' challenge because the law applies only if a person "knowingly acts with those so assembled in creating an immediate danger of damage." *Id.* at 734. That "mens rea requirement," the court held, "denies application of the law to members of an assembly who do not take part in the group's actions creating an imminent threat of violence." *Id.*

So too here.

2. Next, Plaintiffs' allegations that the Act "criminalizes . . . standing on the street and hindering any traffic" is belied by the plain language of the statute which imposes a civil sanction. *See* Fla. Stat. § 318.14(1).

Furthermore, Florida is allowed to impose time, place, and manner restrictions on speech in a public forum if the restrictions are 1) justified without reference to the content to the speech; 2) the restriction is narrowly tailored to serve a significant government interest; and 3) there are alternative channels for communication. *One World One Fam. Now v. City of Miami Beach*, 175 F.3d 1282, 1285 (11th Cir. 1999). Here, the statute is content neutral and is tailored to serve the significant government interest of maintaining safety on the roadways. The statute prohibits neither speech on public sidewalks nor obtaining a special permit to engage in expressive activity on a public street.

27

3. Plaintiffs further allege that Section 14 is overbroad. But it does not criminalize a substantial amount of protected speech. It only prohibits speech that is not afforded protection by the First Amendment—incitement and true threats.

a. In *Brandenburg*, the Supreme Court held that the state may not "forbid or proscribe advocacy of the use of force . . . except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 385 U.S. at 447. The Court differentiated between "mere abstract teachings of doctrines" and "preparing a group for violent action" and found that "a statute which fails to draw this distinction impermissibly intrudes upon the freedoms guaranteed by the First Amendment. *Id.* at 448.

Here, the statute clearly differentiates between mere advocacy by requiring "an intent to incite violence or commit a crime against the person" whose personal identify information is published. *See* Fla. Stat. § 836.115(2)(a).

b. True threats are "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." *Virginia*, 538 U.S. at 359. Actual intent to carry out the threat is not required. *Id.* at 360. "Rather, a prohibition on true threats protect[s] individuals from the fear of violence

28

and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Id*.

This is precisely what Section 14's second clause prohibits.  It prohibits publishing a person's identifying information with the "intent to threaten or harass the person, placing such person in reasonable fear of bodily harm." Fla. Stat. § 836.115(2)(b). The plain text of the statute belies Plaintiffs' argument that the statute does not require "any threat to a specific person putting them in fear of bodily harm."  The Act defines the term "harass," and the word "threat," while not explicitly defined by the statute, has been defined by the Florida Supreme Court as "an expression of intention to inflict evil, injury, or damage." *See Puy v. State*, 294 So.3d 930, 933 (2020).

According to Plaintiffs, Section 14 is overbroad because it "hinges criminal liability on the speaker's intent without any proof of injury, or any threat to a specific person putting them in fear of bodily harm." But proof of injury is not required to constitute a "true threat" and the statute's text requires a person to be placed in a reasonable fear of bodily harm.

Finally, Plaintiffs allege that the "intent-based standard" chills their speech.  Yet the intent requirement is integral to distinguish between "mere advocacy" and "incitement" and also to what constitutes a "true threat."  And Plaintiffs' allegations that there is a "significant risk" that racial justice

advocates would be presumed to be acting with the requisite intent is entirely speculative and they provide no factual support for this contention.

**D.    Plaintiffs Fail to State a Due Process Claim**

A statute is void for vagueness if it (1) "fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits" and (2) "authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor*, 848 F.3d 1293, 1320 (11th Cir. 2017). A statute should inform the regulated parties of what is required of them and provide guidance to those who enforce the law so they do not act in an arbitrary or discriminatory manner. *Id.*

Importantly, in a facial challenge, a law only violates due process if it is impermissibly vague in all applications.  A statute is facially vague when it is "utterly devoid of a standard of conduct so that it 'simply has no core' and cannot be validly applied to any conduct. *Id.* (quoting *United States v. Powell*, 423 U.S. 87, 92 (1975)).

Plaintiffs generally allege that the "Act is impermissibly vague." They also specifically allege that Section 15 and Section 2 are vague.  To the extent that Plaintiffs allege that any other portion of the Act is vague, they have failed to meet the requisite pleading requirements.

1. As to Section 15, Plaintiffs allege that it "fails to provide fair notice to ordinary people seeking to exercise their right to protest regarding their

exposure to potential criminal liability by merely being  present at a demonstration where violence or property destruction occurs." But it is clear the plain language of the statute places an ordinary person on notice of the prohibited conduct.

This is evidenced by a review of the history and prior application of the statute. Prior to the Act, the common law definition of "riot" was utilized when applying section 870.01(2). A "riot" was defined as a "tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." *Beasley*, 317 So. 2d at 752. The courts have repeatedly applied this common law definition without any issue of vagueness. *See, e.g.*, *City of Daytona Beach v. Brown*, 273 So. 2d 124 (Fla. 1st DCA 1973); *Bayes v. State*, 454 So.2d 703 (1st DCA 1984); *Mack v. State*, 463 So.2d 344 (2d DCA 1985). And the Florida Supreme Court, in *Beasley*, found that section 870.01(2) was not unconstitutionally vague. The court stated, "[w]e believe that citizens understand the term "riot" to mean a group acting defiantly and unlawfully in a violent manner." *Beasley*, 317 So. 2d at 753.

The Act's changes to the term "riot" does not render section 870.01(2) impermissibly vague. It does not remove the necessity to act in a violent

manner. It reiterates the necessary component of violence by replacing the term "tumultuous disturbance" with "violent public disturbance."  It further reinforces that being in the mere presence of a riot is not sufficient—the person must "willfully participate" in the "violent public disturbance."  Plaintiffs offer no explanation as to how this more specific definition fails to provide them with a reasonable opportunity to understand what the law prohibits.

Finally, Plaintiffs allege that "the Act" invites arbitrary and discriminatory enforcement by "conferring discretion on law enforcement to arrest non-violent protestors in close proximity to an act committed by others." Again, Plaintiffs fail to point to the specific provision in support of their contention, but assuming they are referring to Section 15, the plain language of the provision requires "willful participation" and acting with a "common intent" and makes no reference to mere proximity to violent acts.

2. Plaintiffs allegations that Section 2 is vague are also without merit. Plaintiffs state that it "fails to provide fair notice to ordinary people regarding where and how to conduct nonviolent protests without exposing themselves to risk of arrest." Doc. 1 at ¶ 170.  Again, the test is whether the statute provides a person with ordinary intelligence a reasonable opportunity to understand what conduct it *prohibits* not what conduct it *allows*.  Further, Plaintiffs presume that Section 2 only applies in the context of protest – it does not. Section 2 generally prohibits obstructing traffic through the enumerated

means regardless of the person's reason for obstructing traffic. This section could apply to protestors, to solicitors, or anyone else who stands in traffic and endangers the public for no apparent reason at all.

Plaintiffs' bald allegation that this Section "invites arbitrary and discriminatory enforcement" also fails as a matter of law. Plaintiffs do not allege any facts in support of their contention that the statute authorizes or encourages arbitrary enforcement. Rather, they allege that Section 2 "invites arbitrary and discriminatory enforcement against nonviolent protestors . . . and nonprotesters." Doc. 1 at ¶170. As discussed above, Plaintiffs are drawing a distinction that does not exist in the statute.

## CONCLUSION

Based on the above, the Complaint should be dismissed against the Attorney General and dismissed in its entirety. Alternatively, Plaintiffs should be required to file an amended complaint that complies with the pleading requirements in the Federal Rules of Civil Procedure. And because HB 1 is codified and in legal effect, references to disputed sections of HB 1 should be to specific statutes, not bill sections.

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

I hereby certify that this Motion and incorporated Memorandum of Law contains 7,642 words.

Respectfully submitted,

ASHLEY MOODY
ATTORNEY GENERAL

/s/ *Anita J. Patel*
Anita J. Patel (FBN 0070214)
Senior Assistant Attorney General
Anita.Patel@myfloridalegal.com
ComplexLitigation.eservice@myfloridalegal.com

Karen Brodeen (FBN 512771)
Senior Assistant General Counsel
Karen.Brodeen@myfloridalegal.com

Office of the Attorney General
PL-01 The Capitol
Tallahassee, FL 32399-1050
850-414-3300

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of June, 2021 a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

/s/ *Anita J. Patel*
Anita J. Patel

34