**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

THE DREAM DEFENDERS, THE
BLACK COLLECTIVE, *et al.*,

Plaintiffs,

v.

RON DESANTIS, *et al*.

Defendants.

Case No.: 4:21-cv-191

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR, ALTERNATIVELY, FOR FURTHER RELIEF

# TABLE OF CONTENTS

I.   INTRODUCTION .................................................................................................3

II.  FACTUAL BACKGROUND ..............................................................................7

    A.   Section 15 Expands Existing Riot Offenses and Defines New Offenses. ..............7

    B.   The Legislature Understood Section 15 To Expose Peaceful Protestors to Criminal Liability.................................................................................................9

    C.   Section 15 Has Chilled Plaintiffs' Speech and Required Them to Divert Resources. ...........................................................................................................11

III. ARGUMENT.......................................................................................................15

    A.   Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Section 15 Is Unconstitutionally Vague and Overbroad. ..................................................16

        1.   Plaintiffs satisfy Article III standing and have sued the proper defendants. .................................................................................................16

        2.   Section 15 is unconstitutionally vague. ....................................................19

        3.   Section 15 is unconstitutionally overbroad.............................................24

        4.   The proscription of First Amendment freedoms is not severable from the remainder of Section 15. ...........................................................31

    B.   Plaintiffs Will Suffer Irreparable Harm Without Court Intervention. ...................32

    C.   Plaintiffs' Injury Without Injunctive Relief Outweighs Any Potential Harm To Defendants, And The Requested Injunction Is In The Public Interest.............34

IV.  CONCLUSION....................................................................................................36

## I.    INTRODUCTION

In the summer of 2020, following the murder of George Floyd, protestors in Florida and across the country took to the streets to voice their opposition to police violence against Black people and the over-use of public funding for police departments relative to other public-safety measures. These demonstrations were overwhelmingly non-violent. While counter-protestors or aggressive police engaged in violence *against* protestors, instigating chaos at a few actions[1] despite the explicit intentions and peacekeeping efforts of organizers—including several of the Plaintiff organizations—any violent behavior was punishable under existing Florida laws and in several cases was met with arrest and prosecution.[2]

Nevertheless, on April 19, 2021, Florida's legislature enacted HB1, a law that deters and punishes peaceful protests and was created in direct response to the summer's demonstrations. The legislative proposal which led to HB1 was unveiled by Governor DeSantis on September 21, 2020, and was titled "Combatting Violence,

---

[1] Sarah Blaskey & Nicholas Nehamas, *'They ignited the situation': Fort Lauderdale police cracked skull of peaceful protester*, Miami Herald (updated Jun. 3, 2020 11:25 AM), https://www.miamiherald.com/news/local/community/broward/article243193481.html.

[2] Megan Reeves, *Hillsborough prosecutors charge dozens more in connection to May protests*, Tampa Bay Times (Jul. 3, 2020), https://www.tampabay.com/news/crime/2020/07/03/hillsborough-prosecutors-charge-dozens-more-in-connection-to-may-protests/.

Disorder, and Looting, and *Law Enforcement Protection Act*."[3] During its unveiling,
Governor DeSantis promised to have "a ton of bricks rain down on" protestors.[4]  On
the day he signed HB1 into law, he called it "the strongest anti-rioting, pro-law
enforcement piece of legislation in the country."[5]

Although HB1 is unconstitutional in its entirety, Plaintiffs specifically seek to
preliminarily enjoin HB1's central enforcement mechanism: Section 15. Section 15
is a guilt-by-association "round-up" provision which Plaintiffs reasonably read as
expanding the definition of "riot" far beyond its common-law roots. It gives police
discretion to arrest an individual who "willfully participates in a violent public
disturbance involving an assembly of three or more persons, acting with a common
intent to assist each other in violent and disorderly conduct…." Fla. Stat.
§ 870.01(2). However, Section 15 fails to clarify (1) whether violence among a few
at a demonstration renders the entire event a "riot," (2) who must share a "common
intent to assist each other in violent and disorderly conduct," and (3) whether a non-
violent demonstrator can be considered as "willfully participating" in a violent

---

[3] Video, Gov. Ron DeSantis Sept. 21, 2020 Press Conf. on Law Enf't Legis., Fla.
Channel (Sept. 21, 2020), https://thefloridachannel.org/videos/9-21-20-press-
conference-on-law-enforcement-legislation/.

[4] *Id.* at 7:17–7:43.

[5] *Gov. DeSantis Signs Florida's 'Anti-Riot' Bill into Law*, NBC Miami (updated Apr.
20, 2021 9:19 AM), https://www.nbcmiami.com/news/local/govdesantis-signs-
floridas-anti-riot-bill-into-law/2431822/.

public disturbance simply because violence occurs among others who are in close proximity. Because of these ambiguities, Section 15 provides Defendants discretion to subjectively interpret Section 15 and selectively arrest anyone willfully participating in a protest, if and where violence occurs, based solely on the intent and acts of others. Section 15 can thus be reasonably interpreted as a guilt-by-association law incompatible with the First Amendment.

Other sections of HB1 also rely on Section 15's expansive "riot" definition. For example, Section 18 provides an affirmative defense in civil actions for "personal injury, wrongful death, or property damage" of "a [riot] participant." Section 18 thus emboldens counter-protestors to use their vehicles as weapons. Indeed, protestors have increasingly faced vehicles plowing into crowds—a move that has been encouraged by some legislators supporting HB1. Meanwhile, protest leaders—the *victims* of these incidents—have been arrested on the scene as a result. *E.g.*, Dream Defenders Decl. ¶ 28.

Plaintiffs and their members are reasonably frightened, not only because they could be arrested and held without bail for peacefully demonstrating, but also because given Section 15's interaction with Section 18, it is more likely that Plaintiffs and their members could be seriously injured or killed by people who disagree with their message. Consequently, Plaintiffs and their members have canceled or modified planned activities and diverted resources from their regular

activities to respond to the law. Enjoining Section 15 would block HB1's vague and overbroad guilt-by-association effect and curtail the effectiveness of other provisions relying on Section 15, including Section 18.

Plaintiffs have a strong likelihood of success because the plain text of Section 15 is vague and overbroad: it lends itself to subjective interpretation and provides no fair notice of what it proscribes. Moreover, it can reasonably be read as prohibiting a substantial amount of constitutionally-protected conduct. This deprivation of First Amendment rights constitutes irreparable injury. Defendants have no legitimate interest in enforcing an unconstitutional law and cannot identify any harm they or the public will suffer if an injunction issues. Accordingly, Plaintiffs ask this Court to preliminarily enjoin Section 15.[6]

---

[6] The Executive Director for the Department of Law Enforcement at the Broward County Sheriff's Office, over which Defendant Sheriff Tony presides, has stated HB1 will not change its enforcement practices. *See* ECF 1, Complaint ¶ 112. However, all Defendants have repeatedly stated they lack "authority to agree that any portion of House Bill 1 is unconstitutional or to agree not to enforce laws that the Complaint alleges each Defendant is responsible for enforcing." *See* ECF 61 ¶ 4.f.; ECF 63 at 2.  Even taking the statements by the Broward County Sheriff's Office at face value, a government agency's non-binding extra-judicial promises not to enforce a law do not moot a request for injunctive relief.  *See, e.g., Roman Cath. Archdiocese of N.Y. v. Sebelius*, 907 F. Supp. 2d 310, 327 (E.D.N.Y. 2012) (injunctive relief appropriate when government has not made "a formally announced change to official government policy").

## II.   FACTUAL BACKGROUND

**A.    Section 15 Expands Existing Riot Offenses and Defines New Offenses.**

Before HB1, Florida proscribed rioting under its common-law definition, which required that any person guilty of riot share the common intent to promote violent and disorderly conduct. The law is under Fla. Stat. § 870.01(2), originally enacted in 1832 and (until HB1) last revised in 1971. It provides: "All persons guilty of a riot, or of inciting or encouraging a riot, shall be guilty of a felony of the third degree[.]" Fla. Stat. Ann. § 870.01 (1971). Because the word "riot" was undefined, Florida's Supreme Court borrowed its common-law definition:

> a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.

*State v. Beasley*, 317 So. 2d 750, 752 (Fla. 1975).

The primary substantive change the legislature made by revising § 870.01 via Section 15 was arguably to substantially expand the scope of "riot." The definition can now be reasonably interpreted as encompassing not only those with the "common intent" to commit violence, but also those who willfully participate in a disturbance that turns violent, even if they lack the intent to—and do not—commit any violence themselves. Fla. Stat. § 870.01(2) (2021).

Section 15 was also created to define new offenses that enhance police discretion to arrest non-violent protestors. Fla. Stat. § 870.01(2)–(5). It amends § 870.01 to define and expand previously uncodified offenses of (as relevant here) "riot" and "inciting a riot," and create new offenses for "aggravated rioting" and "aggravated inciting of a riot."

A person commits a "riot" under Section 15 if they willfully participate in a violent public disturbance involving an assembly of three or more persons who share a common intent to assist each other in violent and disorderly conduct resulting in: (a) injury to another person; (b) damage to property; or (c) imminent damage of injury to another person or damage to property. *Id.* § 870.01(2). This is a third-degree felony, punishable by up to five years in prison. *Id.* § 775.082(3)(e).

A person commits the new crime of "inciting a riot" if they willfully incite another to participate in "a riot," resulting in a riot or imminent danger of a riot. *Id.* § 870.01(4). This offense is also a third-degree felony, punishable by up to five years in prison and a $5,000 fine. *Id.*; *id.* §§ 775.082, 775.083.

Unlike all other third-degree felonies in Florida, which allow an individual to post an initial bond upon being charged,[7] Section 15 requires that arrestees be held

---

[7] All other third-degree felonies under Broward County's bond schedule have an initial bond of $1,000 if no bond is outlined in the schedule. Where the bond is outlined, the amount varies by charge. 17th Jud. Cir. Admin. Order No. 2019-98-Crim, at 2 (Dec. 11, 2019), http://www.17th.flcourts.org/wp-

without bail until they are brought before a judge. *Id*. § 870.01(6). Accordingly, protestors charged with riot or inciting a riot will remain in jail for hours or days, in some cases merely for exercising their First Amendment freedoms.[8]

The new crimes of "aggravated rioting," Fla. Stat. § 870.01(3), and "aggravated inciting a riot," *id*. § 870.01(5), are both second-degree felonies, punishable by up to 15 years in prison. Likewise, both new offenses depend on Section 15.

## B.   The Legislature Understood Section 15 To Expose Peaceful Protestors to Criminal Liability.

---

content/uploads/2019/12/2019-98-Crim.pdf.  All other third-degree felonies under Hillsborough County's bond schedule have an initial bond of $2,000. 13th Jud. Cir. Admin. Order No. S-2021-025, at 4 (Apr. 20, 2021), https://www.fljud13.org/Portals/0/AO/DOCS/S-2021-025.pdf.  And all other third-degree felonies under Escambia County's bond schedule have a recommended initial bond of $2,500. 1st Jud. Cir. Admin. Order No. ECAD2018-01 (Feb. 27, 2018), at 6, https://www.firstjudicialcircuit.org/sites/default/files/document_library/ECAD%20 2018-01%20Bond%20Schedule%20-%20Escambia%20County.pdf.  In Leon County, a $5,000 bond applies to third-degree felony burglary charges, a $2,500 bond applies to third-degree felony drug charges, and a $1,000 bond applies to all other third-degree felony charges. 2d Jud. Cir. Admin. Order No. 2019-5 (Mar. 22, 2019), at 13–14, https://cvweb.leonclerk.com/public/clerk_services/official_records/download_docu ment.asp?book=5298&page=1677.

[8] Further, the broad "riot" definition enhances penalties for new and existing crimes if committed during a "riot," including Assault (Fla. Stat. § 784.011), Aggravated assault (*id*. § 784.021), Battery (*id*. § 784.03), Aggravated battery (*id*. § 784.045), Mob intimidation (*id*. § 784.0495), Assault or battery of law enforcement officers (*id*. § 784.07), Burglary (*id*. § 810.02), Theft (*id*. § 812.014), and Unlawful assemblies (*id*. § 870.02). These enhanced penalties, and Section 18 would be ineffective if Section 15 is enjoined.

Several legislators, including the bill's co-sponsors, Representative Juan Fernandez-Barquin and Senator Danny Burgess, admitted the law could expose peaceful protestors to arrest or prosecution. During a hearing before the House Criminal Justice and Public Safety Subcommittee on January 27, 2021, Representative Fernandez-Barquin explained: "[w]hen an individual is in a group, that individual loses their personal sense of responsibility." Video: Jan. 27, 2021, H. Criminal Just & Pub. Safety Subcomm. Hearing at 3:53–4:39, https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/. He continued: "above all, at that moment, they need to be responsible for their actions. If they are in a large group, and they see all these other individuals committing violence—I mean, the switch should go off in their head to stop what they're doing and just get out of the situation." *Id.* at 19:03–20:09. Thus, Representative Fernandez-Barquin, at least, understood, and stated that, one purpose of HB1 was "to hold the individuals in groups to a higher sense of responsibility, hence the harsher sentences." *Id.* at 7:10–7:26.

Lawmakers opposing the bill highlighted its significant constitutional infirmities. Representative Andrew Learned explained that Section 15 could "expand[] the definition of a rioter *to everyone in the crowd, regardless of their own*

*individual behavior*."[9] He remarked if he and other legislators could interpret Section 15 differently, "then judges, States' Attorneys, and police on the street will [also] have different interpretations."[10] Senator Gary Farmer expressed similar concerns, noting: "this language could be used, and interpreted, and applied in a way to subject peaceful protestors to punishment for crimes that they simply happened to be present for. And it just goes too far."[11] No amendments were made to the "riot" definition to address these concerns.

## C.   Section 15 Has Chilled Plaintiffs' Speech and Required Them to Divert Resources.

Section 15's text and legislative record lead Plaintiffs to believe their members could be liable for participating in a protest where some persons become violent, regardless of their members' actions or intent.  Plaintiffs reasonably read the "riot" definition, and the new offenses relying on it (*i.e.*, "aggravated riot," "inciting a riot," and "aggravated inciting a riot"), to expose their members to criminal liability merely for being part of a protest. *See* The Black Collective Decl. ¶ 17 ("The Black Collective have read Section 15 and become fearful of arrest merely for participating

---

[9]   Video: Mar. 10, 2021, H. Judiciary Committee at 2:07:53–2:08:03, https://thefloridachannel.org/videos/3-10-21-house-judiciary-committee/ (emphasis added).

[10] *Id.* at 2:07:53–2:08:47.

[11] Video: Apr. 9, 2021, S. Committee on Appropriations at 1:45:10–1:45:26, https://thefloridachannel.org/videos/4-9-21-senate-committee-on-appropriations-part-1/.

in a non-violent protest."); BLMA Broward Decl. ¶ 21 (Section 15 "allows police officers far too much discretion to arrest non-violent protestors… if anything at a protest goes wrong"); Chainless Change Decl. ¶ 12 ("Chainless Change fears that law enforcement will disproportionately and discriminately target its community."); Dream Defenders Decl. ¶ 14; Northside Coalition of Jacksonville ("Northside") Decl. ¶¶ 14, 17.

Due to Section 15, Plaintiffs have canceled, modified, or postponed numerous planned events for fear of arrest or injury. BLMA Broward Decl. ¶ 22; Chainless Change Decl. ¶ 12; Dream Defenders Decl. ¶¶ 11, 27; Northside Decl. ¶ 15; The Black Collective Decl. ¶¶ 8–10. For example, Plaintiff Dream Defenders canceled demonstrations around the trial of police officer Derek Chauvin for the murder of George Floyd.[12] Dream Defenders Decl. ¶¶ 20–21. It has also canceled other demonstrations to protect its members from violence, a concern that is well founded as in the few instances Dream Defenders *has* participated in demonstrations, it has seen increased threats to its members' physical safety, *id.* ¶¶ 29–30,[13] including from legislators encouraging drivers to plow into the crowd.

---

[12] The only demonstration organized by Dream Defenders was a somber vigil for George Floyd following the verdict in the trial of Derek Chauvin held by one Dream Defenders chapter (known as a "squaDD") in Pensacola, Florida. Dream Defenders Decl. ¶ 22.

[13] In at least three separate instances during HB1's promotion, Dream Defenders experienced cars intentionally running into assembled protestors. *Id.* ¶ 28. Each time,

Similarly, Chainless Change has stopped engaging in direct actions because its leaders are fearful for their members who, because of their previous involvement with the criminal legal system, are at heightened risk of targeting by police. Chainless Change Decl. ¶ 12. BLMA Broward canceled a planned march scheduled for the one-year anniversary of its May 31, 2020 protest out of fear its members would be subject to arrest under Section 15. BLMA Broward Decl. ¶ 23. Members of the NAACP Florida State Conference and its local branches have also refrained from protest, fearing arrest and prosecution. Marie Rattigan Decl. ¶¶ 7–10; Devan Vilfrard Decl. ¶¶ 12–13.

In addition to canceling demonstrations, Plaintiffs have been forced to divert resources to make additional expenditures. For example, Chainless Change diverted resources to bolster its security for future demonstrations in the event counter-protestors or police cause its members bodily harm. Chainless Change Decl. ¶ 16.

 Plaintiffs have also been forced to divert time and scarce resources to respond to issues raised by HB1. For example, Northside has been forced to spend time and resources identifying new legal observers and additional peacekeepers. Northside Decl. ¶ 23. The Black Collective has hired paid canvassers and trained multiple

---

Black protest leaders were arrested while the drivers were let go. *Id*. Plaintiffs reasonably read Section 18 as jeopardizing their lives and safety by shielding against civil liability those who would injure or kill them. BLMA Broward Decl. ¶ 26; Chainless Change Decl. ¶ 16; Dream Defenders Decl. ¶ 32; Northside Decl. ¶¶ 24–25; The Black Collective Decl. ¶ 25.

volunteers to approach people in majority Black communities to discuss the impact of Section 15. The Black Collective Decl. ¶¶ 18–20. However, because of HB1's vagueness and overbreadth, The Black Collective is unclear what would violate HB1 and what would be permissible. Thus, even with substantially increased efforts, it cannot communicate how to safely demonstrate. *Id*. ¶ 22.

Even with these measures, Plaintiffs have seen a considerable decline in member participation at their recent demonstrations. On May 19, 2021, BLMA Broward attended a protest organized by Fight for 15 which demanded a $15-minimum-wage. Only approximately 15 people attended; similar protests historically attracted 50–100 people. BLMA Broward Decl. ¶ 25. Plaintiffs' members fear emboldened counter-protestors will become violent, creating situations where police feel entitled to arrest otherwise non-violent demonstrators for having to defend themselves. *Id*. ¶ 26; Northside Decl. ¶¶ 17, 19, 24. Indeed, many of Plaintiffs' members have stopped encouraging family and friends to attend demonstrations feeling responsible to protect the young people they organize. *E.g.,* Dream Defenders Decl. ¶ 36. Because of fears and unpredictability brought on by HB1, Plaintiffs have evaluated ways to seek protection from white allies to avoid being targeted. Chainless Change Decl. ¶ 18.

Before HB1, Florida law already penalized violence and property destruction—penalties that were enforced during the 2020 racial justice protests—

so Plaintiffs reasonably assume HB1 must serve additional purposes. Dream Defenders Decl. ¶¶ 10–11, 15; Black Collective Decl. ¶ 14. Because Section 15 allows for wide-sweeping mass arrests, and because Section 18 emboldens counter-protestors and agitators to create violent disturbances that attract excessive police response, Plaintiffs and their members fear that when these emboldened counter-protestors incite violence, it is Plaintiffs who will be arrested and prosecuted for "rioting" under Section 15. Dream Defenders Decl. ¶ 31. This fear has impacted demonstration attendance. For example, following a demonstration where a prominent white supremacist counter-protestor not only appeared but alerted media he would be relying on HB1 to protect him and punish non-violent demonstrators, Northside saw its member participation at subsequent events decrease by as much as 40%, despite its increased engagement of peacekeepers.  Northside Decl. ¶¶ 15, 22, 23.

## III.  ARGUMENT

Courts grant a preliminary injunction where plaintiffs are: (1) "likely to succeed on the merits," (2) "likely to suffer irreparable harm in the absence of preliminary relief," (3) where "the balance of equities tips in [plaintiffs'] favor," and (4) the provision of interim relief "is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The chief function of a preliminary injunction is to preserve the status quo until the merits of the controversy can be

fully and fairly adjudicated." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. Jacksonville, Fla.*, 896 F.2d 1283, 1284 (11th Cir. 1990). "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" justifying injunctive relief. *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1271–72 (11th Cir. 2006) (quotations omitted).

As outlined below, Plaintiffs satisfy all four prongs of the preliminary injunction standard. Plaintiffs therefore ask this Court to maintain the status quo *before* HB1's passage and its criminalization of First Amendment freedoms.

## A. Plaintiffs Are Likely to Succeed on the Merits of Their Claim That Section 15 Is Unconstitutionally Vague and Overbroad.

### 1. Plaintiffs satisfy Article III standing and have sued the proper defendants.

As a threshold matter, Plaintiffs have both organizational and associational standing to bring this suit and have sued the proper defendants.[14]

First, Plaintiffs have organizational standing under the "diversion of resources" theory.[15] *E.g.*, *Ga. Latino All. for Human Rts. v. Gov. of Ga. (GLAHR)*,

---

[14] Plaintiffs' Opposition to Defendants' Motions to Dismiss will more fully discuss Plaintiffs' standing.

[15] "In the context of this pre-enforcement challenge to a legislative enactment, the causation element *does not require* that the defendants themselves have 'caused' [plaintiffs'] injury by their own acts or omissions in the traditional tort sense; rather it is sufficient that the injury is directly traceable to the passage of [the Act]." *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1205 (N.D. Fla. 2020) (emphasis added) (internal quotation marks omitted).

691 F.3d 1250, 1259–60 (11th Cir. 2012). Each Plaintiff has suffered injury in fact in that they have cancelled or postponed planned protest activities and have been forced to divert resources to respond to HB1's changes to the law. *See* Compl. ¶¶ 12–13; *id.* ¶ 16; *id.* ¶ 19; *id.* ¶ 26; *id.* ¶¶ 29–30; *id.* ¶ 35; BLMA Broward Decl. ¶¶ 19–20, 22–23; Chainless Change Decl. ¶¶ 12, 16, 18; Dream Defenders Decl. ¶¶ 11– 12, 17–18, 20–24, 27; Northside Decl. ¶¶ 15, 23; The Black Collective Decl. ¶¶ 8– 10, 17–19; *see also GLAHR*, 691 F.3d at 1259–60; *Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008). And, because each Plaintiff's injuries are "directly traceable to the passage of [HB1]," their injuries "would be redressed by enjoining each provision." *See GLAHR*, 691 F.3d at 1260; *accord Support Working Animals*, 457 F. Supp. 3d at 1205.

Second, Plaintiff organizations have associational standing on behalf of their members. Not only has Plaintiffs' speech been chilled by a reasonable fear of enforcement of HB1—where "the injury is self-censorship," *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)—but Plaintiffs Dream Defenders, Chainless Change, and BLMA Broward have canceled scheduled events because of these fears. *See* Compl. ¶¶ 12, 19–20, 22, 25, 27; Dream Defenders Decl. ¶¶ 20, 22; BLMA Broward Decl. ¶ 22. Members of Northside have "expressed that they will not be able to participate in future nonviolent demonstrations due to their fear of

unlawful arrest," and are "afraid to speak out on social media regarding racial and economic justice." Compl. ¶¶ 33–34; Northside Decl. ¶¶ 17–18.

Moreover, both the Attorney General ("AG") and the Governor are proper defendants. The AG's broad law enforcement authority, including her superintendence of state attorneys, makes her a proper defendant. *See Support Working Animals*, 457 F. Supp. 3d at 1212 (holding AG proper defendant under *Young* because she "wields broad statutory and common law authority to enforce Florida law, including the authority to police compliance with Amendment 13 and to enforce the forthcoming civil or criminal penalties"). The Governor's authority to mobilize the militia, which he exercised in 2020 to police the very racial justice protests that HB1 targets, demonstrates he, too, is sufficiently connected to HB1's enforcement to be subject to suit. *See* Fla. Stat § 250.06; Compl. ¶ 37, n.2; *see also* Fla. Stat. § 250.28, (authorizing Governor to mobilize the militia in response to "a riot," "mob," or "unlawful assembly," each of which is defined by HB1).

Sheriff Defendants are also proper defendants as agents of the State of Florida tasked with enforcing the state criminal law, including HB1. *See Troupe v. Sarasota Cty.*, No. 8:02-CV-53T-24MAP, 2004 WL 5572030, at *12 (M.D. Fla. Jan. 22, 2004), *aff'd*, 419 F.3d 1160 (11th Cir. 2005); *see L.S. by Hernandez v. Peterson*, No. 18-CV-61577, 2018 WL 6573124, at *9 (S.D. Fla. Dec. 13, 2018), *aff'd sub nom. L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323 (11th Cir. 2020) (dismissing *Monell*

claim against county for actions of the Sheriff because "[i]n Florida, a county has no authority and control over a sheriff's law enforcement function").

That Defendants may not yet have enforced HB1 is of no moment. *ACLU v. Fla. Bar*, 999 F.2d 1486, 1490 (11th Cir. 1993) ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule.").

Accordingly, Plaintiffs have organizational and associational standing, and have sued the proper defendants.

### 2.    Section 15 is unconstitutionally vague.

Plaintiffs are likely to succeed on the merits because Section 15 is void-for-vagueness. "In our constitutional order, a vague law is no law at all." *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019). A law "can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or *even encourages* arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1319–1320 (11th Cir. 2017) (emphasis added).

In the First Amendment context, vague laws "force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were

clearly marked, thus silencing more speech [and expression] than intended." *Id.* at 1320 (cleaned-up). For that alone, "standards of permissible statutory vagueness" impacting First Amendment freedoms "are strict." *NAACP v. Button*, 371 U.S. 415, 432–33 (1963).

The first step in assessing vagueness is to construe the statutory text. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). If the law is vague, then "the role of courts . . . is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite [the state] to try again." *Davis*, 139 S. Ct. at 2323. Under this standard, Section 15 is undeniably void-for-vagueness.

### a. Section 15's ambiguity fails to provide ordinary people reasonable notice of what the law prohibits.

Section 15 has and will continue to chill Plaintiffs' protected speech and expression because it lends itself to varying interpretations and thus gives no fair warning as to what it proscribes. Section 15 provides in pertinent part:

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct . . . ."

Fla. Stat. § 870.01(2). On its face, this language fails to warn people whether one's willful, peaceful participation in a demonstration is enough to demonstrate willful participation in a "violent public disturbance" if violence occurs among three or more others in attendance. It is unclear whether in order to be criminally liable a

person must share a common intent to assist the assembly in violent disorderly conduct, or whether he need only "willfully participate" in the demonstration in which the assembly members themselves act with a "common intent to assist each other" in violent disorderly conduct.

If the legislature's intent was to impose criminal liability *only* when a "person" shares a common intent with "an assembly of three or more persons" to assist in violent and disorderly conduct, such that non-violent protestors at a demonstration are not tainted by mere proximity to violence, then Section 15 fails to make that plain. *First*, as suggested above, it is unclear whether the participle modifying phrase "acting with a common intent to assist each other in violent and disorderly conduct" modifies only "an assembly of three or more persons," or if it also modifies the person who is the subject of the opening two clauses. BRYAN A. GARNER, GARNER'S MODERN AMERICAN USAGE, 540 (2009) ("When modifying words are separated from the words they modify, readers have a hard time processing the information."). *Second*, it is unclear whether the pronoun "each other" in the phrase "acting with a common intent to assist each other" relates back to the "assembly" alone (the plural subject), or both the assembly *and* the "person" (the singular subject). *Finally*, because Section 15 does not define what it means to "willfully participate" in a violent public disturbance, non-violent protestors will not know whether their proximity to a violent assembly of three or more will bring them within the scope of

what Section 15 proscribes. That, in turn, will "force potential [protestors] to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech [and expression] than intended." *Wollschlaeger*, 848 F.3d at 1320.

These textual defects create an unascertainable standard that effectively chills speech and expression. Without fair notice of what the statute proscribes, ordinary people fearing arrest must guess as to Section 15's meaning and will infer, as Plaintiffs do, that mere presence at a demonstration could subject them to liability should violence occur nearby. *Button*, 371 U.S. at 433 ("The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions."). Indeed, the Supreme Court has held that absent fair warning, vague laws are "a trap for the innocent." *Cramp v. Bd. of Pub. Instruction of Orange County, Fla*., 368 U.S. 278, 281 (1961). Because Section 15 provides no fair notice of what it proscribes, it is void-for-vagueness and must be enjoined.

      **b.**      **Section 15's ambiguity authorizes and encourages arbitrary and discriminatory enforcement.**

The legislature's failure to clearly provide notice under Section 15—namely, what constitutes a "riot" in the context of a demonstration, who must share a "common intent to assist each other in violent and disorderly conduct," and what it means to "willfully participate"—gives police discretion to subjectively determine how, when, and against whom to apply Section 15. This both authorizes and

encourages arbitrary enforcement. Without ascertainable standards to govern its enforcement, Section 15 fundamentally undermines the relationship between government and citizens by delegating legislative power to police and giving police the freedom "to pursue their personal predilections" and discriminate as they choose. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).

Given that HB1 was enacted following mass protests against police killings of Black people and was promoted as the strongest "pro-law enforcement piece of legislation in the country,"[16] the danger that Section 15 will be selectively applied against Plaintiffs is substantial. Remarks by the Governor and other lawmakers in promoting this law, only highlight this risk. For example, while promoting the then-proposed bill on Fox News in September 2020, Governor DeSantis referred to detractors of the bill as "people on the far left" who are "anti-police" and "believe in defunding the police.[17] Representative Learned remarked he and Fernandez-Barquin, "just have different interpretations of that phrase.... [I]f we have different interpretations . . . then judges, states attorneys, and police on the street will have different interpretations of that phrase as well."[18] And, a key supporter of the bill,

---

[16] *Gov. DeSantis Signs Florida's 'Anti-Riot' Bill into Law*, *supra* note 5.

[17] Gov. Ron DeSantis joins 'Tucker Carlson Show', Facebook (Sept. 22, 2020) https://www.facebook.com/watch/?v=356894608832351.

[18] Video: Mar. 10, 2021, H. Judiciary Committee at 2:07:53–2:08:28, https://thefloridachannel.org/videos/3-10-21-house-judiciary-committee/ (emphasis added).

Representative Fernandez-Barquin acknowledged HB1's risk of racially disparate enforcement.[19]

"Unless narrowed by interpretation, [Section 15's susceptibility to multiple interpretations will] encourage erratic administration [by police]; individual impressions [will] become the yardstick of action, and result in regulation in accordance with the beliefs of the individual rather than regulation by law." *Interstate Circuit, Inc. v. City of Dallas*, 390 U.S. 676, 685 (1968) (cleaned-up). Section 15 must therefore be enjoined.

### 3.    Section 15 is unconstitutionally overbroad.

Plaintiffs are also likely to succeed on the merits because Section 15 is fatally overbroad and criminalizes a substantial amount of protected speech. The provisions vagueness authorizes and encourages law enforcement to supply their own interpretation of the provision, and allows them to thus round-up as many persons at a protest, including non-violent protestors, as they desire anytime violence occurs among three or more persons. Section 15 is thus overbroad and must be enjoined.[20]

---

[19] Video: Jan. 27, 2021, H. Criminal Just & Pub. Safety Subcomm. Hearing at 30:10–30:47, https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/.

[20] HB1 is also viewpoint discriminatory and therefore subject to strict scrutiny. *E.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 164 (2015); *see RAV v. City of St. Paul, Minn.*, 505 U.S. 377, 382 (1992). However, Plaintiffs are not asking this Court to reach that determination here. As will be demonstrated in this litigation, Defendants cannot meet their burden of establishing Section 15 is necessary to serve a compelling government interest and narrowly tailored to that end.

*Ashcroft v. Free Speech Coalition* ("*Free Speech Coalition*"), 535 U.S. 234, 244–55 (2002).

The Supreme Court has repeatedly invalidated overbroad laws such as Section 15 within the First Amendment's "vast and privileged sphere." *See*, *e.g.*, *id.* (striking the Child Pornography Prevention Act of 1996 in part because the "overbreadth doctrine prohibits the Government from banning unprotected speech if a substantial amount of protected speech is prohibited or chilled"); *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 605–10 (1967) (finding law making membership to the Communist Party, "unaccompanied by specific intent to further the unlawful goals of the organization," overbroad, and prima facie evidence of categorical disqualification from state employment).   The Supreme Court has used this remedy where the threat of enforcement of an overbroad law deters First Amendment freedoms, especially when the risk of criminal penalties exists.  *See, e.g., Virginia v. Hicks*, 539 U.S. 113, 119 (2003).

As with vagueness, the "first step in overbreadth analysis is to construe the challenged statute" and assess "whether the statute, as [the Court has] construed it, criminalizes a substantial amount of protected expressive activity." *United States v. Williams*, 553 U.S. 285, 293, 297 (2008). When interpreting a statute, "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992). The court

next must consider whether "the unconstitutional portion" is "severable" from the remainder; if so, only that portion "is to be invalidated." *United States v. Miselis*, 972 F.3d 518, 531 (4th Cir. 2020) (quoting *New York v. Ferber,* 458 U.S. 747, 769 n.24 (1982)). Plaintiffs are likely to succeed on the merits under this framework.

### a.   Section 15 can be reasonably understood to criminalize a substantial amount of First Amendment protected activity.

"Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433; *Gooding v. Wilson*, 405 U.S. 518 (1972). "In the First Amendment context," "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (quotations omitted).

Section 15 can reasonably be interpreted to mean a person committing a riot is *not* required to have the same intent as the "assembly of three or more persons," because the participle modifying phrase "acting with a common intent to assist each other in violent and disorderly conduct" could reasonably be read as relating back only to the "assembly of three or more persons." *See Lockhart v. United States*, 577 U.S. at 347, 351 (2016) (Under the "rule of the last antecedent," "a limiting clause or phrase . . .  should ordinarily be read as modifying only the noun or phrase that it immediately follows."); SCALIA & GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS, 140, 144–46, 152–53 (2012).

The court may also look to a statute's legislative history to derive meaning. *Watt v. Alaska*, 451 U.S. 259, 265–66 (1981). Here, the primary substantive change the Florida legislature made by enacting Section 15 was to substantially expand the how the definition of "riot" may be interpreted: it may now be read to reach not only those with the "common intent" to commit violence, but also those who willfully participate in a disturbance that turns violent—even if they were not aware of, and never intended to commit, any violence themselves.[21] *See supra* § II.A; Fla. Stat. § 870.01(2) (2021).

There is a credible threat that this overbroad interpretation will be applied by police against Plaintiffs. Such application of the common intent of "an assembly of three or more persons" engaged in disorderly conduct to all individuals present at a protest renders non-violent protestors guilty-by-association and holds them criminally responsible for the bad acts of other persons. This expansive reach blatantly violates the First Amendment.

### b.    Guilt-by-association laws are unconstitutional.

Guilt-by-association has been repeatedly condemned by the Supreme Court, which has long recognized that "disorderly assembly" laws permitting unwitting criminal liability are unconstitutional. *See Coates v. Cincinnati*, 402 U.S. 611, 614 n.4 (1971) (quoting decision striking down a disorderly assembly ordinance because

---

[21] *Compare* Fla. Stat. § 870.01(2), *with Beasley*, 317 So.2d at 752.

"[a]nyone could become an unwitting participant in a disorderly assembly, and suffer the penalty consequences"); *see also De Jonge v. State of Oregon*, 299 U.S. 353, 364–65 (1937) (rejecting state criminal syndicalism statute and concluding, "peaceable assembly for lawful discussion cannot be made a crime").

A "blanket prohibition of association with a group having both legal and illegal aims" would present "a real danger that legitimate political expression or association would be impaired." *Scales v. United States*, 367 U.S. 203, 229 (1961). Such a law results in the kind of guilt-by-association found unconstitutional in *NAACP v. Claiborne Hardware Co.*, where the Supreme Court reversed a civil judgment against the NAACP and its members for boycotting white merchants, even though some participants advocated for or engaged in violence. 458 U.S. 886, 908 (1982). "The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected." *Id.* Instead, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals *and that the individual held a specific intent to further those illegal aims*." *Id.* at 920 (emphasis added); *see also Scales*, 367 U.S. at 229 (finding that to punish group association, there must be "clear proof that a defendant specifically [intends] to accomplish [the aims of the organization] by resort to violence"). Such intent must be judged "according to the strictest law," lest "one in sympathy with the

legitimate aims of such an organization, but not specifically intending to accomplish them by resort to violence, might be punished for his adherence to lawful and constitutionally protected purposes, because of other and unprotected purposes which he does not necessarily share." *Noto v. United States*, 367 U.S. 290, 299–300 (1961).

As observed above, a fair reading of Section 15's plain language—indeed, how Plaintiffs have interpreted it and acted in response—reveals that an individual risks arrest and criminal prosecution for committing a riot even when they lack the specific intent to both further and participate in any illegal activity. *Contra Keyishian*, 385 U.S. at 606–07. Thus, the fear of guilt-by-association is not mere speculation under Section 15. Indeed, as bill sponsor Representative Fernandez-Barquin acknowledged, Section 15 ensures criminal "responsibility is split amongst the group."[22] By exposing individuals to arrest and prosecution for exercising constitutional rights when violence occurs solely due to others' intentions, Section 15 "infringes unnecessarily on protected freedoms [and] rests on the doctrine of 'guilt by association' which has no place here." *Elfbrandt v. Russell*, 384 U.S. 11, 19 (1966) (citing *Schneiderman* v. *United States*, 320 U.S. 118, 136 (1943)).

---

[22] Video: Jan. 27, 2021, H. Criminal Just & Pub. Safety Subcomm. Hearing at 04:00-04:25, https://thefloridachannel.org/videos/1-27-21-house-criminal-justice-public-safety-subcommittee/.

Punishing associational activity based on the unlawful aims of others is *exactly* what Section 15 does and was intended to do. In the summer of 2020, largely peaceful protests were on few occasions interrupted by violent or disorderly conduct. Although some of this violence was instigated by counter-protestors[23] or police[24] (and condemned by organizers), many people were arrested, including peaceful protestors swept up by police in the fray.[25] Section 15 now expressly legalizes such arrests. It empowers police to target individuals engaged in protected speech and assembly, regardless of whether they intentionally commit violence or are—knowingly or unknowingly—merely in the vicinity of such violence. As detailed above, the fear of wrongful arrest posed by Section 15 has chilled Plaintiffs' speech and expression. The further chilling of Plaintiffs' and others' First Amendment

---

[23] Grace Hauck, *Cars Have Hit Demonstrators 104 Times Since George Floyd Protests Began*, USA Today (Sept. 27, 2020 6:55 PM), https://www.usatoday.com/story/news/nation/2020/07/08/vehicle-ramming-attacks-66-us-since-may-27/5397700002/; Ari Weil, *Protesters Hit By Cars Recently Highlight A Dangerous Far-Right Trend In America*, NBC News (July 12, 2020 11:24 AM), https://www.nbcnews.com/think/opinion/seattle-protester-hit-car-latest-casualty-dangerous-far-right-trend-ncna1233525.

[24] Sarah Blaskey, *She Returns to Where She Was Struck in The Eye by Police. Her New Cause: Fight 'Jim Crow' Bills*, Miami Herald, (Feb. 26, 2021 5:05 PM), https://www.miamiherald.com/news/local/community/broward/article249526205.html.

[25] Dan Sullivan, *Hillsborough declines to prosecute 67 arrested in protests*, Tampa Bay Times (Jun. 15, 2020), https://www.tampabay.com/news/hillsborough/2020/06/15/hillsborough-declines-to-prosecute-67-arrested-in-protests/.

activity is especially likely considering the hefty sanctions Florida has enacted. *See Button*, 371 U.S. at 433 ("The threat of sanctions may deter their exercise almost as potently as the actual application of sanctions."). Section 15 must therefore be enjoined as overbroad.

To the extent Defendants contend the correct reading of Section 15 is any narrower, Plaintiffs require a judicially enforceable way to rely on this interpretation. However, because the plain language of Section 15 indicates participation in a "violent public disturbance" is enough for criminal liability when an assembly of three or more *other* persons engage in disorderly conduct, the provision cannot be saved with a limiting construction. *See Brayshaw v. City of Tallahassee, Fla.*, 709 F. Supp. 2d 1244, 1250 (N.D. Fla. 2010) ("Courts should not rewrite a law to conform it to constitutional requirements, for doing so would constitute a serious invasion of the legislative domain and sharply diminish Congress's incentive to draft a narrowly tailored law in the first place.").

### 4. The proscription of First Amendment freedoms is not severable from the remainder of Section 15.

Severability of state legislative provisions is "a matter of state law." *Leavitt v. Jane L.*, 518 U.S. 137, 139 (1996). Under Florida's settled severability principles, the proscription of constitutionally protected speech, expression, assembly, and association cannot be severed from Section 15, requiring its wholesale invalidation.

Florida's test for the severability of legislative enactments is as follows:

> When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

*Smith v. Dep't of Ins.*, 507 So. 2d 1080, 1089 (Fla. 1987) (citations omitted).

Section 15 cannot satisfy even the first prong of *Smith*'s test, because its overly broad language cannot be excised. Rather, saving Section 15 would require this Court to engraft additional language into its text to limit the criminal intent element in a way the statute is not written. Any such redrafting would contravene Florida law. *See Schmitt v. State*, 590 So. 2d 404, 414 (Fla. 1991) (a court may not "read [an element] into a statute that plainly lacks one" due to "Florida's strong adherence to a strict separation of powers doctrine") (citing Fla. Const. art. II, § 3); *see also Westphal v. City of St. Petersburg*, 194 So. 3d 311, 313–14 (Fla. 2016); *Richardson v. Richardson*, 766 So. 2d 1036, 1042 (Fla. 2000). Florida's Constitution requires precise drafting by the legislature, not legislation rewritten by the judiciary. *Schmitt*, 590 So. 2d at 414. Because virtually all of Section 15 relies on § 870.01(2)'s expansive definition of "riot," the provision should be enjoined in its entirety.

**B.    Plaintiffs Will Suffer Irreparable Harm Without Court Intervention.**

The vagueness and overbreadth of Section 15 has already caused Plaintiffs irreparable harm and will continue to do so absent injunctive relief. "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *KH Outdoor, LLC*, 458 F.3d at 1271–72. The "rationale behind these decisions [is] that chilled free speech . . . , because of [its] intangible nature, could not be compensated for by monetary damages; in other words, plaintiffs could not be made whole." *Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) (quotations omitted). "[A]n actual injury can exist when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences." *Wilson,* 132 F.3d at 1428 (quotations omitted).

Here, Plaintiffs are presented with an untenable choice: *either* forego exercising their First Amendment rights *or* face the threat of criminal sanctions for exercising such rights. As discussed in Section C, *supra*, Plaintiffs and their members have self-censored for fear of arrest and prosecution under HB1 should they engage in protest. The Dream Defenders and BLMA Broward both canceled scheduled events because of fear of subjecting their members to arrest. Dream Def. Decl. ¶¶ 20, 23; BLMA Broward Decl. ¶ 22. Chainless Change has stopped engaging in direct action altogether. Chainless Change Decl. ¶ 12. And members of the NAACP Florida State Conference have self-censored on an individual level to avoid potential criminal exposure. Rattigan Decl. ¶¶ 7-10; Vilfrard Decl. ¶¶ 12-13.

This infringement upon Plaintiffs' First Amendment rights is a substantial injury that cannot be remedied by monetary damages, *KH Outdoor, LLC*, 458 F.3d at 1271–72, and will not abate until HB1 is enjoined. Plaintiffs are accordingly entitled to injunctive relief.

## C.   Plaintiffs' Injury Without Injunctive Relief Outweighs Any Potential Harm To Defendants, And The Requested Injunction Is In The Public Interest.

Plaintiffs' injury absent injunctive relief—*i.e.*, the continued infringement of their First Amendment rights—is plainly substantial, whereas Defendants will suffer no hardship if they are enjoined from enforcing Section 15, primarily because pre-Section 15 law already allows Defendants to arrest and prosecute those who engage in rioting.[26] The Eleventh Circuit has held that "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury, and the [defendant] has no legitimate interest in enforcing an unconstitutional ordinance." *Id.* at 1272.

---

[26] When "[t]he nonmovant [on a motion for preliminary injunction] is the government, [] the third and fourth requirements—'damage to the opposing party' and 'public interest'—can be consolidated." *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 870 (11th Cir. 2020); *see also McMahon v. City of Panama City Beach,* 180 F. Supp. 3d 1076, 1111 (N.D. Fla. 2016) ("When the state is a party, the[] considerations [for 'the threatened injury outweighing whatever damage the injunction may cause' and the 'injunction being in the public interest'] are largely the same.").

The injunction sought by Plaintiffs supports the public interest because "the public interest is always served in promoting First Amendment values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001); *see also Fla. Businessmen for Free Enter. v. City of Hollywood,* 648 F.2d 956, 959 (5th Cir. Unit B June 1981) ("The public interest does not support the city's expenditure of time, money, and effort in attempting to enforce an ordinance that may well be held unconstitutional.").

Meanwhile, Defendants will not be harmed if the injunction is granted. First, "a state is in no way harmed by issuance of a preliminary injunction which prevents the state from enforcing restrictions likely to be found unconstitutional. If anything, the system is improved by such an injunction." *Centro Tepeyac v. Montgomery County*, 722 F.3d 184, 191 (4th Cir. 2013). Second, before HB1, Florida law already proscribed the crime of "riot" (along with a variety of other violent offenses).[27] Defendants will therefore still possess the necessary tools to regulate violent and disorderly conduct should the injunction issue.

Because a preliminary injunction is needed to protect Plaintiffs' exercise of their First Amendment rights, would serve the public interest, and would not harm Defendants, this Court should grant Plaintiffs' requested relief.

---

[27] *See* Fla. Stat. §§ 784.011, 784.021, 784.03, 784.045, 784.07, 806.13, 812.014, 810.02, 876.52.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs ask this Court to issue a preliminary injunction against Section 15 of HB1.

### CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(f)

I hereby certify that this Memorandum of Law contains 7,958 words.

Dated: July 14, 2021

Respectfully submitted,

*/s/ Max Gaston*
Max Gaston

**NAACP LEGAL DEFENSE AND EDUCATIONAL FUND, INC.**

*/s/ Rachel M. Kleinman*
Rachel M. Kleinman*
rkleinman@naacpldf.org
Morenike Fajana*
mfajana@naacpldf.org
40 Rector Street, 5th Floor
New York, NY 10006
Telephone: (212) 965-3709
Facsimile: (212) 226-7592
-and-
Georgina C. Yeomans*
gyeomans@naacpldf.org
700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 216-2721
Facsimile: (202) 682-1312

**COMMUNITY JUSTICE PROJECT, INC.**

*/s/ Alana Greer*
Alana Greer
Florida Bar No. 92423
alana@communityjusticeproject.com
Berbeth Foster
Florida Bar No. 83375
berbeth@communityjusticeproject.com
Denise Ghartey
Florida Bar No. 1019211
denise@communityjusticeproject.com
Miriam Haskell
Florida Bar No. 069033
miriam@communityjusticeproject.com
3000 Biscayne Blvd.
Suite 106
Miami, Florida 33137
Telephone: (305) 907-7697

**AMERICAN CIVIL LIBERTIES UNION FOUNDATION OF FLORIDA, INC.**

*/s/ Anya A. Marino*
Anya A. Marino
Florida Bar No. 1021406
amarino@aclufl.org
Max H. Gaston*
mgaston@aclufl.org
Daniel B. Tilley
Florida Bar No. 102882
dtilley@aclufl.org
Nicholas Warren
Florida Bar No. 1019018
nwarren@aclufl.org
4343 West Flagler Street, Suite 400
Miami, Florida 33134
Telephone: (786) 363-2700
Telephone: (786) 363-2707

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Joseph L. Sorkin*
Joseph L. Sorkin**
jsorkin@akingump.com
Anne M. Evans**
aevans@akingump.com
Erica E. Holland*
eholland@akingump.com
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
-and-
Steven H. Schulman*
sschulman@akingump.com
James E. Tysse*
jtysse@akingump.com
Caroline L. Wolverton**
cwolverton@akingump.com
Robert S. Strauss Tower
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
-and-
Nicholas E. Petree*
npetree@akingump.com
1111 Louisiana Street, 44th Floor
Houston, Texas 77002-5200
Telephone: (713) 220-5800
Facsimile: (713) 236-0822

***Counsel for Plaintiffs***
*\*Admitted pro hac vice*
*\*\* Pro Hac Vice Applications to be filed*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 14th day of July, 2021 a copy of this document was filed electronically through the CM/ECF system and furnished by email to all counsel of record.

*/s/ Anya A. Marino*
Anya A. Marino