## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

THE DREAM DEFENDERS,
THE BLACK COLLECTIVE, *et al.*,

    Plaintiffs,

       v.

RON DESANTIS, *et al.*,

    Defendants.

Case No.: 4:21-cv-191-MW-MAF

## PLAINTIFFS' CONSOLIDATED OPPOSITION
## TO DEFENDANTS' MOTIONS TO DISMISS

## INTRODUCTION

Plaintiffs, The Dream Defenders ("Dream Defenders"); The Black Collective, Inc.; Chainless Change, Inc.; Black Lives Matter Alliance Broward ("BLMA Broward"); the Florida State Conference of the NAACP Branches and Youth Units ("NAACP-FL"); and Northside Coalition of Jacksonville, Inc. ("Northside") (collectively, "Plaintiffs"), all Black-led organizations who organize and participate in racial justice protests in Florida, filed a Complaint on May 11, 2021, alleging the Combating Public Disorder Act (the "Act" or "HB1") violates the First and Fourteenth Amendments of the United States Constitution. Each Defendant filed a motion to dismiss Plaintiffs' Complaint. *See* ECF Nos. 38–39, 48–50. As set forth below, none of Defendants' arguments warrant dismissing Plaintiffs' claims.

*First*, Plaintiffs have adequately pleaded both organizational and associational standing, and have sued the proper Defendants. *Second*, Plaintiffs have more than plausibly pleaded HB1 (a) was passed with the impermissible intent of targeting Black-led protests and protestors who demonstrate for racial justice and (b) is both overly broad and vague, in violation of the First and Fourteenth Amendments.

## **BACKGROUND**

HB1 criminalizes protest activity, removes bail provisions for those arrested at protests, provides a civil defense to people who injure protestors with their vehicles, and allows the State to override any local decision to *decrease* police funding. It is no accident these provisions are all part of a single law. As Florida lawmakers—and most vocally Governor DeSantis—made clear, the law as a whole was a direct response to the racial-justice protests that occurred in Florida and throughout the country in the summer of 2020. Separately and in conjunction, the law's components chill protest activity, devalue protestor safety, and create additional roadblocks with respect to one of the most publicized of protestors' goals: the reallocation of police funding.

In response to widespread protests opposing police violence during the summer of 2020, then-President Donald Trump called on governors across the country to silence racial justice protests. Urging officials to "dominate" the streets

2

and to place protestors in jail "for a long time,"[1] the President's call to action did not include a call to root out the kind of policing that led to George Floyd's murder but focused instead on quelling protest about these issues.[2] Governor DeSantis and the Florida Legislature answered this call by passing HB1, with the goal of stifling protest against police violence and thwarting calls for a reimagining of public safety and reallocation of police budgets. Only a few months after the then-President's call to action, in September 2020, Governor DeSantis announced the "Combatting Violence, Disorder and Looting and Law Enforcement Protection Act"—the legislative proposal that ultimately led to HB1.

Governor DeSantis' announcement included allusions to incidents that had occurred at racial justice protests outside of Florida and received significant media attention over the summer. Echoing then-President Trump's call for "domination," Governor DeSantis threatened any protestor participating in conduct proscribed by his proposed legislation would have "a ton of bricks rain down on [them]."[3]

The purpose of HB1 is to punish protestors who call for racial justice—specifically, Black organizers and organizations—and to protect police budgets and "law and order" ideology at the expense of Plaintiffs' First and Fourteenth

---

[1] Alana Wise, *Trump Calls Governors Weak, Urging Them To 'Dominate' To Quell Violence*, NPR (June 1, 2020), https://www.npr.org/2020/06/01/867063007/trump-calls-governors-weak-and-urges-them-to-dominate-violent-protesters.
[2] *Id*.
[3] ECF No. 1 (Compl.) ¶ 1.

Amendment rights. The law has already accomplished those goals. As pleaded, HB1's overbroad and vague protest-related offenses and heightened penalties for existing offenses serve the governor and legislature's intent: silencing Black people and their allies who protest racial injustice. Plaintiffs have also adequately pleaded the Act was designed to quash antiracist advocacy and advance a "law and order" viewpoint. Such viewpoint favoritism by government officials is anathema to the Constitution. And, as Plaintiffs have pleaded, the law also violates the Equal Protection Clause of the Fourteenth Amendment because it targets Black organizers and organizations. As detailed throughout Plaintiffs' Complaint, the text, legislative history, timing, and public statements about HB1 made by Florida officials all make clear that it was racially motivated.

As set forth below, Plaintiffs have adequately pleaded standing, named the proper Defendants, and pleaded plausible First and Fourteenth Amendment claims. Therefore, Defendants' motions to dismiss should be denied in their entirety.

## **ARGUMENT**

### I.   **Plaintiffs Have Standing**

Defendants argue that Plaintiffs do not have standing because they have failed to allege injury in fact and because the Plaintiffs have sued the wrong Defendants. Defendants are wrong on both counts.

Article III standing requires that Plaintiffs demonstrate (1) an "injury in fact," (2) fairly traceable to the defendant's challenged action, (3) that is "likely" to be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). At the pleading stage, Plaintiffs need only "'clearly . . . allege facts demonstrating' each element." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). And in a multi-plaintiff case, one plaintiff's standing as to each claim is sufficient. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009). Plaintiffs adequately pleaded each element of standing.

A.    Plaintiffs Have Alleged Injury in Fact

Contrary to Defendants' argument that Plaintiffs have not alleged an injury in fact that would entitle them to federal-court jurisdiction, Plaintiffs have pleaded injuries sufficient for both organizational and associational standing, either of which satisfies Article III.

i. *Organizational Standing*

At the pleading stage, plaintiffs need only "generally allege a redressable injury" caused by the challenged action. *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration All.*, 304 F.3d 1076, 1081 (11th Cir. 2002). "[A]n organization has standing to challenge conduct that impedes its ability to attract members, to raise revenues, or to fulfill its purposes." *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1138 (N.D. Fla. 2020) (Walker, C.J.) (quoting *Fla. Democratic Party*

5

*v. Hood*, 342 F. Supp. 2d 1073, 1079 (N.D. Fla. 2004)); *see also Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1342 (11th Cir. 2014) (redirection of resources to counteract governmental acts is a "concrete and demonstrable injury"). The Complaint alleges HB1 has frustrated the Plaintiffs' organizational missions and has forced them to divert resources away from other activities to respond to HB1.

Organizing and participating in demonstrations in support of racial justice is core to the missions of Plaintiffs Dream Defenders, The Black Collective, BLMA Broward, Northside, and Chainless Change. *See* ECF No. 1 ¶¶ 10–11, 15, 18, 24, 32. HB1 has impeded these efforts and has required Plaintiffs to cancel or delay protests and demonstrations indefinitely. *See id*. ¶¶ 12, 19–20, 25. Plaintiff Chainless Change, in particular, was forced to dramatically rethink its advocacy and was "forced to expend funds on hiring a consulting company to transition from direct action to other communication tools." *Id*. ¶¶ 20–21.

HB1 has also affected the way Plaintiffs communicate with members. Plaintiffs Dream Defenders, Chainless Change, and BLMA Broward rely heavily on social media to spread their messages, including encouraging members to communicate with elected officials. *See id*. ¶¶ 11, 13, 22, 27. Because of fear that providing elected officials' contact information might violate HB1's Section 14, Chainless Change and BLMA Broward have ceased this means of communication and "must now seek alternative means" to convey the information. *Id*. ¶¶ 22, 27.

Dream Defenders has expended additional resources to ensure that they steer widely clear of Section 14, expending "additional time and effort to review electronic communications." *Id.* ¶ 13.

Moreover, each Plaintiff has diverted resources away from core activities to study HB1, to anticipate how the Act will affect its mission and members, and to adapt its advocacy accordingly. *See id.* ¶¶ 13, 16, 21, 26, 30, 35.

By alleging that they have diverted resources away from their other programs and services, Plaintiffs have met their burden of pleading organizational standing.

### ii. Associational Standing

In addition to adequately pleading organizational standing, Plaintiffs have also sufficiently pleaded associational standing.

An organization may sue "on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). Defendants argue only that Plaintiffs' members do not have standing in their own right because they lack injury in fact.

Plaintiffs have alleged that their organizations and their members have refrained from expressive conduct to avoid potential arrest, prosecution, and harsh

penalties under HB1.[4] Plaintiffs' self-censorship is borne out of a credible fear of prosecution. That is enough to establish injury. *See ACLU v. Fla. Bar*, 999 F.2d 1486, 1492 (11th Cir. 1993) (refraining from expressive activity to avoid potential enforcement of challenged act constitutes injury in fact); *see also Hallandale Pro. Fire Fighters Loc. 2238 v. City of Hallandale*, 922 F.2d 756, 760 (11th Cir. 1991) ("The injury requirement is most loosely applied . . . where [F]irst [A]mendment rights are involved, because of the fear that free speech will be chilled even before the law, regulation, or policy is enforced.").

Plaintiffs Dream Defenders, Chainless Change, and BLMA Broward have canceled scheduled protests and demonstrations and refrained from expression on social media for fear of HB1's enforcement. *See* ECF No. 1 ¶¶ 12, 19–20, 22, 25, 27. Members of Northside have "expressed that they will not be able to participate in future nonviolent demonstrations due to their fear of unlawful arrest" and are "afraid to speak out on social media regarding racial and economic justice." *Id.* ¶¶ 33–34.

Plaintiffs' decisions to refrain from activities in which they would normally

---

[4] Defendants' assertion that Plaintiffs have alleged only speculative harm mistakes the nature of Plaintiffs' injury. Plaintiffs have not asked the Court to speculate regarding the "actions of independent third parties." ECF No. 38 (Moody Br.) at 13. Plaintiffs have alleged that their organizations' and their members' speech has been chilled by a reasonable fear of enforcement of HB1. Here, "the injury is self-censorship." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998).

participate arises from an objectively reasonable fear that Plaintiffs' and their members' intended conduct could subject them to arrest and significant jail time under HB1.

Plaintiffs' fear is reasonable because their usual expressive conduct is arguably prohibited by HB1. The "law sweeps broadly" and "covers the subject matter of petitioners' intended speech." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 162 (2014). For instance, Section 15, which is HB1's cornerstone, expands the definition of "riot" and "inciting a riot" and creates the new crimes of "aggravated rioting," "inciting a riot," and "aggravated inciting a riot." Fla. Stat. § 870.01. Section 15's overbroad definition of these crimes has reasonably made would-be protesters fearful that they could be caught up in a disturbance and unlawfully arrested for their mere presence at a demonstration in which others engage in violence. *See infra* § V.B. As another example, Section 2, which prohibits willful obstruction of traffic and, on its face, prohibits standing in the street even temporarily, has similarly discouraged Plaintiffs from assembling to protest. ECF No. 1 ¶¶ 170–71; Fla. Stat. § 316.2045.

Plaintiffs have also refrained from certain forms of social media advocacy because the language of Section 14, which prohibits the release of "personal identification information," is overbroad and vague enough that Plaintiffs fear they

could be prosecuted for distributing information about elected officials. *See* ECF No. 1 ¶¶ 11, 13, 22, 27; Fla. Stat. § 836.115.

The overbreadth and vagueness of the law, *see infra* §§ V.B–C, means the activities of Plaintiffs and their members arguably fall within HB1's prohibitions. Plaintiffs therefore have a legally cognizable basis for a reasonable fear of prosecution, and there is no need to wait for the law to be enforced in order to challenge it. *Wilson*, 132 F.3d at 1428 (in First Amendment context, "plaintiffs do not have to expose themselves to enforcement in order to challenge a law" because self-censorship is actual injury); *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (self-censorship is injury).

### B.   Plaintiffs Satisfy Traceability and Redressability

The Attorney General and Governor argue they are not proper defendants in this action because Plaintiffs' harms are not traceable to them nor redressable by them.[5] Not so. The Plaintiffs have alleged they have suffered injury in the form of self-censorship driven by their fear that HB1 will be enforced against them. The Attorney General and the Governor each enjoy enforcement authority under HB1— the potential exercise of that authority is the impetus for Plaintiffs' self-censorship.

---

[5] Sheriff McNeil also argues that he has not undertaken any "'unlawful conduct' that has caused Plaintiffs or any of their members redressible harm." ECF No. 50 (McNeil Br.) at 3. Plaintiffs will address that argument *infra* Part IV.

They have thereby sufficiently caused the Plaintiffs' injury, and enjoining enforcement of HB1 will redress that injury.

The traceability and redressability prongs of standing require that Plaintiffs show a causal connection between their injury and the Defendants' challenged actions, as well as a likelihood that a favorable judgment will redress the injury. *See Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019).

"When a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision." *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015); *see also Lewis*, 944 F.3d at 1299 (relying on *Dig. Recognition Network*); *and see Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1257 (11th Cir. 2020) (same). Traceability and redressability exist when the defendant has enforcement authority and when enjoining the act will redress the plaintiff's harm. *See Georgia Latino Alliance for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1260 & n.5 (11th Cir. 2012) (where Governor had "sufficient, albeit indirect" enforcement authority and plaintiffs' injuries would be redressed by enjoining challenged law, causation and redressability were satisfied in pre-enforcement challenge).

The Attorney General and the Governor each have authority to enforce HB1 and thus Plaintiffs' self-censorship, borne out of their fear of this very enforcement,

is traceable to them. Enjoining enforcement of the Act will redress Plaintiffs' harm. The traceability and redressability prongs of standing are thus met.

### i. Attorney General Moody

This Court recently held the Attorney General's authority to superintend and direct the state attorneys was sufficient to render her a proper defendant for standing purposes in a suit challenging Florida's Amendment 13, which banned dog racing and directed the legislature to enact civil and criminal penalties to enforce the amendment. *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1205 (N.D. Fla. 2020) (Walker, C.J.) (Attorney General's enforcement authority is sufficient for standing); *id*. at 1212–13 (cataloging Attorney General's enforcement authority). *Support Working Animals* is directly on point.

The decision was based on an extensive survey of the Attorney General's authority and the conclusion that she "wields broad statutory and common law authority to enforce Florida law, including the authority to police compliance with Amendment 13 and to enforce the forthcoming civil or criminal penalties." *Id*. at 1212. Indeed, the Attorney General is the State's chief legal officer with broad constitutional and statutory power, as well as residual common law powers. *See Thompson v. Wainwright*, 714 F.2d 1495, 1500 (11th Cir. 1983) (grant of specific powers to Attorney General does not deprive her of common law powers, including "prosecuting 'all actions necessary for the protection and defense of the property and

revenue of the state'" (citation omitted)); *see also United States v. Domme*, 753 F.2d 950, 957 (11th Cir. 1985) (Attorney General is Florida's "principal prosecuting attorney"). In addition to her power of "general superintendence and direction over the several state attorneys," Fla. Stat. § 16.08, the Attorney General is also responsible for representing the State in criminal appeals, including from any conviction under HB1's criminal provisions, *see Barnes v. State*, 743 So. 2d 1105, 1112 (Fla. 4th DCA 1999) ("Section 16.01 unambiguously authorizes only the Attorney General to represent the state in the appellate courts of this state.").

Here, like in *Support Working Animals*, 457 F. Supp. 3d at 1211, the Attorney General argues that traceability and redressability are lacking because the state attorneys are primarily responsible for enforcing the penalties enacted by HB1. And here, like in *Support Working Animals*, the Attorney General "could 'superintend and direct' the state attorneys to bring prosecutions" under HB1's penalties; "she could independently institute such prosecutions; and she could intervene in the trial of the case or on appeal." *Id*. at 1213 (citations omitted); *accord Teltech Sys., Inc. v. McCollum*, No. 08-61664-CIV, 2009 WL 10668266, at *2 (S.D. Fla. June 30, 2009) (holding Florida Attorney General, "as an officer charged with enforcing state statutes, is a proper defendant in a suit challenging the constitutionality of a state

13

criminal statute"). [6]

Finding the Attorney General to be a proper defendant under Article III is consistent with the Middle District of Alabama's conclusion that Alabama's Attorney General is a proper defendant under a standing analysis in a pre-enforcement challenge to a criminal statute because of the Attorney General's "statutory authority to 'superintend and direct' criminal prosecutions statewide and the responsibility to instruct the DAs." *Reproductive Health Servs. v. Strange*, 204 F. Supp. 3d 1300, 1318 (M.D. Ala. 2016).

This Court's decision in *Support Working Animals* and the additional precedent discussed above is not abrogated by the recent decision in *Jacobson*, 974 F.3d 1236. There, the Eleventh Circuit concluded the Secretary of State was not a proper defendant for purposes of standing in a challenge to a state statute governing the order in which candidates appear on the ballot. The court reasoned that the plaintiffs' injury could not be traced to the Secretary of State, and was not redressable by her, because Florida law explicitly tasks the Supervisors of Elections to print the names of candidates on the ballots in the order prescribed by law. The

---

[6] The Attorney General argues that state attorneys have "complete discretion" over decisions to charge and prosecute, citing *Valdes v. State*, 728 So. 2d 736, 738 (Fla. 1999). *Valdes* had nothing to do with the Attorney General's superintendence and nowhere mentions the relationship between the Attorney General and state attorneys. If the Attorney General is conceding that she has no authority whatsoever to enforce HB1, Plaintiffs require a judicially-enforceable determination to that effect in order to be protected from future harm by the Attorney General.

Secretary of State had no role in the process and, crucially, lacked authority over the Supervisors of Elections. *Id*. at 1253. Indeed, the Secretary of State's only means of coercion over the Supervisors was the judicial process. *Id*.; *accord Claire v. Fla. Dep't of Mgmt. Servs.*, 504 F. Supp. 3d 1328, 1331–33 (N.D. Fla. Dec. 3, 2020) (Walker, C.J.) (agencies not proper defendants where state law vests sole responsibility for determination at issue in another, independent entity). The Attorney General, who has statutory, constitutional, and residual coercive authority over the state attorneys, is not similarly situated to the Secretary of State in *Jacobson*.

### ii.  Governor DeSantis

The Governor also has sufficient enforcement authority to satisfy traceability and redressability based on his "power to call out the militia to preserve the public peace, execute the laws of the state, suppress insurrection, or repel invasion." Fla. Const. art. IV, § 1(d); *see also* Fla. Stat. § 250.06 (Governor may mobilize Florida National Guard and "order into state active duty all or any part of the militia").

The Governor is specifically authorized to mobilize the militia in response to "a riot," "a mob," or to respond to "unlawful assembly," all of which are implicated by HB1. *See* Fla. Stat. § 250.28; *e.g.*, *id*. §§ 784.0495, 870.01–.02 (HB1 Sections 8, 15–16). In May and June 2020, the Governor exercised this authority to police the very type of racial justice protest that Plaintiffs routinely participate in or organize and that HB1 was meant to target. He called on 700 National Guard troops and

mobilized 1,300 Florida Highway Patrol officers to respond to protests in Miramar, Camp Blanding, and Tampa. *See* ECF No. 1 ¶ 37 & n.2. The Governor thus has the type of enforcement authority that Plaintiffs fear and that drives their self-censorship.

## II.   Plaintiffs' Claims Are Ripe

Contrary to Defendants' arguments, Plaintiffs' claims are ripe. Ripeness tests the "fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Abbott Lab'y v. Gardner*, 387 U.S. 136, 149 (1967). In First Amendment cases, the ripeness test is "less exacting." *Fla. Right to Life, Inc. v. Lamar*, 273 F.3d 1318, 1323 (11th Cir. 2001). And because Plaintiffs bring a pre-enforcement challenge to HB1, the standing and ripeness inquiries converge. *See Elend v. Basham*, 471 F.3d 1199, 1205 (11th Cir. 2006).

Plaintiffs have alleged they have diverted resources and have been forced to cancel or otherwise change planned protests due to HB1's perceived reach. *See supra* § I.A. The action is therefore ripe. *Virginia v. Am. Booksellers Assoc., Inc.*, 484 U.S. 383, 393 (1988); *Harrell*, 608 F.3d at 1258 (void-for-vagueness claim ripe because the very censorial power of a vague statute is unacceptable).

Defendants suggest this Court should abstain until state courts have been granted an opportunity to weigh in on HB1's scope. That is inconsistent with First Amendment precedent. "[T]o force the plaintiff who has commenced a federal action

16

to suffer the delay of state court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Zwickler v. Koota*, 389 U.S. 241, 252 (1967); *see also Int'l Soc. for Krishna Consciousness v. Eaves*, 601 F.2d 809, 822 (5th Cir. 1979) (finding a First Amendment challenge ripe and noting the harm to plaintiffs of withholding decision to allow state courts to weigh in).

## III.  The Attorney General and Governor Are Not Immune from Suit

The Attorney General and the Governor argue that they enjoy Eleventh Amendment immunity to this suit. But their enforcement authority under HB1 brings them within the *Ex parte Young* exception to sovereign immunity.

*Ex parte Young* provides an exception to the Eleventh Amendment bar on suit against states in federal court. Under the doctrine, "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law" at issue. *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). So long as the official in question has "some connection" with the unconstitutional act, whether that connection "arises out of the general law, or is specially created by the act itself," the *Ex parte Young* exception to sovereign immunity applies. *Ex parte Young*, 209 U.S. 123, 157 (1908).

As the Attorney General acknowledges, the *Ex parte Young* inquiry and the traceability/redressability standing inquiry are similar, though standing requires a more rigorous analysis. *See* ECF No. 38 at 14 (citing *Jacobson*, 974 F.3d at 1256);

*see also Support Working Animals* 457 F. Supp. 3d at 1210 (explaining the inquiries "overlap significantly"). Thus, because the Attorney General and the Governor have significant enforcement authority to meet traceability and redressability, *see supra* § I.B, they also have sufficient enforcement authority to fall within the *Ex parte Young* exception.

A. <u>Attorney General Moody</u>

As to the Attorney General, *Support Working Animals* once again controls. In that case, in addition to satisfying the traceability and redressability prongs of standing, the Attorney General's law enforcement authority also placed her squarely within the *Ex parte Young* exception to sovereign immunity. *See Support Working Animals*, 457 F. Supp. 3d at 1212–13.

And once again, that decision accords with precedent concerning the Governor of Georgia, who has similar law enforcement authority to the Florida Attorney General. The Eleventh Circuit has held that the Governor of Georgia's responsibility for law enforcement, his residual power to commence criminal prosecutions, and his authority to direct the Attorney General to do so, made him a proper defendant under *Ex parte Young* in a suit challenging deficiencies in the provision of indigent legal services, *Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988) and in a suit challenging criminal regulation of firearms,

*GeorgiaCarry.Org, Inc. v. Georgia*, 687 F.3d 1244, 1254 & n.18 (11th Cir. 2012) (relying largely on analysis from *Luckey*).

Recognizing the Attorney General as a proper defendant is also consistent with precedent holding that the Attorney General's superintendence *shields* state attorneys from suit under the Eleventh Amendment. *See Atterbury v. City of Miami Police Dep't*, No. 07-21507-CIV, 2007 WL 9734570, at *2 (S.D. Fla. Nov. 15, 2007). The Attorney General's superintendence cannot serve as a one-way ratchet to protect state officials from suit.

### B. Governor DeSantis

As with the traceability and redressability analysis, the Governor's authority to mobilize the militia to enforce HB1 satisfies the requirement that he have "some connection" with enforcement of the challenged law.

That the Governor's authority to mobilize the militia is discretionary does not undermine this analysis, because the court does not impermissibly impede the exercise of discretionary authority when it enjoins an officer "from doing an act which he had no legal right to do." *Ex parte Young*, 209 U.S. at 159.

## IV. Sheriffs Are Agents of the State for Purposes of Enforcing State Law

Sheriffs Tony, McNeil, and Williams argue that because the Complaint does not allege that the Sheriffs have enforced HB1 or otherwise promulgated a policy to enforce the law, they are not subject to suit under *Monell v. Dep't of Soc. Servs.*, 436

U.S. 658 (1978), and Plaintiffs lack standing. But the Sheriffs are agents of the state when enforcing state law and thus fall outside the *Monell* doctrine. And because this is a pre-enforcement challenge, their authority to enforce the law satisfies Article III. That is true even of Sheriff Tony and even in light of the Broward County Department of Law Enforcement's statements regarding enforcement.

In *McMillian v. Monroe Cnty.*, 520 U.S. 781 (1997), the Supreme Court addressed whether a county could be held liable for the acts of the local sheriff pursuant to the sheriff's exercise of law enforcement duties. The Court acknowledged the lesson of *Monell* that municipalities can only be held liable for their own policies that cause constitutional torts. It then engaged in extended analysis of state law as it bore on the sheriff's authority and held that the Alabama sheriff at issue represented the State, not the county, when he acted in a law enforcement capacity. *Id.* at 793; *see also Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1327 (11th Cir. 2003) (*Monell* does not apply to conduct of Georgia sheriffs when acting pursuant to law enforcement function).

In light of *McMillian*, the Eleventh Circuit reconsidered its precedent holding that Florida sheriffs are not state agents in any context and recognized that the "determination must be made on a function-by-function basis." *Abusaid v. Hillsborough Cnty Bd. of Cnty. Commrs.*, 405 F.3d 1298, 1304 (11th Cir. 2005); *see*

*id.* at 1305 (holding Florida sheriffs are not state agents when enforcing *county* ordinances).

Since *McMillian* and *Abusaid*, Florida district courts have held that Florida sheriffs are state agents when serving in their capacity as enforcers of state laws. *See, e.g.*, *Troupe v. Sarasota Cnty.*, No. 8:02-cv-53-T-24MAP, 2004 WL 5572030, at *12 (M.D. Fla. Jan. 22, 2004) ("[S]heriff's [sic] in Florida act as agents for the state in enforcing the laws of the state."), *aff'd*, 419 F.3d 1160 (11th Cir. 2005); *see also Washington v. Washington*, No. 4:15CV114-RH/CAS, 2015 WL 9918155, at *4 (N.D. Fla. Nov. 24, 2015) (quoting *Troupe* for the same proposition), *report and recommendation adopted*, 2016 WL 335870 (N.D. Fla. Jan. 26, 2016); *L.S. ex rel. Hernandez v. Peterson*, No. 18-CV-61577, 2018 WL 6573124, at *9 (S.D. Fla. Dec. 13, 2018) (dismissing *Monell* claim against county for actions of the Sheriff because "[i]n Florida, a county has no authority and control over a sheriff's law enforcement function" (citation omitted)), *aff'd*, 982 F.3d 1323 (11th Cir. 2020). Because the Defendant Sheriffs are sued in their capacities as agents of the state, Plaintiffs need not satisfy *Monell*.[7] Instead, the Sheriffs are sued for prospective relief in their

---

[7] Sheriff Williams cites *Vigue v. Shoar*, 494 F. Supp. 3d 1204 (M.D. Fla. 2020), which held that sheriffs are liable under *Monell* for their deliberate decisions to enforce state law. The *Vigue* court relied largely on precedent assessing claims against police departments and did not engage in the analysis mandated by *McMillian* and *Abusaid* as it relates to sheriffs. And elsewhere in his brief, Sheriff Williams acknowledges that "[a]uthority from other jurisdictions consistently holds

official capacities as agents of the state, under the *Ex parte Young* doctrine. *See Powell v. Barrett*, 496 F.3d 1288 & n.27, 1308 (11th Cir. 2007), reversed on other grounds by *Powell v. Barrett*, 541 F.3d 1298 (11th Cir. 2008) (noting Georgia Sheriff not immune from claim for prospective, injunctive relief even when immune from money damages claim under Eleventh Amendment).

Next, while it is true that the Complaint does not allege enforcement action on behalf of the Sheriff Defendants, because this is a pre-enforcement challenge, the Sheriffs' authority to enforce HB1 is sufficient to render them proper parties. *See ACLU*, 999 F.2d at 1490 ("[W]hen a plaintiff challenges the constitutionality of a rule of law, it is the state official designated to enforce that rule who is the proper defendant, even when that party has made no attempt to enforce the rule."); *Dig. Recognition Network, Inc.*, 803 F.3d at 957–58 (in pre-enforcement challenge, causation is satisfied where defendant has enforcement authority); *see also Lewis*, 944 F.3d at 1299 (relying on *Dig. Recognition Network*); *Jacobson*, 974 F.3d at 1257 (same).

And finally, the fact that the Broward County Sheriff's Office has said that it will not enforce HB1 does not divest this Court of jurisdiction over Sheriff Tony. Even where defendants affirmatively represent that they will not enforce a

---

that when county officials are sued for their role in enforcing a state law, the county officials are acting as an arm of the state." ECF No. 49 at 17.

challenged law, where they remain free to change their position in the future, the plaintiffs have standing. *See, e.g.*, *Solomon v. City of Gainesville*, 763 F.2d 1212, 1213 n.1 (11th Cir. 1985) (City Commission's motion instructing its City Manager to discontinue all prosecutorial action under challenged statute, including future action, did not moot appeal where defendant could change its position); *see also ACLU*, 999 F.2d at 1494 (nonbinding representations regarding enforcement of challenged rules did not defeat case or controversy requirement). The Sheriff's position is not binding on Sheriff Tony in the future, nor would it bind a successor Sheriff. *See* Fla. Const. art. 8 § 1(d) (Sheriffs are elected officers).

## V.   The Complaint Adequately Alleges First Amendment Violations

Defendants' arguments[8] that Plaintiffs have failed to state claims for relief under the First Amendment fare no better than their jurisdictional arguments. Plaintiffs allege HB1 violates the First Amendment in several ways. It enacts a content- and viewpoint-based restriction on speech and cannot survive the strict scrutiny required of such a law. It is also impermissibly vague and overbroad, meaning that it chills protected speech because of the intolerable risk that it will be used to criminalize expressive activity.

Defendants ignore both the vagueness and overbreadth of HB1's language and

---

[8] All Defendants have incorporated by reference the First Amendment arguments made in the memorandum of law filed by Attorney General Moody.

the drafters' intent in arguing that HB1 only restricts "incitement, fighting words, true threats, and speech integral to criminal conduct." ECF No. 38 at 22. On its face, and absent a narrowing or clarifying construction, HB1 regulates core protected speech. Its overbroad and vague provisions prohibit and chill Plaintiffs' ability to participate in public demonstrations, engage in advocacy and criticize public officials. HB1's facial neutrality, *id.* at 23–24, does not betray its scope, which is, in the words of Defendant Governor DeSantis, to have a "ton of bricks rain down on" protestors advocating for racial justice and police accountability in the state of Florida. ECF No. 1 ¶¶ 56–59.

A.   <u>HB1 in its Entirety Regulates Speech Based on Content and Viewpoint</u>

Facially neutral laws adopted by the government "because of disagreement with the message [the speech] conveys"—like HB1—are considered content-based restrictions. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015). Moreover, where a law regulates speech based on "the specific motivating ideology or the opinion or perspective of the speaker," it is a restriction on speech based on both content and viewpoint. *Reed*, 576 U.S. at 168 (citation omitted).

Plaintiffs allege ample facts demonstrating HB1 was intended to elevate one viewpoint over the other and to crack down on a particular form of protected expression—protest. These allegations include public statements from Governor

DeSantis criticizing advocacy for police reform, ECF No. 1 ¶¶ 56–62; specific provisions in HB1 designed to favor law and order messages and restrict messages of police reform, *id*. ¶ 150; the title of HB1's predecessor proposal, the "Combatting Violence, Disorder and Looting and Law Enforcement Protection Act," *id*. ¶ 56; and HB1's enhanced penalties for certain conduct committed during a "riot," *e.g.*, *id*. ¶ 80. Governor DeSantis plainly stated HB1's preferred viewpoint in announcing that it was "the strongest . . . pro-law-enforcement piece of legislation in the country." *Id.* ¶ 120. Therefore, Governor DeSantis' constant critiques of Black-led protest activities and endorsement of "law and order" are especially probative of HB1's motivation.[9] *See, e.g.*, *Dakota Rural Action v. Noem*, 416 F. Supp. 3d 874, 883 (D.S.D. 2019) (finding that Governor Kristi Noem "clearly stated" one of the principal motivations behind a riot boosting statute while announcing the statute's predecessor proposal at a press conference). Defendants' reliance on post hoc motivations for HB1, ECF No. 38 at 24–25, carries little weight given the force of this evidence.

Because Plaintiffs allege more than enough facts to "state a claim to relief that

---

[9] *Compare* DeSantis' critiques of Black-led protests, ECF No. 1 ¶¶ 56–62, with recent statements of support for mass demonstrations calling for reforms in Cuba, Ron DeSantis (@GovRonDeSantis), Twitter (July 11, 2021 @ 5:29 PM), https://tinyurl.com/tddn4jkb; Michael Moline, *Groups sue to block enforcement of DeSantis' anti-riot law as Cuban violators in FL go largely untouched*, Florida Phoenix (July 14, 2021), https://tinyurl.com/pzzyahzx.

is plausible on its face," Defendants' motion to dismiss Plaintiffs' content-viewpoint discrimination claim must be denied. *Keating v. City of Miami*, 598 F.3d 753, 763 (11th Cir. 2010) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Carollo v. Boria,* 833 F.3d 1322, 1328–30 (11th Cir. 2016); *Bagley v. Herring*, No. 4:12cv611-WS, 2014 WL 585313, at *2 (N.D. Fla. Feb. 14, 2014) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" (citations omitted)).

### B.   Plaintiffs Have Sufficiently Alleged that Sections 15 and 2 Are Unconstitutionally Vague

HB1 is also unconstitutionally vague because it fails to provide adequate notice of what it prohibits and encourages discriminatory enforcement. *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (en banc) (Marcus, J.).

Contrary to Defendants' arguments, ECF No. 38 at 30, Plaintiffs do not challenge the validity of Florida's common law anti-rioting definition. Rather, Plaintiffs challenge Section 15 based on its changes to that definition that render Section 15's definition of "riot" vague.

Yet Defendants mistakenly contend Section 15 is not vague because previous courts have easily interpreted the common law definition of "riot." ECF No. 38 at 31. This argument overlooks the confusing, distinct changes that Section 15 makes

to this very common law definition.  A "riot" under the common law was defined as a "<u>tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent</u>, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." *See State v. Beasley*, 317 So. 2d 750, 752 (Fla. 1975) (emphasis added). But Section 15 now imposes liability for a "riot" upon one who "<u>willfully participates in a violent public disturbance involving an assembly of three or more persons</u>, acting with a common intent to assist each other in violent and disorderly conduct, resulting in: (a) Injury to another person; (b) Damage to property; or (c) Imminent danger of injury to another person or damage to property." Fla. Stat. § 870.01(2) (emphasis added).

By its plain terms, it is unclear from the face of Section 15 what connection is needed between those at the public assembly as compared to those involved in the public disturbance. Can liability be imposed if the disturbance occurs beyond the view of those at the public assembly? Can liability be imposed against individuals who participated in the public assembly but left as soon as the public disturbance occurred?[10]

---

[10] *See also* ECF No. 65 (Plaintiffs' Mem. in Support of Preliminary Injunction Mot.) at 19–22.

This Court should not rely on the common law definition of riot as an interpretive guide here given the stark differences in syntax and structure between these two definitions, and because courts "must presume that a legislature says in a statute what it means and means in a statute what it says there" when engaging in a vagueness analysis. *Wollschlaeger*, 848 F.3d at 1322 (quoting *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992)).

Far from adding clarity to the common law definition of riot, Defendants instead "take[] the plain word and render[] it incomprehensible by appending a wholly nebulous [phrase]." *Id.* at 1321. Because it is unclear from the face of Section 15 what conduct is prohibited, it is impermissibly vague.

Section 15 is also unconstitutionally vague because it invites arbitrary enforcement. Specifically, it leaves the door open for law enforcement officers to arrest peaceful protestors who are at a public assembly that turns violent. A statute which is susceptible to many different interpretations "readily lends itself to harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure" and could "result[] in a continuous and pervasive restraint on all freedom of discussion that might reasonably be regarded as within its purview." *Thornhill v. Alabama*, 310 U.S. 88, 97–98 (1940).

Section 2 is similarly impermissibly vague and subject to many different interpretations. Section 2 imposes criminal liability against a person who willfully

obstructs "the free, convenient, and normal use of a public street, highway, or road by: (1) Impeding, hindering, stifling, retarding, or restraining traffic or passage thereon; (2) Standing on or remaining in the street, highway, or road; or (3) Endangering the safe movement of vehicles or pedestrians traveling thereon." Fla. Stat. § 316.2045.

On its face, Section 2 could prohibit an individual from momentarily blocking the street while walking during a demonstration. Furthermore, Section 2's key terms are undefined and contain no limitations. One has to guess how much traffic or "safe movement of vehicles or pedestrians" must be impeded in order to fall under Section 2's purview. Just as with Section 15, Section 2 sweeps up such a broad range of conduct that it is impossible to know exactly what is prohibited. This is the hallmark of vagueness.

C.   Plaintiffs Have Sufficiently Alleged Three Sections of HB1 Are Unconstitutionally Overbroad

   i.   *Sections 15, 2 and 14 Prohibit and Chill Significant Protected Speech Activities*

Plaintiffs allege Sections 15, 2 and 14 of HB1 are overbroad because they prohibit and chill "a substantial amount of protected speech." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 244–51, 253–55 (2002).

Specifically, Section 15 is impermissibly overinclusive. *See Ward*, 491 U.S. at 799. Section 15 is open to an interpretation that expands the "riot" definition to

encompass not just those with the intent to commit violence, but also those who willfully participate in a disturbance that turns violent—even if they were not aware of, and never intended to commit, any violence themselves. *See supra* § V.B. But guilt-by-association laws are impermissible under the First Amendment. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 908 (1982) ("The right to associate does not lose all constitutional protection merely because some members of the group may have participated in conduct or advocated doctrine that itself is not protected."). Instead, "[f]or liability to be imposed by reason of association alone, it is necessary to establish that the group itself possessed unlawful goals *and that the individual held a specific intent to further those illegal aims*." *Id.* at 920 (emphasis added); *see also Scales v. United States*, 367 U.S. 203, 229 (1961) (to punish group association, there must be "clear proof that a defendant 'specifically [intends] to accomplish [the aims of the organization] by resort to violence'" (quoting *Noto v. United States*, 367 U.S. 290, 299 (1961))). Thus, Section 15 is not, as Defendants argue, the functional equivalent of the common law riot definition. Nor can Plaintiffs rely on Defendants' post hoc reinterpretations of Section 15 to ensure that they are not subject to criminal liability for engaging in protected First Amendment activities. To remedy the harm caused to Plaintiffs by the overbreadth of this section, any narrowing construction of this Section must be judicially enforceable and clearly defined.

Defendants' remaining counterargument that HB1 only proscribes conduct causing "violence and imminent danger of injury," ECF No. 38 at 26, also misses the mark. Unlike the rioting statute at issue in *Ferguson v. Estelle*, Section 15 does not have a clear mens rea requirement, nor does it provide for an affirmative defense that an individual attended an assembly that was lawful at first, and left when the assembly turned riotous. 718 F.2d 730, 732 (5th Cir. 1983). If one takes Section 15 as written—which this Court must for the purposes of this overbreadth inquiry—then Section 15 has the potential to impose criminal liability on individuals engaged in protected First Amendment activities simply because they happen to be in proximity to others engaged in riotous behavior.

Section 2 is also overbroad because it prohibits a wide range of protected expressive conduct, including by those who participate in public demonstrations in the street and hinder any traffic, for even brief periods of time. ECF No. 1 ¶ 153.

On its face, Section 2 does not contain any limiting principles, and thus could impose criminal liability for merely standing on the street and hindering any amount of traffic, even temporarily. *Id.* ¶ 75. Section 2 is therefore not a reasonable time, place and manner restriction because it sweeps up far too much protected speech. *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45–46 (1983). Nor is it akin to the statute at issue in *One World One Fam. Now v. City of Miami Beach*, as it does not leave open ample channels for alternative

communication. 175 F.3d 1282, 1288 (11th Cir. 1999). Instead, Section 2 directly and expansively regulates protected speech and expressive conduct.

Finally, Section 14, which makes it unlawful for a person to electronically publish another person's personal identification information with the intent to incite violence or commit a crime is overbroad as a matter of law under *Brayshaw v. City of Tallahassee*, 709 F. Supp. 2d 1244 (N.D. Fla. 2010). *Brayshaw* concerns a nearly identical harassment by publication statute that was struck down by this court on overbreadth grounds. Specifically, this court found that the statute criminalized protected speech activities, such as the publication of personal information about law enforcement officers. *Id.* at 1248–49. Although the governmental defendants in *Brayshaw* argued the statute was not overbroad because it only addressed true threats and fighting words, another court in this district explained: "the release of personal information, even with the intent to intimidate, is not per se a true threat," nor can it be "a serious expression of intent to commit an unlawful act of violence." *See id.* at 1248. Section 14—which criminalizes the publication of another's personal information with "intent" to incite violence or commit a crime—is similarly overbroad because it seeks to criminalize speech even when it is unlikely to produce imminent and violent disorder. *See, e.g., Hess v. Indiana*, 414 U.S. 105, 109 (1973). Because the core conduct it seeks to prohibit is protected speech under *Brayshaw*, Defendants' attempted reliance on *Brandenburg v. Ohio*,

395 U.S. 444 (1969), and *Virginia v. Black*, 538 U.S. 343 (2003), is completely misplaced.

### ii. HB1 Cannot Be Saved by Severing the Overbroad Sections

Where a statute is found to be overbroad, the court next must consider whether "'the unconstitutional portion' is 'severable' from the remainder; if so, only that portion 'is to be invalidated.'" *United States v. Miselis*, 972 F.3d 518, 531 (4th Cir. 2020) (quoting *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982)). Here, Sections 15, 2 and 14 cannot be saved in this manner because the overbroad portions are the heart of these sections and define the conduct prohibited. If the overbroad sections are removed, there would be nothing left for this court to enforce.[11] As such, HB1 is impermissibly overbroad.

## VI. The Equal Protection Claims Are Adequately Pleaded

Plaintiffs adequately allege HB1 intentionally discriminates against Black-led organizations and Black protestors (Count 1 – Racially Discriminatory Purpose) as well as their viewpoints and those of their allies advocating for racial justice and police reform (Count 2 – Targeting Racial Justice Advocacy). Rather than acknowledge Plaintiffs' well-pleaded allegations, Defendants misconstrue these allegations and the applicable law.[12]

---

[11] *See also* ECF No. 38 at 31–32.

[12] All Defendants have incorporated by reference the Equal Protection arguments made in the memorandum of law filed by Attorney General Moody.

A law is unconstitutional under the Equal Protection Clause so long as race is a "motivating" factor in its enactment; Plaintiffs need not allege "a particular purpose was the 'dominant' or 'primary' one." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977) ("*Arlington Heights*"). The *Arlington Heights* factors, as supplemented by the Eleventh Circuit, guide this inquiry. *See Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1322 (11th Cir. 2021) ("*GBM*"); *id.* at 1328 (explaining that Equal Protection claims require allegations about both "discriminatory purpose and effect") (citations omitted).

The *Arlington Heights* factors are: "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to its passage; (4) procedural and substantive departures; and (5) the contemporary statements and actions of key legislators." *Id.* at 1322. Courts in the Eleventh Circuit also consider: "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *Id.* Because claims of intentional discrimination are fact-intensive, they are rarely decided pre-trial. *See Hunt v. Cromartie*, 526 U.S. 541, 549 (1999).[13]

---

[13] Once discriminatory intent and effect are established, "the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discrimination] factor." *GBM*, 922 F.3d at 1321 (alteration in original) (quoting *Hunter v. Underwood*, 471 U.S. at 222, 228 (1985)).

Plaintiffs' allegations amply support an inference of discriminatory purpose and effect—far beyond what is required at the pleading stage. As the Complaint alleges, HB1 was proposed and enacted in direct response to the overwhelmingly peaceful racial justice protests of summer 2020. *See, e.g.*, ECF No. 1 ¶¶ 4, 5, 47, 56, 67. The Act "was enacted, at least in part, with the purpose to discriminate against Black-led organizations and Black protestors" and "to deter the exercise of First Amendment rights by certain individuals—namely, those interested in changing the way police interact with Black communities." *Id.* ¶¶ 1, 127. And the Act has, in fact, chilled Black-led organizations and Black protestors from engaging in speech and demonstrations regarding racial justice issues. *See, e.g.*, *id.* ¶¶ 12, 19–20, 22, 25, 27.

Plaintiffs support these assertions by addressing each of the *Arlington Heights* factors in detail. *See, e.g.*, *id.* ¶¶ 12, 19–20, 22, 25, 27, 64–66, 101–02 (disproportionate impact on Black protestors that was also known and reasonably foreseeable, including based on history, testimony, and statistics regarding (i) discriminatory enforcement of criminal laws in Florida overall and during the summer 2020 racial justice protests, (ii) the Act's enhanced criminal penalties and law enforcement discretion, and (iii) Plaintiffs' resulting fear of arrest or other consequences under the Act); *id.* ¶¶ 1, 4, 45, 49, 56–58, 60–61, 106, 120 (historical background including statements by Governor DeSantis and bill sponsors indicating that HB1 was a direct response to summer 2020's racial justice protests and calls for

a reimagining of public safety, notwithstanding that such protests were overwhelmingly peaceful); *id.* ¶¶ 5, 107, 113–19 (evidence of procedural and substantive departures in HB1's passage, including the legislature's rushed timeline for consideration, curtailment of public comment, refusal to study its discriminatory impact, bypassing of multiple Senate committees, and revision to give it an unusual immediate effective date to coincide with the eve of the verdict in the murder trial of Minneapolis police officer Derek Chauvin over the killing of George Floyd); *id.* ¶¶ 108–12 (availability of less discriminatory alternatives, including pre-existing criminal laws).

Despite these extensive factual allegations, Defendants contend Plaintiffs have "failed to allege facts sufficient to establish discriminatory intent or impact." ECF No. 38 at 19. With respect to Count 1 (Racially Discriminatory Purpose), Defendants raise several spurious arguments—not one of which undermines Plaintiffs' claim.

*First*, Defendants argue that Plaintiffs fail to plead discriminatory purpose because "the Complaint is rife with allegations regarding purportedly discriminatory statements on the part of the Governor but is devoid of any such allegations on the part of the legislature—the governing body that enacted the law." *Id.* As an initial matter, the Complaint does include allegations going to "the contemporary statements and actions of key legislators," *GBM*, 992 F.3d at 1322. *See, e.g.*, ECF

No. 1 ¶¶ 61, 106 (alleging statements and conduct by various legislative sponsors and proponents). Moreover, the *Arlington Heights* analysis "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." 429 U.S. at 266. Accordingly, statements by Governor DeSantis—the highest elected official in the State and who is alleged to have played a significant, if not singular, role in the drafting, promotion, and promulgation of HB1—are plainly relevant to establishing an inference of discriminatory intent at this pleading stage. *See, e.g.*, *Caron Found. of Fla., Inc. v. City of Delray Beach*, No. 12-80215-CIV, 2012 WL 12855473, at *3 (S.D. Fla. June 6, 2012) (explaining that there is "authority for the proposition that a legislative body acting under heavy discriminatory political pressure becomes tainted with discriminatory intent"); *see also Tracy P. v. Sarasota Cnty.*, No. 8:05-CV-927-T-27EAJ, 2007 WL 9723801, at *6 (M.D. Fla. Sept. 5, 2007) ("Government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others.").[14]

*Second*, Defendants contend that Plaintiffs fail to plead discriminatory purpose because the curtailment of public comment "is hardly a departure from

---

[14] *Cf. Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2349–50 (2021) (upholding district court's post-trial finding of a lack of discriminatory intent as not clearly erroneous, where based on the full evidentiary record the court determined that the legislature undertook a full and good faith consideration of the law untainted by a sponsor's potentially-discriminatory intent).

common practice" and "the Act was not the only bill from the 2021 legislative session that took immediate effect." ECF No. 38 at 20–21. But the Complaint's allegations support an inference of discriminatory intent, including the allegations regarding the legislature's arbitrary time limits imposed during public hearings despite "significant interest in public comment," hurried timeline for the Act overall, and revision of the Act to have immediate effect upon the Governor's signature, which ultimately took place on the eve of Derek Chauvin's verdict. ECF No. 1 ¶¶ 113–19. Plaintiffs' allegations must be taken as true at this stage, even if Defendants would characterize them differently.[15]

*Third*, Defendants suggest that Plaintiffs "have not established discriminatory impact" but instead rely on a "blanket, conclusory allegation that the Act will disproportionately impact Black-led organizations." ECF No. 38 at 20–21. This again has no merit. As discussed, the Complaint contains specific and detailed allegations regarding (i) statistics and other history evidencing discriminatory enforcement of criminal laws against Black Floridians, *see* ECF No. 1 ¶¶ 64–66, 102; (ii) the enhanced criminal penalties and law enforcement discretion created by the Act, *see id.* ¶¶ 128, 139, 168; and (iii) Black Floridians' resulting fear of arrest

---

[15] Even if the Court could consider Defendants' explanation on a motion to dismiss regarding the time limits and other curtailment measures imposed by the legislature during public hearings, *see, e.g.*, ECF No. 38 at 19-20, such self-serving statements would only create a question of fact and would not undermine the plausibility of Plaintiffs' claim.

or other harm because of the Act, *see id.* ¶¶ 12, 19–20, 22, 25, 27, 74. Of course, in a pre-enforcement challenge, allegations of actual discriminatory impact in enforcement are not required—and Plaintiffs' allegations here more than support their Equal Protection claim. *Cf. City of S. Miami v. DeSantis*, 424 F. Supp. 3d 1309, 1344 (S.D. Fla. 2019) (denying motion to dismiss Equal Protection claim where complaint "set[] forth statistics and data indicating that racial minorities are more likely to be targeted, questioned, and detained" as a result of challenged law).

With respect to Count 2 (Targeting Racial Justice Advocacy), Defendants do not contest that laws burdening the fundamental right of expression and targeted at certain messages violate the Equal Protection Clause. *See Police Dep't of Chi. v. Mosely*, 408 U.S. 92, 102 (1972). Instead, Defendants baselessly complain that "no facts are alleged" regarding what "various viewpoints" are targeted by HB1 and "which sections of the Act allegedly suppress viewpoints." ECF No. 38 at 21. Defendants further state that "the Act does not discriminate against any viewpoints or otherwise raise First Amendment concerns." *Id.*

But as explained, the Complaint contains numerous allegations supporting the inference that "the Act's intent is to suppress the viewpoints of Black-led organizations and their allies . . . while advancing the viewpoints of those who support the government's 'law and order' message." ECF No. 1 ¶ 138. The Complaint also alleges that the Act has the discriminatory impact of suppressing

viewpoints, with provisions like Section 15 which "vest[] the police with wide discretion in determining whom to arrest" and thus "rais[e] a substantial risk that police will target for arrest individuals advocating messages with which the police disagree," *id.* ¶ 139. Indeed, Governor DeSantis touted HB1 as "the strongest . . . pro-law-enforcement piece of legislation in the country." *Id.* ¶ 120. Plaintiffs' allegations are thus more than sufficient to establish their Targeting Racial Justice Advocacy claim—and Defendants cannot (and do not) seriously contend otherwise. And as discussed *supra* § V, such targeting also violates the guarantees of the First Amendment.

## VII.   Plaintiffs' Complaint Does Not Constitute an Impermissible Shotgun Pleading

Finally, Plaintiffs' Complaint is not an impermissible "shotgun" pleading. The Eleventh Circuit defines a shotgun complaint as a pleading that fails "to give the defendants adequate notice of the claims against them and the grounds upon which each claim rests." *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1323 (11th Cir. 2015). A shotgun pleading dismissal is appropriate only where "it is virtually impossible to know which allegations of facts are intended to support which claim(s) for relief." *Id.* at 1325 (citation omitted). In contrast, Plaintiffs' clear and well-organized Complaint provides Defendants ample notice of the claims alleged against them. Each of its counts specifies the applicable legal basis and re-asserts the pertinent supporting factual allegations for that count.

Plaintiffs' Complaint includes four separate counts, with "each claim for relief" from HB1 "clearly labeled" by legal theory and "separate[d] into a different count." *Surgery Ctr. of Viera, LLC v. Meritain Health, Inc.*, No. 6:19-cv-1694-Orl-40LRH, 2020 WL 7389987, at *9 (M.D. Fla. June 1, 2020).

Additionally, the factual bases for each count are concisely stated in the body of the count. Count 1 expressly challenges the racially discriminatory purpose of the HB1 in its entirety under the Equal Protection Clause of the Fourteenth Amendment. Count 1 then describes various grounds for finding discriminatory intent—including the history surrounding the adoption of the HB1, unusual events leading up to its signing, substantive departures from the normal legislative process, statements from various governmental officials, and testimony surrounding HB1's enactment. Count 2 similarly expressly challenges the act as a whole under the theory that it violates the Equal Protection Clause of the Fourteenth Amendment because it targets racial justice advocacy.

Counts 3 and 4 are no less straightforward. They each challenge both the act as a whole and specific subsections of the act as violating the First Amendment (Count 3), and the Due Process Clause of the Fourteenth Amendment (Count 4).

"Although lengthy, the factual allegations in the Complaint are clearly stated and well-organized." *Villarino v. Pacesetter Pers. Serv., Inc.*, 481 F. Supp. 3d 1252, 1255 (S.D. Fla. 2020). To the extent the four counts cite to overlapping allegations,

it is because those allegations "are generally relevant to each count." *Middleton v. Morgan*, 3:17cv346/MCR/GRJ, 2018 WL 11202672, at *4 (N.D. Fla. Mar. 1, 2018). As an example, allegations regarding the legislative intent behind the passage of HB1 are pleaded both in Count 1's racially discriminatory intent claim and in Count 2's claim that HB1 impermissibly targets certain messages, because those allegations support both counts. *See* ECF No. 1 ¶¶ 128–29, 137–38*; see also Davis v. City of Lake City*, No. 3:10-cv-1170-J-34TEM, 2011 WL 13295721, at *3 (M.D. Fla. Nov. 14, 2011) (sustaining complaint that re-alleged identical factual allegations for discrimination and retaliation counts and noting that "the facts set forth in the general allegations are relevant to both types of claims"). Furthermore, although each count does incorporate the factual pleadings from Paragraphs 1–120, "counts are not re-alleged and re-incorporated into successive counts." *Villarino*, 481 F. Supp. 3d at 1255; *see also Weiland* 792 F.3d at 1324 (distinguishing between the incorporation of factual allegations on the one hand and incorporation of prior *count*s on the other).

The Complaint clearly alleges all claims are brought against all Defendants and that the relief sought is an injunction against all Defendants from enforcing HB1 in its parts and its entirety. *See* ECF No. 1 ¶¶ 131–33, 142–44, 161–63, 173–75; *id.* at 60. Thus, there can be no cognizable argument that any of the Defendants is not on fair notice of which claims are brought against them and on what basis. Indeed,

it is evident from Defendants' motions to dismiss Plaintiffs' Complaint for failure to state a claim that they are keenly aware of which claims have been brought by Plaintiffs and against whom.

Because the Complaint gives each Defendant ample "notice of [the] plaintiff[s'] allegations and claims" against them, it cannot be deemed a shotgun pleading. *Charudattan v. Darnell*, No. 1:18cv109MW/GRJ, 2019 WL 12043587, at *4 (N.D. Fla. Feb. 7, 2019) (Walker, C.J.) (citing *Weiland*, 792 F.3d at 1323).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny all Defendants' motions to dismiss in their entirety.

Dated:  July 23, 2021                           Respectfully submitted,

                                                */s/ Rachel M. Kleinman*
                                                Rachel M. Kleinman

**NAACP LEGAL DEFENSE AND**          **COMMUNITY JUSTICE PROJECT,**
**EDUCATIONAL FUND, INC.**            **INC.**

*/s/ Rachel M. Kleinman*              */s/ Alana Greer*
Rachel M. Kleinman*                   Alana Greer
rkleinman@naacpldf.org                Florida Bar No. 92423
Morenike Fajana*                      alana@communityjusticeproject.com
mfajana@naacpldf.org                  Berbeth Foster
40 Rector Street, 5th Floor           Florida Bar No. 83375
New York, NY 10006                    berbeth@communityjusticeproject.com
Telephone: (212) 965-3709             Denise Ghartey
Facsimile: (212) 226-7592             Florida Bar No. 1019211
-and-                                 denise@communityjusticeproject.com
Georgina C. Yeomans*                  Miriam Haskell
gyeomans@naacpldf.org                 Florida Bar No. 069033

700 14th Street NW, Suite 600
Washington, DC 20005
Telephone: (202) 216-2721
Facsimile: (202) 682-1312

miriam@communityjusticeproject.com
3000 Biscayne Blvd., Suite 106
Miami, Florida 33137
Telephone: (305) 907-7697

**AKIN GUMP STRAUSS HAUER & FELD LLP**

*/s/ Joseph L. Sorkin*
Joseph L. Sorkin*
jsorkin@akingump.com
Anne M. Evans**
aevans@akingump.com
Erica E. Holland*
eholland@akingump.com
One Bryant Park
New York, New York 10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
-and-
Steven H. Schulman*
sschulman@akingump.com
James E. Tysse*
jtysse@akingump.com
Caroline L. Wolverton**
cwolverton@akingump.com
Robert S. Strauss Tower
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
-and-
Nicholas E. Petree*
npetree@akingump.com
1111 Louisiana Street, 44th Floor
Houston, Texas 77002-5200
Telephone: (713) 220-5800
Facsimile: (713) 236-0822

*Admitted pro hac vice*
** *Pro Hac Vice applications to
be filed*

*Counsel for Plaintiffs*

44

## **LOCAL RULE 7.1(F) CERTIFICATION**

Pursuant to Local Rule 7.1(F) and in accordance with the Court's July 16, 2021 ruling, the foregoing Consolidated Opposition contains 9,962 words, excluding the case caption, signature block, this certification, and the certificate of service.

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of the foregoing was served to all counsel of record through the Court's CM/ECF system on July 23, 2021.

*/s/ Rachel M. Kleinman*
Rachel M. Kleinman

*Attorney for Plaintiffs*