IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

**THE DREAM DEFENDERS,
et al.,**

     *Plaintiffs,*

**v.**                       **Case No.: 4:21cv191-MW/MAF**

**RON DESANTIS, in his official
capacity as Governor of the
State of Florida, et. al.,**

     *Defendants.*
_____/

## ORDER ON MOTIONS TO DISMISS

In April 2021, Governor DeSantis signed House Bill 1 (HB1 or "the Act")—better known as the "anti-riot" bill—into law. The ultimate question in this case is whether HB1 violates the First Amendment, the Fourteenth Amendment's Equal Protection clause or the Due Process clause. *See generally* ECF No. 1. All Defendants move to dismiss Plaintiffs' Complaint. *See* ECF Nos. 38, 39, 48, 49, and 50. Before this Court can begin to answer the ultimate question, it must rule on the motions to dismiss.

I

A

Before turning to the parties' arguments, some background is necessary. HB1's new definition of "riot" sits at the core of Plaintiffs' suit. Prior to the Act's passage, Florida law criminalized rioting, "or . . . inciting or encouraging a riot." § 870.01, Fla. Stat. (1971). Because the statute did not define riot, Florida courts relied on the common-law definition of riot. *State v. Beasley*, 317 So. 2d 750, 752 (Fla. 1975). HB1's section 15 amended section 870.01 to, among other things, define riot. Plaintiffs argue that this new definition "fails to clarify whether a participant in a larger demonstration where violence occurs" is guilty of rioting. ECF No. 1 ¶ 72. Plaintiffs have also moved to preliminarily enjoin Defendants from enforcing section 15. ECF No. 64.

Although Section 15 is the subject of Plaintiffs' motion for preliminary injunction, Plaintiffs challenge HB1 in its entirety. In doing so, Plaintiffs discuss only certain sections of the Act; specifically, sections 1, 2, 3, 8, 14, 15, 16, and 18.

Section 1 of the Act provides for appeals from a municipality's decision to reduce funding "to the operating budget of [a] municipal law enforcement agency." § 166.241(4)(a), Fla. Stat. (2021). Any member of the municipal governing body or the state attorney for the local judicial circuit may lodge an appeal with the Executive Office of the Governor. *Id.* The Governor's office then holds a hearing and makes

findings and recommendations to the Administration Commission, which either approves or modifies the municipality's budget. *Id.* § 166.241(5). The Administration Commission is part of the Executive Office of the Governor and is made up of the Governor and Cabinet. § 14.202, Fla. Stat. The Commission cannot act without the Governor's approval. *See id.* (explaining that any action by the Commission "shall require the approval of the Governor and at least two other members of the commission"). Thus, in effect, Section 1 gives the Governor veto power over any reduction in a municipal police force's budget.[1]

Section 2 amends section 316.2045, Florida Statutes, to prohibit persons from obstructing "the free, convenient, and normal use of a public street, highway, or road by" either "[s]tanding on or remaining in the street, highway, or road." § 316.2045(1)(a)(1), Fla. Stat. (2021).

Section 3 amends section 768.28, Florida Statutes, to provide that "[a] municipality has a duty to allow the municipal law enforcement agency to respond appropriately to protect persons and property during a riot" and, "[i]f the governing body of the municipality . . . breaches that duty, the municipality is civilly liable for any damages . . . proximately caused by the . . . breach of duty." § 768.28(5)(b), Fla.

---

[1] Florida law already provides for a budget appeal process for Florida sheriffs in the event the board of county commissioners or budget commission "amend[s], modif[ies], increase[s], or reduce[s] any or all items of expenditure in the proposed budget." *See* § 30.49(4), Fla. Stat. (2011). HB1 creates and expands this appeal process for municipal law enforcement agencies with a particular focus on proposed budget reductions. *See* § 166.241, Fla. Stat. (2021).

Stat. (2021). In such a suit, the normal "sovereign immunity recovery limits . . . do not apply." *Id.*

Section 8 creates a new crime, mob intimidation, which prohibits three or more persons "acting with a common intent, to use force or threaten to use force, to compel or induce, or attempt to compel or induce, another person to do or refrain from doing any act or to assume, abandon, or maintain a particular viewpoint against his or her will." § 784.0495(1), Fla. Stat. (2021). Any person who violates this provision commits a first-degree misdemeanor and must be held without bail until brought before a court. *Id.* § 784.0495(2)–(3).

Section 14 creates another new crime, cyberintimidation by publication. A person commits cyberintimidation when they "electronically publish another person's personal identification information with the intent to, or with the intent for a third party to" either "[i]ncite violence or commit a crime against the person" or "[t]hreaten or harass the person, placing such person in reasonable fear of bodily harm." § 836.115(2)(a)–(b), Fla. Stat. (2021). A violation of this statute amounts to a first-degree misdemeanor punishable by up to a year in jail and a $1,000 fine. *See* §§ 775.082(4)(a) & 775.083(1)(d), Fla. Stat.

Section 16 "amends the misdemeanor offense of Unlawful Assemblies to require anyone arrested under this provision to be held without bail until brought before a judge for a hearing." ECF No. 1 ¶ 78; § 870.02(2), Fla. Stat. (2021).

4

Finally, section 18 creates an affirmative defense in civil actions. Specifically, "[i]n a civil action for damages for personal injury, wrongful death, or property damage, it is an affirmative defense that such action arose from an injury or damage sustained by a participant acting in furtherance of a riot." § 870.07(1), Fla. Stat. (2021). To establish this new defense, a party may either show "that the participant has been convicted of a riot or an aggravated riot . . . or by proof of the commission of such crime by a preponderance of the evidence." *Id.* § 870.07(2).

Other provisions of the Act not specifically discussed in Plaintiffs' Complaint create enhanced penalties for assaults committed "in furtherance of a riot or an aggravated riot," § 784.011(3), Fla. Stat. (2021); § 784.021(3), Fla. Stat. (2021), or for battery or aggravated battery committed "in furtherance of a riot," § 784.021(1)(b)(3), Fla. Stat. (2021); § 784.045(1)(b)(3), Fla. Stat. (2021). Plus, the Act enhances penalties for battery on certain enumerated first responders in furtherance of a riot and sets a mandatory minimum 6-month jail sentence for anyone who batters a law enforcement officer in furtherance of a riot. §§ 784.03(2)(b), (4), Fla. Stat. (2021). The Act also criminalizes defacing or destroying "a memorial or historic property." § 806.13(3), Fla. Stat (2021); § 806.135, Fla. Stat. (2021). And the Act enhances the penalties for burglary or theft when the perpetration of the theft or burglary "is facilitated by conditions arising from [a] riot," and restricts bail for

those arrested for such crimes. § 810.02(3)(f), Fla. Stat. (2021); §§ 812.014(b)(4), (b)(13), Fla. Stat. (2021).

Finally, other miscellaneous sections repeal section 870.03, Florida Statutes, which prohibited unlawfully assembled persons from "demolish[ing], pull[ing] down or destroy[ing], or begin[ning] to demolish, pull down or destroy, any dwelling house or other building, or any ship or vessel," § 870.03, Fla. Stat. (1971); increase the penalties for injuring or removing a tomb or monument or disturbing the contents of a grave or tomb when the defendant does so "in furtherance of a riot," § 872.02(3), Fla. Stat. (2021); amend the criminal punishment code severity ranking chart consistent with the changes made by other portions of the Act, § 921.0022, Fla. Stat. (2021); and provide that the Act shall take immediate effect upon becoming law.

## B

Roughly a month after Governor DeSantis signed HB1 into law, Plaintiffs brought this suit. *See* ECF No. 1. Plaintiffs are all organizations that advocate for the interests of minority groups, particularly Black Floridians, and sue on behalf of themselves and their members. *Id.* at 1.

Based in Miami, Plaintiff Dream Defenders "is a chapter and membership-based organization led by Black and Latinx youth who focus on promoting civic engagement and organizing young people and students against structural inequality." *Id.* ¶ 10. Also based out of Miami, Plaintiff The Black Collective, Inc. "is a Florida

nonprofit corporation focused on promoting political participation and economic empowerment of Black communities." *Id.* ¶ 14. Based out of Broward County, Plaintiff Chainless Change, Inc. "is a Florida nonprofit corporation and recovery community that aims to improve the lives of justice-involved individuals through community organizing that addresses systemic inequality." *Id.* ¶ 17. As their name would suggest, Plaintiff Black Lives Matter Alliance Broward is likewise based in Broward County. *Id.* ¶ 23. It "is a grassroots alliance of community organizations and individuals . . . aiming to abolish institutional racism and policing through direct actions, political education, and community organizing." *Id.* Plaintiff Florida State Conference of the NAACP Branches and Youth Units "is a Black-led organization that is committed to ensuring the political, educational, social, and economic equality rights for all persons and to eliminate race-based discrimination." *Id.* ¶ 28. Finally, Plaintiff Northside Coalition of Jacksonville "is a Florida nonprofit corporation that focuses on the problems of social, racial, and economic injustice and regularly engages in nonviolent direct action." *Id.* ¶ 32.

Plaintiffs name as defendants Florida Governor Ron DeSantis in his official capacity, Florida Attorney General Ashley Moody in her official capacity, Leon County Sheriff Walt McNeil in his official capacity, Jacksonville Sheriff Mike Williams in his official capacity, and Broward County Sheriff Gregory Tony in his official capacity. *Id.* ¶¶ 36, 38, 40, 41, 42.

7

Plaintiffs claim that HB1 violates the Fourteenth Amendment's Equal Protection Clause because the Act was passed with discriminatory intent (Count 1) and because the Act targets certain messages (Count 2). *Id.* ¶¶ 121–33, 134–44. Plaintiffs also claim that the Act violates the First Amendment because it "constitutes impermissible viewpoint and content discrimination, and is overbroad" (Count 3). *Id.* ¶¶ 145–63. Finally, Plaintiffs argue that the Act violates the Fourteenth Amendment's Due Process Clause because it is impermissibly vague (Count 4). *Id.* ¶¶ 164–75.

As for relief, Plaintiffs ask this Court to "[d]eclare that Sections 2, 3, 8, 14, 15, 16, and 18" of the Act, and the "Act in its entirety, are unconstitutional." ECF No. 1 at 60. Plaintiffs further request that this Court "[p]reliminarily and permanently enjoin Sections 2, 3, 8, 14, 15, 16, and 18 of the Act." *Id.*

C

In response, all Defendants move to dismiss Plaintiffs' Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[2] Defendants' arguments, which are discussed in more detail below, can be sorted into four general categories. *First*, all Defendants argue both that Plaintiffs lack standing and that this case is not ripe. *Second*, Attorney General Moody and Governor DeSantis argue that they are

---

[2] Although Sheriff Williams does not explicitly mention Rule 12(b)(1), he adopts Attorney General Moody's argument that Plaintiffs lack standing. ECF No. 49 at 18.

not proper parties under *Ex parte Young*. *Third*, all Defendants argue that Plaintiffs have failed to state a claim.[3] *Fourth*, and finally, the Sheriffs argue that Plaintiffs have not alleged any official policy or custom of the Sheriffs caused Plaintiffs' alleged constitutional injury as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978). This Court addresses each argument in turn.

## II

As it must, this Court first addresses threshold jurisdictional issues. A Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction "can be asserted on either facial or factual grounds." *Carmichael v. Kellogg, Brown & Root Servs., Inc.*, 572 F.3d 1271, 1279 (11th Cir. 2009) (citation omitted). A facial challenge occurs when, as here, defendants base their challenge to subject matter jurisdiction solely on the allegations in the complaint. *Id.* In considering Defendants' facial challenge, this Court must take Plaintiffs' allegations as true. *Id.*

## A

First, standing. To establish standing, Plaintiffs must show (1) that they have suffered an injury-in-fact that is (2) traceable to Defendants and that (3) can likely be redressed by a favorable ruling. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). And they must do so for each statutory provision they challenge.

---

[3] The Sheriffs and the Governor have incorporated by reference Attorney General Moody's arguments with respect to Rule 12(b)(6).

*CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1273 (11th Cir. 2006) (emphasizing that courts have an "independent obligation . . . to ensure a case or controversy exists as to each challenged provision even in a case where the plaintiffs established harm under one provision of the statute"). Plaintiffs proceed under two theories of standing, organizational standing and associational standing. This Court discusses each in turn.

"In certain scenarios, an organization has standing to assert claims based on injuries to itself if that organization is affected in a tangible way." *Namphy v. DeSantis*, 493 F. Supp. 3d 1130, 1138 (N.D. Fla. 2020). Here, Plaintiffs proceed under a diversion of resources theory. "Under the diversion-of-resources theory, an organization has standing to sue when a defendant's illegal acts impair the organization's ability to engage in its own projects by forcing the organization to divert resources in response." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014). To successfully challenge the entire Act, Plaintiffs must establish organizational standing as to all the Act's sections. *CAMP*, 451 F.3d at 1273.

In addition to organizational standing, an organization may sue "on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries*

*v. Sec'y of State of Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) ("*GBM*"). As discussed below, Plaintiffs' members have standing as to certain provisions of the Act. Additionally, this lawsuit is germane to Plaintiffs, whose core purpose is to organize and participate in support of racial justice. Finally, neither the claims asserted, nor the relief requested requires the participation of the individual members in this lawsuit. *See Nat'l Parks Conservation Ass'n v. Norton*, 324 F.3d 1229, 1244 (11th Cir. 2003); *GBM*, 992 F.3d at 1316 n.29 ("[P]rospective relief weigh[s] in favor of finding that associational standing exists.").

In addressing both forms of standing, this Court starts with the injury requirement. And to streamline the analysis, this Court will begin with the provisions for which it finds that Plaintiffs have not pleaded an injury-in-fact.

### 1. *Injury*

i.   Section 1

Section 1 of the Act provides for appeals from a municipality's decision to reduce funding "to the operating budget of [a] municipal law enforcement agency." § 166.241(4)(a), Fla. Stat. (2021). The Governor's office considers appeals and makes recommendations to the Administration Commission, which cannot act without his approval.

Plaintiffs argue that "[b]ecause the Commission's authority under Section 1 adds administrative and logistical hurdles to proposals to reduce law enforcement

11

budgets, Plaintiffs are refraining from advocating for such proposals," and that section 1 therefore injures Plaintiffs through "self-censorship" and "through the frustration of Plaintiffs' missions to advocate for . . . diverting funding from police departments." ECF No. 85 at 10–11 (citing *Namphy*, 493 F. Supp. 3d at 1138).

However, the injury through frustration of purpose that supported organizational standing in *Namphy* was based on organizations, whose purpose was registering voters, being denied the ability to register voters. 493 F. Supp. 3d at 1138 (relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). Here, Plaintiffs describe themselves as having the "missions to advocate for racial justice and police accountability in the form of diverting funding from police departments to other social services." ECF No. 85 at 10.

While this Court has no doubt as to Plaintiffs' collective disappointment and frustration at the effect of section 1 on municipal funding of police departments over a variety of social services, the asserted injury must be "far more than simply a setback to the organization's abstract social interests." *Havens*, 455 U.S. at 379. Setting aside the effects of the other challenged sections of the Act, Plaintiffs are just as able to fulfill their purpose, i.e., *advocate*, after section 1 went into effect as they were beforehand. Plaintiffs' position would appear to lead to a cognizable injury for every organization that objects to the way a municipality allocates its funds. This

Court cannot find legal support for such a scheme, nor would it like to imagine the results.

In short, though it may be more difficult for Plaintiffs to have their preferred policies implemented at the municipal level, this does not frustrate their purpose—to advocate for those policies. Plaintiffs are not injured by section 1.

ii.    Sections 3 and 18

Section 3 creates a duty for municipalities to allow law enforcement agencies to respond appropriately during a riot. *See* § 768.28(5)(b), Fla. Stat. (2021). If a responsible party breaches this duty, the municipality is liable for damages proximately caused by the breach and sovereign immunity recovery limits do not apply. *Id*. Plaintiffs allege that this amendment incentivizes municipalities "not to intervene or otherwise thwart overly punitive law enforcement responses to demonstrations, for fear of running afoul of this provision." ECF No. 1 ¶ 97. As a result, Plaintiffs assert this provision chills "Black would-be protesters from engaging in protests," and "impedes would-be protesters from petitioning their municipal governments to reform the local policy by rendering such advocacy useless." *Id*. ¶ 99. However, in response to Defendants' motions to dismiss, Plaintiffs offer no argument that they have suffered a concrete injury based on this provision.

The same is true of section 18, which generates an affirmative defense in civil actions for those sued for personal injury, wrongful death, or property damage, if the

plaintiff sustained his or her injuries by acting in furtherance of a riot. § 870.07(1), Fla. Stat. (2021). Plaintiffs allege this new affirmative defense, which hinges on the amended definition for "riot," "invites violence against protestors and others engaged in protected speech activity by completely insulating the aggressors from money damages," if they can "point to a 'rioting' conviction or provide 'proof' . . . that the injured or killed person participated in a riot." ECF No. 1 ¶ 91. This Court understands Plaintiffs' allegations to imply that their members' speech is chilled for fear of the potential violence this provision invites. However, again, Plaintiffs offer no supporting argument in response to the motions to dismiss to show they are suffering a concrete injury as a result of this provision and this Court will not make the argument for them.

  iii.  Sections 4 through 7

  Sections 4 through 7 of the Act are similar to each other in that they enhance the penalties for certain acts that are already criminalized. Sections 4 and 5 create enhanced penalties for assaults and aggravated assaults committed "in furtherance of a riot or an aggravated riot" respectively. §§ 784.011(3) & 784.021(3), Fla. Stat. (2021). And sections 6 and 7 enhance the penalties for battery and aggravated battery committed "in furtherance of a riot." §§ 784.021(1)(b)(3) & 784.045(1)(b)(3), Fla. Stat. (2021).

Plaintiffs do not allege that they—or rather, their members—intend to commit any assaults, aggravated assaults, batteries, or aggravated batteries. Nor do Plaintiffs argue that they have diverted resources due to these enhanced criminal penalties, nor that these sections have chilled Plaintiffs' speech. As such, Plaintiffs are not injured by sections 4, 5, 6, or 7.

iv.     Section 8

Section 8 creates a new crime, mob intimidation, which prohibits three or more persons "acting with a common intent, to use force or threaten to use force, to compel or induce, or attempt to compel or induce, another person to do or refrain from doing any act or to assume, abandon, or maintain a particular viewpoint against his or her will." § 784.0495(1), Fla. Stat. (2021). Any person who violates this provision "commits a misdemeanor of the first degree" and must be held without bail until brought before a court. *Id.* § 784.0495(2)–(3).

While Plaintiffs rely on *R.A.V. v. City of St. Paul, Minnesota* to attack section 8 as "an unconstitutional content-based regulation on a subset of protected, non-proscribable speech," 505 U.S. 377, 383–84 (1992); ECF No. 1 ¶ 152, they do not allege actual injury stemming from this section. Plaintiffs do not allege that they, or their members, plan to use force or threaten force to compel or induce any other person to do or refrain from doing anything or change or maintain a particular viewpoint. Nor do Plaintiffs allege any injury due to diversion of resources or self-

censorship as a result of section 8. And, finally, Plaintiffs do not allege that section 8 is vague or overbroad, and therefore chills their speech. As such, Plaintiffs are not injured by section 8.

     v.     Sections 9 through 13

Sections 9 through 13 either criminalize acts or, like sections 4 through 7, enhance the penalties for certain criminal acts. Section 9 enhances penalties for battery on certain enumerated first responders in furtherance of a riot and sets a mandatory minimum six-month jail sentence for anyone who batters a law enforcement officer in furtherance of a riot. §§ 784.03(2)(b), (4), Fla. Stat. (2021). Section 10 criminalizes defacing "a memorial or historic property," § 806.13(3), Fla. Stat. (2021), and section 11 criminalizes destroying such property, § 806.135, Fla. Stat. (2021). Section 12 enhances the penalties for burglary when the perpetration of the burglary "is facilitated by conditions arising from [a] riot," and restricts bail for those arrested for such crimes. § 810.02(3)(f), Fla. Stat. (2021). And section 13 enhances the penalties for theft when the perpetration of the theft "is facilitated by conditions arising from [a] riot," and restricts bail for those arrested for such crimes. §§ 812.014(b)(4), (b)(13), Fla. Stat. (2021).

Plaintiffs do not allege that they or their members intend to commit battery, deface or destroy "memorial[s] or historic propert[ies]," commit burglary, or commit theft. Nor do Plaintiffs argue that these criminal penalties have caused Plaintiffs to

divert their resources to self-censor. Accordingly, Plaintiffs are not injured by sections 9 through 13.

vi.    Section 17

Section 17 repeals section 870.03, Florida Statutes, which prohibited unlawfully assembled persons from "demolish[ing], pull[ing] down or destroy[ing], or begin[ning] to demolish, pull down or destroy, any dwelling house or other building, or any ship or vessel." § 870.03, Fla. Stat. (1971). Plaintiffs do not attempt to argue that this particular section, which merely repeals a criminal statute, injures them in any way, including through any diversion of resources or self-censorship.

vii.    Section 19

Similar to several sections already described, section 19 increases the penalties for an extant crime; namely, injuring or removing a tomb or monument or disturbing the contents of a grave or tomb when the defendant does so "in furtherance of a riot." § 872.02(3), Fla. Stat. (2021). Plaintiffs do not allege that they—or rather, their members—intend to defile graves. Nor do they allege that section 19 has caused them to divert their resources or to engage in self-censorship. As such, Plaintiffs are not injured by section 19.

viii.    Section 20

Section 20 amends the criminal punishment code severity ranking chart consistent with the changes made by other portions of the Act. *See* § 921.0022, Fla.

Stat. (2021). Plaintiffs do not attempt to single out any injury from section 20, which does not appear to cause any injury independent of another section. This section has not caused Plaintiffs to divert their resources, nor has it chilled their speech. As such, Plaintiffs have not alleged that they are injured by section 20.

ix.    Section 21

Section 21 provides that the Act shall take immediate effect upon becoming law. While Plaintiffs cite this provision as evidence of the atypical, hurried process used by the Florida Legislature to pass the Act, ECF No. 1 ¶¶ 5, 118–19, they do not specify any particular injury caused by this section. This includes any diversion of resources or chilling of speech. As such, there is no injury caused by section 21. This Court, however, finds that, as described below, the remaining sections have injured Plaintiffs.

x.    Sections 2, 14, 15, and 16

That leaves sections 2, 14, 15, and 16 of the Act. Section 2 makes it a noncriminal traffic infraction to obstruct a public street, highway, or road. § 316.2045, Fla. Stat. (2021); § 318.14(1), Fla. Stat. Section 14 creates the crime of "cyberintimidation by publication." § 836.115, Fla Stat. (2021). Section 15 defines "riot." § 870.01, Fla. Stat. (2021). And finally, section 16 changes when bail is available for those arrested for unlawful assembly. § 870.02, Fla. Stat. (2021).

18

Plaintiffs allege that section 2 will allow police to arrest and ticket peaceful protestors. ECF No. 1 ¶ 76. Thus, because of section 2, "would-be protesters . . . have already been and will continue to be discouraged from exercising their First Amendment rights for fear of arrest." *Id.* ¶ 77. Plaintiffs allege that section 14 is overbroad, and chills "constitutionally protected electronic communications." *Id.* ¶ 155. This is because it "runs the risk of subjecting a speaker to arrest or criminal prosecution for simply posting another's name." *Id.* ¶ 158. As for section 15, Plaintiffs claim that the new definition of riot is vague and overbroad in that it may criminalize "merely being present at a demonstration where violence or property destruction occurs" and encourages selective or arbitrary enforcement. *Id.* ¶ 168. As a result, "Plaintiffs have already . . . and will continue to be discouraged from participating in demonstrations for fear that the intent and actions of others may subject them to arbitrary enforcement and severe criminal penalties." *Id.* ¶ 169. Finally, Plaintiffs allege that section 16 ensures that "a person arrested for breach of the peace . . . will spend at least one night in jail." *Id.* ¶ 79. Accordingly, section 16 chills "protected speech by discouraging would-be protesters from participating in a demonstration for fear that they may be arrested . . . and have to spend at least one night in jail." *Id.* ¶ 80. For all of these provisions, this Court finds that Plaintiffs have sufficiently alleged an injury in fact.

As to organizational standing, Plaintiffs have alleged, with the exception of the NAACP, that "organizing and participating in support of racial justice is core to" their missions. ECF No. 76 at 6; ECF No. 1 ¶¶ 11, 15, 24, 32. Plaintiffs also rely heavily on social media to spread their message and organize their members' activities. *Id.* ¶¶ 11, 13, 22, 27. As a result of the Act, Plaintiffs claim, they have been forced to redirect staff, volunteers, and other resources from organizing or protesting to working on issues surrounding the Act, including organizing "Know Your Rights trainings." *Id.* ¶¶ 13, 16, 19, 25, 26, 29. For future protests, Plaintiff "NAACP will have to reallocate more time and resources in order to attempt to ensure that gatherings will remain safe." *Id.* ¶ 30. Plaintiff Northside Coalition "has been forced to spend time and resources identifying legal observers . . . and additional peacekeepers." *Id.* ¶ 35. Plaintiff Chainless Change "has been forced [by the Act] to expend funds on hiring a consulting company to transition from direct action to other communication tools." *Id.* ¶ 21. And at least one Plaintiff has declined to hire for certain positions. *Id.* ¶ 20. Plaintiffs also allege that, because of section 14 of the Act, Plaintiffs Dream Defenders, Chainless Change, and BLMA Broward have sought alternative means of communication. *Id.* ¶¶ 13, 22, 27. Plaintiff Dream Defenders has also devoted additional time and effort to screening electronic communications. *Id.* ¶ 13.

Because sections 2, 14, 15, and 16 arguably sweep up peaceful protests or other protected speech and because Plaintiffs have been forced to divert resources to respond to these sections, Plaintiffs sufficiently allege organizational standing as to sections 2, 14, 15, and 16. *Arcia*, 772 F.3d at 1342 ("This redirection of resources to counteract the [the effects of the Act] is a concrete and demonstrable injury.").

Defendants' argument to the contrary is not persuasive. Citing *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), Defendants argue that Plaintiffs' allegations fall short because Plaintiffs fail to "specify what activities the expenditures were diverted away from in order to combat HB 1." ECF No. 81 at 2. *Jacobson*, however, is distinguishable. In *Jacobson*, the defendants appealed from a final order following trial. And, as the Supreme Court has observed, a plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [this Court must] 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.' " *Id.* (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). At this stage, Plaintiffs' allegations are sufficient. To require anything more would contravene Rule 8(a)(1)'s admonition that a complaint contain "a short and plain statement of the grounds for the court's jurisdiction."

Plaintiffs' allegations are also sufficient to establish an injury for associational standing. This is because Plaintiffs allege that sections 2, 14, 15, and 16 chill their members' speech. *Id.* ¶¶ 76–77, 170. While Defendants argue both that Plaintiffs are not injured and that this case is not ripe because there is no credible threat of enforcement, as discussed further below, Plaintiffs sufficiently allege a credible threat of enforcement to establish both injury and ripeness.

The injury-in-fact requirement applies "most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010). And ripeness—which seeks to prevent the premature adjudication of inchoate disputes— requires this Court to evaluate (1) whether this case is fit "for judicial decision and (2) the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

This is a pre-enforcement challenge. And thus, as to the injury-in-fact inquiry, "[t]his is one of those cases where 'the Article III standing and ripeness issues . . . boil down to the same question.' " *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1304 (11th Cir. 2017) (en banc) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)). That question is, "when [does] the threatened enforcement of a law create[] an Article III injury"? *Driehaus*, 573 U.S. at 158. As the Supreme Court has often done, in addressing this issue, this Court will use the term "standing"

22

to describe both standing and ripeness. *Id.* at 157 n.5. "A person can bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Wollschlaeger*, 848 F.3d at 1304 (quoting *Driehaus*, 573 U.S. at 159) (cleaned up).

Here, Plaintiffs have alleged an intention—their members' intention—to engage in a course of conduct arguably affected with a constitutional interest but proscribed by a statute. There is no doubt Plaintiffs' intended course of conduct, protesting in support of racial justice, is affected with a constitutional interest. The harder question, though, is whether such conduct is arguably forbidden by sections 2, 14, 15, and 16.

Defendants argue that the Act does not prohibit any speech that Plaintiffs allege they intend to engage in. But at this stage, that is not the question. Instead, Plaintiffs must only show that their desired expression is "at least arguably forbidden by the pertinent law." *Harrell*, 608 F.3d at 1260 (emphasis deleted) (quoting *Hallandale Pro. Fire Fighters Local 2238 v. City of Hallandale*, 922 F.2d 756, 762 (11th Cir. 1991)). Here, such activity certainly is. First, section 2 allows fines for "[s]tanding on or remaining in the street." § 316.2045(1)(a)(2), Fla. Stat. (2021). It is not hard to imagine how this provision could be used to penalize protestors. Likewise, section 14, which prohibits cyberintimidation, could arguably be read to

prohibit sharing the contact information of government officials, something most of the Plaintiffs allege they do. *See, e.g.*, ECF No. 1 ¶ 11. Section 15 is perhaps the most pernicious. This is because it arguably criminalizes mere presence at a protest where violence occurs—even if that violence is caused by counter protestors. Finally, under section 16, an unlawful assembly occurs whenever three or more people gather "to do any . . . unlawful act." § 870.02(1), Fla. Stat. (2021). Thus, if three or more people gather to participate in a peaceful protest that is marred by violence, they may be arrested for violating both sections 15 and 16 and held overnight without bail. Plaintiffs' desired expression is therefore at least arguably prohibited by sections 2, 14, 15, and 16.

This Court is also satisfied that a credible threat of enforcement exists as to each Defendant.[4] The Eleventh Circuit has described the analysis for determining whether a credible threat of enforcement exists as "quite forgiving." *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (citation omitted). Indeed, "[i]f a challenged law or rule was recently enacted, or if the enforcing authority is defending the challenged law or rule in court, an intent to enforce the rule may be inferred." *Harrell*, 608 F.3d at 1257. HB1 is newly enacted, and all Defendants are

---

[4] This discussion excludes Attorney General Moody who, as discussed below, has no enforcement authority vis-à-vis HB1.

defending it. On that basis alone, this Court finds a credible threat of enforcement exists.

But even if that were not enough, public statements by Governor DeSantis and Sheriff Williams leave this Court with little doubt that they intend to enforce HB1. *See* News Release, Office of Gov. Ron DeSantis, *What are They Saying: Governor Ron DeSantis Signs Hallmark Anti-Rioting Legislation Taking Unapologetic Stand for Public Safety* (Apr. 19, 2021), https://www.flgov.com/2021/04/19/what-they-are-saying-governor-ron-desantis-signs-hallmark-anti-rioting-legislation-taking-unapologetic-stand-for-public-safety/. Plus, as for all the sheriffs, Florida law states in no uncertain terms that they "*shall* . . . [s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary." § 30.15(1)(f), Fla. Stat. (emphasis added). This Court seriously doubts that any of the sheriffs would neglect such an explicit statutory duty. For all these reasons, it is manifestly clear that a credible threat of enforcement exists as to sections 2, 14, 15, and 16.

Thus, when it comes to associational standing, Plaintiffs have alleged an injury-in-fact that is ripe for adjudication. Having so decided, this Court turns to the second element of standing, causation.

## 2. *Causation*

As described above, this Court is satisfied that Plaintiffs have suffered an injury-in-fact as to sections 2, 14, 15, and 16 of the Act.[5] But an injury-in-fact is not enough, Plaintiffs must also show causation and redressability. *Lujan*, 504 U.S. at 560.

First, causation. Plaintiffs must establish causation by showing that "their injuries are connected with" Defendants' conduct. *Wilding v. DNC Servs. Corp.*, 941 F.3d 1116, 1125 (11th Cir. 2019) (cleaned up) (quoting *Trump v. Hawaii*, 138 S. Ct. 2392, 2416 (2018)). In other words, Plaintiffs must show that their injury is "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

To do so, Plaintiffs need only show "that there is a substantial likelihood of causation." *Duke Power Co. v. Env't Study Grp.*, 438 U.S. 59, 75 n.20 (1978). This is not an exacting standard; "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 (2014). And thus "[a] plaintiff . . . need not show (or, as here, allege) that 'the defendant's actions are the very last step in the chain of causation.' " *Wilding*, 941 F.3d at 1126 (quoting *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997)). "[E]ven harms that flow indirectly from the action in question can be said to be 'fairly

---

[5] Corresponding with sections 316.2045, 836.115, 870.01, and 870.02 respectively.

traceable' to that action for standing purposes." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003).

    i.    Governor DeSantis

Starting with Governor DeSantis, he adopts by reference Attorney General Moody's standing arguments. ECF No. 39 at 15. Nonetheless, the Governor's traceability argument is clear: "Plaintiffs' purported injury is not 'fairly traceable' to [the Governor] because [he] has no enforcement authority over the laws they challenge." ECF No. 38 at 14 (citing *Jacobson*, 974 F.3d at 1256). In large part, this argument overlaps with the Governor's *Ex parte Young* arguments.[6] And so this Court discusses them here, keeping in mind that standing requires a more rigorous analysis. *See Jacobson*, 974 F.3d at 1256.

Governor DeSantis argues that his "status and authority as Governor of Florida do not, as a matter of law, make him a proper party to this case." ECF No. 39 at 13. This Court agrees. And it has not been shy about dismissing Governor DeSantis from cases where he did "not have more than 'some connection' with the underlying claim." *See Namphy*, 493 F. Supp. 3d at 1137; *Support Working Animals, Inc. v. DeSantis*, 457 F. Supp. 3d 1193, 1209 (N.D. Fla. 2020). On this argument,

---

    [6] In *Ex parte Young*, the Supreme Court created a legal fiction in which, under some circumstances, a suit against a state officer in their official capacity for prospective relief "is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Governor DeSantis argues that he does not have a sufficient connection to HB1 for the legal fiction to apply.

this Court can quickly resolve traceability as to sections 2 and 14 of the Act.[7] No provision of Florida law provides the Governor with *any* enforcement authority when it comes to these sections. Plaintiffs do not attempt to argue otherwise. Thus, when it comes to sections 2 and 14, Plaintiffs lack standing to sue Governor DeSantis. *See Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

Sections 15 and 16, however, are trickier.[8] As to these sections, Plaintiffs argue that the Governor has enforcement power because Florida law specifically gives the Governor the power to call out the militia in response to "a riot, a mob, an unlawful assembly, a breach of the peace, or resistance to the execution of the laws of the state." § 250.28, Fla. Stat. Plus, Governor DeSantis used this very power in response to protests in May and June 2020. ECF No. 76 at 15. Governor DeSantis responds that his militia power is insufficient to render Plaintiffs' injuries traceable to him, claiming that such "power is part of the Governor's general executive authority to enforce the law and protect the public." ECF No. 38 at 3.

---

[7] As described above, section 2 makes it a noncriminal traffic infraction to obstruct a public street, highway, or road. § 316.2045, Fla. Stat. (2021); § 318.14(1), Fla. Stat. (2021). Section 14 creates the crime of "cyberintimidation by publication." § 836.115, Fla. Stat. (2021).

[8] To recap, section 15 defines "riot" and section 16 changes when bail is available for those arrested for unlawful assembly. § 870.01, Fla. Stat. (2021); § 870.02, Fla. Stat. (2021).

But this Court is not convinced. Section 250.28's delegation of power strikes this Court as anything but general. And executive power is the *only* power the Governor wields. Does Governor DeSantis really contend that no plaintiff in any case could ever have standing to sue him? Still, there are reasons to suspect that Governor DeSantis's power to deploy the militia might be insufficient to establish standing. For example, the Governor can only authorize a military deployment to suppress a riot that "civil authorities are unable to suppress." § 250.28, Fla. Stat.[9] This Court, however, need not decide whether the Governor's power to call out the militia, on its own, makes Plaintiffs' injuries traceable to Governor DeSantis. This is because other provisions of Florida law give the Governor the power to enforce sections 15 and 16 of the Act.

Section 14.022(2), Florida Statutes, gives the Governor the power, in his or her complete discretion, to "by proclamation, declare that, because of unlawful assemblage, violence, overt threats of violence, or otherwise, a danger exists to the person or property of any citizen or citizens of the state." Upon making such a proclamation, the Governor may "[o]rder any sheriff . . . to exercise fully the powers

---

[9] That said, other provisions may give the Governor more discretion to deploy the militia. *See* Fla. Const. art. IV, § 1(d); § 250.06(4), Fla. Stat. On the other hand, whether Florida law authorizes it or not, Governor DeSantis has ordered the Florida National Guard to respond to protests that he himself acknowledged were peaceful. *See* News Release, Office of Gov. Ron DeSantis, *Gov. Ron DeSantis Reports That Fla. Demonstrations Have Remained Largely Peaceful Over Past 24 Hours* (June 2, 2020), https://www.flgov.com/2020/06/02/governor-ron-desantis-reports-that-florida-demonstrations-have-remained-largely-peaceful-over-past-24-hours.

granted them . . . under s. 30.15(1)(f) (suppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary)" and "[o]rder and direct the State Highway Patrol, and each and every officer thereof, to do and perform such acts . . . as the Governor may direct" that the Governor believes "necessary in the circumstance to maintain peace and good order." *Id.* § 14.022(3)(b)–(c).

In other words, Florida law specifically gives the Governor the power to order sheriffs to suppress riots and unlawful assemblies and to take direct command of the Florida Highway Patrol to do the same. Governor DeSantis has not hesitated to use this power. *See* ECF No. 1 ¶ 37 n.2 (citing June 2, 2020 statement from Governor DeSantis that he is mobilizing "more than 1,300 sworn FHP troopers to support local law enforcement efforts"). Plaintiffs' injuries are therefore traceable to the Governor in a way that the plaintiffs' injuries in *Jacobson* were not.

In *Jacobson*, the plaintiffs attempted to sue the Florida Secretary of State in a challenge to Florida's ballot order law. But the court explained that "[t]he problem for the [plaintiffs] [was] that Florida law tasks the Supervisors, independently of the Secretary, with printing the names of candidates on ballots in the order prescribed by the ballot statute." *Jacobson*, 974 F.3d at 1253. The court paused to emphasize that the Supervisors were "independent officials not subject to the Secretary's

control" and that "[o]nly the Governor of Florida . . . may suspend county officials such as supervisors." *Id.*

Here, Florida law gives Governor DeSantis the power to specifically order the sheriffs to enforce sections 15 and 16 and to suspend sheriffs who decline to obey his directives. Fla. Const. Art. IV, § 7(a) (stating the governor may suspend "any county officer" for "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony").[10]

That the Florida Senate must later approve or deny any suspension does not make suspensions less coercive. Indeed, the fact that the Governor may reinstate a suspended sheriff at any time before the senate finalizes their removal creates a carrot and stick through which the Governor may exert control. *Id.* And in this Court's experience, Governor DeSantis has not been timid about exercising his removal powers. *See Israel v. DeSantis*, No. 4:19cv576-MW/MAF, 2020 WL 2129450, at *1 (N.D. Fla. May 5, 2020).[11]

---

[10] Florida law also gives the Governor the power to order the Florida Department of Law Enforcement to investigate the sheriffs before the Governor suspends them. § 943.03, Fla. Stat.

[11] In *Abusaid v. Hillsborough County Board of County Commissioners*, the Eleventh Circuit questioned whether section 14.022, combined with the Governor's removal power, rendered Florida sheriffs agents of the state. 405 F.3d 1298, 1307 (11th Cir. 2005). Because, the court said, both powers apply "only in exceptional circumstances," they did not "alter that under Florida's regime the Sheriff generally functions as a county official." Whether a sheriff generally functions as a county official is an entirely different issue from whether Florida law gives the Governor the power to enforce Florida's riot statute, and thus *Abusaid* has no bearing on whether

That is not to say that the power to suspend *alone* can establish that Plaintiffs' injuries are traceable to Governor DeSantis. But here, Florida law combines that power with the power to specifically order sheriffs to enforce the challenged law and to take control of state law enforcement—specifically the Florida Highway Patrol— to do the same.

In short, Governor DeSantis's mere status as Florida's chief executive does not mean that injuries inflicted by the state are *always* traceable to him, but neither does it mean injuries inflicted by the state are *never* traceable to him. Instead, traceability turns on nuanced questions of Florida law, and varies from case to case. Here, the Governor has the power to enforce sections 15 and 16 and Plaintiffs' injuries are therefore traceable to him. *See Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1252 (11th Cir. 2021) (explaining that "[t]he plaintiffs' injuries are traceable to the Attorney General and the District Attorney" because "[t]he Act contemplates enforcement by the Attorney General and the District Attorney").[12]

---

Plaintiffs' injuries are traceable to Governor DeSantis. Moreover, *Abusaid* emphasized that the sheriff in that case had identified "no instance in which the governor has actually exercised this authority to remove a sheriff." *Id.* But *this* Governor has exercised that authority. *Israel*, 2020 WL 2129450, at *1. And he has also exercised his authority under section 14.022. ECF No. 1 ¶ 37 n.2. Accordingly, *Abusaid* does not alter this Court's conclusion that Governor DeSantis has the power to enforce sections 15 and 16 of the Act.

[12] Because Governor DeSantis has the power to enforce sections 15 and 16, he has "some connection" with the Act's enforcement and is a proper party under *Ex parte Young*. *See Osterback v. Scott*, 782 F. App'x 856, 858–59 (11th Cir. 2019).

ii. Defendant Sheriffs

As to the Defendant Sheriffs, this Court has determined that Plaintiffs can establish an injury in fact—be it through a diversion of resources theory or a self-censorship theory—with respect to sections 2, 14, 15, and 16 of the Act. These provisions amend several sections of the Florida Statutes governing Florida's Uniform Traffic Control Law and criminal laws, creating or redefining new crimes and imposing tougher penalties and collateral consequences that allegedly violate Plaintiffs' members' constitutional rights and require Plaintiffs to divert their limited resources from core activities to counter the effects of the amended statutes. To have standing to proceed against the Defendant Sheriffs, Plaintiffs must also show that their injury is "fairly traceable to the challenged action of the [Defendant Sheriffs], and not the result of the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560.

To start, this Court will make it simple for the Defendant Sheriffs—some of whom appear confused as to why they have been hauled into court in the first place.[13]

---

[13] Specifically, Sheriff Williams asserts it is "far from apparent" why he should be required to be a party to this lawsuit and suggests he has been "arbitrarily singled out" in this case. ECF No. 49 at 5–6. This Court will make clear what Sheriff Williams does not seem to understand. He has been named as a codefendant in an action involving several plaintiffs, including an organization based in his jurisdiction and subject to his authority to enforce the law. Members of the organization based in his jurisdiction regularly protest "racial bias" and "police relations," but with the passage of the Act, this organization's members are self-censoring for fear of arrest by Sheriff Williams (or his deputies). This Court will not engage with Sheriff Williams's suggested speculation that this action is simply an indirect attempt to "defund the police." This is not a legal argument and deserves no response. Indeed, Sheriff Williams's ad hominem attacks have no place

Here, the analysis is straightforward. The "challenged action" with respect to the Defendant Sheriffs is their enforcement of the challenged statutory provisions that cause Plaintiffs' injuries—i.e., self-censorship and the diversion of resources. The provisions at issue are each enforceable by the Defendant Sheriffs. Thus, Plaintiffs' injuries resulting from enforcement of these new provisions are traceable to the Defendant Sheriffs.

Not only are Plaintiffs' injuries traceable to the Defendant Sheriffs' general authority to enforce the criminal laws of Florida, but sections 2, 15, and 16 arguably implicate the Defendant Sheriffs' particular statutory authority with respect to quelling riots and maintaining the peace.[14] As previously discussed, Florida sheriffs "shall . . . [s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary." § 30.15(1)(f), Fla. Stat. Florida sheriffs also "shall . . . [a]pprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer, that further proceedings may be had against him or her according to law." *Id*. § 30.15(1)(g). They are the "conservators

---

in this litigation. For his part, Sheriff Tony offers the unhelpful observation that had he been the only named defendant in this action, venue would not be proper in the Northern District of Florida. ECF No. 48 at 3. Indeed, had the Governor not signed HB1, this action would not exist. But the bill is now law and Sheriff Tony is a named Defendant along with the Sheriff of Leon County and the Governor, which makes the Northern District of Florida a proper venue.

[14] As discussed in more detail below, the Defendant Sheriffs are not acting as "arms of the state" when enforcing the new law prohibiting "cyberintimidation by publication," which section 14 of the Act creates. *See* § 836.115, Fla. Stat. (2021).

of the peace in their counties," and the Governor can order them "to do all things necessary to maintain peace and good order." § 14.022(3)(b), Fla. Stat.

Sheriff Williams's argument that "Sheriffs cannot criminalize anything" and that "none of Plaintiffs' points relate to any activity by the Sheriffs," misses the boat given the Defendant Sheriffs' statutory duty to, among other things, "suppress . . . riots . . . and unlawful assemblies" and make warrantless arrests of persons disturbing the peace. ECF No. 82 at 10. Indeed, Sheriff McNeil implicitly concedes that he is responsible for enforcing the challenged provisions in asserting he is not tasked with enforcing *all* sections of the Act. *See* ECF No. 50 at 3–4 (also noting the "possibility" that Sheriff McNeil is responsible for enforcing the amended statutes against Plaintiff Dream Defenders). This Court agrees with Sheriff McNeil that the Defendant Sheriffs are not tasked with enforcing *all* sections of the Act; however, they *are* tasked with enforcing the statutes amended by sections 2, 14, 15, and 16 of the Act.

The fact that Plaintiffs have not alleged a specific instance of enforcement under these new provisions is not fatal to this analysis. Nor is the fact that Sheriff Tony's subordinate has publicly announced that he directed his officers not to enforce the new law. As explained above, this is a pre-enforcement challenge. An "alleged danger of this [Act] is, in large measure one of self-censorship; *a harm that can be realized without an actual prosecution.*" *ACLU v. Fla. Bar*, 999 F.2d 1486,

1493 (11th Cir. 1993) (emphasis in original) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). In addition, Plaintiffs have alleged that Defendant Sheriffs are responsible for enforcing the challenged provisions—an allegation taken as true for the purposes of this motion to dismiss, despite Sheriff Tony's assurances to this Court that he does not intend to enforce the new law.[15]

The fact of the matter is the Defendant Sheriffs are responsible for, among other things, maintaining the peace, arresting those who disturb the peace, and suppressing "riots" and "unlawful assemblies." Their enforcement authority in this respect causes the self-censorship and diversion of resources based on Plaintiffs' well-founded fears that the challenged provisions will be enforced against them. Notwithstanding Sheriff Tony's assertion that he will not enforce the new provisions, his full-throated defense of the challenged provisions leads this Court to

---

[15] Indeed, Sheriff Tony's assertion that he "stands by" his subordinate's "policy pronouncement" that the Sheriff's Office will "not . . . enforce HB1" does little work to show why Plaintiffs' claims are due to be dismissed as to him simply because he has an official policy not to enforce HB1. *See* ECF No. 48 at 4. The Act is comprised of 21 sections and amends numerous provisions of Florida law, including several sections of Florida's criminal statutes. At this point, it is not clear exactly what the Broward County Sheriff's Office policy is with respect to enforcement of specific provisions amended or created by the Act and whether the Sheriff is bound by his subordinate's "policy pronouncement." Moreover, even though Sheriff Tony asserts in his papers that he "stands by" his subordinate's announcement about not enforcing HB1, he is not bound by his court statements. *See ACLU*, 999 F.2d at 1494 (noting that despite defendants' "acquiescence in" plaintiff's initial complaint, the fact that they continued to assert the challenged provision was constitutional gave the Eleventh Circuit "no reason to think it would not be enforced in the future against [plaintiff or others] . . . because [defendants were not] bound by [their] court statements"). "Mid-litigation assurances are all too easy to make and all too hard to enforce." *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018). This Court is hard pressed to believe Sheriff Tony will not act to suppress a riot should widespread violence reach his jurisdiction or if the Governor orders him to do so.

infer he *will* enforce the challenged provisions. *See Wollschlaeger*, 848 F.3d at 1305 (noting that "an intent to enforce the challenged provisions may be inferred" when the Act is challenged soon after its enactment and the defendant "has since vigorously defended the Act in court"). Accordingly, Plaintiffs have shown that their alleged injuries are fairly traceable to the Defendant Sheriffs authority to enforce the challenged provisions.

iii. Attorney General Moody

Attorney General Moody, as Attorney General of Florida, argues that Plaintiffs have failed to show an injury in the first place. ECF No. 38 at 10. She then goes on to say that any injury Plaintiffs may show is not fairly traceable to, nor redressable by her. *Id.* at 14. As discussed *supra*, Plaintiffs have not shown injury as to sections 1, 3 through 13, or 17 through 21. Nor have they shown that any potential injury from the remaining four sections would be traceable to the Attorney General. Therefore, this Court agrees with the Attorney General's second argument—Plaintiffs' injuries are not traceable to her.

Sections 2, 14, 15, and 16 each either newly criminalize behavior or modify extant criminal provisions. Plaintiffs argue that traceability and redressability between the injury caused by these criminal statutes and the Attorney General of Florida is a straightforward affair due to that officeholder's "general superintendence and direction over the several state attorneys . . . .". ECF No. 85 at 3 (quoting § 16.08,

Fla. Stat. (2021)). They rely on *Reproductive Health Services v. Strange*, in which the Eleventh Circuit found the Alabama Attorney General to be a proper party, along with a local District Attorney, as the plaintiffs there showed a credible threat of enforcement. 3 F.4th at 1252–55. However, due to our federalist system and the distinct governmental structures of our fifty states, the situation in this case is different from the situation in *Strange*.

While the State of Alabama has chosen to entrust its Attorney General with the power to "enforce[e] criminal laws in Alabama," *id.* at 1256 n.5 (citing Ala. Code §§ 12-17-184(2), 36-15-14, & 36-15-21), the State of Florida has not done so with *its* Attorney General. As Attorney General Moody points out, *see* ECF No. 81 at 4–5, she lacks the ability to criminally prosecute *anyone* for a violation of a statute amended by HB1.[16] While any number of other state officials may be involved in the decision to arrest or prosecute someone under sections 2, 14, 15, or 16, Attorney General Moody is not so privileged.[17]

Plaintiffs quote section 16.08, Florida Statutes, which states that the Attorney General "shall exercise a general superintendence and direction over the several state

---

[16] The Office of Statewide Prosecution is empowered to investigate and prosecute certain offenses, none of which are relevant here. *See* § 16.56, Fla. Stat. (2021).

[17] *But see Frequently Asked Questions*, Office of Attorney General Ashley Moody, http://myfloridalegal.com/pages.nsf/Main/20AFA53C4EC9E3EA85256CCB00522BE1#question 12 (last visited Aug. 6, 2021) ("The Constitution provides the Attorney General with authority to investigate and prosecute violations of duly enacted statutes.").

attorneys of the several circuits as to the manner of discharging their respective duties . . . ." They also refer to the Attorney General as "the State's chief legal officer," ECF No. 76 at 12, and cite the Eleventh Circuit's reference to the officeholder as Florida's "principal prosecuting attorney." *United States v. Domme*, 753 F.2d 950, 957 (11th Cir. 1985). But Attorney General Moody points out that her auspicious authority and illustrious title are merely an illusion—under Florida's Constitution, State Attorneys have discretion and independence, and the Attorney General can no more superintend and direct their lunch order than their enforcement or non-enforcement of these criminal provisions. ECF No. 87 at 3 (citing Fla. Const. Art. 5, § 17). Meaning that Attorney General Moody cannot cause State Attorneys to prosecute Plaintiffs, causing an injury, nor can she tell those State Attorneys to *not* prosecute Plaintiffs, redressing any injury. And since *Domme*, the Eleventh Circuit has made it clear that a state official merely being the "chief [x] officer" does not make a plaintiff's injuries derived from [x] traceable to or redressable by that state official. *See Jacobson*, 974 F.3d at 1254.

As Attorney General Moody has made clear, the Attorney General of the State of Florida has little to nothing to do with the criminal laws of the state of Florida. This Court must agree with the Attorney General's admission. Plaintiffs' injuries cannot be traced to Attorney General Moody, an order enjoining Attorney General Moody cannot redress Plaintiffs' injuries, and Plaintiffs cannot maintain her as a

defendant in this matter. Accordingly, Plaintiffs claims against Attorney General Moody are **DISMISSED for lack of standing**.

### 3. *Redressability*

Next, redressability. The redressability prong "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008) (emphasis removed). A "substantial likelihood" of redressability will satisfy this prong. *Duke Power*, 438 U.S. at 79.

### i.    Governor DeSantis

Here, enjoining Governor DeSantis from using his powers, which he has used already, to enforce Sections 15 and 16 will go a long way towards redressing Plaintiffs' injuries. To understand why, one need only ask what practical effect such an order would have. *See Utah v. Evans*, 536 U.S. 452, 464 (2002) (finding redressability where a favorable ruling's "practical consequence" was to make it more likely "that the plaintiff would obtain relief that directly redresses the injury suffered"). Enjoining Governor DeSantis would remove the threat that the Florida National Guard, thousands of state troopers, or the sheriffs themselves, will, under the Governor's orders, enforce sections 15 and 16 against Plaintiffs. And it makes no difference that, were Governor DeSantis enjoined, sheriffs across Florida might still enforce sections 15 and 16. "Article III . . . does not demand that the redress

40

sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018); *accord I. L. v. Alabama*, 739 F.3d 1273, 1282 (11th Cir. 2014).

In sum, this Court is hard-pressed to say that enjoining Governor DeSantis, HB1's chief proponent who possesses—and has recently used—the direct power to suppress riots, cannot at least partially redress Plaintiffs' alleged injuries. Accordingly, this Court finds that, as to sections 15 and 16, an injunction against Governor DeSantis would redress Plaintiffs' injuries.

ii.    Defendant Sheriffs

As to the Defendant Sheriffs, "in assessing this third component of the standing doctrine, [this Court] ask[s] whether a decision in a plaintiff's favor would 'significantly increase the likelihood that she would obtain relief that directly redresses the injury that she claims to have suffered." *Lewis v. Gov. of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (quoting *Harrell*, 608 F.3d at 1260 n.7). In addition, this Court asks if it is "the effect of the court's judgment on the defendant—not an absent third party—that redresses the plaintiff's injury, whether directly or indirectly[?]" *Lewis*, 944 F.3d at 1301 (quoting *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952 (8th Cir. 2015)). Here, the answer to both questions is yes. Because the Defendant Sheriffs' authority to enforce Sections 2, 15, and 16 causes Plaintiffs' injuries, relief against them will directly redress those injuries.

Specifically, Plaintiffs' requested relief—an order declaring the challenged provisions unconstitutional and enjoining Defendant Sheriffs from taking any action to enforce those provisions—will directly redress Plaintiffs' alleged injuries flowing from their reasonable fear that the challenged provisions will be enforced against their members by Defendant Sheriffs. Rather than seek relief against some absent third party like a State Attorney, Plaintiffs seek relief against officials who are on the frontlines of law enforcement in Florida and whose statutory duty to suppress riots and unlawful assemblies compels them to enforce the challenged provisions.

Having satisfied the injury, traceability, and redressability prongs, Plaintiffs have standing to seek an injunction against Governor DeSantis prohibiting him from enforcing sections 15 and 16 and against the Defendant Sheriffs prohibiting them from enforcing sections 2, 15, and 16.

## B

Finally, the Defendant Sheriffs have each sought dismissal of Plaintiffs' pre-enforcement challenge for failure to adequately allege an official policy or custom causing Plaintiffs' alleged constitutional injuries pursuant to *Monell*, 436 U.S. at 694. ECF No. 48 at 8; ECF No. 50 at 5; ECF No. 80 at 4–5.[18] Plaintiffs assert in

---

[18] Some of the Defendant Sheriffs appear to suggest that one can only be sued in an action to enjoin enforcement of a particular law if the party had a particular role in *enacting* the law. *See, e.g.*, ECF No. 49 at 15 ("In no manner do Plaintiffs allege the Sheriff was party to the Act's drafting, passage, or ultimate signing into law."); ECF No. 50 at 5 ("Here, Plaintiffs do not allege that Sheriff McNeil was responsible for enacting HB1."). This is not the law, nor have Defendant Sheriffs cited any authority to support the suggestion.

response that this is not a *Monell* claim and any failure to allege an unconstitutional policy or custom is not dispositive of their claims against the Sheriffs.[19] Instead, Plaintiffs argue that their claims seeking prospective injunctive relief are brought against the Defendant Sheriffs pursuant to *Ex parte Young* because the Defendant Sheriffs are acting as "arms of the state" in the context of this case. ECF No. 76 at 20–23. Plaintiffs' argument is well-taken.

The Eleventh Amendment ordinarily bars citizens from suing their state in federal court unless the state waives its immunity or Congress abrogates it under section 5 of the Fourteenth Amendment. *See Attwood v. Clemons*, 818 F. App'x 863, 866 (11th Cir. 2020). But *Ex parte Young*, 209 U.S. 123 (1908), holds that "a suit alleging a violation of the federal constitution against a *state official in his official capacity* for injunctive relief on a prospective basis is not a suit against the state, and, accordingly, does not violate the Eleventh Amendment." *Attwood*, 818 F. App'x at 867 (emphasis added) (quoting *Grizzle*, 634 F.3d at 1319). Here, Plaintiffs assert that they are suing Defendant Sheriffs in their official capacity—indeed, as "state officials"—pursuant to *Ex parte Young* because Defendant Sheriffs function as

---

[19] Allegations that the Defendant Sheriffs adopted a policy or custom that causes Plaintiffs' constitutional injuries could have been an alternative basis to reach the Defendant Sheriffs in this action. However, by Plaintiffs' own assertions, they have arguably not alleged a policy or custom, nor have they argued that their claims satisfy *Monell*.

"arms" or "agents" of the state, rather than county officials, when they enforce the challenged provisions.

The first question this Court must decide is whether Defendant Sheriffs are considered "arms of the state" for purposes of Eleventh Amendment immunity and application of the *Ex parte Young* exception to immunity. In other words, are Defendant Sheriffs properly considered "state officials" under *Ex parte Young*?

The Eleventh Circuit has previously considered whether, and under what circumstances, Florida sheriffs may be considered "arms of the state." *See, e.g.*, *Freyre v. Chronister*, 910 F.3d 1371, 1385 (11th Cir. 2018) (holding that "while this case presents an especially close call," the Hillsborough County Sheriff's Office does not act as an arm of the state when conducting child-protective investigations under a Grant Agreement with the Florida Department of Children and Families); *Stanley v. Israel*, 843 F.3d 920, 926 (11th Cir. 2016) (holding that Florida Sheriff acting in capacity as Chief Correctional Officer in the hiring and firing of deputies is not an arm of the state); *Abusaid*, 405 F.3d at 1305 (holding that "a Florida sheriff, when acting to enforce a county ordinance, is not an arm of the state"). The Eleventh Circuit has "repeatedly acknowledged that Florida sheriffs are, by default, county officers." *Freyre*, 910 F.3d at 1381. However, "[n]otwithstanding a Florida sheriff's presumptive status as a county officer, [the Eleventh Circuit] ha[s] also held out the

possibility that when carrying out some functions, the sheriff may well be acting as an arm of the state." *Id*. (quoting *Abusaid*, 405 F.3d at 1310).

In determining whether Defendant Sheriffs should be considered state or county policymakers for purposes of this section 1983 action, "the question is not whether the sheriff[s] act[] for the state or the county in some categorical, 'all or nothing manner,' but rather whether the sheriff[s] . . . act[] for the state in a particular area, or on a particular issue." *Abusaid*, 405 F.3d at 1303 (quoting *McMillian v. Monroe Cnty.*, 520 U.S. 781, 785 (1997) (holding that Alabama sheriff was policymaker for the state, not for the county)). Accordingly, this Court must determine whether Defendant Sheriffs, "while engaged in the relevant function," are acting as arms of the state by considering four factors; namely, (1) how state law defines the entity, (2) what degree of control the state maintains over the entity, (3) the source of the entity's funds, and (4) who bears financial responsibility for judgments entered against the entity. *Id*. (citing *Manders v. Lee*, 338 F.3d 1304, 1309 (11th Cir. 2003)).

This Court recognizes that the Eleventh Circuit has not had occasion to say definitively that a Florida sheriff is deemed an "arm of the state" for Eleventh Amendment purposes. It appears that every time the Eleventh Circuit has been presented with the question in the context of various functions, it has found—though sometimes a close call—that the Florida sheriff at issue was *not* functioning as an

"arm of the state." Given the Eleventh Circuit's hesitation to find that a Florida sheriff has acted as an arm of the state, this Court is unwilling to embrace the categorical approach Plaintiffs advance. The question is more nuanced than simply whether a Florida sheriff enforcing state law is automatically acting as an arm of the state. Instead, this Court must focus on the function at issue—enforcing the challenged provisions; namely, suppressing riots and unlawful assemblies.

Though sections 2, 15, and 16 of the Act directly implicate the Defendant Sheriffs' specific function of suppressing riots and unlawful assemblies, section 14 does not. Section 14 creates a new internet crime that is unrelated to Defendant Sheriffs' enumerated duty to suppress riots and unlawful assemblies. So, while Plaintiffs may be injured by section 14, and that injury is arguably traceable to the Defendant Sheriffs as well as redressable by them, Plaintiffs must still satisfy the requirements of *Monell* to proceed against the Defendant Sheriffs with respect to section 14. *See* footnote 19. Plaintiffs have not argued that their allegations satisfy *Monell*. *Id*. Accordingly, their claims, to the extent they pertain to challenging section 14, may not proceed against Defendant Sheriffs. *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1330 (11th Cir. 2015) (affirming dismissal for failure to allege factual allegations regarding a custom or policy causing constitutional injury).

46

On the other hand, in the context of this specific function and for the reasons set out below, this Court finds the Defendant Sheriffs are acting as "arms of the state" when enforcing sections 2, 15, and 16 of the Act.

(1) How does state law define the entity?

As to the first *Manders* factor, this Court must consider "state law concerning the status of the entity generally, and state law concerning the specific function the entity performs in the instant case." *Freyre*, 910 F.3d at 1381 (citations omitted). With respect to how Florida law defines sheriffs generally, and as mentioned above, "Florida sheriffs are, by default, county officers." *Id*. Several features of Florida law generally define sheriffs as county officers, including the Florida Constitution, "the fact that Florida sheriffs are generally elected by electors of each county," Florida counties' ability to abolish the office of sheriff altogether, and "Florida courts' recognition of sheriffs as county officers." *Id*. (citations omitted).

However, "[w]hen carrying out some . . . enumerated functions, the sheriff may well be acting as an arm of the state." *Abusaid*, 405 F.3d at 1310 (citing enumerated functions under section 30.15, Florida Statutes). Here, state law—not county ordinance—defines the function at issue. State law specifically requires sheriffs to (1) "[b]e conservators of the peace in their counties," (2) "[s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary," and (3) "[a]pprehend, without warrant, any person disturbing the

peace, and carry that person before the proper judicial officer[.]" § 30.15 (e), (f), & (g), Fla. Stat. The challenged provisions before this Court include amended definitions for "riots" and "unlawful assemblies"—definitions which have the force of law statewide and guide the Defendant Sheriffs in the execution of their enumerated duties under section 30.15. Accordingly, the Defendant Sheriffs' relevant function involves carrying out "state policy" through enforcement of the challenged provisions. This Court finds this factor is mixed between the general definition of Florida sheriffs as county officers and the "arm-of-the-state" function of sheriffs in suppressing riots and unlawful assemblies. Because the Eleventh Circuit has emphasized the "function-by-function" approach to this analysis, this Court finds this factor, situated in the context of the Sheriffs' function in suppressing riots and unlawful assemblies, weighs in favor of "arm-of-the-state" status.

(2) What degree of control does the State maintain over the entity?

"The second factor requires [this Court] to look at the degree of control the state exercises over the entity generally as well as with respect to the specific function at issue." *Freyre*, 910 F.3d at 1382–83. Without question, "the office of the sheriff is fundamentally a county entity." *Id*. at 1383.

"The state does, however, retain some control over its sheriffs." *Abusaid*, 405 F.3d at 1307. For instance, "the governor may remove a county officer." *Id*. (citing Fla. Const. art. IV, § 7). As previously discussed, the Eleventh Circuit in *Abusaid*

recognized "this removal power applies only in extraordinary circumstances," and took care to note the Florida sheriff in that case had shown "no instance in which the governor has actually exercised this authority to remove a sheriff (or any other county officer, for that matter)." *Id*. But times have changed since the Eleventh Circuit issued this opinion in 2005. This Court is intimately familiar with two separate occasions upon which the current Governor and his predecessor have flexed their removal-power muscles to remove at least one sheriff and other county officials. *See Israel*, 2020 WL 2129450, at *1 (Walker, C.J.) (order on motions to dismiss in due process case involving Governor DeSantis's decision to suspend former-Sheriff Scott Israel "for several alleged operational and organizational failures" relating to the 2017 Fort Lauderdale-Hollywood International Airport shooting and the 2018 Marjory Stoneman Douglas High School Shooting) and *Snipes v. Scott*, Case No.: 4:18cv580-MW/CAS, 2019 WL 163352, *1 (N.D. Fla. Jan. 10, 2019) (Walker, C.J.) (amended order granting in part motion for preliminary injunction in due process case involving former-Governor Scott's decision to suspend former-Broward County Supervisor of Elections Brenda Snipes); *see also Jackson v. DeSantis*, 268 So. 3d 662 (Fla. 2019) (denying petition challenging Governor DeSantis's suspension of former-Superintendent of Schools for Okaloosa County Mary Beth Jackson for "neglect of duty" and "incompetence").

49

In addition, the Eleventh Circuit has recognized state control over sheriffs in the Governor's "authority to enlist sheriffs to help keep the peace." *Abusaid*, 405 F.3d at 1307. "[U]pon declaration of a state of emergency," the Governor may order any Florida sheriff or sheriffs "to exercise fully the powers granted them, and each of them, under § 30.15(1)(f) (suppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary) and to do all things necessary to maintain peace and good order." *Id.* (quoting §§ 14.022(2) & 14.022(3)(b), Fla. Stat.).

Finally, the Eleventh Circuit has noted that "[p]erhaps the most significant indication of residual state control over county sheriffs is that Florida law expressly enumerates a list of functions that sheriffs must perform." *Id.* at 1308 (referring to § 30.15, Fla. Stat.). Among these enumerated functions is a sheriff's duty to suppress riots and unlawful assemblies. § 30.15(1)(f), Fla. Stat.

In this case, Plaintiffs' claims against the Defendant Sheriffs arise out of their authority to enforce sections 2, 15, and 16 of the Act, including the amended criminal statute redefining what amounts to a "riot" under Florida law. The Defendant Sheriffs derive their enforcement authority for the challenged provisions not only from their positions as county officials, but also from their enumerated functions as defined by state law. Moreover, their function in "suppressing riots and unlawful assemblies" is subject to further state control in that the Governor can order them to

50

exercise this function in certain circumstances and remove them from office for their failure to do so. *See Israel v. DeSantis*, 269 So. 3d 491, 496 (Fla. 2019) (Lagoa, J.) (noting that grounds supporting Governor's decision to remove sheriff—neglect of duty and incompetence—are not solely limited to the sheriff's performance of his or her statutorily enumerated duties).

Again, this factor is mixed between local control over the office of the sheriff in general and the function-specific analysis that *Manders* requires. In the specific context of the Defendant Sheriffs' responsibility to suppress riots and unlawful assemblies, they appear to wear a " 'state hat' . . . because the authority to do so derives from Florida statutes." *Freyre*, 910 F.3d at 1383–84. Similarly, their *obligation* to perform this function "derives . . . directly from the State." *Id*. at 1384 (quoting *United States ex rel. Lesinski v. S. Fla. Water Mgmt. Dist.*, 739 F.3d 598, 604 (11th Cir. 2014)). On balance, this Court finds this factor—though mixed— weighs in favor of "arm-of-the-state" status given the state-law origins of Defendant Sheriffs' responsibility and obligation to suppress riots and the Governor's ability to order the Defendant Sheriffs to perform this exact function. *See Manders*, 338 F.3d at 1319 n.35 ("The key question is not what arrest and force powers sheriffs have, but *for whom* sheriffs exercise that power) (emphasis in original).

(3) What is the source of the entity's funds?

The third *Manders* factor asks what the source of Defendant Sheriffs' funding is generally and with respect to the specific function at issue. The Eleventh Circuit has frequently recognized that "Florida sheriff's offices are generally funded by county taxes." *Freyre*, 910 F.3d at 1384 (citing *Stanley*, 843 F.3d at 929). Plaintiffs have cited no provision to show Defendant Sheriffs receive state funding with respect to the specific function at issue. But the Eleventh Circuit has recognized "residual state control" over Florida sheriffs' budgets based on their ability to appeal their county's budget allocation to Florida's Administrative Commission. *Abusaid*, 405 F.3d at 1311. However, this Court's "inquiry on this third prong . . . asks what is the *source* of a sheriff's funds, not (as the second prong asks) what degree of control the state retains over the budgeting process." *Id.* (emphasis added). Accordingly, this Court finds this factor weighs against "arm-of-the-state" status.

(4) Who bears financial responsibility for judgments entered against the entity?

The Eleventh Circuit "has repeatedly acknowledged that 'no provision of Florida law provides state funds to a Florida sheriff to satisfy a judgment against the sheriff." *Freyre*, 910 F.3d at 1385 (quoting *Stanley*, 843 F.3d at 930). But while the "state treasury factor is a 'core concern,' " *Manders*, 338 F.3d at 1327 n.51, "[n]ever has the Supreme Court required an actual drain on the state treasury as a per se condition of Eleventh Amendment immunity," *id*. at 1327. Though this final factor

weighs against "arm-of-the-state" status, it does not defeat Plaintiffs' claims against the Defendant Sheriffs with respect to their role in enforcing sections 2, 15, and 16 of the Act. Plaintiffs have raised claims for declaratory and prospective injunctive relief—money damages are no issue here. Moreover, to the extent Plaintiffs are entitled to attorneys' fees, Sheriff Williams has persuasively demonstrated that the state, and not the Defendant Sheriffs, may be on the hook down the road, although the Eleventh Circuit has yet to decide this specific issue with respect to Florida sheriffs. *See* ECF No. 49 at 17 (listing out-of-circuit cases and noting that other courts outside the Eleventh Circuit have held that "when county officials are sued for their role in enforcing a state law, the county officials are acting as an arm of the state, and thus the state alone is responsible for attorneys' fees under 42 U.S.C. § 1988").[20]

Accordingly, having considered each of the *Manders* factors generally and with specific reference to the function at issue, this Court finds that—while a close call—the Defendant Sheriffs, in their official capacities, are functioning as "arms of the state" when enforcing state law that prohibits rioting and unlawful assemblies. This function specifically derives from Florida statutes enumerating Florida sheriffs'

---

[20] Plaintiffs have included a request for attorneys' fees in their prayer for relief, ECF No. 1 at 60, rather than allege a separate claim for fees. It is obviously too soon to determine whether Plaintiffs are entitled to attorneys' fees. Accordingly, this Court takes Sheriff Williams's argument regarding Plaintiffs' request for attorneys' fees under advisement. Like many of the remaining issues of which this Order does not dispose, this Court would benefit from further briefing before resolving this matter.

responsibilities under state law and is subject to various controls by the Governor. As alleged in the Complaint, the Governor—the very person who can control Defendant Sheriffs through order and suspension—was an initial proponent of the "Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act," which ultimately led to enactment of the challenged provisions now at issue. *See* ECF No. 1 ¶ 56. This legislation allegedly represented a shift in state policy toward a more "pro-law enforcement" and "anti-rioting" position. *See id*. ¶ 120. Thus, given their enumerated state function to suppress riots under § 30.15(1)(f) and their authority to enforce the challenged provisions at issue in this case, Defendant Sheriffs are properly considered arms of the state for purposes of Eleventh Amendment immunity and proceeding under *Ex parte Young*.

Finally, "[u]nder *Ex parte Young*, a litigant must bring his case 'against a state official or agency responsible for enforcing the allegedly unconstitutional scheme." *Osterback*, 782 F. App'x at 858–59 (quoting *ACLU*, 999 F.2d at 1490)). "[A] state officer, in order to be an appropriate defendant, must, at a minimum, have some connection with the enforcement of the provision at issue." *Id*. at 859 (quoting *Socialist Workers Party v. Leahy*, 145 F.3d 1240, 1248 (11th Cir. 1998)). Here, Defendant Sheriffs have more than "some connection with the enforcement of the provision[s] at issue"—they have independent enumerated statutory duties to do so

and can be further ordered to do so by the Governor under certain circumstances. Accordingly, Defendant Sheriffs are appropriate defendants in this case.

III

As indicated above, Plaintiffs only have standing to challenge sections 15 and 16 against the Governor and sections 2, 15, and 16 against the Defendant Sheriffs. This Court, therefore, will not address the remainder of the sections in determining whether Plaintiffs have failed to state a claim.

In evaluating Defendants' motions, this Court accepts the allegations in the Complaint as true and construes them in the light most favorable to Plaintiffs. *See Hunt v. Amico Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016). "To withstand a motion to dismiss under Rule 12(b)(6), a complaint must include 'enough facts to state a claim to relief that is plausible on its face.' " *Id.* (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "Plaintiff's allegations must amount to 'more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.' " *Id.* (quoting *Twombly*, 550 U.S. at 555).

A

Plaintiffs' Complaint includes four counts. ECF No. 1 at 46–60. Each count is against each Defendant. *Id.* ¶¶ 133, 144, 163, 175. Plaintiffs, in their Complaint, incorporate all of their general factual allegations into each of the four counts. *Id.* ¶¶ 121, 134, 145, 164. Defendants take issue with the format and contents of the Complaint because they assert it fails to put them on notice of the claims against them.

This Court has reviewed Defendants' arguments and the form and substance of the Complaint. While not a model of clarity, Plaintiffs' Complaint is not a shotgun pleading. "Shotgun pleadings are characterized by: (1) multiple counts that each adopt the allegations of all preceding counts; (2) conclusory, vague, and immaterial facts that do not clearly connect to a particular cause of action; (3) failing to separate each cause of action or claim for relief into distinct counts; or (4) combining multiple claims against multiple defendants without specifying which defendant is responsible for which act." *McDonough v. City of Homestead*, 771 F. App'x 952, 955 (11th Cir. 2019) (citing *Weiland*, 792 F.3d at 1321–23). The key feature of shotgun pleadings is that they fail to give defendants "adequate notice" of the claims being bought against them and the supporting factual allegations for each claim. *Weiland*, 792 F.3d at 1323.

Here, Plaintiffs' Complaint is not a shotgun pleading within the meaning of *McDonough.* The Complaint does not adopt each allegation of all the preceding counts. Instead, Plaintiffs' Complaint is the type of complaint the Eleventh Circuit in *Weiland* did not find to be a shotgun pleading. *Id.* at 1324 (noting that re-alleging paragraphs 1 through 49 at the beginning of each count is not the most common type shotgun pleading). And while the Eleventh Circuit has held that incorporating all the factual allegations into each claim constitutes shotgun pleading, it has done so when it is nearly impossible for defendants and the Court to determine with any certainty which factual allegations give rise to which claims for relief. *See Jackson v. Bank of Am., N.A.*, 898 F.3d 1348, 1356 (11th Cir. 2018); *see also Weiland*, 792 F.3d at 1325 (holding that dismissal is appropriate only "where it is *virtually impossible* to know which allegations of facts are intended to support which claim(s) for relief"). This is not the case here.

Here, Defendants' lengthy motions to dismiss, totaling roughly 100 pages, belie any assertion that it is *virtually impossible* for Defendants to understand which allegations of fact are intended to support which claims for relief. Additionally, this Court, like Defendants, has no difficulty discerning which factual allegations support which counts.

As it relates to Count I, Plaintiffs claim that the Act in its entirety violates the Fourteenth Amendment's Equal Protection Clause because the Act has a racially

57

discriminatory purpose. To support this count, Plaintiffs lay out detailed factual allegations in the Complaint, including the events that led to widespread "racial justice protests" in Florida in the summer of 2020, ECF No. 1 ¶¶ 43–54, the Governor's response to the protests in the form of proposed legislation, *id.* ¶¶ 55–66, various statements the Governor made considering the proposed legislation, *id.* ¶¶ 56–60, and the allegedly unusual process leading up to the consideration and passage of the Act, *id.* ¶¶ 113–20. And while some of the factual allegations may seem unrelated to Count I, such as the text of each section of the Act, they are nonetheless helpful to understand the basis for Count I. Similarly, Count II relies on the same allegations to support Plaintiffs' claim that the Act in its entirety violates the Equal Protection Clause because it targets racial justice advocacy.

As to Count III, Plaintiffs allege that the Act as a whole violates the First Amendment to the U.S. Constitution because it constitutes content and viewpoint-based discrimination. To support this count, Plaintiffs identify key provisions of the Act in the Complaint. ECF No. 1 ¶¶ 67–99. Plaintiffs also allege the background and history of the events leading up to the passage of the Act, which provides context. While these allegations may not, in and of themselves, support Plaintiffs' argument that the Act amounts to unconstitutional content- and viewpoint-based discrimination, this Court does not find that incorporating these background facts in the count amounts to shotgun pleading. Additionally, Count III alleges that certain

sections of the Act are unconstitutionally overbroad. Indeed, Plaintiffs specifically identify the sections of the Act that they allege are overbroad. *Id.* ¶¶ 153–59. And while only a few sections are alleged to be overbroad, Plaintiffs' incorporation of other allegations is not improper because, in the event this Court finds the certain sections to be overbroad, it will have to determine whether the sections are severable.

Finally, Count IV also gives adequate notice to Defendants of the claim asserted against them. This count alleges that sections 15 and 2 are impermissibly vague in violation of the Fourteenth Amendment's Due Process Clause. As it relates to section 15, Plaintiffs allege that the amended definitions for "riot" and other terms are unconstitutionally vague. The term "riot" is then incorporated in multiple sections of the Act, *see, e.g.*, sections 3, 4, 5, 6, 7, 9, 12, 13, 18, & 19, arguably making these sections vague as well. And while Plaintiffs could have limited the factual allegations incorporated in Count IV, they need not do so to avoid dismissal for shotgun pleading. The question is not whether Plaintiffs' Complaint is perfect or a model of clarity; rather, it is whether the Complaint puts the Defendants on notice of the allegations against them. In this case, it does.

Sheriff Williams also argues that the Complaint is improper because it contains legal arguments accompanied by citations to law. While some courts have held that including "lengthy legal arguments, case citations, and quotations from treatises" improper in a complaint, *Chevy Chase Bank, F.S.B. v. Carrington*, No.

6:09-cv-2132-Orl-31GJK, 2010 WL 745771, at *4 (M.D. Fla. Mar. 1, 2010), this Court does not find that Plaintiffs' few quotations from case law and case citations transforms an otherwise permissible complaint to an impermissible shotgun pleading. Indeed, the quotations and citations help this Court and Defendants to understand Plaintiffs' allegations and the theories brought under each count.[21]

## B

In Count I, Plaintiffs allege that the Act was enacted, at least in part, with the purpose of discriminating against Black-led organizations and Black protesters in violation of United States Constitution. ECF No. 1 ¶ 127. Plaintiffs concede, and Defendants agree, that the law is neutral on its face.

A facially neutral law may nonetheless violate the Equal Protection Clause if Plaintiffs can establish "that the State's 'decision or act had a discriminatory purpose and effect.' " *GBM*, 992 F.3d at 1321. The discriminatory purpose need not be the " 'dominant' or 'primary' one;" rather it only needs to be a motivating factor because "[r]arely can it be said that a legislature or an administrative body operating under a broad mandate made a decision motivated by a single concern." *Vill. of Arlington*

---

[21] Sheriff Williams also takes issue with Plaintiffs' citations to multiple media articles. It is unclear to this Court whether Sheriff Williams is arguing that Plaintiffs' inclusion of citations to articles transforms the Complaint into a shotgun pleading. If so, Sheriff Williams has failed to provide any legal authority for his argument, nor has he argued that the inclusion of these articles confuses him or fails to give him adequate notice of the claims against him.

*Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265–66 (1977).[22] "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id.* at 266. "Once discriminatory intent and effect are established, the second prong provides that 'the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this [racial discriminatory] factor.' " *GBM*, 992 F.3d at 1321 (citation omitted).

The Eleventh Circuit, relying on *Arlington Heights*, has provided certain factors that help determine whether Plaintiffs have alleged a viable Equal Protection claim. The factors are "(1) the impact of the challenged law; (2) the historical background; (3) the specific sequence of events leading up to it passage; (4) procedural and substantive departure; . . . (5) the contemporary statements and actions of key legislators[;] . . . (6) the foreseeability of the disparate impact; (7) knowledge of that impact, [sic] and (8) the availability of less discriminatory alternatives." *Id.* at 1321–22. The "factors require a fact intensive examination of the record," *GBM*, 992 F.3d at 1322 n.33, and therefore such a claim does not lend itself to dismissal in the pleading stages where the record is not fully developed.

---

[22] Defendants rely on *Arlington Heights* to assert that "plaintiff must establish that discrimination was a *substantial and motivating factor* in the adoption of the law." ECF No. 38 at 18 (emphasis added). The term "substantial factor" appears nowhere in the decision, and indeed goes against *Arlington Heights*' requirement that the unlawful purpose be a "motivating factor" that need not be a dominant or a primary factor.

Nonetheless, Defendants have raised the issue in their motions and this Court must, therefore, review the allegations in the Complaint, accept them as true, view them in the light most favorable to Plaintiffs, and determine whether the Complaint supports Plaintiffs' assertion that the Act has a discriminatory purpose and effect. Here, Count I avoids dismissal because the allegations in the Complaint are sufficient to satisfy the factors enumerated by the Eleventh Circuit and because Defendants have not attempted to argue that "the law would have been enacted without this [racial discriminatory] factor." *Id.* at 1321.

The Complaint alleges that the Act will disproportionately impact Black protestors and that the impact is foreseeable and known. For example, the Complaint alleges that there is racially discriminatory enforcement of criminal laws in Florida. ECF No. 1 ¶¶ 65–66. The Complaint further alleges that during the racial justice protests in 2020, law enforcement officers discriminatorily arrested or threatened to arrest members of Black-led groups and their allies while allowing people opposing racial justice reforms to protest without intervention. *Id.* ¶ 64. The Complaint also alleges that the impact was foreseeable and known based on the concerns raised by the opponents of the bill, the warning by American Civil Liberties Union of Florida, the testimony of citizens who opposed the Act, the concerns raised by Ranking Member Michael Grieco, and Representative Marie Woodson's warning about the potential for disparate impact on Black and Brown communities. *Id.* ¶¶ 101–06.

Moreover, the Complaint alleges that despite these concerns, the legislature did not conduct a study of the law's racial impact. *Id.* ¶ 107.

The historical background of the Act alleged in the Complaint also supports Plaintiffs' assertion that the Act has a discriminatory purpose. The Complaint alleges that following the racial justice protests in Florida and nationwide in the summer of 2020, Governor DeSantis and other proponents of the Act opposed the demonstrations advocating for an end to police violence against Black people. *Id.* ¶ 55. In September, the Governor proposed a legislation, the "Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act," which ultimately led to HB1. *Id.* ¶ 56. The Complaint highlights numerous statements made by Governor DeSantis when announcing the proposed legislation, and soon after on the Tucker Carlson Show. *Id.* ¶¶ 57–60. The Complaint further alleges that the earliest proponents of the bill, Senate President-Designate Wilton Simpson and House Speaker-Designate Chris Sprowls, characterized the Act as a direct response to the Black-led protests advocating for racial justice and police reform that occurred throughout the summer of 2020. *Id.* ¶ 61. These allegations, when viewed in light most favorable to Plaintiffs, support an inference that the Act has an unlawful racially discriminatory purpose.

The Complaint also alleges that there were substantive and procedural departures in HB1's passage, including the legislature's rushed timeline for

consideration, curtailment of public comment, refusal to study its discriminatory impact, bypassing multiple Senate committees, and revision to give it an unusual immediate effect. *Id.* ¶¶ 107, 113–19.

Finally, the Complaint alleges that there are less discriminatory alternatives, in the form of preexisting law that already criminalizes riots and unlawful assemblies, and other acts criminalized by HB1. *Id.* ¶¶ 108–12.

All of these allegations when viewed in light most favorable to Plaintiffs support the assertion that HB1 has a discriminatory purpose and effect. Defendants, however, contend that Plaintiffs have "failed to allege facts sufficient to establish discriminatory intent or impact." ECF No. 38 at 19. To support their assertion, Defendants raise multiple arguments, none of which this Court finds persuasive.

First, Defendants argue that the Complaint includes allegations pertaining only to the Governor's statements and is devoid of any such allegations on the part of the legislature. *Id.* at 19. This assertion is inaccurate. ECF No. 1 ¶ 61, 106. Even assuming that the Complaint only contained the Governor's statements, Defendants ignore the fact that the Complaint alleges that the Governor proposed legislation that ultimately led to HB1. *Id.* ¶ 56. As such, the Governor's statements, coming from the official who allegedly played a substantial role in the promotion and promulgation of HB1, are highly relevant to establish an inference of discriminatory purpose. Here, the Governor allegedly proposed legislation with the purpose of

discriminating against Black protestors, which the legislature then enacted in the form of HB1. At this stage in the litigation, such allegations are sufficient. *Tracy P. v. Sarasota Cnty.*, No. 8:05-cv-927-T-27EAJ, 2007 WL 9723801, at *6 (M.D. Fla. Sept. 5, 2007) (citing *Hallmark Devs. v. Fulton Cnty., Ga.*, 466 F.3d 1276, 1284 (11th Cir. 2006)) ("Government officials are generally held to act with discriminatory intent, regardless of their personal views, when they implement the discriminatory desires of others.").

Second, Defendants assert that the "unusual events" highlighted by Plaintiffs are not so problematic as to establish discriminatory intent. ECF No. 38 at 20. To support their assertion, Defendants provide various justification for the "unusual events." ECF No. 38 at 20. However, such arguments are improper in a motion to dismiss. Defendants' assertion invites this Court to improperly weigh the evidence and look outside the four corners of the Complaint, which this Court cannot do at this juncture.

Finally, Defendants contend that Plaintiffs have not established discriminatory impact. *Id.* at 20–21. But, as discussed above, Plaintiffs have sufficiently alleged discriminatory impact. *See also City of S. Miami v. DeSantis*, 424 F. Supp. 3d 1309, 1344 (S.D. Fla. 2019) (denying motion to dismiss Equal Protection claim where complaint "sets forth statistics and data indicating that racial

65

minorities are more likely to be targeted, questioned, and detained by local law enforcement following the implementation of" the challenged law).

For these reasons, this Court finds that Plaintiffs have established discriminatory impact and purpose. The burden therefore shifts to Defendants to establish "that the law would have been enacted without this [racial discriminatory] factor." *GBM*, 992 F.3d at 1321. Defendants have not attempted to carry their burden here. As such, the Governor's and Defendant Sheriffs' motions as they relate to the argument that Plaintiffs have failed to state a claim under Count I are **DENIED**.

C

In Count II, Plaintiffs allege that the Act "targets and burdens fundamental speech activities on the part of those who wish to advocate on behalf of racial justice and police reform" in violation of the Equal Protection Clause of the Fourteenth Amendment. ECF No. 1 ¶ 140. In essence, Plaintiffs' claim under Count II is the same as their claim under Count III.[23] Although asserting First Amendment rights under an Equal Protection claim may seem redundant, Plaintiffs' right to do so finds support in Supreme Court precedent and decisions of various circuit courts. *R.A.V.*, 505 U.S. at 384 n.4 (noting that the Supreme "Court itself has occasionally fused the First Amendment into the Equal Protection Clause . . . with the acknowledgment . .

---

[23] Indeed, even Plaintiffs recognize that their First Amendment claim in Count III overlaps with their Equal Protection claim in Count II.

. that the First Amendment underlies its analysis."); *Police Dep't of Chi. v. Mosley*, 408 U.S. 92 (1972) (invoking Equal Protection Clause in striking down an ordinance which impinged upon the fundamental right to picket and therefore express one's views); *Barr v. Lafon*, 538 F.3d 554 (6th Cir. 2008); *Lac Vieux Desert Bank of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd.*, 276 F.3d 876, 879 n.1 (6th Cir. 2002); *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 779 (9th Cir. 2014) ("Government action that suppresses protected speech in a discriminatory manner may violate both the First Amendment and the Equal Protection Clause."); *Hardwick ex rel. Hardwick v. Heyward*, 711 F.3d 426, 442 (4th Cir. 2013).

Where plaintiffs allege violations of the Equal Protection Clause relating to expressive conduct, courts "employ 'essentially the same' analysis as . . . a case alleging only content or viewpoint discrimination under the First Amendment." *Dariano*, 767 F.3d at 779; *see also R.A.V.*, 505 U.S. at 384 n.4; *Barr*, 538 F.3d at 575 ("[O]ur analysis of Plaintiffs-Appellants' Equal Protection claim is essentially the same as our analysis of Plaintiffs-Appellants' First Amendment claim."). As explained *infra* in section III.D, Plaintiffs' First Amendment claim survives Defendants' motions to dismiss. Because the analysis for Count II is essentially the same, Plaintiffs' Equal Protection claim also survives.[24]

---

[24] In Defendants' motions, Defendants only argue that the Act does not violate the First Amendment and, therefore, the Equal Protection claim premised on a violation of the First Amendment also fails. ECF No. 38 at 21–22. In their reply, Defendants raise several new

D

In Count III, Plaintiffs allege that HB1 violates the First Amendment, in part, because it constitutes "impermissible viewpoint and content discrimination." ECF No. 1 ¶ 147. To be sure, Plaintiffs concede that HB1 is facially content neutral. ECF No. 76 at 24. But that does not mean that the law is, in fact, content neutral. *See Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (recognizing that facially neutral laws motivated by a desire to target a specific message are not content neutral).

Defendants acknowledge as much but argue that HB1 "was not enacted with the 'manifest purpose' to regulate speech related to racial justice." ECF No. 38 at 24 (citing *Turner Broad. Sys. v. F.C.C.*, 512 U.S. 622, 645 (1994)). They further claim that Plaintiffs "offer no factual support for [their] sweeping allegations." *Id.* at 25.

This Court cannot agree. Plaintiffs have alleged, for example, that Governor DeSantis announced the legislative proposal leading to HB1 by criticizing racial justice protestors. ECF No. 1 ¶¶ 56–58. That the Governor publicly promoted HB1 by denouncing people who are "anti-police" and "believe in defunding the police." *Id.* ¶ 60. And that the Governor, "Senate President-Designate Wilton Simpson, and

---

arguments as it relates to Count II. ECF No. 81 at 7–9. For example, Defendants argue for the first time that Plaintiffs have failed to identify comparators. This Court will not consider these arguments because they are raised for the first time in Defendants' reply brief and to consider them would be prejudicial to Plaintiffs. *See Broughton v. HPA Subway, Inc.,* No. 11-0036-WS-N, 2011 1321728, at *1 (S.D. Ala. Apr. 5, 2011) ("District Courts, including this one, ordinarily do not consider arguments raised for the first time on reply."); *Park City Water Auth. v. N. Fork Apartments, L.P.*, No. 09-0240-WS-M, 2009 WL 4898354, at *1 n.2 (S.D. Ala. Dec. 14, 2009) (citing cases from over 40 districts applying the rule in 2009 alone).

House Speaker-Designate Chris Sprowls . . .  all characterized the Act as a direct response to Black-led protests advocating for racial justice and police reform that occurred throughout the summer of 2020." *Id.* ¶ 61.

Whether Plaintiffs can ultimately succeed on their claim that HB1 constitutes impermissible viewpoint and content discrimination is an issue for another day. For now, it is enough to say that these allegations are sufficient to survive Defendants' motions to dismiss.

E

Plaintiffs also allege in Count III that the Act is unconstitutionally overbroad in violation of the First Amendment. And in Count IV, Plaintiffs allege that the Act is impermissibly vague in violation of the Due Process Clause of the Fourteenth Amendment. In their Response to Defendants' motions, Plaintiffs however only argue that sections 2, 14, and 15 are overbroad and sections 2 and 15 are vague. To the extent Plaintiffs maintain that the remainder of the sections are overbroad or vague, this Court finds that Plaintiffs have abandoned the issue by failing to brief it in in their response. *Mamon v. Midland Funding, LLC*, No. 1:13-CV-02301-AT-GGB, 2013 WL 12382685, at *4 (N.D. Ga. Nov. 14, 2013) ("In this circuit, a party's failure to brief and argue an issue before the district court is grounds for declaring it abandoned."). In addition, given Plaintiffs' lack of standing with respect to section 14 of the Act, this Court will limit its analysis to sections 2 and 15.

The question, then, is whether Plaintiffs have plausibly alleged that sections 2 and 15 are unconstitutionally overbroad or vague. As it relates to section 15, this Court takes the issue of whether it is overbroad or vague under advisement because Plaintiffs have raised the issue in their motion for preliminary injunction. ECF Nos. 64 & 65. As it relates to section 2, "it is enough at the pleading stage for the plaintiff to allege sufficient factual material to allow the Court to reasonably infer that the contested law is unconstitutionally vague." *Fla. Action Comm., Inc. v. Seminole Cnty.*, 212 F. Supp. 3d 1213, 1224 (M.D. Fla. 2016) (citing *Iqbal*, 556 U.S. at 678). "In short, a vagueness claim lies where those who enforce the law or those who are subject to its enforcement 'must necessarily guess at its meaning and differ as to its application.' " *Id.* (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)). Having reviewed the factual allegations in the complaint, the challenged provision at issue, and  the parties' arguments, this Court finds that Plaintiffs have adequately alleged a vagueness claim that allows this Court to reasonably infer that section 2 is vague in the way Plaintiffs contend—that the "amendment's language is broad enough to criminalize standing on the street and hindering any traffic, even temporarily," and  "will make it easier for law enforcement to use their discretion to arrest and ticket peaceful protesters who temporarily block a street." *See Wollschlaeger*, 848 F.3d at 1320 (Marcus, J.) (noting that a law is vague if it "fails to provide people of ordinary intelligence a reasonable opportunity to understand

70

what conduct it prohibits" and "authorizes or even encourages arbitrary and discriminatory enforcement").

As to Plaintiffs' claim that section 2 is overbroad, this Court recognizes that the statute it amends—section 316.2045—has not withstood constitutional challenges in the past. *See Bischoff v. Florida*, 242 F. Supp. 2d 1226 (M.D. Fla. 2003). The Florida Legislature appears to have tried to fix the problems highlighted in *Bischoff* with the amendments passed in section 2 of the Act. Nonetheless, this Court finds Plaintiffs have plausibly alleged that the amended version of section 316.2045 continues to "sweep unnecessarily broadly and thereby invade" protected speech, and thus, is arguably overbroad. *Bischoff*, 242 F. Supp. 2d at 1245 (quoting *NAACP v. Alabama*, 357 U.S. 449 (1958)).[25] However, this is certainly not the end of the matter, and Defendants may further develop their arguments as to this claim at the summary-judgment stage.

For these reasons, the Governor's and Defendant Sheriffs' motions as they relate to Count III's overbreadth claim and Count IV are **DENIED in part** and otherwise taken under advisement.

For the foregoing reasons,

---

[25] In her reply, Attorney General Moody inexplicably asserts that Plaintiffs have abandoned their Due Process Clams by failing to respond. ECF No. 81 at 6. Plaintiffs, however, have responded to Attorney General Moody's Due Process argument. ECF No. 76 at 26. Indeed, Attorney General Moody's reply cites to the portion of Plaintiffs' response where Plaintiffs have responded to her argument relating to Count IV.

**IT IS ORDERED**:

1. Attorney General Moody's motion to dismiss, ECF No. 38, is **GRANTED** for lack of standing. Plaintiffs' claims against Attorney General Moody are dismissed for lack of standing.

2. Governor DeSantis's motion to dismiss, ECF No. 39, is **GRANTED in part** and **DENIED in part**. Plaintiffs' claims against the Governor are limited to those for which Plaintiffs have standing (claims challenging sections 15 and 16).

3. The Defendant Sheriffs' motions, ECF Nos. 48, 49, and 50, are **GRANTED in part** and **DENIED in part**. Plaintiffs' claims against the Sheriffs are limited to those for which Plaintiffs have standing and Defendant Sheriffs are acting as "arms of the state" (claims challenging sections 2, 15, and 16).

**SO ORDERED on August 9, 2021.**

**s/Mark E. Walker**
**Chief United States District Judge**