## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## TALLAHASSEE DIVISION

**THE DREAM DEFENDERS,**
**et al.,**

     *Plaintiffs,*

**v.**                                                   **Case No.: 4:21cv191-MW/MAF**

**RON DESANTIS, in his official**
**capacity as Governor of the**
**State of Florida, et. al.,**

     *Defendants.*

_____/

## PRELIMINARY INJUNCTION

On May 27, 1956, Wilhelmina Jakes and Carrie Patterson, two Black students from Florida Agricultural and Mechanical University in Tallahassee, boarded a local city bus.[1] They sat in the only available seats, which were in the "whites-only" section. The two women refused to move when ordered to do so, and the bus driver called in the police.[2] Three police cars arrived at the scene and Ms. Jakes and Ms.

---

[1] For a brief history of the Tallahassee Bus Boycott, see Sadie Uhl and Hope Evans, *Black History Month: The Story of the Tallahassee Bus Boycott*, (Feb. 6, 2021 12:00 PM), https://history.fsu.edu/article/black-history-month-story-tallahassee-bus-boycott.

[2] The women offered to step off the bus if their bus fares were returned, but the bus driver refused to provide a refund. Charles Smith and Lewis M. Killian, *The Tallahassee Bus Protest,* FIELD REPORTS ON DESEGREGATION IN THE SOUTH, February 1958, *available at* https://www.bjpa.org/content/upload/bjpa/fiel/FIELD%20REPORTS%20ON%20DESEGREGA TION%20IN%20THE%20SOUTH%20TALLAHASSEE%20FL.pdf.

Patterson were arrested. Their charge—"inciting a riot." The rest is history.[3]

Five years after the FAMU students' arrests, nine clergymen arrived at the Tallahassee Airport to test the state's Jim Crow laws as part of the Freedom Rides of 1961. The clergymen were Black and White men of various faiths, including two rabbis and ordained ministers from several Protestant denominations. Over the course of about 24 hours, they repeatedly rescheduled their outbound flights in an apparent attempt to see if the Tallahassee Airport's restaurant would serve them as a group. *See Dresner v. City of Tallahassee, Fla.*, 375 U.S. 136, 145 (1963) (reproducing in full the opinion of the Circuit Court of the Second Judicial Circuit, Leon County, Florida). The clergymen had previously been "given protection against violence or other disorder from groups or individuals who resented [their] activities," but after a day of rescheduled flights, the City had enough of their efforts "to goad the municipality and its restaurant lessee to open the restaurant," and serve the Black and White men together. *Id.* at 148. Accordingly, the city attorney approached the clergymen at the airport and proclaimed that their assembly "at the municipal Airport of Tallahassee will tend to create a disturbance or incite a riot or

---

[3] Namely, events following the arrest of Ms. Jakes and Ms. Patterson led to an organized bus boycott in Tallahassee as part of an ongoing struggle to integrate the city's public transit system. Now Tallahassee's City Bus Plaza, just a block away from this Court, bears the name of the bus boycott's lead organizer, Reverend C.K. Steele. *See* Rosa Parks Marker and Reverend C.K. Steele Statue, Visit Florida, https://www.visitflorida.com/listing/rosa-parks-marker-and-c-k-steele-statue/24245/ (last visited Sep. 9, 2021).

disorderly conduct within the City of Tallahassee at its Municipal Airport over which the city had jurisdiction." *Id*. at 145. The city attorney ordered the clergymen to disperse, but after about ninety seconds and their failure to do so, the city attorney directed the chief of police to arrest them. *Id*.

In 1956 and 1961, Florida's anti-riot laws were used to suppress activities threatening the state's Jim Crow status quo. However, the definition of "riot" and "inciting a riot" were not clearly defined by Florida Statute. It was not until 1975 that the Florida Supreme Court explained that both terms, though undefined by statute, should be construed according to their common-law definitions. *See State v. Beasley*, 317 So.2d 750, 753 (Fla. 1975); *see also Hutchin v. State*, 290 So. 2d 35, 37 (Fla. 1974) (Ervin, J., concurring).

What's past is prologue.[4] Now this Court is faced with a new definition of "riot"—one that the Florida Legislature created following a summer of nationwide protest for racial justice, against police violence and the murder of George Floyd and many other people of color, and in support of the powerful statement that Black lives matter.[5] The question before this Court is whether the new definition is constitutional.

---

[4] WILLIAM SHAKESPEARE, THE TEMPEST, act 2, sc. 1. Of course, the past merely provides context for the present; it does not necessarily predetermine the course of events, nor should it.

[5] The state of Florida was no stranger to these largely peaceful protests. In Defendant DeSantis's own words, protests following the murder of George Floyd were "largely peaceful." Moreover, the Governor's office reported that the Florida Department of Law Enforcement "ha[d]

Plaintiffs have moved for a preliminary injunction to enjoin Defendants from enforcing the new definition of riot under section 870.01(2), Florida Statutes (2021), as amended by HB1. Plaintiffs assert this statute is impermissibly overbroad in violation of the First Amendment[6] and unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.[7]

This Court held a telephonic hearing on Plaintiffs' motion on August 30, 2021. For the reasons set out below, Plaintiffs' motion, ECF No. 64, is **GRANTED in part** and **DENIED in part**.[8]

---

not received reports of widespread property damage, commercial or residential." *See* News Release, Office of Gov. Ron DeSantis, Gov. Ron DeSantis Reports That Fla. Demonstrations Have Remained Largely Peaceful Over Past 24 Hours (June 2, 2020), https://www.flgov.com/2020/06/02/governor-ron-desantis-reports-that-florida-demonstrations-have-remained-largely-peaceful-over-past-24-hours.

[6] "The First Amendment prohibits the political restriction of speech in simple but definite terms: 'Congress shall make no law . . . abridging the freedom of speech.' " *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020) (quoting U.S. Const. amend. I)). "Those same terms, and their guarantee of free speech, now apply to states and municipalities as well as to the federal government." *Id*. at 860–61 (citation omitted).

[7] "The Fourteenth Amendment prohibits States and their components from depriving any person of life, liberty, or property, without due process of law." *Indigo Room, Inc. v. City of Fort Myers*, 710 F.3d 1294, 1300 (11th Cir. 2013) (quoting *Bankshot Billiards, Inc. v. City of Ocala, Fla.*, 634 F.3d 1340, 1349 (11th Cir. 2011)). "Due process encompasses the concepts of notice and fair warning." *Id*. at 1301. "[A]t its core is the principle 'that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed.' " *Id*. "Thus, 'vagueness arises when a statute is so unclear as to what conduct is applicable that persons of common intelligence must necessarily guess at its meaning and differ as to its application.' "*Id*. (quoting *Mason v. Fla. Bar*, 208 F.3d 952, 958 (11th Cir. 2000)).

[8] This Court dismissed Plaintiffs' claims against Attorney General Moody, *see* ECF No. 90; accordingly, Plaintiffs' motion for preliminary injunction is **DENIED as moot** with respect to Attorney General Moody.

I

A

HB1's new definition of "riot" sits at the core of Plaintiffs' motion for preliminary injunction. Prior to the Act's passage, Florida law criminalized rioting, "or . . . inciting or encouraging a riot." § 870.01, Fla. Stat. (1971). Because the statute did not define the term riot, Florida courts relied on the common-law definition of riot. *Beasley*, 317 So. 2d at 752. Specifically, the Florida Supreme Court restricted the offense of rioting to one where "three or more persons acted with a common intent to mutually assist each other in a violent manner to the terror of the people and a breach of the peace." *Id*. at 753.

HB1's Section 15 amended section 870.01 to, among other things, define riot. Section 870.01(2) now provides that "[a] person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," which results in "injury to another person . . . damage to property . . . or imminent danger of injury to another person or damage to property." § 870.01(2), Fla. Stat. (2021). Plaintiffs argue that this new definition "fails to clarify whether a

_____

As for the remaining Defendants, this Court has considered the Plaintiffs' motion, memoranda in support, all of the Defendants' responses thereto, all supplemental briefing and supplemental authority, and all attachments and exhibits that the parties filed, in addition to the argument this Court considered at the hearing on August 30, 2021.

participant in a larger demonstration where violence occurs" is guilty of rioting. ECF No. 1 ¶ 72.

## B

As an initial matter, this Court ruled in its Order on the Motions to Dismiss, ECF No. 90, that each of the Plaintiff Organizations have standing to pursue their claims against the Governor and the Defendant Sheriffs challenging, among other things, enforcement of statutes amended by HB1's Section 15. But, as the Supreme Court has observed, a plaintiff must establish standing "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). Again, Plaintiffs assert in their motion for preliminary injunctive relief that they have standing to pursue a preliminary injunction against these Defendants.

## 1

Article III standing requires Plaintiffs to demonstrate that they have suffered an injury in fact. *Id*. at 560. But a conclusory statement that one has "concrete plans to engage in . . . constitutionally protected activities by peacefully expressing [protected] speech," and may be subject to an offensive law, without more, is not enough to show an injury in fact at the preliminary-injunction stage. *LaCroix v. Lee Cnty., Fla.*, 819 F. App'x 839, 842 (11th Cir. 2020). Instead, Plaintiffs must demonstrate "an unambiguous intention at a reasonably foreseeable time to engage

in a course of conduct arguably affected with a constitutional interest." *Id.* at 842 (quoting *Bloedorn v. Grube*, 631 F.3d 1218, 1228 (11th Cir. 2011)). This does not require Plaintiffs to submit a detailed accounting of all future protests. But it does require something more than generally stating that one intends to speak in public places in the future. For this reason, in *LaCroix*, the Eleventh Circuit held that a street preacher who only "generally stated that he intends to preach in public places in Lee County" had not demonstrated an injury to support standing. *See also Elend v. Basham*, 471 F.3d 1199, 1209 (11th Cir. 2006) (noting that "[o]ther than the one instance in November 2002," the plaintiffs failed to give "a description of [their] past conduct from which to infer that they might act in a similar manner in the future").

Here, Plaintiffs have done much more than simply state in conclusory fashion that their speech is chilled. In support of their standing arguments, Plaintiffs have attached declarations setting out facts regarding each organization's mission, members, activities, and reaction to the passage of the challenged law. *See* ECF Nos. 65-1, 65-2, 65-3, 65-4, 65-5, 65-6, and 65-7. Plaintiffs' evidence shows they and their members have suffered past injuries and their members' speech continues to be chilled, which supports their standing to pursue preliminary injunctive relief against the remaining Defendants.

Specifically, Plaintiffs' evidence establishes, beyond mere conclusions, that their members have engaged in self-censoring for fear of the challenged statute's enforcement against them. Plaintiffs' and their members' First Amendment rights are chilled by section 870.01(2). The chill is evidenced by the unwillingness of their members to turn out at protest events in the weeks following HB1's enactment, the fact that some of the Plaintiffs have chosen to modify their activities to mitigate any threat of arrest at events, and the fact that at least one Plaintiff has ceased protest activities altogether. *See Pittman v. Cole*, 267 F.3d 1269, 1284 (11th Cir. 2001) (finding that plaintiffs had made sufficient showing that First Amendment rights were chilled as evidenced by their unwillingness to engage in protected speech). Apart from the chilling of speech, Plaintiffs, as organizations, have also shifted their activities away from their core mission and diverted resources to different events and operations in response to the statute's amendment.

For example, in support of their motion, Plaintiff Dream Defenders attached the declaration of its co-director, Rachel Gilmer. ECF No. 65-1. Ms. Gilmer states that "[h]istorically, Dream Defenders and its members regularly organized and participated in political actions and demonstrations focused on bringing attention to structural inequality." *Id*. ¶ 4. According to Ms. Gilmer, "[i]n 2020, Dream Defenders observed and was engaged in political protests in rural parts of Florida where members had never previously seen activity," including "Palatka, Florida,

where young people led protests and efforts to remove a confederate statue from their city government complex and faced significant counter-protests, including receiving threats." *Id*. ¶¶ 5–6. During the summer of 2020, "Dream Defenders led demonstrations to protest police violence . . . in 10 different counties in Florida." *Id*. ¶ 7. For example, on May 31, 2020, "Dream Defenders hosted an action that resulted in the blockage of Biscayne Boulevard in Miami, Florida." *Id*. ¶ 14. Ms. Gilmer estimates that "more than one thousand people attended that demonstration." *Id*.

In addition, "Dream Defenders members have demonstrated in Tallahassee against legislation they oppose." ECF No. 65-1 ¶ 17. Past protests responded to "stand your ground" legislation, "public funding for private prison[s]," "demonstrating in support for reforms to the juvenile detention system," and "a large demonstration against Governor DeSantis'[s] inauguration in 2019." *Id*. But "because [HB1] became effective immediately," Ms. Gilmer states that "Dream Defenders feared that any protest activity around the bill would lead to its members' unlawful arrest under Section 15." *Id*. ¶ 18.

Ms. Gilmer states that "Dream Defenders fears police will be emboldened to provoke demonstrators or to respond with extreme force or mass arrests to anyone allegedly inciting a riot, even if they are not associated with the demonstration." *Id*. ¶ 32. This is because "Dream Defenders has witnessed disproportionate reactions from police in the past," apparently including the arrest of over a dozen protesters in

Tallahassee on September 5, 2020. *Id*. ¶ 33; *see also Police Break Up Black Lives Matter March in Tallahassee; TCAC Leaders Arrested*, WFSU (September 5, 2020 7:15 PM EDT), https://news.wfsu.org/wfsu-local-news/2020-09-05/police-break-up-black-lives-matter-march-in-tallahassee; *Activists renew calls for charges against Tally19 to be dropped*, WCTV (January 12, 2021 5:59 PM EST), https://www.wctv.tv/2021/01/12/activists-renew-calls-for-charges-against-tally19-to-be-dropped/. Dream Defenders has also witnessed violence against protesters in Tallahassee, Gainesville, Tampa, and St. Petersburg, Florida, in June and September of 2020, when individuals attempted to drive their vehicles through groups of protesters or pulled a gun on protesters. ECF No. 65-1 ¶¶ 28–29.

Out of fear of arrest and injury at protests due to the enactment of HB1, Dream Defenders did not schedule any events this past May 25, 2021, "a national day of action in honor of George Floyd," even though "Dream Defenders would normally have planned numerous events around the state" for the occasion. *Id*. ¶ 21. Nor has Dream Defenders scheduled any other "direct actions, political protests, or demonstrations," since HB1 was enacted—aside from a "somber vigil for George Floyd following the verdict in the trial of Derek Chauvin" in Pensacola, Florida. *Id*. ¶ 22. According to Ms. Gilmer, Dream Defenders' members "no longer want[] to invite friends or family to events, out of fear for their safety," because of HB1. *Id*. ¶ 25. Their members' fear of violence and arrest due to HB1's enactment has prompted

Dream Defenders to refrain from demonstrating against the law for now. *Id*. ¶ 26. Instead, "Dream Defenders has planned numerous events around the state focused on educating members and communities on the risks associated with political protests and public gatherings now that HB1 has been enacted." *Id*. ¶ 34. So far, Dream Defenders has held educational events in Pinellas, Hillsborough, Broward, and Alachua Counties. ECF No. 65-1 ¶ 34.

Plaintiffs have also provided the declaration of Valencia Gunder, a founding board member of The Black Collective. ECF No. 65-2. "The Black Collective is a Florida nonprofit corporation focused on promoting political participation and economic empowerment of Black communities." *Id*. ¶ 2. The Black Collective has recently diverted its limited resources from "base-building and program development" to focusing on educating communities about the impacts of HB1. *Id*. ¶¶ 9–11, 18. Specifically, The Black Collective has hired three paid canvassers and trained multiple volunteer canvassers to engage members of the public and discuss HB1 in Black communities in Miami-Dade, Palm Beach, Broward, Duval, and Orange County. *Id*. ¶¶ 18–21. In addition, Ms. Gunder states that "The Black Collective worries that HB1 emboldens police to overreach . . . and also emboldens civilians to hit protestors with their cars." *Id*. ¶ 25. "This has made community members afraid to gather at demonstrations and has made The Black Collective hesitant to call for such attendance." *Id*.

Plaintiffs also attach the declaration of Emory Marquis Mitchell, the CEO and Founder of Chainless Change. ECF No. 65-3. Mr. Mitchell states that "Chainless Change was established in 2018 to provide programs and services that promote self-sufficiency and public safety for those negatively impacted by the criminal legal system." *Id.* ¶ 2. The organization "provides a vast array of services to people returning home after a period of incarceration ("Returning Citizens") and individuals who are involved with the criminal legal system, as well as their families." *Id.* ¶ 3. In addition, "Chainless Change regularly engages in direct actions and has led four protests since May 2020," *id.* ¶ 6, along with a "mobile protest" on April 17, 2020, where Mr. Mitchell was "personally stopped and harassed by [police] officers," *id.* ¶ 13.

On October 21, 2020, Chainless Change protested "at the entrance of public property, the Broward Sheriff's Office headquarters," where "officers approached [the] group and threatened to arrest [its] staff and other attendees for disturbing the peace, trespassing, and disorderly conduct." *Id.* ¶ 14. At Chainless Change's February 1, 2021 protest, the group "was met by agitators who spit on [their] staff and made efforts to attack one of [their] members." ECF No. 65-3 ¶ 15. Mr. Mitchell states that "[o]fficers nearby took no action to remove the agitators," but instead "harassed [their] members and set up barricades to prevent [them] from accessing areas of downtown." *Id.*

12

Further, because of HB1, Chainless Change "does not know how to protect [their] community of supporters" and "is no longer able to engage in rapid response direct actions, similar to its last two protests." *Id.* ¶ 16. Finally, "[a]s a Black man who is a Returning Citizen and also the founder of Chainless Change," Mr. Mitchell has the personal, "added fear that HB1 will be disproportionately used against [him] for the same reasons that the organization is in fear." *Id.* ¶ 19.

Plaintiffs have also provided the declaration of Tifanny Burks, a "Community Organizer for Black Lives Matter Alliance Broward ("BLMA Broward")." ECF No. 65-4 ¶ 1. Ms. Burks states that "BLMA Broward was formed in June 2015, after a white supremacist took the lives of nine Black parishioners in a Charleston, South Carolina church." *Id.* ¶ 2. The organization has about 30 members and its purpose "was to bring together the efforts of several small community organizations that were doing similar Black liberation work." *Id.* According to Ms. Burks, "BLMA Broward is known for . . . rapid direct action responses," including a "May 31, 2020 protest and another protest on July 9, 2016 in response to the killings of Alton Sterling and Philando Castile." *Id.* ¶ 3. BLMA Broward "mobilized protests highlighting and demanding accountability for police killings of Black and Brown residents of Florida . . . [and] has co-organized approximately 30 protests since May 31, 2020 advocating for the defunding of police." *Id.* ¶ 5. These include events on June 19, 2020, and September 26, 2020. *Id.* ¶¶ 13, 15.

BLMA Broward's co-organized protest on May 31, 2020 in Ft. Lauderdale, Florida, turned out about 3,000 protesters. *Id*. ¶ 8. According to Ms. Burks, "[t]he demonstration was non-violent and calm, and it was coming to an end when agitators joined the crowd," who appeared to be "trying to cause chaos and incite a reaction from police." ECF No. 65-4 ¶ 9. Ultimately, "[p]olice deployed tear gas and used physical violence on protesters." *Id*. ¶ 10. BLMA Broward's members worry that had HB1 been the law at that time, many of their non-violent members "would be guilty by association, even if they were attempting to leave the area when agitators were being disruptive." *Id*. ¶ 12.

BLMA Broward's members are unsure of what actions will violate the new law and are concerned that it affords law enforcement too much discretion to arrest non-violent protesters or onlookers "if anything at a protest goes wrong or if agitators make trouble." *Id*. ¶ 21. Similarly, members "are concerned HB1 will be disproportionately enforced against [their] predominantly Black supporters," and therefore, "BLMA Broward has stopped organizing direct actions." *Id*. ¶ 22. "For example, BLMA Broward planned a march on the one-year anniversary of its May 31, 2020 protest." ECF No. 65-4 ¶ 23. But "due to the implementation of HB1, BLMA Broward canceled the march and instead planned a stationary event at Delevoe Park in Ft. Lauderdale," which "saw a very low turnout as compared to last year's march." *Id*.

14

Plaintiffs have also provided declarations from Marie Rattigan and Devan Vilfrard, both of the NAACP Florida State Conferences and Youth Branches of the NAACP ("Florida NAACP"). ECF Nos. 65-5 and 65-6. Ms. Rattigan is the Second Vice President of the Tallahassee Chapter of the Florida NAACP. ECF No. 65-5 ¶ 1. She is likewise the "Lead Organizer" for the Dream Defenders in Tallahassee. *Id*. ¶ 3. Mr. Vilfrard is the Second Vice President of the Youth & College Division of the Florida NAACP, a rising senior at FAMU, and the President of the FAMU University Chapter of the NAACP ("FAMU NAACP"). ECF No. 65-6 ¶¶ 1–2.

Before HB1 became law and during the summer of 2020, Ms. Rattigan "personally engaged in and organized protest activities concerning racial justice and policing, including sponsoring protests in Tallahassee." ECF No. 65-5 ¶ 4. She did so in her leadership capacities with the Florida NAACP and Dream Defenders. *Id*. But since HB1 was enacted on April 19, 2021, Ms. Rattigan has chosen not to engage in protest activities for fear that she will be "subject to criminal penalties for the unlawful acts of others in attendance." *Id*. ¶ 7. Ms. Rattigan's fear is rooted in her reading of HB1's new definition of "riot," which she believes could allow for her arrest "simply for attending a protest where violence or disorderly conduct takes place, even if [she] did not engage in any such conduct [herself]." *Id*. ¶ 8. Ms. Rattigan is also wary of the collateral consequences that a felony conviction can have on her life, including losing the right to vote and the right to receive financial

assistance for her education. *Id*. ¶ 9. This fear prevented her from protesting what Ms. Rattigan describes as "an incident of police brutality against an unarmed Black man named Jacquez Kirkland in Tallahassee," in May of 2021. ECF No. 65-5 ¶ 10. But for the enactment of HB1, Ms. Rattigan would have protested. *Id*.

Mr. Vilfrard's declaration states that the NAACP's objectives include educating "persons regarding their constitutional rights and [taking] all lawful action to secure the exercise thereof." ECF No. 65-6 ¶ 3. Accordingly, "[d]emonstrations against racial discrimination and racial injustice are critical to the national NAACP's organizational mission." *Id*. The FAMU NAACP is a subdivision of the Florida NAACP, and it "maintains the same mission as the national NAACP." *Id*. ¶¶ 5–6.

According to Mr. Vilfrard, "the FAMU NAACP regularly participates in direct actions that highlight the racial injustices that Black Floridians, including students and young people, continue to face." *Id*. ¶ 6. Members of the FAMU NAACP also "organize and attend demonstrations in their individual capacities, such as during the racial justice protests of summer 2020." *Id*. Mr. Vilfrard states that as soon as Governor DeSantis "announced the legislative proposal that would eventually become HB1 on September 21, 2020," FAMU NAACP and its members became concerned about how such legislation would impact the right to protest. ECF No. 65-6 ¶¶ 7–8. Their concerns were based, in part, on how law enforcement recently treated protesters in Florida, including the nineteen individuals arrested in

Tallahassee over Labor Day weekend in September 2020. *Id.* ¶ 8. The FAMU NAACP's and its members' concerns were also based on incidents in Florida during the summer of 2020 when "individuals . . . threatened or harmed peaceful racial justice protesters with a vehicle or weapon and were not charged with any crime." *Id*.

Mr. Vilfrard also notes that since HB1 was enacted, "[m]any FAMU NAACP members have expressed confusion to [him] about what they can and cannot do under HB1, particularly Section 15." *Id.* ¶ 11. Specifically, Mr. Vilfrard states that many members "are concerned that under Section 15, they can be arrested simply for attending a protest where violence or disorderly conduct takes place, even if they do not engage in any such conduct themselves." *Id.* As a result, "HB1 has had a severe chilling impact on demonstrations by FAMU NAACP members." *Id.* ¶ 12. "[M]any FAMU NAACP members have decided not to protest out of fear of being arrested and potentially charged under this new law." ECF No. 65-6 ¶ 12. And "[s]everal FAMU NAACP members have expressly told [Mr. Vilfrard] that they have decided not to protest because of this fear." *Id*.

Finally, Plaintiffs attach the declaration of Ben Frazier, the founder and President of Northside Coalition of Jacksonville. ECF No. 65-7. Mr. Frazier states that "Northside Coalition of Jacksonville is a Florida nonprofit corporation focused on speaking out against all forms of racial, social, and economic injustice." *Id.* ¶ 2.

"Currently, there are approximately 1,400 members, supporters, and volunteers of Northside Coalition of Jacksonville." *Id*. ¶ 3. "Members include retired teachers, bankers, and correctional officers, among others." *Id*. "Northside Coalition of Jacksonville aims to make quality of life better for people in . . . communities [with large Black populations] and to address all forms of racial injustice." *Id*. ¶ 7.

To effect the change the organization wishes to see in its community, Northside Coalition of Jacksonville engages with community members with "boots on the ground." ECF No. 65-7 ¶ 8. The Coalition has joined with other organizations to "spearhead[] marches that led to thousands of community members coming out to march in the streets," following the murder of George Floyd. *Id*. ¶ 9. Since May 2020, "Northside Coalition of Jacksonville has held 25-30 rallies, marches, and press conferences," and has also "hosted numerous actions at County Commission and other public board meetings." *Id*. ¶ 11. However, since the enactment of HB1, Mr. Frazier states, "the number of participants at Northside Coalition of Jacksonville's events has decreased by approximately 30-40 percent." *Id*. ¶ 15.

The organization has hosted several events since the new definition of "riot" went into effect, and the average turnout at those events was around 30 people, compared to the 100 or so people who would normally attend such events in the past. *Id*. In addition, Mr. Frazier states that many members have relayed their fears about what "police or vigilantes will do to justify causing bodily harm to protesters" if they

attend rallies, and that it has become "increasingly difficult to bring people out to rallies." ECF No. 65-7 ¶¶ 16–18.

Mr. Frazier asserts that his members' fears of police and outside influence on their events are grounded in fact—namely, the organization's experience this past spring when on three occasions "a known white power activist and agitator came to a Northside Coalition of Jacksonville event." *Id*. ¶ 20. Mr. Frazier also points to the response by Sheriff Williams, which he describes as an overzealous reaction to non-violent mass actions. ECF No. 65-7 ¶ 10. Specifically, Mr. Frazier refers to "one instance [in late May 2020], after the formal event ended, [when] non-member march participants continued their own protest." *Id*. "Eventually, Sheriff [Williams] called the SWAT team out for minor graffiti and a possible broken window." *Id*. "At the end of the day, officers arrested over 70 people," and  "treated many harshly." *Id*.

"To protect folks, Northside Coalition of Jacksonville has increased the number of peacekeepers in the ranks during rallies and actions." *Id*. ¶ 23. The organization "has also sought out the help of legal observers and has asked all members to review the organization's non-violence protocols." *Id*.

2

Plaintiffs' organizational and associational injuries, including their diversion of resources and self-censorship, are sufficiently concrete and particularized to

support Article III standing to challenge the enforcement of Section 15's definition

of "riot." *See Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014)

("Under a diversion-of-resources theory, an organization has standing to sue when a

defendant's illegal acts impair the organization's ability to engage in its own projects

by forcing the organization to divert resources in response."); *ACLU v. Fla. Bar*, 999

F.2d 1486, 1493 (11th Cir. 1993) ("[T]he alleged danger of this statute is, in large

measure one of self-censorship; *a harm that can be realized without an actual

prosecution.*") (emphasis in original) (quoting *Virginia v. Am. Booksellers Ass'n,

Inc.*, 484 U.S. 383, 393 (1988)).

Plaintiffs' declarations color in the detailed outline established by their

Complaint. I credit the declarants' statements regarding their organizations'

missions, core activities, and their members' fears of protesting now that HB1 has

become law. I also credit the declarants' statements regarding the self-censoring that

their members now engage in, the measurable drop in turnout at events that have

occurred since the passage of HB1, and the diversion of resources some Plaintiffs

have had to make to continue organizing in ways that do not involve direct actions

or large protests.

In *LaCroix*, the Eleventh Circuit noted that the appellant waited over a year

before moving for a preliminary injunction and that he had not shown that he would

be "imminently subject to" the challenged permitting ordinance. 819 F. App'x at

843–44. Here, on the other hand, Plaintiffs have moved for preliminary injunctive relief within three months of the law's enactment. They have also demonstrated that their members, like all Floridians, are subject to the criminal laws of the state, including the challenged definition of "riot," which went into effect immediately; that their organizations' core activities include demonstrations and protests; that they have already been harmed through the diversion of their resources to hire canvassers to educate members and the public about the new law and the modification of their events from marches and protests to stationary events or no protests at all; and that their members' First Amendment rights have been chilled based on the demonstrably lower turnout at events that have occurred since the law's enactment. "Past injury from alleged unconstitutional conduct does not in itself show a present case or controversy regarding injunctive relief, if unaccompanied by current adverse effects." *Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984) (citing *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974)). But "[p]ast wrongs do constitute evidence bearing on whether there is a real and immediate threat of repeated injury which could be averted by the issuing of an injunction." *Id*. Thus, this case is wholly distinguishable from the scenarios in *Eland*, *LaCroix*, and related cases where the plaintiffs' injuries were purely conjectural.

This Court notes Plaintiffs' evidence is largely unchallenged,[9] because of all the Defendants, Governor DeSantis was the only one to submit evidence in response to Plaintiffs' declarations. *See* ECF No. 99-1. The evidence consists of print-outs of event postings from the Broward, Goddsville, and Miami Dream Defenders' Facebook pages, *id*. at 1–5; Chainless Change, Inc.'s Facebook page, *id*. at 6; and other organizations' event postings on Facebook, *id*. at 7–17. Based on these print-outs, the Governor asserts "it is clear . . . that [Plaintiffs] have participated in protests, demonstrations, or other events since the Act's passage that they did not mention in their declarations." ECF No. 99 at 27. This evidence, according to the Governor, belies their claim that they have suffered an injury-in-fact and irreparable harm. *Id*.

Governor DeSantis is mistaken for several reasons. First, the evidence that pertains to the Plaintiffs in this case does not contradict Plaintiffs' declarations or

---

[9] When Plaintiffs originally filed their motion, this Court held an expedited scheduling conference and set a briefing schedule to allow the parties sufficient time to prepare for the hearing. This Court by no means limited the parties to declarations and written argument. Had the parties requested to proceed with limited discovery or to present live witnesses at the hearing on Plaintiffs' motion, this Court would have absolutely permitted it. Indeed, this Court routinely allows for limited discovery ahead of preliminary-junction hearings and hears live witness testimony at such hearings. *See, e.g.*, *Aderant N. Am., Inc. v. Yezovich*, Case No. 4:21cv343-MW/MAF (permitting limited discovery ahead of hearing); *21st Century Oncology, Inc. v. Moody*, 402 F. Supp. 3d 1351, 1361 (N.D. Fla. 2019) (Walker, C.J.) ("During the [preliminary-injunction] hearing before this Court, the parties presented lengthy expert testimony . . . ."); *League of Women Voters of Fla. v. Scott*, 366 F. Supp. 3d 1311, 1314 (N.D. Fla. 2018) (Walker, C.J.) (describing testimony from evidentiary hearing on motion for preliminary injunction); *Hoffer v. Jones*, 290 F. Supp. 3d 1292, 1294 (N.D. Fla. 2017) (Walker, J.) (order granting preliminary injunction after five-day hearing that included testimony from expert witnesses, prison officials, and inmates). But here, none of the parties sought limited discovery, nor did anyone ask to present live testimony at the hearing. Thus, this Court is limited to only the evidence that Plaintiffs and Governor DeSantis have submitted.

their asserted injuries. For example, Plaintiff BLMA Broward provided Tifanny Burks's declaration, ECF No. 65-4, in which she states that "BLMA Broward has stopped organizing direct actions," because of the challenged law. *Id*. ¶ 22. Ms. Burks explains that "BLMA Broward planned a march on the one-year anniversary of its May 31, 2020 protest," *id.*  ¶ 23, but "due to the implementation of HB1, BLMA Broward canceled the march and instead planned a stationary event at Delevoe Park in Ft. Lauderdale," which "saw a very low turnout as compared to last year's march." *Id*. Consistent with this evidence, the Governor attaches screenshots of Broward Dream Defenders' Facebook page, which promoted Plaintiff BLMA Broward's "Justice for George Floyd and Barry Gedeus Anniversary Protest" on Sunday, May 30, 2021, in Delevoe Park, Ft. Lauderdale, Florida. *See* ECF No. 99-1 at 1–2.

Similarly, Governor DeSantis points to event posts for various Dream Defender groups, including the Goddsville Dream Defenders, who apparently use the handle, "@UFDreamDefenders," and organized a "demonstration in solidarity with Palestine" in May of this year. *See id*. at 3. These posts also include a "solidarity" with Palestine event and a "Vigil for Nakba Day and the Ongoing Catastrophe in Palestine," in Wynwood and Fort Lauderdale—all of which were promoted by Miami Dream Defenders. *Id*. at 4–5. Of course, Ms. Gilmer's declaration already explained that "[r]ecent conflict in Israel and Palestine led to

some small political demonstrations around the state," and Dream Defenders participated in such demonstrations, including rallies and marches in Tallahassee, Orlando, and Gainesville. ECF No. 65-1 ¶ 23. But, Ms. Gilmer says, "[b]ecause of HB1, Dream Defenders did not recruit people to demonstrate around these issues— something it has historically done and would normally do during periods of conflict." *Id*.

Second, the Governor attaches evidence that has nothing to do with a purported protest. Specifically, Governor DeSantis points to a screenshot of Plaintiff Chainless Change, Inc.'s Facebook post showing a flyer for a "Juneteenth Black Joy Celebration" at Coleman Community Park in West Palm Beach on June 19, 2021. ECF No. 99-1 at 6. The post notes that "There will be . . . Music, Food, Games, Rental Assistance, Performers, Giveaways, Community Resources, and More," and includes a photograph of several joyful Black children. The post is reproduced for reference below.



*Id.*

This Court is perplexed by the Governor's decision to include this specific Facebook post as evidence that Plaintiffs' speech is not actually chilled in the manner they assert in their motion. To start, this year marked the first official recognition of Juneteenth National Independence Day as a federal holiday. 5 U.S.C. § 6103(a)

(2021). This Court—along with other courts across the country—was closed for the occasion. The Facebook post advertises a community celebration on a federal holiday commemorating the end of slavery in America. But nothing in Mr. Mitchell's declaration, ECF No. 65-3, indicates that his organization's members are concerned about gathering in public for community celebrations of federal holidays. Instead, Mr. Mitchell states that "Chainless Change leaders . . . understood [Section 15 of HB1] to mean that anyone who attends a protest may be arrested and held without bond." *Id*. ¶ 10. Mr. Mitchell goes on to describe past protests and fears about discriminatory enforcement of the anti-riot law against his organization's members at future protests.

Here, the Governor has conflated a community celebration of a federal holiday commemorating the end of slavery with a protest. He does so to argue that Plaintiff Chainless Change's claimed injury of chilled speech and self-censorship is not to be believed. It should go without saying that a public gathering of Black people celebrating "Black joy" and release from bondage does not automatically equate to a protest—or something that the Governor apparently implies should be chilled by the new riot law if Plaintiff Chainless Change's claimed injury is to be believed.[10]

---

[10] If Governor DeSantis included this particular post to imply that *any* gathering of Black people in a public space is a de facto protest, Plaintiffs' concerns about the how the statute's new definition of "riot" will be enforced are indeed well-founded.

Accordingly, this post is evidence of nothing other than the fact that Chainless Change promoted a community celebration of a federal holiday.

Third, and lastly, the balance of Governor DeSantis's evidence adds little to the discussion about Plaintiffs' asserted injuries because it does not pertain to these Plaintiffs. The Governor's decision to include flyers from groups like Black Lives Matter: Tampa, Tampa Bay for Change, and Black Lives Matter Restoration Polk, Inc., who are not before this Court, and for events that are not in Leon, Duval, or Broward counties, simply does nothing to contradict Plaintiffs' evidence or their claimed injuries. Though it is true the event flyers include images of Black men and women apparently engaged in peaceful protest, Plaintiffs are not before this Court representing all Black men and women in the State of Florida. Instead, Plaintiffs have limited their evidence to establish that (1) they and their members have engaged in protests in Leon, Duval, and Broward Counties in the past, (2) they intend to do so in the future or they already have engaged in demonstrations with much lower turnout than before, and (3) the challenged law's confusing definition of "riot" fails to give their members sufficient notice of what is prohibited or when they could be subject to arrest, such that their members do not wish to participate in future protests or have ceased organizing protests altogether. For these reasons, I find Plaintiffs have suffered both organizational and associational injuries-in-fact for Article III standing.

Next, I conclude that Plaintiffs' injuries are fairly traceable to the Governor and Defendant Sheriffs for the same reasons discussed in this Court's Order on the Motions to Dismiss, which I incorporate by reference here.[11] ECF No. 90. Namely, as to enforcing section 870.01(2), Florida law specifically gives Governor DeSantis the power to order sheriffs to suppress riots and unlawful assemblies and to take direct command of the Florida Highway Patrol to do the same. Indeed, Governor DeSantis has used this power in the past. *See* ECF No. 1 ¶ 37 n.2 (citing June 2, 2020 statement from Governor DeSantis that he is mobilizing "more than 1,300 sworn FHP troopers to support local law enforcement efforts."). In addition, Governor DeSantis has the power under Florida law to suspend sheriffs who decline to obey his directives to suppress riots. Fla. Const. Art. IV, § 7(a) (stating the governor may suspend "any county officer" for "malfeasance, misfeasance, neglect of duty, drunkenness, incompetence, permanent inability to perform official duties, or commission of a felony"). Finally, Florida law also gives Governor DeSantis the power to order the Florida Department of Law Enforcement to investigate sheriffs before the Governor suspends them. § 943.03, Fla. Stat. Accordingly, Florida law specifically empowers Governor DeSantis to enforce section 870.01(2), beyond any

---

[11] This Court must consider standing anew at every stage in the proceeding. This motion presents a new standing inquiry in light of the new evidence submitted in support of and opposition to Plaintiffs' motion. While I have considered standing anew based on this new evidence, I incorporate by reference the legal analysis regarding traceability from my 72-page order on the motions to dismiss. *See* ECF No. 90. It makes no sense to cut and paste that order here, as the legal analysis does not change.

mere general supervisory authority as the Chief Executive of Florida. *Cf. Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020); *see also Reprod. Health Servs. v. Strange*, 3 F.4th 1240, 1252 (11th Cir. 2021) (explaining that "[t]he plaintiffs' injuries are traceable to the Attorney General and the District Attorney" because "[t]he Act contemplates enforcement by the Attorney General and the District Attorney").[12]

As to the Defendant Sheriffs, they are responsible for, among other things, maintaining the peace, arresting those who disturb the peace, and suppressing "riots" and "unlawful assemblies." *See, e.g.*, § 30.15(1)(f), Fla. Stat. ("Sheriffs, in their respective counties . . . shall . . . [s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary."); § 30.15(1)(g), Fla. Stat. ("Sheriffs, in their respective counties . . . shall . . . [a]pprehend, without warrant, any person disturbing the peace, and carry that person before the proper judicial officer, that further proceedings may be had against him or her according to law."); § 870.04, Fla. Stat. (specifying officers to "disperse riotous assembl[ies]," and stating that "the sheriff or the sheriff's deputies . . . shall in the name of the state command all the persons so assembled immediately and peaceably to disperse," and

---

[12] Because Governor DeSantis has the power to enforce section 870.01(2), he has "some connection" with the law's enforcement and is a proper party under *Ex parte Young*. *See Osterback v. Scott*, 782 F. App'x 856, 858–59 (11th Cir. 2019).

authorizing the sheriff to arrest any person who does not "immediately and peaceably disperse").

In addition, Plaintiffs' declarations set out evidence that their members and others present at protest events over the past year have been subject to allegedly discriminatory enforcement activities within the jurisdiction of each Defendant Sheriff. *See, e.g.*, ECF No. 65-4 ¶ 28 (describing event where "a white supremacist counter protester . . . attacked a protester by kicking and spitting on them," but "[e]ven though the incident was witnessed by police officers, nothing was done until protesters chased the counter protestor and demanded that police officers arrest him"); ECF No. 65-6 ¶ 8 (describing arrest of nineteen protesters in Tallahassee in September 2020); ECF No. 65-1 ¶ 33 (describing the same event on September 5, 2020, when nineteen protesters were arrested in Tallahassee); ECF No. 65-7 ¶ 10 (describing event where "Sheriff Mike Williams react[e]d overzealously to . . . non-violent mass actions," in May 2020); ECF No. 65-3 ¶ 13 (describing early protests in Broward County where "police officers regularly threatened to arrest us for obstructing traffic," and noting that the declarant had personally been "stopped and harassed by officers during a mobile protest," on April 17, 2020); *id*. ¶ 14 (describing October 2020 protest at the Broward Sheriff's Office headquarters where "officers approached [protesters] and threatened to arrest [their] staff and other attendees for disturbing the peace, trespassing, and disorderly conduct," in an apparent attempt to

"intimidate . . . and deter [the protesters] from exercising their First Amendment rights").

Not one of the Defendant Sheriffs filed any evidence to dispute Plaintiffs' version of the facts.[13] Plaintiffs' evidence at least establishes that Defendant Sheriffs have taken an active role in making arrests and enforcing Florida's criminal statutes against protesters. And although Sheriff Tony asserts one of his employees has made statements that his office will not enforce the challenged law, Sheriff Tony has filed no evidence of an actual, formal policy to that effect. "Mid-litigation assurances are all too easy to make and all too hard to enforce." *W. Ala. Women's Ctr. v. Williamson*, 900 F.3d 1310, 1328 (11th Cir. 2018). Here, the reality is that Defendant Sheriffs have an affirmative state-law duty to enforce the law at issue. *See* § 30.15(1)(f), Fla. Stat. What's more, the Governor can order the Defendant Sheriffs to do so and suspend them if they fail or refuse to act. In short, Florida law commands sheriffs to suppress "riots," if and when a sheriff or the Governor decides a gathering of people has turned into a riot. Accordingly, this Court finds Plaintiffs have demonstrated that Defendant Sheriffs' enforcement authority causes Plaintiffs to

---

[13] Sheriff McNeil filed no response whatsoever and takes no position on the motion for preliminary injunction or the meaning of section 870.01(2), Florida Statutes (2021).

self-censor and divert resources based on their well-founded fears that section 870.01(2) will be enforced against them.[14]

Next, redressability. This prong of Article III standing "focuses . . . on whether the injury that a plaintiff alleges is likely to be redressed through the litigation." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 287 (2008). As this Court has already noted, enjoining the Governor and the Defendant Sheriffs from enforcing the challenged law has the practical consequence of removing the threat that Florida law enforcement acting under the Governor's orders, or the Defendant Sheriffs themselves, will enforce section 870.01(2) against Plaintiffs' members. *See* ECF No. 90 at 40–42; *see also Utah v. Evans*, 536 U.S. 452, 464 (2002) (finding redressability where a favorable ruling's "practical consequence" was to make it more likely "that the plaintiff would obtain relief that directly redresses the injury suffered").

"Article III also does not demand that the redress sought by a plaintiff be complete." *Moody v. Holman*, 887 F.3d 1281, 1287 (11th Cir. 2018). Here, Defendant Williams asserts that, should any preliminary injunction issue, the public interest served by the injunction would be limited given that Plaintiffs have not sued

---

[14] Because Defendant Sheriffs have the power to enforce section 870.01(2), they have "some connection" with the law's enforcement and are proper parties under *Ex parte Young*. *See Osterback,* 782 F. App'x at 858–59. This Court recognizes that there is an additional wrinkle concerning the Defendant Sheriffs' status as state officials, which this Court addressed in its order on the motions to dismiss, ECF No. 90, incorporated by reference herein and discussed in more detail below.

the relevant State Attorneys, the remaining 63 Sheriffs' Departments, or other policing agencies in Florida. ECF No. 98 at 12–13. To the extent Defendant Williams implies that Plaintiffs must either have complete redress or receive no relief at all, this is not the law. *See Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801 (2021) ("True, a single dollar often cannot provide full redress, but the ability 'to effectuate a partial remedy' satisfies the redressability requirement." (quoting *Church of Scientology of Cal. v. United States*, 506 U.S. 9, 13 (1992)); *Church of Scientology*, 506 U.S. at 13 ("Even though it is now too late to prevent, or to provide a fully satisfactory remedy for, the invasion of privacy that occurred when the IRS obtained the information on the tapes, a court does have power to effectuate a partial remedy by ordering the Government to destroy or return any and all copies it may have in its possession.").[15]

Finally, Defendant Tony takes no position on the merits of Plaintiffs' claims, but instead reasserts his argument from the motion-to-dismiss stage that he is not properly before this Court. ECF No. 96. Defendant Tony's consternation is apparently based on the fact that this Court did not blindly apply *Hufford v. Rodgers*, 912 F.2d 1338 (11th Cir. 1990), to find that the Defendant Sheriffs are not state

---

[15] Plaintiffs have done what the Eleventh Circuit, in *Jacobson* and other cases, has instructed plaintiffs to do when choosing the proper party to sue—they have sued those responsible for enforcing the challenged law. Here, Plaintiffs have sued the chief law enforcers of the counties where Plaintiffs and their members operate and who are tasked with the state-law duty of enforcing Florida's anti-riot laws.

officials. *Id*. at 4–5. However, *Hufford* is no longer controlling after the Eleventh Circuit's en banc decision in *Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) and the Supreme Court's related decision in *McMillian v. Monroe County*, 520 U.S. 781 (1997).

Upon review of Defendant Tony's response and the arguments presented at the telephonic hearing with respect to this point, this Court reaffirms that Defendant Sheriffs are properly before this Court as "state officials" with respect to their state-law function to enforce Florida's anti-riot laws.[16] As discussed at the hearing, Florida sheriffs are required by Florida law to command, "in the name of the state," that unlawful assemblies are to disperse. *See* § 870.04, Fla. Stat. Indeed, no other crime in Florida is subject to such statewide concern. *See* § 14.022, Fla. Stat. (establishing Governor's emergency power to order sheriffs to suppress riots); § 30.15(1)(f), Fla. Stat. (establishing Sheriffs' duty to suppress riots). For these reasons, and those set out in this Court's Order on the Motions to Dismiss, this Court concludes that Florida sheriffs act as state officials when enforcing Florida's anti-riot laws, dispersing riots under section 870.04, and quelling riots pursuant to their state-law duty under section 30.15(1)(f).

---

[16] As discussed in footnote 14, I incorporate by reference the legal analysis regarding the "Florida-sheriffs-as-state-officials" issue from my 72-page order on the motions to dismiss. *See* ECF No. 90.

34

3

This is a pre-enforcement facial challenge to a Florida criminal statute that implicates Plaintiffs' and their members' First Amendment rights. Governor DeSantis argues, though, that Plaintiffs' claims are premature, essentially for two reasons. First, because this Court may not invalidate a law in a facial, pre-enforcement vagueness and overbreadth challenge regardless of the risks of discriminatory enforcement. ECF No. 99 at 5 (citing *High Ol' Times, Inc. v. Busbee*, 673 F.2d 1225, 1231 (11th Cir. 1982)). And second, because this Court should abstain from ruling on a pre-enforcement facial challenge to a statute that is "susceptible to 'construction by the state courts that would avoid or modify the constitutional question.' " *Id.* at 6 (quoting *Zwickler v. Koota*, 389 U.S. 241, 249 (1967)). This Court will address each argument in turn.

In support of his first point, Governor DeSantis relies on several cases concerning pre-enforcement challenges outside of the First Amendment context to suggest that pre-enforcement review is essentially never appropriate when it comes to vagueness and overbreadth claims that implicate First Amendment rights. But decades of binding Supreme Court and Eleventh Circuit precedent has held that pre-enforcement review is available for plaintiffs in facial vagueness and overbreadth challenges in the First Amendment context. *See Am. Booksellers Ass'n, Inc.*, 484 U.S. at 392–93; *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964); *Wollschlaeger v.*

*Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) (en banc); *Bankshot Billiards, Inc. v. City of Ocala*, 634 F.3d 1340, 1350 (11th Cir. 2011) (listing cases addressing pre-enforcement review of vagueness claims based on challenged law's chilling effect on constitutionally protected activity). Unless and until the Supreme Court charts a new path, or the Eleventh Circuit, en banc, takes a different approach, this Court will apply the law that binds it.

Of course, "premature" could also mean that Plaintiffs' pre-enforcement challenge is not ripe. Although it is unclear whether Governor DeSantis is arguing that Plaintiffs' claims are unripe, this Court finds that the vagueness and overbreadth claims are ripe for review.

Ripeness requires this Court to evaluate whether the case is fit for judicial adjudication and the hardship to the parties of withholding court consideration. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). Courts apply the ripeness doctrine "most permissively" in the First Amendment context. *Harrell v. Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010); *Temple B'Nai Zion, Inc. v. City of Sunny Isles Beach, Fla.*, 727 F.3d 1349, 1357 (11th Cir. 2013) ("In the First Amendment context, our ripeness review is at its most charitable, and should any significant doubt prevail, we will resolve it in favor of justiciability."); *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) ("Because this case involves an alleged violation of the First Amendment, our review of this suit's ripeness is at

its most permissive."). For pre-enforcement challenges, "Article III standing and ripeness issues . . . boil down to the same questions." *Wollschlaeger*, 848 F.3d at 1304 (internal quotation omitted). That question is, "when [does] the threatened enforcement of a law create[] an Article III injury?" *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). For the same reasons this Court finds that Plaintiffs have suffered sufficiently concrete injuries, Plaintiffs' challenge is ripe for review. Moreover, the question of whether section 870.01(2) is facially vague or overbroad requires no factual development; rather, it is a purely legal question and is, therefore, presumptively ripe for judicial review. *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019) ("A facial challenge presenting purely legal argument is presumptively ripe for judicial review because that type of argument does not rely on a developed factual record.").

As to his second point, Governor DeSantis argues that, in the absence of any state court interpretation of the challenged law, this Court should abstain from reaching the merits of Plaintiffs' vagueness and overbreadth claims. Governor DeSantis fails to identify the abstention doctrine he is relying on to argue that this Court should abstain until a state court interprets the statute. Accordingly, this Court will discuss some possible options and whether they apply in this case.

First, there is *Burford* abstention, which requires federal courts to abstain in deference to complex state administrative procedures. *Burford v. Sun Oil Co.*, 319

U.S. 315, 332 (1943); *Boyes v. Shell Oil Prods. Co.*, 199 F.3d 1260, 1265 (11th Cir. 2000). Second, there is *Thibodaux* abstention, which applies when state law is uncertain and important state issues such as eminent domain are at issue. *See La. Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 27–30 (1959). Third, there is the well-known *Younger* abstention, which requires a court to abstain when there is a pending state judicial proceeding absent extraordinary circumstances. *See Younger v. Harris*, 401 U.S. 37, 53 (1971). Fourth, under *Colorado River* abstention, a court should abstain in certain circumstances when there is an ongoing, parallel state proceeding. *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). Finally, there is *Pullman* abstention, which generally requires a federal court to abstain when state law is unclear, and a state court decision may make federal adjudication of a constitutional issue unnecessary. *See Duke v. James*, 713 F.2d 1507, 1510 (11th Cir. 1983).

*Burford*, *Thibodaux*, *Younger*, and *Colorado River* abstention are all inapplicable here because there are no parallel state court proceedings, Governor DeSantis has pointed to no important state issues, and no complex state administrative procedures are at issue. What remains, then, is *Pullman* abstention. It appears from Governor DeSantis's arguments that he relies on *Pullman* abstention. *See* ECF No. 107 (invoking *Pullman* abstention in Governor's Answer to Plaintiffs' Complaint). So, the question is whether abstaining under *Pullman* is appropriate.

38

"[F]ederal courts have a virtually unflagging obligation . . . to exercise the jurisdiction given to them." *Colorado River*, 424 U.S. at 817. "Abstention from the exercise of federal jurisdiction is the exception not the rule." *Id.* at 813. Indeed, it is "an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it." *Id.*

Moreover, abstention is not an automatic rule, but one of discretion. *Baggett*, 377 U.S. at 375; *Siegel v. LePore*, 234 F.3d 1163, 1174 (11th Cir. 2000) (en banc). The Supreme Court has made clear that "the power to dismiss under the *Burford* doctrine, *as with other abstention doctrines*, . . . derives from the *discretion* historically enjoyed by courts of equity." *Quackenbush v. Allstate Ins. Co.*, 517 U.S. 706, 727–28 (1996) (emphases added). In exercising its discretion, a federal court must consider whether "certain classes of cases, and certain federal rights" are more appropriately "adjudicated in federal court." *Id*. at 728. Abstention is improper when a party alleges that certain rights are threatened. Courts "must also take into consideration the nature of the controversy and the particular right sought to be enforced." *Edwards v. Sammons*, 437 F.2d 1240, 1243 (5th Cir. 1971).[17]

The statute in question implicates free expression and assembly rights protected by the First Amendment. In similar situations, the Supreme Court and a

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

whole host of other courts have repeatedly held that abstention is inappropriate. *See, e.g.*, *Baggett*, 377 U.S. at 378–79; *Dombrowski v. Pfister*, 380 U.S. 479, 490–92 (1965); *City of Houston, Tex. v. Hill*, 482 U.S. 451, 467–68 (1987) ("We have held that 'abstention . . . is inappropriate in cases [where] . . . statutes are justifiably attacked on their face as abridging free expression.' "); *Cate v. Oldham*, 707 F.2d 1176, 1184–85 (11th Cir. 1983) (declining to invoke *Pullman* abstention due to "the great costs imposed by abstaining in" a case involving the First Amendment); *Hobbs v. Thompson*, 448 F.2d 456, 462 (5th Cir. 1971) ("Courts have long recognized that abstention is particularly inappropriate in an overbreadth or vagueness case grounded upon the First Amendment."). This is because the practical reality of abstention is that it would require "piecemeal adjudication in many courts, thereby delaying ultimate adjudication on the merits for an undue length of time, a result quite costly where the vagueness of a state statute may inhibit the exercise of First Amendment freedoms." *Id.* at 379. "[T]o force the plaintiff who has commenced a federal action to suffer the delay of state-court proceedings might itself effect the impermissible chilling of the very constitutional right he seeks to protect." *Hill*, 482 U.S. at 467–68 (quoting *Zwickler*, 389 U.S. at 252).

Here, the chilling effect is particularly pronounced given that the law not only creates a risk of prosecution, but also subjects the person to mandatory time in custody until first appearance. § 870.01(6), Fla. Stat. Given that a vague law does

not give a would-be protestor any notice about what the law criminalizes, and that the person may be punished for constitutionally protected activity given the law's potentially overbroad scope, a reasonable person, as the declarations in this case make clear, would censor his own speech rather than risk arrest and time in jail. *See Dombrowski*, 380 U.S. at 491–92 ("[T]o abstain is to subject those affected to the uncertainties and vagaries of criminal prosecution, whereas the reasons for the vagueness doctrine in the area of expression demand no less than freedom from prosecution prior to a construction adequate to save the statute.").

Moreover, as it relates to vagueness, the Supreme Court has held that when a statute is challenged because plaintiffs "cannot understand the required promise, cannot define the range of activities in which they might engage in the future, and do not want to forswear doing all that is literally or arguably within the purview of the vague terms," abstention is not required. *Baggett*, 377 U.S. at 378. This is because "it is fictional to believe that anything less than extensive adjudication, under the impact of a variety of factual situations, would bring the [statute] within the bounds of permissible constitutional certainty." *Id.* That is precisely the case here. As it relates to overbreadth, the Supreme Court in *Zwickler* "squarely held that the abstention doctrine is inappropriate for cases in which the statute is justifiably attacked on its face for an 'overbreadth' that abridges free expression." *Davis v. Francois*, 395 F.2d 730, 732 (5th Cir. 1968); *see also Zwickler*, 389 U.S. at 246–52.

The practical effect of Governor DeSantis's request to abstain is that many individuals who seek to protest would stay home due to the chilling effect of a vague and overbroad statute (as evident from Plaintiffs' declarations), and those brave enough to go protest may not understand whether their actions conform to the bounds set forth by the statute and risk being arrested. What is more, even if a person who is arrested acted within constitutional bounds, he or she may have to spend time in custody before a state court dissects the statute to discern its meaning and determine whether that person was lawfully arrested. § 870.01(6), Fla. Stat. Surely, the abstention doctrine does not place such a burden on a person's fundamental right to freedom of speech. While legal doctrines often ignore practical realities, the Supreme Court has repeatedly emphasized the importance of *not* abstaining in cases involving the First Amendment.

In any event, even if the Supreme Court's repeated admonition against abstaining in cases involving facial challenges to statutes that allegedly violate the First Amendment is an insufficient basis for this Court to decline the Governor's request to abstain, this Court still exercises its discretion to decline to abstain here because the statute in question is not "obviously susceptible to a limiting construction." *Hill*, 482 U.S. at 468. As explained in detail below, section 870.01(2) is incomprehensibly vague. And although Governor DeSantis argues that state courts may provide a limiting construction, he proffers no narrow construction that would

save the statute from its constitutional infirmity. Absent wholly rewriting the statute, state courts cannot provide a limiting construction that would resolve section 870.01(2)'s constitutional infirmity.

Given the potential, and actual, chilling effect that abstention would prolong, and the Supreme Court's repeated warning against abstaining in First Amendment cases, this Court chooses not to abstain from hearing Plaintiffs' claims and resolving Plaintiffs' motion for preliminary injunction.

## III

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel*, 234 F.3d at 1176. Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (5th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing on one element may

compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

A

This Court begins with whether Plaintiffs have shown a substantial likelihood of success on the merits. This Court addresses this factor first because failure here obviates the need to "consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman*, 267 F.3d at 1292). On the merits, Plaintiffs argue that the new definition of "riot" is impermissibly vague and overbroad.

Vague laws violate the Due Process Clause because they fail to give notice of what they prohibit. A law can be impermissibly vague in two distinct ways. "First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger*, 848 F.3d at 1319–20. Overbroad laws, on the other hand, violate the First Amendment because they punish "a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (cleaned up).

Vagueness and overbreadth are interrelated but discrete concepts. *Am. Booksellers v. Webb*, 919 F.2d 1493, 1505 (11th Cir. 1990). For example, a law that

prohibits any person from engaging "in First Amendment activities" in a set area is overbroad but not vague. Erwin Chemerinsky, *Constitutional Law* 1032 (6th ed. 2019) (quoting *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 571 (1987)). And a law that bans all activity not protected by the First Amendment is vague but not overbroad. *Id.* But often a law is both overbroad and vague—a concept the Eleventh Circuit has called "[o]verbreadth from indeterminacy." *Webb*, 919 F.2d at 1505. This is so because an indefinite law may give the government leeway to punish protected conduct. So, in addressing overbreadth, this Court must "evaluate the ambiguous as well as the unambiguous scope of the enactment." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 n.6 (1982).

1

For both challenges, this Court begins by construing the statute at issue. This Court starts here because it is mindful that it has a duty to construe the statute as constitutional if it can.[18] *See Boos v. Barry*, 485 U.S. 312, 330 (1988).

This Court addressed constitutional avoidance at the hearing and pressed Governor DeSantis's counsel as to the proper standard that applies in this case. *See* Tr. at 25 ("What is your best case that says in the context of a First Amendment

---

[18] This Court recognizes that there are really two doctrines at play here. One "holds that courts should, if possible, interpret ambiguous statutes to avoid rendering them unconstitutional." *United States v. Davis*, 139 S. Ct. 2319, 2332 n.6 (2019). The other "suggests courts should construe ambiguous statutes to avoid the need to address serious questions about their constitutionality." *Id.* Given their obvious overlap, both are addressed together here.

analysis that so long as there's one constitutional reasonable construction, that's the end of the inquiry?"). Although the Governor could not identify a case at the hearing, he later filed supplemental authority partially addressing this Court's questions. ECF No. 130. But upon review, the Governor's supplemental authority left this Court with more questions than answers. Accordingly, this Court ordered the parties to submit supplemental briefing addressing (1) whether the constitutional avoidance canon that the Governor cited applies in facial vagueness and overbreadth challenges to state statutes and, if so, (2) what the proper framework is for this Court to apply that canon. ECF No. 131.

In their supplemental briefs, Plaintiffs and Sheriff Williams agree that when a narrowing construction of a state statute would avoid a constitutional infirmity, this Court may adopt such a construction only if it is "reasonable and readily apparent." ECF No. 133 at 2-3; ECF No. 134 at 5. Governor DeSantis, on the other hand, asserts that whenever Florida courts and federal courts are "presented with two constructions of a statute, at least one of which is reasonable and constitutional, courts adopt that construction." ECF No. 135 at 5 n.4. But the Governor misstates the rule by merging different standards into one. Accordingly, this Court pauses to set out the standard this Court must use and explain how it applies in this case.

The nature of this Court's duty to narrowly construe a challenged statute varies depending on whether this Court is construing a state or federal enactment.

When a federal law is at issue, this Court has a "duty to avoid constitutional difficulties by [adopting a limiting construction] if such a construction is *fairly possible*." *Boos*, 485 U.S. at 331 (emphasis added). If, on the other hand, a state law is at issue, this Court cannot "adopt a narrowing construction . . . unless such a construction is *reasonable and readily apparent*." *Id.* at 330 (emphasis added); *accord Stenberg v. Carhart*, 530 U.S. 914, 944 (2000); *see also Gooding v. Wilson*, 405 U.S. 518, 520 (1972) (noting that "[o]nly the [state] courts can supply the requisite construction" to save an otherwise vague and overbroad statute).

"The distinction is an important one" because "[w]hen a state statute has unconstitutional applications and has not been given a narrowing construction by the state court that saves it from those applications, federal courts 'must be careful not to encroach upon the domain of a state legislature by rewriting a law to conform it to constitutional requirements.' " *Toghill v. Clarke*, 877 F.3d 547, 556 (4th Cir. 2017) (quoting *Legend Night Club v. Miller*, 637 F.3d 291, 301 (4th Cir. 2011)); *see also Dimmitt v. City of Clearwater*, 985 F.2d 1565, 1572 (11th Cir. 1993) ("[A]s a federal court, we must be particularly reluctant to rewrite the terms of a *state* statute." (emphasis in original)); *Wis. Right to Life, Inc. v. Barland*, 751 F.3d 804, 833 (7th Cir. 2014) (explaining that "the 'unless' clause" in "unless such construction is

reasonable and readily apparent" is an "important federalism principle [that] should be invoked sparingly and with caution.").[19]

So the question before this Court is not whether there is *any* reading that would render the statute constitutional. Nor is it whether there is a possible, plausible, or simply reasonable reading that would render the statute constitutional. Instead, the question is whether there is a constitutional reading of the statute that is both *reasonable* and *readily apparent* and, thus, does not require this Court to rewrite the statute to conform it to constitutional requirements. *See Citizens for Responsible Gov. State Pol. Action Comm. v. Davidson*, 236 F.3d 1174, 1194–95 (10th Cir. 2000) (declining state's invitation to give statute at issue "a construction more restrictive than that provided by [its] plain language" (quoting *Wilson v. Stocker*, 819 F.2d 943, 948 (10th Cir. 1987)).

With that in mind, this Court starts with the text. Section 870.01(2) provides that

---

[19] Governor DeSantis relies on *Pine v. City of West Palm Beach* for the proposition that "when one interpretation of a law raises serious constitutional problems, courts will construe the law to avoid those problems so long as the reading is not plainly contrary to legislative intent." 762 F.3d 1262, 1270 (11th Cir. 2014). *Pine*, says the Governor, sets the standard in this case. But the Governor's interpretation of *Pine*—that it requires this Court to adopt any plausible constitutional interpretation—is inconsistent with decades of Supreme Court and Eleventh Circuit cases. *See Boos*, 485 U.S. at 331 (explaining that a federal court cannot "adopt a narrowing construction [of a state statute] . . . unless such a construction is reasonable and readily apparent"); *see also Dimmitt*, 985 F.2d at 1572; *Webb*, 919 F.2d at 1508; *Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1550 (11th Cir. 1997). Instead, this Court reads *Pine* as holding that the ordinance at issue was susceptible to a reasonable and readily apparent limiting construction. Just because the Eleventh Circuit did not use the magic words does not mean it sought to overrule itself and the Supreme Court *sub silentio*.

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in:
> (a) Injury to another person;
> (b) Damage to property; or
> (c) Imminent danger of injury to another person or damage to property.

§ 870.01(2), Fla. Stat. (2021).

Plaintiffs assert that this language is vague because it does not make clear (1) whether a person must share a common intent with three or more persons to engage in violent and disorderly conduct; or (2) whether it merely requires a person to willfully participate in a violent public disturbance that includes a discrete assembly of three or more persons who are assisting each other in violent and disorderly conduct (even though the person willfully participating in the disturbance does not share their common intent). ECF No. 65 at 20–21. Plaintiffs also argue that it is unclear whether the reciprocal pronoun "each other" is intended to relate to the "three or more persons" in the assembly or to both the person *and* the assembly of three or more persons. *Id*. at 21. Lastly, Plaintiffs contend that the phrase "willfully participates" provides no notice of what conduct is prohibited. *Id*. at 21–22. In short, Plaintiffs assert that one could plausibly read the statute to prohibit a peaceful protester from continuing to peacefully protest the moment he or she knows that violence has broken out between several persons at a demonstration.

49

Pushing back, Governor DeSantis asserts that the definition is not vague because " 'riot' has a common meaning that will inform an ordinary person's reading." ECF No. 99 at 8. Further, in their papers, both Governor DeSantis and Sheriff Williams argue that the new definition "merely codifies Florida's long-standing definition of 'riot.' " ECF No. 98 at 6; ECF No. 99 at 10 (arguing that section 870.01(2) "mirrors the common law definition of 'riot' "). At the hearing, however, Governor DeSantis changed his argument from what was briefed to assert the amendment *clarified*, not codified, the common-law definition. Tr. at 18 ("And the legislature was not simply trying to mirror the common law definition."). Finally, both Defendants assert that the new definition plainly requires the "person" described in the statute share the common intent to do violence with the "three or more people" described later in the sentence. *See* ECF No. 99 at 13.

To start, this Court must make clear the question before it. The question is not how the statute *actually applies*. That is to say, this Court is not construing the statute to apply it in a particular, well-defined context. Rather, the question is whether a person of ordinary intelligence can understand what the statute prohibits. Thus, the canons of construction, while still relevant, take on less significance. And while this is a Court of law—not grammar—the "ordinary principles of English prose" are not "irrelevant" to the definition's construction. *See Flora v. United States*, 362 U.S.

145, 150 (1960). This is especially true here, where the question is how a person of ordinary intelligence would read the statute.

That said, Governor DeSantis is absolutely right that "the Due Process clause does not demand perfection from legislators." ECF No. 99 at 7 (citing *Grayned v. City of Rockford*, 408 U.S. 104, 110–11 (1972)). And so this Court will not enjoin the statute's enforcement merely because it can imagine some "close cases." *United States v. Williams*, 553 U.S. 285, 305 (2008).

This Court also acknowledges the obvious up front; some conduct clearly falls within the definition's scope. Tossing Molotov cocktails at the police station with 10 of your best friends is clearly rioting. But the Supreme Court has squarely rejected the argument that "a vague provision is constitutional merely because there is some conduct that clearly falls within the provision's grasp." *Johnson v. United States*, 576 U.S. 591, 602 (2015).

Likewise, although it is well within the Florida Legislature's purview to ban coordinated violent or destructive conduct, overbreadth is an exception to the rule that a plaintiff who brings a facial attack on a statute must show that the statute can never be constitutionally applied. *Doe v. Valencia Coll.*, 903 F.3d 1220, 1232 (11th Cir. 2018). All of this is to say that the mere fact that the statute has some constitutional applications does not decide the ultimate issue before this Court.

With those caveats, this Court turns back to the statute's language. Starting with the first part of the statute, "a person commits a riot if he or she willfully participates in a violent public disturbance . . . ." § 870.01(2), Fla. Stat. First, a person must "willfully participate" to commit a riot. To be sure, as Defendants argue, "willfully" has a commonly understood definition in Florida—"intentionally and purposefully." *Cahours v. State*, 147 So. 3d 574, 576 (Fla. 1st DCA 2014). So a person must do something on purpose rather than on accident.

So far so good. But even a commonly understood word may be rendered ambiguous by the language surrounding it. *Wollschlaeger*, 848 F.3d at 1321. Here, our potential rioter must "willfully participate in a violent public disturbance." This begs the questions of (1) what does it mean to participate, and (2) what is a violent public disturbance?

This is where things fall apart. Although both Governor DeSantis and Sheriff Williams argue that the phrase "willfully participate" is commonly understood, neither party offers an actual definition. Is it enough to stand passively near violence? What if you continue protesting when violence erupts? What if that protest merely involves standing with a sign while others fight around you? Does it depend on whether your sign expresses a message that is pro- or anti-law enforcement? What about filming the violence? What if you are in the process of leaving the disturbance and give a rioter a bottle of water to wash tear gas from their eyes?

The Governor would have this Court pencil in an exception for a person who merely "attend[s]" a violent demonstration but does not actively engage in violence or conduct that poses an imminent risk of injury or property damage. ECF No. 99 at 13. But the Governor offers no explanation or construction that limits when mere attendance becomes participation, except that a person must "intend to commit violence." *Id*. But this ignores the plain text of the statute, which separates a person from an assembly of three or more persons sharing that intent. *See infra*.

A "violent public disturbance" raises similar questions. Is a violent public disturbance a peaceful protest that later turns violent? Is it a protest that creates an imminent risk of violence? Do the violent actions of three people render an otherwise peaceful protest of 300 people a violent public disturbance? Does a rowdy group of Proud Boys[20] or anarchists have veto power over peaceful protests under this definition? At least one Florida court has defined a "riot" as a "violent public disturbance." *City of Daytona Beach v. Brown*, 273 So. 2d 124, 126 (Fla. 1st DCA 1973). Perhaps, then, a person riots if they willfully participate in a riot?

Governor DeSantis offers no answers to these questions—instead, he insists the statute is clear in that "it merely prohibits participating in, or assisting others in

---

[20] The "Proud Boys" are "a far-right extremist group," whose members have been accused of "taking part in the siege of the U.S. Capitol" on January 6, 2021. *Proud Boy organizer arrested in Florida over riot at Capitol*, Associated Press, (January 21, 2021, 3:22 AM), https://abcnews.go.com/Politics/wireStory/proud-boy-organizer-arrested-florida-riot-capitol-75387065 (last visited Sep. 9, 2021).

participating in, violent protests." ECF No. 135 at 9.[21] The Governor's strained construction eliminates the phrase "a violent public disturbance involving" and would instead require only that a person commits a riot if he or she willfully participates in an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct. ECF No. 99 at 13 ("And it logically follows that a person willfully participating in a group that acts with a common intent will share that intent."). But as Governor DeSantis acknowledges, this Court must read the statute as a whole and give meaning to each word or phrase that the Legislature used. And here, the Legislature situated the riotous assembly of three or more persons within a larger whole—a "violent public disturbance." Surely the smaller assembly and the larger public disturbance are two distinct concepts, as discussed in more detail below.

The next portion of the statute further muddles things because it stacks multiple participial phrases on each other in a way that has led to fundamental disagreement between the parties. It provides that a person commits a riot if they willfully participate in a violent public disturbance "*involving* an assembly of three or more persons, *acting* with a common intent to assist each other in violent and disorderly conduct, *resulting* in" injury, property damage, or imminent risk of either

---

[21] This begs the question whether the Governor reads a "public disturbance" to mean a "protest."

injury or property damage. § 870.01(2), Fla. Stat. (emphasis added). To start, the statute qualifies the public disturbance as "involving an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct, resulting in" either "(a) Injury to another person; (b) Damage to property; or (c) Imminent danger of injury to another person or damage to property."

The key word here, which Defendants refuse to confront, is "involving." Oxford Dictionary defines "involve" as "(of a situation or event) include (something) as a necessary part or result." *Involve*, Oxford Dictionaries, https://premium.oxforddictionaries.com/us/definition/american_english/involve?q= involving (last visited Sep. 9, 2021); *see also Involve, Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/ involve (last visited Sep. 9, 2021) (noting that "involve" means "to contain within as part of the whole"). "Involving" is the present participle of "involve," which modifies "a violent public disturbance." *See* Bryan A. Garner, *Garner's Modern American Usage* 909 (3d ed. 2009) (noting that a participle is a word derived from a verb but having characteristics of both a verb and an adjective, and functions as an adjective when it modifies a noun or pronoun).

The closest Governor DeSantis comes to addressing this term is in offering his construction, which requires a person to willfully participate "in a violent public disturbance involving 3 or more people." ECF No. 99 at 10. Setting aside the fact

that the Governor has eliminated the statutory phrase "an assembly of" from the text of the statute, he does not address head on whether a peaceful protest that is disrupted by violent counter protesters, unruly college students, or anyone else who seeks violence is transformed into a larger "violent public disturbance," or if only the subset of people actively engaging in violent or destructive activities is the "violent public disturbance." By using the modifier "involving," the Florida Legislature appears to have intended for the riotous assembly to be only a smaller component of the larger whole, in the same sense that a movie involving sex and violence is not necessarily a film in which all the characters do throughout the film is engage in sex and violence. Thus, it appears that a person must participate in a violent public disturbance that includes, as a necessary part or contains as part of the whole, "an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct" and that results in injury, property damage, or an imminent threat of injury or property damage.

While Defendants argue at length that the person must share the intent to assist the three or more persons in violent and disorderly conduct, this reading finds no support in the text. Grammatically, "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003). Thus, the participial phrase, "acting with a common intent to assist each other" would ordinarily modify the assembly of three

or more persons—the phrase that it immediately follows and not, as Defendants'
suggest, the "person" at the beginning of the sentence.

Putting it all together, the statute—if it is susceptible to any reasonable
reading—appears to require a person to intentionally participate in a violent public
disturbance. Further, that disturbance must include three or more persons acting
together with a common intent to assist each other in violent and disorderly conduct,
and either the violent public disturbance or the violent and disorderly conduct—it is
not entirely clear which or if there is even a difference between the two—must result
in injury, property damage, or the imminent risk thereof. Such a reading raises grave
constitutional concerns.

This reading also comports with the sentence diagram Plaintiffs submitted, and which this Court has reproduced below.[22]



ECF No. 119 at 2 (Plaintiffs' sentence diagram).

_____

[22] Plaintiffs read the statute such that the "resulting in" phrase modifies the "violent public disturbance." However, the statute could also plausibly require the "violent and disorderly conduct"—the object of an assembly of three or more persons' common intent to assist each other—to result in injury, property damage, etc.

On the other hand, Governor DeSantis and Sheriff Williams argue strenuously against this reading. The diagram below visualizes their alternative reading, which shifts the participial phrase "acting with a common intent to assist each other in violent and disorderly conduct" from modifying the phrase "an assembly of three or more persons," as shown in Plaintiffs' diagram, to modifying the pronouns "he or she"—the placeholders for the subject "person."



ECF No. 121-1 (Governor DeSantis's sentence diagram).

Leaning on the doctrine of constitutional avoidance, Governor DeSantis argues that this Court must adopt the above interpretation because it is just as reasonable as Plaintiffs'. Tr. at 26 ("[B]etween two reasonable interpretations, one of which is constitutional, . . . the Court accepts that constitutional interpretation").[23] To start, as explained above, because this is a state statute, the Governor's suggested reading can save the statute only if it is *both* reasonable and readily apparent. It is not. Sheriff Williams, on the other hand, argues that this construction is the *only* reasonable way to read the statute. ECF No. 134 at 2 ("Because the interpretation of Section 15 advanced by Sheriff Williams is the only grammatically and legally correct interpretation of the statute, there is no need to apply the canon of constitutional avoidance, as two readings of the statute are not equally reasonable or plausible."). Again, it is not. As explained below, section 870.01(2)'s text simply will not bear the construction the Defendants would have this Court give it.

In advancing their interpretation, Governor DeSantis and Sheriff Williams make multiple arguments, which this Court will address in turn. First, Governor DeSantis asserts, correctly, that the provision at issue cannot be read in isolation. Further, he argues, this Court must look to section 870.01(7) for additional clarification, because it provides that "[t]his section does not prohibit

---

[23] Although Governor DeSantis did not raise this issue in his papers, it became a major feature of his argument during the hearing. But the mere fact that the Governor's argument has morphed does not absolve this Court of its responsibility to consider the issue.

constitutionally protected activity such as a peaceful protest." § 870.01(7), Fla. Stat. (2021).

Governor DeSantis argues that this section "mak[es] plain" that the statute cannot be read as Plaintiffs suggest. ECF No. 99 at 13. Governor DeSantis is right, in part. While a "savings clause" like section (7) may "validate a construction of the statute which avoids its application to protected expression," the clause "cannot substantively operate to save an otherwise invalid statute." *CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*, 770 F.2d 468, 474 (5th Cir. 1985). Put another way, section (7) does nothing more than restate the constitutional avoidance canon. *Id.* (explaining that constitutional savings clauses are "mere restatement[s] of well-settled constitutional restrictions on the construction of statutory enactments"). And so, even if section (7) supports a constitutional reading of the statute, it cannot, on its own, render the statute unambiguous.

Defendants also argue that the statute merely enacts riot's long-applied common-law definition—although, as noted above, their argument has been a bit of a moving target. At common law, a riot was "a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner." *Beasley*, 317 So. 2d at 752. Thus, at common law, a person accused of

rioting was required to share the same intent as his or her compatriots to act "in a violent and turbulent manner." *See Bayes v. State*, 454 So. 2d 703, 704 (Fla. 1st DCA 1984) (upholding a child's conviction for rioting under 1971 statute where he, "with at least three other boys, acted in a violent manner, thereby causing a tumultuous disturbance of the peace in throwing pieces of asphalt toward vehicles and staff members" at the Arthur G. Dozier School for Boys).

It is clear why Defendants make this argument. If, for example, the Legislature had passed a bill that was identical to HB1 in all respects, except that it provided that a "riot" means "riot as defined at common law," this Court would not hesitate to uphold the law against a vagueness or overbreadth challenge. The same would be true if the Legislature made minor changes to riot's definition that left the meaning intact. The problem, however, is that Defendants cannot articulate why this Court should conclude that the new definition merely codified the common law. Indeed, regardless of whether the Defendants' argument is that the new definition enacts the common-law definition or clarifies it, their argument cannot be squared with what is before this Court. For one, the common-law definition appears to be engrafted, in part, into the statute's definition; specifically, the portion describing "an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct."

But if the statute carries the same meaning as the common-law definition, one must wonder what the 17 words preceding this portion of the definition are doing. That Florida law directs this Court to give meaning to "every word, phrase, sentence, and part of the statute" makes this interpretation all the more problematic. *Edwards v. Thomas*, 229 So. 3d 277, 284 (Fla. 2017) (quoting *Quarantello v. Leroy*, 977 So. 2d 648, 651–52 (Fla. 5th DCA 2008)). Giving meaning to *all* the words used by the Legislature, it appears the new definition changed the common-law definition by separating "a person" from the "assembly of three or more persons" who share a "common intent."

As for the statute's grammar and internal logic, Governor DeSantis argues that the "term 'each other' is a reciprocal pronoun that only refers to exactly two people or things" and that "the reciprocal pronoun 'one another,' on the other hand, refers to three or more people or things." ECF No. 121 at 2 (citing Bryan A. Garner, *Dictionary of Modern Legal Usage* 302 (2d ed. 2001)). Thus, says Governor DeSantis, because the statute uses the term "each other," it "requires the 'person' to act with the intent to assist the assembly in violent and disorderly conduct." *Id.* at 3 (cleaned up). If instead the new definition described the intent of the persons in the assembly, it would have used "one another" because it was referring to three or more people as opposed to one person and a separate thing—an assembly. *Id.*

63

While Mr. Garner is certainly well respected and his texts serve as helpful references, he is not the emperor of grammar and usage. And here, his description of the difference between "each other" and "one another," though technically correct, does not end the inquiry—nor does it match the reality of common usage.

To start, Governor DeSantis's citation to the technical rule that "each other" refers only to two persons or things relies on there being only two persons or things to make *proper* use of "each other" in the statute. Accordingly, the Governor points to the "person" who is the subject of the statute ("A person commits a riot if he or she . . . ) and the "assembly" of three or more persons as the two persons or things to which "each other" refers. Indeed, a person is a single person, and an assembly is a single "thing." So, under the Governor's reading, the Legislature has made proper use of "each other" by referring to a single person and a single thing. But Governor DeSantis ignores—either out of convenience or necessity—that the assembly at issue *must include* "three or more persons." With that in mind, "each other" effectively refers back to at least *four people*: "a person" and "three or more persons."

Governor DeSantis's reading also ignores the common usage of "each other." Merriam-Webster explains that "[e]ach other and one another are used interchangeably by good writers and have been since at least the 16th century." *Each Other*, Merriam-Webster, (emphasis deleted) https://www.merriam-

64

webster.com/dictionary/each%20other (last visited Sep. 9, 2021). It should come as no surprise that the Florida Legislature has also used the terms interchangeably in other statutes—but in violation of the technical grammar rule the Governor cites. *See* § 732.703(3)(i), Fla. Stat. (stating "the decedent and that person are married to one another"); § 837.021(1), Fla. Stat. (addressing "two or more material statements . . . which contradict each other"). All this is to say that a person of ordinary intelligence will not look at the statute and think, "ah ha! the statute says 'each other,' not 'one another,' it's all clear now." [24] *But see* ECF No. 120 at 4 (arguing that, had the Legislature "used the reciprocal pronoun 'one another,' " it would have "rendered the statute ambiguous").

Finally, as partially addressed above, Defendants DeSantis and Sheriff Williams argue at length that (1) "riot" has a common meaning that will inform an average person's reading of the statute, (2) that "willfully participate" has an obvious meaning, and (3) that people will know what the statute prohibits because "it logically follows that a person willfully participating in a group that acts with a common intent will share that intent." ECF No. 99 at 13; ECF No. 98 at 7, 11; *see also* Tr. at 29 ("[A] common, ordinary person would certainly understand what a riot means.").

---

[24] All bets are off if English teachers, who some would say are people of extraordinary intelligence, read the statute.

The problem for Defendants is that, although they repeatedly claim that their preferred reading is crystal clear, they never truly explain why. Simply put, Defendants argue that one can tell that the statute embraces their reading because of the way it is.[25] And it should come as no surprise that Defendants refuse to engage meaningfully with the statute's text. As demonstrated above, the moment one does, Defendants' interpretation crumbles.

Defendants' proposed interpretation strains the rules of construction, grammar, and logic beyond their breaking points, and requires this Court to ignore the plain text of the statute and blithely proclaim that "everyone knows what a riot means," notwithstanding this new definition that the Florida Legislature enacted. Under both separation of powers and federalism principles, this Court cannot "rewrite" the statute "to conform it to constitutional requirements." *Am. Bookseller's Assn., Inc.*, 484 U.S. at 397. But that is what Defendants ask this Court to do. Indeed, Defendants would have this Court pencil in the margins that only active, violent acts in furtherance of either the "violent public disturbance" or the "violent and disorderly conduct"—again, it is not clear which—constitute participation. In so doing, Defendants also imply that this Court should strike the "imminent danger" requirement under the "resulting in" phrase, as it is unclear how someone actively

---

[25] In that regard, Defendants' argument is reminiscent of the beloved aspen tree meme. *See This is an Aspen*, YouTube (Oct. 19, 2019), https://www.youtube.com/watch?v=wKiXdqaY180.

engaging in violent and disorderly acts has not already caused injury or property damage.

Plus, Defendants would have this Court strike the participle "involving," and merge the "violent public disturbance" with "assembly of three or more persons" to reflect that this is really just the common-law definition of riot. And, in addition to these edits, Defendants suggest that the Legislature obviously meant to include the "person" with the "assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct," so this Court should just do their job for them and construe it that way. *But see Dimmitt*, 985 F.2d at 1572 ("The task of drafting a constitutionally permissible [statute] must be left to the [state].").

In short, Defendants' preferred construction is neither reasonable nor readily apparent given the plain language of the statute. Instead, it reduces much of the verbiage to surplusage and invites this Court to fill in the blanks that the Florida Legislature left behind. To accept that invitation would usurp the powers of the Florida Legislature. Constitutional avoidance cannot resolve this case nor is the challenged definition readily susceptible to a reasonable construction that saves it; this Court must meet the statute's potential vagueness and overbreadth head on. Having so concluded, this Court turns to Plaintiffs' vagueness argument.

2

"[A] vague law is no law at all," as enforcement of a vague law violates our "twin constitutional pillars of due process and separation of powers." *Davis*, 139 S. Ct. at 2323, 2325. "Vague laws contravene the 'first essential of due process of law' that statutes must give people 'of common intelligence' fair notice of what the law demands of them." *Id.* at 2325 (quoting *Connally v. Gen. Constr. Co.*, 269 U.S. 385, 391 (1926)) (citations omitted). "[T]he purpose of [this] requirement is to enable the ordinary citizen to conform his or her conduct to the law." *City of Chicago v. Morales*, 527 U.S. 41, 58 (1999).

Vague laws "also undermine the Constitution's separation of powers and the democratic self-governance it aims to protect. Only the people's elected representatives in the legislature are authorized to 'make an act a crime.' " *Id.* (quoting *United States v. Hudson*, 7 Cranch 32, 34, 11 U.S. 32 (1812)). But vague laws may leave "relatively unaccountable police, prosecutors, and judges" empowered to *define* crimes, "eroding the people's ability to oversee the creation of the laws they are expected to abide." *Id.* (citations omitted). *See also Smith v. Goguen*, 415 U.S. 566, 572–73 (1974); *Grayned*, 408 U.S. at 108–09; *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972).

The void-for-vagueness doctrine is based on "at least two connected but discrete due process concerns: first, that regulated parties should know what is

required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). The standard for vagueness is particularly strict in the context of the First Amendment; "[w]hen speech is involved, rigorous adherence to those requirements is necessary to ensure that ambiguity does not chill protected speech."[26] *Id.* at 253–54; *see also Reno v. ACLU*, 521 U.S. 844, 871–72 (1997) ("The vagueness of [content-based regulations of speech] . . . raise[s] special First Amendment concerns because of its obvious chilling effect on free speech."); *Winters v. New York*, 333 U.S. 507, 509 (1948) ("It is settled that a statute so vague and indefinite, in form and as interpreted, as to permit within the scope of its language the punishment of incidents fairly within the protection of the guarantee of free speech is void, on its face, as contrary to the Fourteenth Amendment.").

The Supreme Court and the Eleventh Circuit have recognized that "[w]hile 'perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity,' . . . 'government may regulate in the area' of First

---

[26] Governor DeSantis argues that Plaintiffs' must show that the law at issue is "impermissibly vague in all of its applications." ECF No. 99 at 8 (quoting *Flipside*, 455 U.S. at 494–95). But he misstates the standard for Plaintiffs' facial attack based on vagueness here. "The court should then examine the facial vagueness challenge and, *assuming the enactment implicates no constitutionally protected conduct*, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Id.* at 494–95 (emphasis added). As Plaintiffs show, this new definition of "riot" implicates constitutionally protected speech, making the "in all of its applications" requirement irrelevant.

Amendment freedoms 'only with narrow specificity.' " *Wollschlaeger*, 848 F.3d at 1320 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989) and *NAACP v. Button*, 371 U.S. 415, 433 (1963)). This special sensitivity to vagueness in the context of freedom of expression exists because "[v]ague laws force potential speakers to 'steer far wider of the unlawful zone . . . than if the boundaries of the forbidden areas were clearly marked,' thus silencing more speech than intended." *Id.* (quoting *Baggett*, 377 U.S. at 372) (cleaned up).

As discussed *supra*, the parties in this case have put forward multiple interpretations of HB1's new definition of "riot." These alternative interpretations are not simply technically distinct; they result in different meanings of varying breadth. For example,

- Either the term "participates" requires a person to actively join in a violent public disturbance or it requires mere passivity—such as continuing to hold up one's protest sign or failing to disperse as soon as violence erupts.

- Either the term "violent public disturbance" means that the protest already turned violent before the person "willfully participated" or it means the protest turned violent after she "willfully participated."

- Either violence must have already occurred objectively, or there need only be a law enforcement officer's subjective sense of imminent

property damage or injury for a protestor to risk arrest and detention until first appearance.

- Either peaceful protestors effectively have a duty to stop expressing their views and leave the scene at the first sign of a potential riot, or this new definition imposes no such duty.

The net effect of these multiple readings of the new definition of "riot" is that an individual of ordinary intelligence could read the now-modified Section 870.01(2) and not be sure of its real-world consequence. She would not know if this law meant that she had to merely avoid sharing a common intent to assist two others in violent and disorderly conduct, or if she had to avoid participating in any public event where such violent and disorderly conduct could occur. The vagueness of this definition forces would-be protesters to make a choice between declining to jointly express their views with others or risk being arrested and spending time behind bars, with the associated collateral risks to employment and financial well-being. "[A] vague law is no law at all," *Davis*, 139 S. Ct. at 2323, and certainly neither is one that can lead to multiple opposing interpretations. That type of law is simply "a trap for the innocent." *United States v. Cardiff*, 344 U.S. 174, 176 (1952).

In addition to creating a wide scope of potential interpretations for individuals, failing to give them reasonable notice, the vagary of this statute empowers law enforcement officers to exercise their authority in arbitrary and discriminatory ways.

Because the statute leaves unclear who must share what intent to be arrested, law enforcement officers, prosecutors, and courts cannot rely, and cannot be held to rely, on objective standards. Without at least "minimal guidelines," "a criminal statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.' " *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (quoting *Goguen*, 415 U.S. at 575); s*ee also United States v. Reese*, 92 U.S. 214, 221 (1875) ("It would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large. This would, to some extent, substitute the judicial for the legislative department of the government.").

Vague laws "encourage erratic administration whether the censor be administrative or judicial; 'individual impressions become the yardstick of action, and result in regulation in accordance with the beliefs of the individual censor rather than regulation by law.' " *Interstate Cir., Inc. v. City of Dallas*, 390 U.S. 676, 685 (1968) (quoting *Kingsley Int'l Pictures Corp. v. Regents*, 360 U.S. 684, 701 (1959) (Clark, J., concurring in result)). The "impermissible risk of discriminatory enforcement" due to the beliefs of individual censors is particularly concerning in this context, "for history shows that speech is suppressed when either the speaker or

the message is critical of those who enforce the law." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1051 (1991) (citations omitted).

Governor DeSantis cannot credibly argue that this new definition of "riot" was not intended to empower law enforcement officers against those who may criticize their legal authority, as he has referred to the proposed legislation that led to HB1 as "the strongest anti-rioting, pro-law enforcement piece of legislation in the country," ECF No. 65 at 4 n.5, and referred to HB1's critics as "anti-police," *id.* at 23 n.17. Governor DeSantis further "promised to have 'a ton of bricks rain down on' " those who violate the law when he unveiled HB1's preceding proposed legislation. ECF No. 65 at 4 n.4. Through this new definition of "riot," he appears to have done just that, using a threat of selective enforcement as his rain clouds.

To recap, HB1's new definition of "riot" both fails to put Floridians of ordinary intelligence on notice of what acts it criminalizes and encourages arbitrary and discriminatory enforcement, making this provision vague to the point of unconstitutionality. It requires individuals to "speculate as to the meaning of penal statutes," at the risk of their liberty. *Lanzetta v. State of New Jersey*, 306 U.S. 451, 453 (1939).

"When Congress passes a vague law, the role of courts under our Constitution is not to fashion a new, clearer law to take its place, but to treat the law as a nullity and invite Congress to try again." *Davis*, 139 S. Ct. at 2323. While it is not Congress

that authored this statute, the same principle applies; this Court's role is not to remedy the Florida Legislature's mistake, but to give the Legislature the opportunity to do so itself. Accordingly, I conclude that Plaintiffs have shown a substantial likelihood of success as to their claim that section 870.01(2) is unconstitutionally vague in violation of the 14th Amendment.

3

This Court turns next to Plaintiffs' second argument, overbreadth. As explained above, the overbreadth doctrine loosens the rules typically governing facial attacks on the constitutionality of a statute. *Valencia Coll.*, 903 F.3d at 1232. The exception exists because "the threat of enforcement of an overbroad law may deter or 'chill' constitutionally protected speech—especially when the overbroad statute imposes criminal sanctions." *Hicks*, 539 U.S. at 119.

To prevail on their overbreadth claim, Plaintiffs must show that section 870.01(2) "punishes a 'substantial' amount of protected free speech, 'judged in relation to the statute's plainly legitimate sweep.' " *Id.* at 118–19. "Substantial overbreadth" is not "readily reduced to an exact definition." *Members of City Council of City of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984). But the Supreme Court has recognized that "the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Id.* So the question is not whether this Court can conceive

74

of *any* hypothetical situation in which section 870.01(2) would violate the Constitution. Instead, this Court must ask whether section 870.01(2) prohibits a substantial amount of activity protected by the First Amendment relative to the amount of unprotected activity it prohibits.

The first step, then, is to figure out what the statute prohibits. *Williams*, 553 U.S. at 293. At this step, this Court "should, of course, construe the statute to avoid constitutional problems, if the statute is subject to such a limiting construction." *New York v. Ferber*, 458 U.S. 747, 769 n.24 (1982). But this Court cannot twist itself into a pretzel to save an otherwise invalid statute. *See Boos*, 485 U.S. at 330 ("[F]ederal courts are without power to adopt a narrowing construction of a state statute unless such a construction is reasonable and readily apparent."). Assuming the statute is not subject to a limiting construction, the next question is whether the statute "criminalizes a substantial amount of protected expressive activity." *Williams*, 553 U.S. at 297. "In making that determination, a court should evaluate the ambiguous as well as the unambiguous scope of the enactment." *Flipside*, 455 U.S. at 495 n.6. If the statute is overbroad, this Court must ask whether it can sever the problematic provision from the rest of the statute. *Ferber*, 458 U.S. at 769 n.24.

First, as explained above, the statute is vague because it is subject to multiple reasonable constructions. It is also not subject to a limiting construction. Second, considering the statute's ambiguous scope, it is overbroad. To be sure, the statute

criminalizes a large amount of unprotected activity. But, in its ambiguity, it also consumes vast swaths of core First Amendment speech. Because it is unclear whether a person must share an intent to do violence and because it is unclear what it means to participate, the statute can plausibly be read to criminalize continuing to protest after violence occurs, even if the protestors are not involved in, and do not support, the violence. The statute can also be read to criminalize other expressive activity, like remaining at the scene of a protest turned violent to film the police reaction. *See Toole v. City of Atlanta*, 798 F. App'x 381, 388 (11th Cir. 2019) (explaining that persons have a clearly established First Amendment right to peacefully protest and to film police).

That is not to say that the police cannot order protestors to leave once violence occurs. *See Bell v. Keating*, 697 F.3d 445, 457 (7th Cir. 2012) ("It is well established that otherwise protected speech may be curtailed when an assembly stokes—or is threatened by—imminent physical or property damage."). But there is a world of difference between the law addressed in *Bell*, which criminalized defying a lawful dispersal order, and section 870.01(2). Section 870.01(2) appears to criminalize mere presence and nothing more. Not disobeying a lawful order, not obstructing justice, not actively joining in violent or destructive conduct—mere presence. Thus, through section 870.01(2), protestors could be held criminally liable for others' violent acts. Such "guilt by association is a philosophy alien to the traditions of a

free society . . . and the First Amendment itself." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 932 (1982).

That said, there can be no doubt, overbreadth is "strong medicine" that must be employed sparingly. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). But here we are not dealing with marginal cases. As Plaintiffs' unrebutted evidence makes clear, through no fault of Plaintiffs, violence often occurs at their protests. Agitators and white supremacists have spit on and attacked Plaintiffs' members at protests. ECF No. 65-3 ¶ 15; ECF No. 65-4 ¶ 28. Individuals have also attempted to drive their vehicles through groups of protestors or pulled a gun on protesters. ECF No. 65-1 ¶¶ 28–29. Plus, on three occasions, white supremacists hounded Plaintiff Northside Coalition's protests, and even expressed confidence that HB1 endorsed their actions. ECF No. 65-7 ¶¶ 20–22. As these incidents demonstrate, it unfortunately takes only a handful of bad actors to transform a peaceful protest into a "violent public disturbance."

If this Court does not enjoin the statute's enforcement, the lawless actions of a few rogue individuals could effectively criminalize the protected speech of hundreds, if not thousands, of law-abiding Floridians. This violates the First Amendment. *See, e.g.*, *Bible Believers v. Wayne Cnty., Mich.*, 805 F.3d 228, 252 (6th Cir. 2015). Florida's interest in preventing public violence is beyond question, but when that interest collides with rights guaranteed by the First Amendment, the

"government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. Otherwise, those rights, which "are delicate and vulnerable, as well as supremely precious in our society," may be suffocated. *Id.* Section 870.01(2), through its ambiguity, chills speech and eviscerates that essential breathing space. The law is overbroad.[27] Accordingly, I conclude that Plaintiffs have established a substantial likelihood of success on the merits as to their overbreadth claim.

B

The remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiffs' claims. On balance, these factors weigh in favor of granting Plaintiffs' motion for preliminary injunction.

First, irreparable injury. This Court can only grant Plaintiffs' motion for injunctive relief if "irreparable injury will be suffered unless the injunction issues." *Siegel*, 234 F.3d at 1176. And because "the very idea of a preliminary injunction is premised on the need for speedy and urgent action to protect a plaintiff's rights," the injury must be "imminent." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016).

---

[27] The third, and final, issue in the overbreadth analysis is severability. Because, as discussed more in depth below, Plaintiffs only ask this Court to enjoin section 870.01(2)'s enforcement, this Court need not address severability at this stage.

Here, Governor DeSantis argues (1) that "Plaintiffs do not demonstrate that they will suffer *any* injury" and (2) that "even if Plaintiffs faced such an injury, their significant delay in seeking an injunction demonstrates it is not imminent." ECF No. 99 at 26–27 (emphasis in original).

The first argument merits little discussion. As this Court discussed at length in its 72-page order on Defendants' motions to dismiss, Plaintiffs sufficiently alleged injury at the pleading stage. *See generally* ECF No. 90. Now, as discussed at length above, at the preliminary-injunction stage, Plaintiffs have shown a First Amendment injury. That some members of a Plaintiff organization participated in a holiday celebration—as distressing as that may be to the Governor—changes nothing. In short, Plaintiffs have demonstrated that their speech has been, and is being, chilled by section 870.01(2). In addition, Plaintiffs have demonstrated that they have had to divert their scarce resources from organizing around other issues to educating their members and the public about the inherent risks of protesting under this new law. "An ongoing violation of the First Amendment constitutes an irreparable injury." *FF Cosms. FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017). I conclude that Plaintiffs have suffered and are suffering an irreparable injury.

Plaintiffs' delay in bringing their motion for preliminary injunction does not dictate otherwise. Roughly three months passed from the day Governor DeSantis signed HB1 to the day Plaintiffs filed their motion for preliminary injunction.

Although "[a] delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm," such delay is not determinative. *Wreal*, 840 F.3d at 1248. Indeed, as the Governor acknowledged, "delay is but one factor in the irreparable harm analysis." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1211 (10th Cir. 2009); *Cuviello v. City of Vallejo*, 944 F.3d 816, 833 (9th Cir. 2019); *see also Ideal Indus., Inc. v. Gardner Bender, Inc.*, 612 F.2d 1018, 1025 (7th Cir. 1979) (explaining there is no "general rule that irreparable injury cannot exist if the plaintiff delays in filing its motion for a preliminary injunction."). Generally, each case hinges on the reason for the delay. Some cases have held a two-year delay excusable. *See Arc of Cal. v. Douglas*, 757 F.3d 975, 990–91 (9th Cir. 2014). Others have held a five-month delay inexcusable. *See Wreal*, 840 F.3d at 1248.

The Governor's suggestion to the contrary notwithstanding, delay is less probative in the context of continuing injuries—especially constitutional injuries. *Cuviello*, 944 F.3d at 833. Moreover, the Governor cites zero cases in support of his attempt to stretch Plaintiffs' delay by arguing that Plaintiffs should have been ready to go on day one because they knew HB1 would pass.

At the hearing, Plaintiffs explained that their delay stemmed from the time it took them to consider their options, prepare their lawsuit, and prepare their motion. I find Plaintiffs' explanation well founded. *See Georgia v. United States*, 398 F. Supp. 3d 1330, 1347 (S.D. Ga. 2019) ("The Court considers that roughly two-and-

a-half-month period to be a reasonable time for Plaintiffs to consider their options under the [the relevant law] and decide to prepare for and pursue injunctive relief . . . ."). And Plaintiffs had good cause to move slowly, Defendants—as they should— have vigorously challenged Plaintiffs on every issue, holding them strictly to their burden at each stage. Indeed, moving quickly has its own risks; in a parallel case in which the plaintiffs moved much faster, the court denied the plaintiffs' motion for a temporary restraining order as insufficiently briefed. *See Legacy Ent. & Arts Found., Inc. v. Mina*, No. 6:21-cv-698-PGB-DCI, 2021 WL 2907722, at *2 (M.D. Fla. May 18, 2021).[28]

And this is no simple case. A point that is perhaps best demonstrated by comparing this case to *Study Edge, LLC v. Skoolers Tutoring Center*, which Governor DeSantis cited at the hearing. No. 1:17cv76-MW/GRJ, 2017 WL 6994563 (N.D. Fla. Dec. 8, 2017). *Study Edge*, like many of the cases addressing delay, was a copyright infringement case. *Id.* at *1. It was much simpler than the complex constitutional litigation presented here. Additionally, the plaintiff in *Study Edge*

---

[28] As Governor DeSantis points out, the court dismissed this case just days ago because it found the plaintiffs had failed to establish standing to sue. ECF No. 127-1. It limited its holding "to the extremely narrow issue of whether *these particular Plaintiffs* have standing to sue in *this particular case*." *Id.* at 13. This Court is not familiar with the record in the case, but it has no quarrel with the ruling as it relates to the specific facts that were deemed insufficient to support the plaintiffs' standing to proceed before the District Court in the Middle District of Florida. However, this Court has carefully considered the district court's order and, for the reasons discussed at length above, this Court respectfully disagrees with its conclusion that the statute is not vague.

waited seven months, more than twice as long as the plaintiffs here, to bring its motion for preliminary injunction. *Id.* at *5. And, most importantly, the plaintiff in *Study Edge* "sought to enjoin distribution of spring 2017 materials—a semester that ended long before [it] moved for a preliminary injunction." *Id.* (emphasis deleted).

Compared to the plaintiff in *Study Edge*, the Plaintiffs moved at least twice as fast, are suffering continuing constitutional injuries, and have offered a reasonable explanation for their delay. There is no comparison; Plaintiffs have not unduly delayed. The irreparable injury factor weighs in favor of an injunction.

The final two factors for a preliminary injunction—damage to the opposing party and the public interest—are consolidated when the injunction is to be issued against the government. *See Otto*, 981 F.3d at 870; *Scott v. Roberts*, 612 F.3d 1279, 1280 (11th Cir. 2010) ("When the state is a party, the third and fourth [preliminary injunction] considerations are largely the same.").

Governor DeSantis contends that enjoining the enforcement of section 870.01(2) would "severely curtail the State's ability to deter and prosecute violent demonstrations to protect public safety and private property." ECF No. 99 at 30. Thus, Governor DeSantis argues, the state will suffer, and the public interest will be thwarted if this Court were to enjoin Defendants from enforcing section 870.01(2). *Id.* This Court disagrees.

Even if this Court enjoins Defendants from enforcing section 870.01(2), the Governor still has the power to take any measures to prevent overt threats of violence or violence, § 14.022(1), Fla. Stat., and to declare that a danger exists to the person or property of any citizen or citizens of the state and order any sheriff to exercise their full powers to suppress riots, § 14.022(3)(b), Fla. Stat. Indeed, the sheriffs are directed to suppress riots in their counties "with force and strong hand when necessary." § 30.15(1)(f), Fla. Stat. An injunction preventing the Defendants from using the new definition of "riot" does not prevent them from suppressing riots; rather they merely cannot employ the new definition of a riot, and must rely instead on the common-law definition, as they have in the past. This option precludes any argument that Defendants will be harmed by the injunction, especially given the fact that they have repeatedly argued that the new definition of riot contained in section 870.01(2) merely mirrors or clarifies the common-law definition of riot.[29]

Moreover, state law enforcement officers have numerous criminal statutes at their disposal that prohibit and punish unlawful conduct, and which protect public safety and private property. This non-exhaustive list *includes, but is not limited to,*

---

[29] As this Court has noted throughout this Order, Governor DeSantis and Sheriff Williams both argued at length in their papers that the new definition merely mirrors or codifies the common-law definition of riot. Governor DeSantis then retreated from that position at the hearing in asserting that, instead of *codifying* the definition, it *clarified* the definition. Regardless of whether the new definition is an attempt to codify the common-law definition or an attempt to clarify it, I conclude that the definition is still vague and overbroad.

Disorderly Conduct, § 877.03, Fla. Stat.; Affray, § 877.01(1), Fla. Stat.; Criminal Mischief, § 806.13, Fla. Stat.; Arson, § 806.01, Fla. Stat.; Fire bombs, § 806.111, Fla. Stat.; Assault, § 784.011, Fla. Stat.; Aggravated Assault, § 784.021, Fla. Stat.; Battery and Felony Battery, § 784.03, Fla. Stat.; Aggravated Battery, § 784.045, Fla. Stat.; Assault or Battery on Law Enforcement, § 784.07, Fla. Stat.; Assault or Battery on Person 65 or Older, § 784.08, Fla. Stat.; Trespassing §§ 810.08–09, Fla. Stat.; Burglary, § 810.02, Fla. Stat.; Mob Intimidation, § 784.0495, Fla. Stat.; Resisting Officer With Violence, § 843.01, Fla. Stat.; Resisting Officer Without Violence, § 843.02, Fla. Stat.; Obstruction by Disguised Person, § 843.03, Fla. Stat.; Unlawful Assemblies, § 870.02, Fla. Stat.; and Destroying/Demolishing Memorial or Historic Property, § 806.135, Fla. Stat.[30]

On the flip side, the public and the state have no interest in enforcing a likely unconstitutional statute. *Odebrecht Const., Inc. v. Sec'y, Fla. Dep't of Transp.*, 715 F.3d 1268, 1289 (11th Cir. 2013) ("[t]he public has no interest in the enforcement of what is very likely an unconstitutional statute."); *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) ("As noted, even a temporary

---

[30] One could also argue that enjoining the enforcement of the new definition of riot does not prevent prosecution under section 870.01(2), because the statute is divided into two categories. It defines "riot" and then criminalizes it. This Court is merely enjoining the enforcement of the new definition of riot; it is not decriminalizing rioting as understood at common law. However, this Court need not decide whether this argument is persuasive or whether the statute is enforceable without the new definition of riot because the State has plenty of other tools in its arsenal to maintain public order and punish criminal conduct.

infringement of First Amendment rights constitutes a serious and substantial injury, and the city has no legitimate interest in enforcing an unconstitutional ordinance. For similar reasons, the injunction plainly is not adverse to the public interest. The public has no interest in enforcing an unconstitutional ordinance.").

Balancing, on one hand, the fact that Defendants may still protect private property and public safety using the numerous tools at their disposal, and, on the other hand, the state and the public's lack of interest in enforcing a statute that is likely unconstitutional, this Court finds that the final two factors weight in favor of granting a preliminary injunction.

Before proceeding any further, this Court makes plain what it is not doing. It is not striking the definition of "riot" from the Florida Statutes. Nor is it enjoining all law enforcement agencies across the state from enforcing this specific law. Instead, this Court is granting the narrow relief of enjoining the Governor and three sheriffs from enforcing Florida's law against "rioting" as defined by section 870.01(2).

Additionally, this Court notes that while Plaintiffs assert the Governor's timing in announcing the legislation that ultimately became HB1 suggests that this new definition is in response to the racial justice protests that occurred during the summer of 2020, it is not lost on this Court, nor should it be lost on the public, that this statute sweeps in all manner of conduct and speech, regardless of the point of

view of the speaker or the cause he or she may be advocating. This definition of "riot" casts a broad net. Though Plaintiffs claim that they and their members fear that it will be used against them based on the color of their skin or the messages that they express, its vagueness permits those in power to weaponize its enforcement against *any* group who wishes to express *any* message that the government disapproves of. *See Gentile*, 501 U.S. at 1051 ("[H]istory shows that speech is suppressed when either the speaker or the message is critical of those who enforce the law."). Thus, while there may be some Floridians who welcome the chilling effect that this law has on the Plaintiffs in this case, depending on who is in power, next time it could be their ox being gored.

Finally, this Court recognizes that much ink has been spilled over whether this definition is simply a restatement of the common-law definition of riot. For the reasons discussed above, it is not. But this Court is certain that had the Florida Legislature simply codified the definition that the Florida Supreme Court announced in the *Beasley* case, Plaintiffs' claims would likely fail. This Court is also *not* saying that the Florida Legislature is unable to expand upon the common-law definition of a riot, or that it is not allowed to enhance the crime, or that it cannot enact tougher penalties for rioting. It is the Florida Legislature's prerogative to enact such policies. But it must do so within the bounds of the Constitution. In this case, it has failed to do so.

86

IV

Plaintiffs have demonstrated that they are entitled to a preliminary injunction. In their requested relief, Plaintiffs seek to enjoin the enforcement of Section 15 of HB1. ECF No. 64 ¶ 6. However, Section 15 is part of a bill that amended section 870.01. This Court cannot enjoin the enforcement of a bill; rather, it can enjoin parties from enforcing a statute. And so, Plaintiffs' requested relief can be construed as enjoining the enforcement of section 870.01 as amended by Section 15. After questioning by this Court during the preliminary injunction hearing, Plaintiffs clarified that they *only* seek to enjoin Defendants from enforcing the new definition of "riot" in section 870.01(2).[31]

Even if Plaintiffs did not narrow their requested relief, this Court can tailor the remedy as it sees fit and need not grant the total relief sought by Plaintiffs. When "the court decides to grant an injunction, it must also ascertain what relief to provide, keeping in mind that the purpose of the injunction is not to conclusively determine the rights of parties, but to balance the equities in the interim as the litigation proceeds." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1327 (11th Cir. 2019) (citation omitted). "So it is axiomatic that a district court 'need not grant the

---

[31] In their papers, Plaintiffs argued that the definition of riot is not severable from the remainder of section 870.01, Florida Statutes, as amended by Section 15. Therefore, Plaintiffs sought to enjoin the enforcement of the entirety of section 870.01, Florida Statutes, as amended by Section 15. However, considering severance at this juncture is likely premature, because this Court is not invalidating the challenged law. *See Scott*, 612 F.3d at 1297. Accordingly, this Court will not pass on the issue of severability at this time.

total relief sought by the applicant but may mold its decree to meet the exigencies of the particular case.' " *Id.* (citation omitted). Based on these principles, this Court enjoins Defendants from enforcing the new definition of "riot" contained in section 870.01(2).

V

Having determined a preliminary injunction is warranted, this Court next addresses whether it will stay that injunction pending appeal. Stays pending appeal are governed by a four-part test: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987); *see also Venues Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1313 (11th Cir. 2000) (applying the same test). Considering that this test is so similar to that applied when considering a preliminary injunction, courts rarely stay a preliminary injunction pending appeal. That rings true here. Because no exceptional circumstances justify staying this Order pending appeal, *see Brenner v. Scott*, 999 F. Supp. 2d 1278, 1292 (N.D. Fla. 2014) (Hinkle, J.) (issuing a rare stay of a preliminary injunction given the public interest in stable marriage laws across the country), this Court refuses to do so. Defendants have every right to appeal, and this

Court sees no reason to delay Defendants in seeking an appeal by requiring them to file a motion to stay with this Court under Rule 62.

VI

Though what's past is prologue, this Court need not give it any power beyond providing context for the case now before it. A critical part of that context, which has not yet been discussed, is that following Ms. Jakes's, Ms. Patterson's, and the 1961 Freedom Riders' arrests under Florida's anti-riot laws, the rule of law ultimately prevailed. *Katzenbach v. McClung*, 379 U.S. 294 (1964); *Browder v. Gayle*, 142 F. Supp. 707 (M.D. Al. 1956), *aff'd* 352 U.S. 903 (1956); *see also Batson v. Kentucky*, 476 U.S. 79 (1986); *Loving v. Virginia*, 388 U.S. 1 (1967); *Harper v. Va. State Bd. of Elections*, 383 U.S. 663 (1966); Verdict, *Minnesota v. Chauvin*, No. 27-CR-20-12646 (Minn. Dist. Ct. April 20, 2021). And so too, with this Court, the rule of law prevails.

Accordingly,

**IT IS ORDERED**:

1. Plaintiffs' motion for preliminary injunction, ECF No. 64, is **GRANTED in part** and **DENIED in part**. The motion is **DENIED as moot** with respect to Defendant Moody. The motion is **GRANTED** with respect to Defendants DeSantis, McNeil, Tony, and Williams.

89

2. Defendants must take no steps to enforce Florida Statutes § 870.01(2) (2021) as it pertains to the definition of "riot," until otherwise ordered. This preliminary injunction binds Defendants DeSantis, McNeil, Tony, and Williams and their officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

3. This injunction is effective immediately, without the posting of security, but Defendants may seek an order requiring the posting of security.

**SO ORDERED on September 9, 2021.**

**s/Mark E. Walker**
**Chief United States District Judge**