[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13489

_____

DREAM DEFENDERS,
BLACK COLLECTIVE INC.,
CHAINLESS CHANGE INC.,
BLACK LIVES MATTER ALLIANCE BROWARD,
FLORIDA STATE CONFERENCE OF THE NAACP, et al.,

Plaintiffs-Appellees,

*versus*

GOVERNOR OF THE STATE OF FLORIDA,
SHERIFF OF JACKSONVILLE/DUVAL COUNTY FLORIDA,

Defendants-Appellants,

ATTORNEY GENERAL, STATE OF FLORIDA, et al.,

                                                                    Defendants.

————————————————

Appeals from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00191-MW-MAF

————————————————

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

JILL PRYOR, Circuit Judge:

In the summer of 2020, people took to the streets across the country to protest the murder of George Floyd by a police officer and other police violence against persons of color. That fall, Florida's Governor, Ron DeSantis, characterized these protests as "disorder and tumult" and promised to have "a ton of bricks rain down on" those who engaged in violent and disorderly conduct. *Press Conference on Law Enforcement Legislation*, The Florida Channel (Sept. 21, 2020), at 1:20–1:24, 7:17–7:43 https://thefloridachannel.org/videos/9-21-20-press-conference-on-law-enforcement-legislation. The following spring, the Florida Legislature passed the Combatting Violence, Disorder, and Looting, and Law Enforcement Protection Act, also known as House Bill 1 ("HB 1"), 2021

Fla. Leg. Sess. Laws Serv. ch. 2021-6. HB 1 redefined the crime of "riot."

After HB 1's passage, Dream Defenders and other organizations that lead protests for racial justice challenged the new definition as unconstitutional, alleging that it infringed their members' First Amendment right to engage in peaceful protest. The district court agreed with the plaintiffs that the new statutory definition was vague and overbroad and therefore likely to chill or deter their members' exercise of their First Amendment rights. The court entered a preliminary injunction that prevented the defendants, Governor DeSantis and three sheriffs, from taking any steps to enforce the law using the new definition.

Governor DeSantis and Mike Williams, the Sheriff of Jacksonville, challenge the preliminary injunction on appeal. Whether Florida's riot statute is unconstitutional turns on the proper interpretation of the new definition of "riot" under Florida law—a question the Florida Supreme Court, the final arbiter of State law, has not yet addressed. We think it appropriate to give the Florida Supreme Court the opportunity to provide an authoritative interpretation of the state law before we decide whether the law is constitutional. We therefore certify a question regarding the meaning of "riot" in the new state law to the Florida Supreme Court.

## I.

It has long been a felony under Florida law to engage in a riot. *See* Fla. Stat. § 870.01(2) (2020) ("[A person] guilty of a riot, or

of inciting or encouraging a riot, shall be guilty of a felony of the third degree . . . ."). Before HB 1, Florida statutes did not define the term "riot." *See State v. Beasley*, 317 So. 2d 750, 752 (Fla. 1975). In the absence of a statutory definition, the Florida Supreme Court applied the common-law definition of "riot." *Id.* The common law defined a riot as:

> a tumultuous disturbance of the peace by three or more persons, assembled and acting with a common intent, either in executing a lawful private enterprise in a violent and turbulent manner, to the terror of the people, or in executing an unlawful enterprise in a violent and turbulent manner.

*Id.* Under this definition, to convict a person of the criminal offense of riot, the State had to prove beyond a reasonable doubt that the defendant was one of the three or more persons acting "with a common intent to mutually assist each other in a violent manner to the terror of the people and a breach of the peace." *Id.* at 753. This "restrictive limitation[]" on the definition, the Florida Supreme Court said, ensured its constitutionality. *Id.*

With HB 1, the Florida Legislature amended the Florida statute prohibiting riots, § 870.01(2), to add a definition of "riot." *See* HB 1 § 15. As amended, Florida law now provides:

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a

common intent to assist each other in violent and dis-
orderly conduct, resulting in:

> (a) Injury to another person;

> (b) Damage to property; or

> (c) Imminent danger of injury to another person
> or damage to property.

Fla. Stat. § 870.01(2).[1] With HB 1, the Florida Legislature also
amended § 870.01 to specify that the statute "does not prohibit con-
stitutionally protected activity such as a peaceful protest." *Id.*
§ 870.01(7); HB 1 § 15. Also relevant here, it added a requirement
that any person arrested for rioting "shall be held in custody" until
his bail hearing. Fla. Stat. § 870.01(6); *see* HB 1 § 15.

The plaintiffs in this case are organizations that regularly
stage peaceful protests, encouraging their members to come to-
gether to demonstrate their opposition to police violence and their
support for racial justice. Some of the plaintiffs' protests are con-
frontational—for example, the protestors block roads and high-
ways—but the plaintiffs strive to keep the protests free from vio-
lence. Some plaintiffs designate members to attend protests as
"peacekeepers" tasked with keeping people with opposing views

---

[1] In this opinion, when we say "§ 870.01(2)," we refer to the version of the
statute as amended by HB 1.

physically separated from one another. Doc. 137 at 19.[2] They began to use peacekeepers after several incidents in which "individuals attempted to drive their vehicles through groups of protestors" and another in which an individual "pulled a gun on protestors." *Id.* at 10. Peacekeepers have chased away counter-protestors in efforts to stop the violence.

The plaintiffs sued Governor DeSantis, Sheriff Williams, Leon County Sheriff Walt McNeil, and Broward County Sheriff Gregory Tony, all in their official capacities, challenging § 870.01(2). Shortly after filing the complaint, the plaintiffs filed a motion for a preliminary injunction to block Governor DeSantis and the sheriffs from enforcing § 870.01(2)'s new definition of riot. The plaintiffs argued that they were entitled to a preliminary injunction because they had a substantial likelihood of success on their claims that, as amended, the statute prohibiting rioting was unconstitutional because it was void for vagueness and overly broad.[3]

---

[2] "Doc." numbers refer to the district court's docket entries.

[3] In the complaint, the plaintiffs included claims against another defendant and raised other constitutional challenges to HB 1, none of which are at issue in this appeal. The complaint named Florida Attorney General Ashley Moody as an additional defendant. The district court dismissed the claims against the Attorney General, concluding that the plaintiffs lacked standing because their injuries were not traceable to her, and the plaintiffs have not appealed the dismissal. And even though the plaintiffs raised other constitutional challenges to

After a hearing, the district court issued a 90-page order and entered a preliminary injunction. In the order, the court began by addressing standing. It explained that the plaintiffs were suffering injury because their evidence, which the district court found credible, showed that their members' speech was being chilled. The court found that the plaintiffs' members had engaged in and continued to engage in "self-censoring for fear of the challenged statute's enforcement against them." *Id.* at 8. Given the defendants' authority under Florida law to suppress riots and arrest rioters, the court concluded that the plaintiffs' injuries were fairly traceable to Governor DeSantis and the sheriffs and could be redressed by an injunction barring Governor DeSantis and the sheriffs from enforcing the challenged law.

The district court then addressed why it believed that the plaintiffs were entitled to a preliminary injunction. The court determined that the plaintiffs demonstrated a substantial likelihood that they would succeed on their void-for-vagueness and overbreadth claims. To evaluate these claims, the court explained, it had to interpret the scope of § 870.01(2)'s prohibition on riots. After parsing the statute, the court concluded that it "raise[d] grave constitutional concerns." *Id.* at 57.

_____

HB 1, their motion for a preliminary injunction requested only that the court enjoin enforcement of § 870.01(2) based on their void-for-vagueness and overbreadth claims. Because the plaintiffs' other claims are not at issue in this appeal, we do not address them.

Addressing the plaintiffs' vagueness challenge, the district court concluded that § 870.01(2) was open to "multiple reasonable constructions," and thus "an individual of ordinary intelligence could read the [statute] and not be sure of its real-world consequence." *Id.* at 71, 75. The court stated that a person "would not know if this law meant that she had to merely avoid sharing a common intent to assist two others in violent and disorderly conduct" or if she could also violate the statute by being present at "any public event where such violent and disorderly conduct could occur." *Id.* at 71. Given the lack of clarity that the court perceived, it concluded that the statute forced "would-be protestors" to choose "between declining to jointly express their views with others or risk being arrested and spending time behind bars." *Id.* The court further concluded that "the vagary of [§ 870.01(2)] empower[ed] law enforcement officers to exercise their authority in arbitrary and discriminatory ways" because "the statute [left] unclear who must share what intent to be arrested." *Id.* at 71–72. For these reasons, it determined that the plaintiffs were substantially likely to prevail on their vagueness challenge.

The district court also determined that the plaintiffs were substantially likely to succeed on their overbreadth claim. Section 870.01(2), the court concluded, "criminalize[d] a large amount of unprotected activity," as well as "vast swaths of core First Amendment speech." *Id.* at 76. The court thought that the statute could plausibly be read to criminalize activities protected under the First Amendment including "continuing to protest after violence

occurs, even if the protestor[] [is] not involved in, and d[oes] not support, the violence," as well as "remain[ing] at the scene of a protest turned violent to film the police reaction." *Id.* Because the court concluded that the statute "punishe[d] a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep," it held that the statute was unconstitutionally overbroad. *Id.* at 74, 78.

After concluding that the plaintiffs also faced irreparable injury and that the public interest would be served by an injunction, the court enjoined Governor DeSantis and the sheriffs "from enforcing the new definition of 'riot.'" *Id.* at 87–88. Governor DeSantis and Sheriff Williams appealed.

## II.

We begin by reviewing the plaintiffs' standing to maintain their claims. Under Article III of the Constitution, federal courts may exercise jurisdiction only over "Cases" and "Controversies." U.S. Const. art. III, § 2. "To satisfy the case-or-controversy requirement, a plaintiff must have standing to sue." *Debernardis v. IQ Formulations, LLC*, 942 F.3d 1076, 1083 (11th Cir. 2019). To have standing, "a plaintiff must have suffered or be imminently threatened with a concrete and particularized 'injury in fact' that is fairly traceable to the challenged action of the defendant and likely to be redressed by a favorable judicial decision." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1303–04 (11th Cir. 2017) (en banc) (internal quotation marks omitted). "We review standing

determinations *de novo.*" *BBX Cap. v. Fed. Deposit Ins. Corp.*, 956 F.3d 1304, 1312 (11th Cir. 2020).

As organizations, the plaintiffs can establish associational standing to enforce the rights of their members when "(a) [their] members would otherwise have standing to sue in their own right; (b) the interests [the lawsuit] seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1316 (11th Cir. 2021) (internal quotation marks omitted). In this case, only the first requirement is seriously in dispute, so we focus on whether the plaintiffs established that their members would otherwise have standing in their own right.[4] The answer, as we explain below, is yes.

## A.

The plaintiffs in this case challenge a law that has not yet been enforced against their members. A threat of future injury is sufficient to establish standing when "the threatened injury is certainly impending or there is a substantial risk that the harm will

---

[4] The plaintiffs easily satisfy the other two prongs of the associational standing inquiry. This lawsuit seeks to protect First Amendment rights to free speech and free assembly, rights that are essential—not merely germane—to the organizations' purposes of securing change through protests and civic engagement. *See Greater Birmingham Ministries*, 992 F.3d at 1316. And the constitutional claims asserted and injunctive relief sought assuredly did not require the participation of individual members in this lawsuit. *See id.*

occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted). "When an individual is subject to such a threat, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenging the law." *Id.*

We apply a two-part test to determine whether an injury is sufficiently imminent to permit pre-enforcement review. *See Wollschlaeger*, 848 F.3d at 1304. First, the plaintiff must have "an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute." *Driehaus*, 573 U.S. at 159 (internal quotation marks omitted). Second, there must "exist[] a credible threat of prosecution." *Id.* (internal quotation marks omitted). We have inferred the existence of a credible threat of prosecution when a plaintiff challenged the law soon after it was enacted and the state "vigorously defended" the law in court. *Wollschlaeger*, 848 F.3d at 1305.

Applying this two-part test, we conclude that the plaintiffs' members face an injury that is sufficiently imminent for standing purposes. First, the plaintiffs' members wish to exercise their right to protest, speech that is affected with a First Amendment interest, and believe that § 870.01(2) prevents them from doing so. The district court credited the plaintiffs' evidence showing that their members continue to self-censor by abstaining from protests for fear of being arrested and charged with rioting. For example, Dream Defenders planned to hold multiple events around the State of Florida on the anniversary of George Floyd's murder. But it canceled its plans because of its members' fears of being arrested for violating

§ 870.01(2). Because the district court's findings established that the plaintiffs and their members intended to "engage in a course of conduct arguably affected with a constitutional interest, but proscribed by" the challenged law, they satisfied the first part of the test. *See Driehaus*, 573 U.S. at 159; *see also Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998) (describing self-censorship as an injury that occurs "when the plaintiff is chilled from exercising her right to free expression or forgoes expression in order to avoid enforcement consequences" (internal quotation marks omitted)).

The plaintiffs also satisfied the second prong of the test. They brought this lawsuit shortly after HB 1 was enacted. From this timing, along with Governor DeSantis's and Sheriff Williams's vigorous defense of the statute, we infer "an intent to enforce the challenged provisions." *Wollschlaeger*, 848 F.3d at 1305 (alteration adopted) (internal quotation marks omitted). We thus conclude that the plaintiffs' members' injuries in this case were sufficiently imminent to permit pre-enforcement review.

Governor DeSantis nevertheless argues that the injury requirement is not satisfied because the plaintiffs' members face no credible threat of prosecution. To support his position, he relies on the Supreme Court's decision in *Clapper v. Amnesty International USA*, 568 U.S. 398 (2013).

In *Clapper*, several plaintiffs brought a lawsuit challenging a provision of the Foreign Intelligence Surveillance Act ("FISA") that allowed surveillance of individuals outside the United States. *Id.* at 401. The plaintiffs argued that they satisfied the injury requirement

because they intended to make phone calls with foreign corre-
spondents and feared government agents would surveil their for-
eign correspondents and listen to their calls under the surveillance
program. *Id.* The Supreme Court rejected their argument and con-
cluded they lacked standing. The Court explained that government
agents would listen to the plaintiffs' phone calls—and thereby in-
jure them—only if five conditions were met. Those conditions
were: (1) among their many possible foreign targets, agents would
try to listen to the plaintiffs' foreign correspondents' calls;
(2) agents would try to listen to those correspondents' calls under
the authority of the FISA rather than by some other means; (3) the
Article III judges on the Foreign Intelligence Surveillance Court
would conclude that the government's surveillance procedures sat-
isfied FISA's safeguards and were consistent with the Fourth
Amendment; (4) the agents would successfully implement the
technology enabling them to listen to the phone calls; and (5) the
specific plaintiffs would be on the other line when the agents lis-
tened to calls. *Id.* at 410. Given this "highly attenuated chain of pos-
sibilities," the Court rejected as "speculative" the plaintiffs' theory
that they faced imminent injury. *Id.* at 410–11.

　　The Governor's invocation of *Clapper* does not persuade us
that the plaintiffs' fears of prosecution in this case are speculative.
As the district court's findings of fact reflect, the plaintiffs' members
have engaged and continue to engage in self-censorship in response
to the prospect of being charged with the crime of "riot" under
§ 870.01(2). Unlike the plaintiffs in *Clapper*, the plaintiffs' members'

fears do not depend upon on speculation that, in enforcing the law against third parties, the government would end up harming the members. Instead, the members fear that the government will enforce the riot statute directly against them by arresting them for engaging in a riot if they engage in peaceful protesting activities to advocate for racial justice. And here there is no sequence of uncertain contingencies involving multiple independent actors (like the government agents and Article III judges in *Clapper*) that must occur before the plaintiffs' members would experience this harm. Because the plaintiffs have established a "substantial risk" of future harm, we conclude that they satisfied the injury-in-fact requirement. *Driehaus*, 573 U.S. at 158.

## B.

Having assured ourselves that the plaintiffs' members' injuries suffice for standing purposes, we inquire whether those injuries are fairly traceable to Governor DeSantis and Sheriff Williams and can be redressed by the district court's preliminary injunction. To establish traceability and redressability in a lawsuit seeking to enjoin a government official from enforcing the law, a plaintiff must show "that the official has the authority to enforce the particular provision [being] challenged, such that [the] injunction prohibiting enforcement would be effectual." *Support Working Animals, Inc. v. Governor of Fla.*, 8 F.4th 1198, 1201 (11th Cir. 2021).

Both Governor DeSantis and Sheriff Williams have legal authority to enforce the riot statute, and the preliminary injunction has effectively prohibited them from enforcing it. Under Florida

law, the governor has the authority to "[o]rder any sheriff . . . to exercise fully the powers granted . . . [to] suppress tumults, riots, and unlawful assemblies in [his] count[y] with force and strong hand when necessary." Fla. Stat. § 14.022(3)(b). And Florida law authorizes sheriffs to "[s]uppress tumults, riots, and unlawful assemblies in their counties with force and strong hand when necessary." *Id.* § 30.15. Given this clear statutory authority, the traceability and redressability requirements are satisfied.[5] *See Support Working Animals*, 8 F.4th at 1201. We therefore conclude that the plaintiffs have standing to bring this challenge.

### III.

We now turn to whether the district court abused its discretion when it entered the preliminary injunction. *See Gonzalez v.*

---

[5] Governor DeSantis also argues that he is not the proper party under *Ex parte Young*, 209 U.S. 123 (1908). The Eleventh Amendment ordinarily bars a state's citizens from suing the state in federal court. *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1336 (11th Cir. 1999). It also "prohibits suits against state officials where the state is, in fact, the real party in interest" such as when "a lawsuit seeks to order [a] state officer to pay funds directly from the state treasury for the wrongful acts of the state." *Id.* But the Supreme Court in *Ex parte Young*, 209 U.S. 123 (1908), recognized an exception to this rule permitting a suit in federal court against a state officer when the suit seeks "prospective equitable relief to end continuing violations of federal law." *Summit Med. Assocs.*, 180 F.3d at 1336 (emphasis omitted). *Ex parte Young* requires that the state officer have "authority to enforce the challenged statute." *Id.* at 1342.

We agree with the district court that, based on *Ex parte Young*, Governor DeSantis is a proper party because he has statutory authority to enforce § 870.01(2)'s prohibition on riots.

*Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020) ("We review the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error."). A district court may grant a preliminary injunction only if the moving party shows: (1) "it has a substantial likelihood of success on the merits;" (2) "it will suffer an irreparable injury unless the injunction is granted;" (3) "the harm from the threatened injury outweighs the harm the injunction would cause the opposing party;" and (4) "the injunction would not be adverse to the public interest." *Id.* at 1271 (footnote omitted). The first factor "is generally the most important." *Id.* at 1271 n.12. (internal quotation marks omitted).

Governor DeSantis and Sheriff Williams argue that the district court erred in concluding that the plaintiffs are likely to succeed on their claims that § 870.01(2) is unconstitutional because it is void for vagueness and overly broad. But we defer deciding whether the plaintiffs have a likelihood of success on the merits of their constitutional claims and instead exercise our discretion to first certify a question about the meaning of the statute to the Florida Supreme Court.

To address why certification is warranted here, we begin by explaining how the plaintiffs' constitutional claims turn on a novel issue of Florida state law, the meaning of "riot" under § 870.01(2). In these circumstances, certification is appropriate to avoid the risk of friction that may arise when a federal court endeavors to construe a novel state law in the first instance. *See Arizonans for Off.*

*Eng. v. Arizona*, 520 U.S. 43, 75 (1997). Indeed, certification affords the State's highest court an opportunity to interpret § 870.01(2) in a way that may obviate the plaintiffs' constitutional concerns.

Resolution of the plaintiffs' vagueness and overbreadth claims requires interpretation of § 870.01(2). Under due-process principles, a law is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). "Unconstitutionally vague laws fail to provide 'fair warning' of what the law requires, and they encourage 'arbitrary and discriminatory enforcement' by giving government officials the sole ability to interpret the scope of the law." *Keister v. Bell*, 29 F.4th 1239, 1258 (11th Cir. 2022) (quoting *Grayned*, 408 U.S. at 108–09). "The First Amendment context amplifies these concerns because an unconstitutionally vague law can chill expressive conduct by causing citizens to 'steer far wider of the unlawful zone' to avoid the law's unclear boundaries." *Id.* at 1258–59 (quoting *Grayned*, 408 U.S. at 109); *see also Smith v. Goguen*, 415 U.S. 566, 573 (1974) (explaining that when "a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts").

The parties' arguments illustrate how the plaintiffs' vagueness claim depends on the interpretation of § 870.01(2). The plaintiffs argue that § 870.01(2) "fails to define what it means to 'participate' in a violent public disturbance" or to define what the term "violent public protest" encompasses, leaving it "hopelessly

unclear whether the statute criminalizes continuing to protest peacefully while others commit violence." Appellees' Br. at 20, 42–43 (internal quotation marks omitted). As a result, the plaintiffs say, the statute is unconstitutionally vague. In contrast, Governor DeSantis and Sheriff Williams argue that the statute is not vague because it has a "readily ascertainable meaning," and "[u]nder the statute, a person who is peacefully protesting does not commit a riot." DeSantis Appellant's Br. at 8; *see also* Williams Appellant's Br. at 19–20 (arguing that under the statute "[a] peaceful protestor who continues to protest peacefully amid the chaos created by others" does not commit a riot).

The plaintiffs' overbreadth claim rests on a First Amendment doctrine designed "to prevent the chilling of protected expression." *Massachusetts v. Oakes*, 491 U.S. 576, 584 (1989). A statute is overly broad if it "punishes a substantial amount of protected free speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113, 118–19 (2003) (internal quotation marks omitted). "[A] statute found to be overbroad is totally forbidden until and unless a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1303 (11th Cir. 2017) (internal quotation marks omitted). The Supreme Court has warned that the overbreadth doctrine is "strong medicine" that should be used "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).

Like their vagueness claim, the plaintiffs' overbreadth claim turns on what conduct is prohibited by the definition of riot in § 870.01(2). The plaintiffs argue that the statute is overbroad because on its face it "appears to criminalize . . . protected expressive activity, such as willfully participating in a public disturbance by photographing or videotaping police conduct after violence erupts." Appellees' Br. at 58 (alteration adopted) (internal quotation marks omitted). Governor DeSantis and Sheriff Williams again counter that the statute is constitutional because it plainly does not encompass protected speech and expressly exempts peaceful protesting. *See* DeSantis Appellant's Br. at 27 ("The statute . . . prohibits no constitutionally protected speech, let alone a 'substantial' amount, and thus cannot be overbroad."); *see* Williams Appellant's Br. at 30 ("Because [t]he statute does not sweep in a substantial amount of protected speech, or criminalize innocent behavior, it is not unconstitutionally overbroad." (internal quotation marks omitted)).

To determine what qualifies as a riot under § 870.01(2), we look to the "actual text of the statute," *Boos v. Barry*, 485 U.S. 312, 329 (1988), as well as "any limiting constructions that a state court . . . has proffered," *Village of Hoffman Estate v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 n.5 (1982). The statute provides:

> A person commits a riot if he or she willfully participates in a violent public disturbance involving an assembly of three or more persons, acting with a

common intent to assist each other in violent and dis-
orderly conduct, resulting in:

>   (a) Injury to another person;
>
>   (b) Damage to property; or
>
>   (c) Imminent danger of injury to another person
>       or damage to property.

Fla. Stat. § 870.01(2).

The plaintiffs contend that the text raises some questions about what kind of conduct the statutory definition prohibits. To begin with, the statute bars a person from "willfully participat[ing] in a violent public disturbance." *Id.* But what is required for willful participation? In its ordinary meaning, to participate means "to take part in something . . . to have a part or share in something." *Participate*, Webster's New Third International Dictionary 1646 (2002). According to the plaintiffs, saying that a person takes part or participates in an event usually reveals little about the degree of the person's involvement. They argue that common usage suggests that she could be actively engaged or passively present. After all, the same participation trophy goes to the child who hit the game-winning home run and the child who simply showed up to play the game.

And what kind of conduct constitutes the "violent public disturbance," Fla. Stat. § 870.01(2), in which a rioter participates? It could be argued that the statute indicates that a riot requires more

than a violent public disturbance; it requires that the disturbance be one in which three or more people act with a common intent— not every man and woman for themselves. The violent public disturbance cannot itself be a riot, this argument would go, because otherwise the definition would be circular: A person would commit a riot if he willfully participated in a violent public disturbance, i.e., a riot. The canons of construction may suggest that "violent public disturbance" means something else. *See Fuerst v. Hous. Auth. of City of Atlanta*, 38 F.4th 860, 869 (11th Cir. 2022) ("[T]he surplusage canon obliges us, whenever possible, to disfavor an interpretation when that interpretation would render a clause, sentence, or word superfluous, void, or insignificant." (alteration adopted) (internal quotation marks omitted)); *Edwards v. Thomas*, 229 So. 3d 277, 284 (Fla. 2017) (applying same canon under Florida law).

To construe the statute, we would need to determine the *mens rea* required for a conviction for rioting. The statute first provides that a person is guilty of rioting when he "willfully," Fla. Stat. § 870.01(2), that is, intentionally, participates in the violent public disturbance, *see Harris v. State*, 318 So. 3d 645, 647 (Fla. Dist. Ct. App. 2021) (defining "willful" under Florida state law). But the statute contains another reference to intent: it requires "an assembly of three or more persons, acting with a common intent to assist each other in violent and disorderly conduct." Fla. Stat. § 870.01(2). To be guilty of rioting does a person also need to share the common intent to assist in violent and disorderly conduct? Or can a

person outside of the assembly, who does not share that common intent, nonetheless commit the crime?

A hypothetical helps to explain why it is necessary to answer these questions. Imagine a protest. Those attending the protest engage in a wide range of activities. Some people silently hold signs, while some chant or sing songs. Others show up to watch or support, with their presence alone, the more active protestors. Now imagine that several counter-protestors show up and begin to attack the peaceful protestors. Are the counter-protestors part of the assembly? Have they created a violent public disturbance? Let's assume that the answer to these two questions is yes. Now some protestors begin to fight the counter-protestors; others stand passively watching the violence; still others continue to chant or hold signs. Someone assists a person lying unconscious on the ground; another person washes tear gas from his friend's eyes. A few people pull out their phones and record the fracas. Who has violated § 870.01? The parties sharply disagree about which participants could be arrested and charged with rioting in this hypothetical scenario.

According to the plaintiffs, every person present could be arrested and charged with rioting because each willfully participated in the protest, which became a violent disturbance—even those who did not engage in any violence or disorderly conduct themselves. The plaintiffs express concern that protestors could be charged with rioting if they remained on the scene after violence erupted and continued to protest, assisted those who were injured,

or filmed the events. The plaintiffs acknowledge § 870.01's savings clause, which provides that the law "does not prohibit constitutionally protected activity such as a peaceful protest." Fla. Stat. § 870.01(7). But even considering the savings clause, they say, the prohibition on rioting could be enforced against peaceful protestors because the savings clause contradicts the express terms of the statute. *See Gay Lesbian Bisexual All. v. Pryor*, 110 F.3d 1543, 1545, 1550 (11th Cir. 1997) (holding that a statute that included the clause "[t]his section shall not be construed to be a prior restraint of . . . first amendment protected speech" nonetheless reached protected speech).

Governor DeSantis and Sheriff Williams disagree with the plaintiffs about the hypothetical. The Governor argues that a nonviolent demonstrator cannot be considered as willfully participating in a violent public disturbance simply because violence occurs among others who are in close proximity. The Sheriff argues that "[a] peaceful protestor who continues to protest peacefully amid the chaos created by others will not be committing a riot if the peaceful protestor shares no common intent to assist those others." Williams Appellant's Br. at 19–20.

But despite their general agreement on the outcome of the hypothetical, even the two defendants do not share the same interpretation of the statute. They offer different views about how the statutory definition of riot relates to the common law definition. Sheriff Williams says that the new definition "merely codif[ied] Florida's long-standing common-law definition of 'riot.'" *Id.* at 23.

Governor DeSantis's view has shifted during the litigation. In the district court, he initially agreed with Sheriff Williams that the statutory definition simply "mirror[ed]" the common law. Doc. 99 at 16. But he later changed his view and disclaimed that "the [L]egislature was . . . simply trying to mirror the common law." Doc. 132 at 17. Now, Governor DeSantis says that HB 1 "narrow[ed]" the definition of "riot" and made it "more specific" than the common-law definition. DeSantis Appellant's Br. at 24.[6]

The proper interpretation of the statutory definition is a novel issue of state law that the Florida Supreme Court has yet to address. After careful consideration, we exercise our discretion to

---

[6] Governor DeSantis's position that § 870.01(2) narrowed the common-law definition of "riot" rests on the assumption that there is a distinction between a "tumultuous" disturbance of the peace, as required under the common law, and a "violent" one, as required by the statute. *See* DeSantis Appellant's Br. at 23. Although he argues that "'violent' is more specific and narrower than 'tumultuous,'" he provides no example of a public disturbance that would be tumultuous but not violent. *Id.* at 23–24.

At oral argument Sheriff Williams also shifted positions as to the difference between the statutory and common-law definitions, suggesting that § 870.01(2) narrowed the common-law definition by adding a second layer to the intent requirement: those assembled must share a common intent to assist each other in violent and disorderly conduct, and the individual facing prosecution must willfully participate. In this way, Sherriff Williams argued, § 870.01(2) provides additional protection for peaceful protestors. But it is not clear how the statute's intent requirement offers greater protection to peaceful protestors or innocent bystanders. At common law a person may be guilty of inciting a riot only if his words or actions are "said or done *with intent* to provoke a riot." *Beasley*, 317 So. 2d at 753 (emphasis added).

certify a question to that Court to determine precisely what conduct the definition prohibits. As the United States Supreme Court decided under similar circumstances, "we should not attempt to decide the constitutional issues presented" in this appeal "without first having the [Florida] Supreme Court's interpretation of key provisions of the statute." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 393 (1988).

Certification in this circumstance allows us to avoid the friction that could arise if we, as a federal court, addressed the merits of the plaintiffs' pre-enforcement constitutional challenge without first giving the Florida Supreme Court an opportunity to interpret its State's law. *See Arizonans for Off. Eng.*, 520 U.S. at 75. As we have explained, certification "give[s] the highest court of a state an opportunity to . . . attempt to interpret [state law] in such a way as to make it constitutional." *Pittman v. Cole*, 267 F.3d 1269, 1289–90 (11th Cir. 2001) (internal quotation marks omitted). Providing this opportunity is "especially important, because it may well be that the courts of the relevant state are less constrained than is the federal judiciary with respect to statutory interpretation." *Id.* at 1290 (alteration adopted) (internal quotation marks omitted). We conclude that certification is consistent with "respect for the place of the States in our federal system." *Arizonans for Off. Eng.*, 520 U.S. at 75.

Importantly, certification is permitted by Florida law. "Florida's constitution expressly provides for certification to the Florida Supreme Court of state law questions that are 'determinative of the

cause and for which there is no controlling precedent of the su-preme court of Florida.'" *United States v. Conage*, 976 F.3d 1244, 1263 (11th Cir. 2020) (quoting Fla. Const. art. V, § 3(b)(6)); *see also* Fla. Stat. § 25.031; Fla. R. App. P. 9.150. This case raises such a state law question. We therefore conclude that certification is appropri-ate. And if the Florida Supreme Court accepts the certification and answers the state law question, adjudication of the remaining fed-eral constitutional questions related to the plaintiffs' vagueness and overbreadth challenges "may indeed become greatly simplified." *Arizonans for Off. Eng.*, 520 U.S. at 80; *see generally Spain v. Brown & Williamson Tobacco Corp.*, 230 F.3d 1300, 1312 n.16 (11th Cir. 2000) (explaining that federal courts are responsible for deciding federal law issues when they arise in federal court and may not certify those issues to a state supreme court).[7]

We certify to the Florida Supreme Court the following ques-tion of law:

> What meaning is to be given to the provision of Flor-ida Stat. § 870.01(2) making it unlawful to "willfully participate[] in a violent public disturbance involving an assembly of three or more persons, acting with a

---

[7] Although we conclude that certification is appropriate in this case, we em-phasize that we are not adopting a bright-line rule that certification is the only appropriate course of action when an appeal raises a constitutional question that turns upon a novel question of state law. Instead, as we have previously recognized, "federal courts have discretion to certify" questions. *Pittman*, 267 F.3d at 1289.

common intent to assist each other in violent and dis-
orderly conduct, resulting in . . . [i]njury to another
person; . . . [d]amage to property; . . . or [i]mminent
danger of injury to another person or damage to
property"?

To assist the Florida Supreme Court in answering our ques-
tion, we ask the Court to consider:

1. What qualifies as a "violent public disturbance"? Is
   it something more than "three or more per-
   sons[]acting with a common intent to assist each
   other in violent and disorderly conduct resulting
   in injury to another person, damage to property,
   or imminent danger of injury to another person or
   damage to property"?

2. What conduct is required for a person to "willfully
   participate in a violent public disturbance"? Can a
   person "willfully participate in a violent public dis-
   turbance" without personally engaging in vio-
   lence and disorderly conduct or advocating for vi-
   olence and disorderly conduct? If so, what level of
   "participat[ion]" is required?

3. To obtain a conviction, does the State have to
   prove beyond a reasonable doubt that the defend-
   ant intended to engage or assist two or more other
   persons in violent and disorderly conduct? If not,
   what must the State prove regarding intent?

4. May a person be guilty of the crime of riot if the person attends a protest and the protest comes to involve a violent public disturbance in which three or more people acting with a common intent to assist each other engage in violent and disorderly conduct and the violent disturbance results in injuries to another person, damage to property, or imminent danger of injury to another or damage to property, but the person did not engage in, or intend to assist others in engaging in, violent and disorderly conduct?

Of course, our statement of the certified question is merely suggestive and "does not limit the inquiry of the Supreme Court of Florida or restrict its consideration of the issues that it perceives are raised by the record certified in this case." *Pincus v. Am. Traffic Sols., Inc.*, 986 F.3d 1305, 1321 (11th Cir. 2021) (internal quotation marks omitted). "In short, we leave all aspects of the state law issues in the Florida Supreme Court's hands. That Court's assistance will be, as always, greatly appreciated." *Essex Ins. Co. v. Zota*, 466 F.3d 981, 990 (11th Cir. 2006), *certified question answered*, 985 So. 2d 1036 (Fla. 2008).

## IV.

We defer our decision as to the preliminary injunction this case until the Florida Supreme Court has had the opportunity to consider our certified question and, if it chooses to answer, until after we receive its answer. The entire record on appeal in this case,

21-13489                    Opinion of the Court                    29

including copies of the parties' briefs, is transmitted along with this certification.

**QUESTION CERTIFIED.**

[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13489

ERRATA SHEET

_____

DREAM DEFENDERS,
BLACK COLLECTIVE INC.,
CHAINLESS CHANGE INC.,
BLACK LIVES MATTER ALLIANCE BROWARD,
FLORIDA STATE CONFERENCE OF THE NAACP, et al.,

                                        Plaintiffs-Appellees,

*versus*

GOVERNOR OF THE STATE OF FLORIDA,
SHERIFF OF JACKSONVILLE/DUVAL COUNTY FLORIDA,

                                        Defendants-Appellants,

2                    Opinion of the Court                    21-13489

ATTORNEY GENERAL, STATE OF FLORIDA, et al.,

                                                    Defendants.

————————————————

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 4:21-cv-00191-MW-MAF

————————————————

The opinion has been changed as follows:

On page 26, the phrase "an assembly of three or persons" has been changed to "an assembly of three or more persons".

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

January 10, 2023

Clerk - Florida Supreme Court
Florida Supreme Court
500 S DUVAL ST
TALLAHASSEE, FL 32399-1927

Appeal Number:  21-13489-JJ
Case Style:  Dream Defenders, et al v. Governor of the State of Florida, et al
District Court Docket No:  4:21-cv-00191-MW-MAF

Dear Clerk,

Enclosed is the Court's certified question issued January 10, 2023.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna H. Clark
Phone #: 404-335-6151

OPIN-7 Ltr to State Court Certif Ques

Case 4:21-cv-00191-MW-MAF Document 138 Filed 01/10/23 Page 33 of 34
USCA11 Case: 21-13489    Document 84-4    Date Filed: 01/10/2023    Page: 1 of 2



Home  /  Video Library  /  9/21/20 Press Conference on Law Enforce...

# 9/21/20 Press Conference on Law Enforcement Legislation

**_Courtesy of WTVT_**

SEE WHAT'S ON ...

Today's Schedule

**10**    Tuesday
          January 2023

TV 24/7              LIVE STREAMS

TV 24/7

02:30 pm    Senate Committee on Education
03:15 pm    Postsecondary (from January 4)
            TV 24/7

03:15 pm    Florida Crossroads Shortcuts:
03:30 pm    Union Academy
            TV 24/7

03:30 pm    The Florida Channel Programming,
06:00 pm    TBA
            TV 24/7

Click on Live Streams to watch today's LIVE events. Click on TV 24/7 to watch The Florida Channel's TV feed. Click off Live Streams or TV 24/7 to view a combined list of both.

Tags: Bobby Schultz, Chris Sprowls, FDLE - Florida Department of Law Enforcement, Grady Judd, police officers/law enforcement, protests/demonstrations, Ron DeSantis, Wilton Simpson

## Capitol Update

_A full half-hour review of developments in state government, including Florida's legislative, judicial and executive branches_

VIEW PROGRAM ARCHIVES

## Florida Crossroads

_Florida Crossroads takes viewers on a journey of our state – exploring issues of state-wide interest in each half hour program._

VIEW PROGRAM ARCHIVES

This website uses cookies to improve your experience. Learn More     Got It

1/10/23, 1:20 PM

Case 4:21-cv-00191-MW-MAF Document 139 Filed 01/10/23 Page 34 of 34
USCA11 Case: 21-13489    Document: 84-4    Date Filed: 01/10/2023    Page: 2 of 2

*Committed to bringing people closer to their government.*

Suite 901, the Capitol Bldg | 402 South Monroe Street | Tallahassee, FL 32399

**Phone:** (850) 645-9030 | **Fax:** (850) 488-4876

© **Copyright 2011 – 2023 The Florida Channel. All Rights Reserved.** |   Privacy Policy

This website uses cookies to improve your experience. Learn More